Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**1722-CC00895**

**STATE OF MISSOURI**

**CITY OF ST. LOUIS**

### IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
### STATE OF MISSOURI

| | |
|---|---|
| SHERANGELIA MCCLAIN, AMBER HEDGES, ROBIN DOOLEY, ASHLEY CAMP, BRANDY LEVIERE, ASHLEY ROBERSON, RUTH GONZALEZ, JENNIFER MILLER, MARY POWELL, BETTY KILLY, CRYSTAL BURDETTE, SHERRI HOWARD, BRANDY KELLY, KELLY HAINLINE, MARIA MADRID, AMY DANISAVICH, PATRICIA GARDNER, LORRAINE SEGARS, NIKKIE SWINEY, SHELIA HARDEN, JULIE THOMPSON, ASHLEY RUNYAN, REATHA DAVIS, STEPHANIE WILLE, KRISTIE UPRIGHT, EUGENIA DANTZLER, LISA FINK, MARSHA CREASEY, MARITZA CABRERA, ALEXA CALDWELL, MELISSA SLAYBACK, JILL POTWIN, MICHELLE POWERS, CORA CARILLO, BRANDIE TABOR, JESSICA CRUZ, TATESHEA IRVING, TOKI SANDOVAL, SHEYRA LUGO, AMBER SALMON, DENISE NELSON, LINDA SLAUSON, JENNIFER COMPTON, NIESHA ANDERSON, ALEXIS ARENAS, AMY MCMICHEN, CRYSTAL GASSETT, KERI-ANNE ROGERS, JENNIFER LANGLEY, MEARA CANNON, JAMI LOZADA, SANDRA NEESE, STACY COOLEY, ERICA PIKE, MELISSA LUKE, SHANNON CHASE, ILIASUE LILLY, JASMIN JEFFERSON, STACI PARKER, BRANDEE CUTTER, SHANNON SANTORE, ALISHA DAVIS, JESSICA MCFARLAND, CAROLYN MORRIS, LUCIA SAUCEDA, STACEY SPRINGFIELD, NATACHEE CHANDLER, ADRIANNE SUTTON, JANETSY ANDUJAR, SARAH CRAWFORD, KIMBERLY KELSEY, JAIME CHANCE, KRISTIN ALMAN, KEISHA WISE, STEPHANIE EVANS, STEPHANIE (WAY) ENSOR, MARSHONNTRI REID, AMY OLSON, MISTI KELLMAN, NAOMI FARMER, DAWN COSTA, KARENA WINKLE, HOLLY KEMBLE, | CASE NO: <br><br> DIVISION NO.: <br><br> JURY TRIAL DEMAND <br><br> PETITION FOR DAMAGES |

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

JANASHAYA DENNIS, ANGEL MCCALEY,
CAROLA VALENCIA, DONNA ANDRUS,
SUSAN MAULDIN, KIM TROKEY,  CARRIE
GOODE, NINA WORLEY, CINDY FELTNER,
SANTANA ROYALS, NIYA LLOYD,
MICHELLE MITCHOM, JANAE BROWN

      Plaintiffs

v.

BAYER CORP., BAYER HEALTHCARE LLC.,
BAYER ESSURE, INC., (F/K/A CONCEPTUS,
INC.), BAYER HEALTHCARE
PHARMACEUTICALS, INC.

      Defendants

_____

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## Table of Contents

I.    **INTRODUCTION** ........................................................................................ 1

II.   **PARTIES** ................................................................................................... 6

    A.    **PLAINTIFFS.** ................................................................................... 6

    B.    **DEFENDANTS.** ............................................................................. 11

III.  **JURISDICTION AND VENUE** ............................................................ 14

IV.   **FACTS** .................................................................................................... 16

    A.    **DESCRIPTION OF ESSURE® AND HOW IT WORKS.** .................... 16

    B.    **MEDICAL DEVICE REGULATORY FRAMEWORK.** ....................... 19

        1.    Class III Medical Device Pre-Market Approval Requirements. ............... 21

        2.    General Reporting Duties to the FDA are Required After the PMA Process. ........................................................................................ 23

        3.    A Manufacturer Must Follow Current Good Manufacturing Practices. ... 27

        4.    PMA Supplements For Labeling Changes. ................................................ 29

        5.    The FDA Prohibits Misleading Or False Promotion And Marketing. ...... 30

        6.    Violations of Federal Statutes or FDA Regulations Void the Federal Preemption Defense. ............................................................................. 31

    C.    CONCEPTUS DEPENDED SOLELY ON ESSURE® SALES TO FIX THEIR PROBLEMS WITH MASSIVE DEBT AND ACHIEVE PROFITABILITY. ......... 33

    D.    MANIPULATING SAFETY INFORMATION ALLOWED CONCEPTUS TO BECOME A VIABLE COMPANY. ............................................................ 34

    E.    CONCEPTUS AND BAYER CONTINUOUSLY SPREAD FALSE AND MISLEADING INFORMATION TO ALTER PERCEPTIONS OF ESSURE®'S SAFETY RISKS. ............................................................................... 37

    F.    CONCEPTUS AND BAYER HAVE ALWAYS KNOWN THAT ESSURE® IS DANGEROUS. ................................................................................. 40

        1.    Conceptus Was Charged With Early Regulatory Violations. ................... 40

        2.    Conceptus Knew About A Myriad Of Manufacturing Problems. ............ 40

        3.    Conceptus Concealed Thousands of Migration and Perforation Reports From the FDA. ................................................................................... 41

        4.    Conceptus Demonstrated A Continuing Pattern of Concealing Safety Complaints. ......................................................................................... 44

        5.    Trends in FDA Reports Prove That Conceptus and Bayer Withheld An Enormous Amount of Safety Information. ............................................... 46

        6.    Bayer Misled the FDA About Rates of Essure® Breaking. ...................... 48

        7.    Now The Medical Community Is Discovering What Conceptus And Bayer Knew For Years: Essure® Is Dangerous. ...................................... 50

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

8. The Revelation Of Safety Information In The Public Leads To The Inevitable: FDA Mandates Major Changes To Essure® Sales.................. 54

G. CONCEPTUS' AND BAYER'S PARTICIPATION IN THE COVERING UP AND FAILURE TO ADEQUATELY WARN OF SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH ESSURE® CAUSED PLAINTIFFS' INJURIES ............................ 59

V. EQUITABLE TOLLING/FRAUDULENT CONCEALMENT ......................... 61

VI. GENERAL ALLEGATIONS............................................................... 62

Representations ................................................................................... 63

Causation............................................................................................. 64

Damages............................................................................................... 65

VII. SPECIFIC PLAINTIFF ALLEGATIONS ............................................. 66

A. SHERANGELIA MCCLAIN ............................................................ 66

1. Initial Essure® Procedure: ................................................... 66

2. Post Essure® Procedure Condition and Treatment: ................. 67

B. AMBER HEDGES ........................................................................ 67

1. Initial Essure® Procedure: ................................................... 67

2. Post Essure® Procedure Condition and Treatment: ................. 68

C. ROBIN DOOLEY ......................................................................... 68

1. Initial Essure® Procedure: ................................................... 68

2. Post Essure® Procedure Condition and Treatment: ................. 69

D. ASHLEY CAMP ........................................................................... 71

1. Initial Essure® Procedure: ................................................... 71

2. Post Essure® Procedure Condition and Treatment: ................. 71

E. BRANDY LEVIERE ...................................................................... 72

1. Initial Essure® Procedure: ................................................... 72

2. Post Essure® Procedure Condition and Treatment: ................. 73

F. ASHLEY ROBERSON .................................................................... 73

1. Initial Essure® Procedure: ................................................... 74

2. Post Essure® Procedure Condition and Treatment: ................. 74

G. RUTH GONZALEZ ....................................................................... 75

1. Initial Essure® Procedure: ................................................... 75

2. Post Essure® Procedure Condition and Treatment: ................. 75

H. JENNIFER MILLER ...................................................................... 76

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

|  |  |  |
|---|---|---|
| | 1. Initial Essure® Procedure: | 77 |
| | 2. Post Essure® Procedure Condition and Treatment: | 77 |
| **I.** | **MARY POWELL** | 77 |
| | 1. Initial Essure® Procedure: | 78 |
| | 2. Post Essure® Procedure Condition and Treatment: | 78 |
| **J.** | **BETTY KILLY** | 79 |
| | 1. Initial Essure® Procedure: | 79 |
| | 2. Post Essure® Procedure Condition and Treatment: | 79 |
| **K.** | **CRYSTAL BURDETTE** | 80 |
| | 1. Initial Essure® Procedure: | 80 |
| | 2. Post Essure® Procedure Condition and Treatment: | 80 |
| **L.** | **SHERRI HOWARD** | 81 |
| | 1. Initial Essure® Procedure: | 81 |
| | 2. Post Essure® Procedure Condition and Treatment: | 82 |
| **M.** | **BRANDY KELLY** | 82 |
| | 1. Initial Essure® Procedure: | 82 |
| | 2. Post Essure® Procedure Condition and Treatment: | 83 |
| **N.** | **KELLY HAINLINE** | 84 |
| | 1. Initial Essure® Procedure: | 84 |
| | 2. Post Essure® Procedure Condition and Treatment: | 84 |
| **O.** | **MARIA MADRID** | 85 |
| | 1. Initial Essure® Procedure: | 85 |
| | 2. Post Essure® Procedure Condition and Treatment: | 85 |
| **P.** | **AMY DANISAVICH** | 87 |
| | 1. Initial Essure® Procedure: | 87 |
| | 2. Post Essure® Procedure Condition and Treatment: | 87 |
| **Q.** | **PATRICIA GARDNER** | 89 |
| | 1. Initial Essure® Procedure: | 89 |
| | 2. Post Essure® Procedure Condition and Treatment: | 89 |
| **R.** | **LORRAINE SEGARS** | 92 |
| | 1. Initial Essure® Procedure: | 92 |
| | 2. Post Essure® Procedure Condition and Treatment: | 92 |
| **S.** | **NIKKIE SWINEY** | 93 |

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

        1.  Initial Essure® Procedure: ................................................................ 93
        2.  Post Essure® Procedure Condition and Treatment: .................... 93
T.    SHELIA HARDEN ....................................................................................... 94
        1.  Initial Essure® Procedure: ................................................................ 94
        2.  Post Essure® Procedure Condition and Treatment: .................... 94
U.    JULIE THOMPSON ...................................................................................... 95
        1.  Initial Essure® Procedure: ................................................................ 95
        2.  Post Essure® Procedure Condition and Treatment: .................... 96
V.    ASHLEY RUNYAN ....................................................................................... 96
        1.  Initial Essure® Procedure: ................................................................ 97
        2.  Post Essure® Procedure Condition and Treatment: .................... 97
W.    REATHA DAVIS ........................................................................................... 98
        1.  Initial Essure® Procedure: ................................................................ 98
        2.  Post Essure® Procedure Condition and Treatment: .................... 98
X.    STEPHANIE WILLE ..................................................................................... 99
        1.  Initial Essure® Procedure: ................................................................ 99
        2.  Post Essure® Procedure Condition and Treatment: .................... 99
Y.    KRISTIE UPRIGHT ..................................................................................... 101
        1.  Initial Essure® Procedure: .............................................................. 101
        2.  Post Essure® Procedure Condition and Treatment: .................. 101
Z.    EUGENIA DANTZLER .................................................................................. 102
        1.  Initial Essure® Procedure: .............................................................. 103
        2.  Post Essure® Procedure Condition and Treatment: .................. 103
AA.   LISA FINK ................................................................................................. 104
        1.  Initial Essure® Procedure: .............................................................. 104
        2.  Post Essure® Procedure Condition and Treatment: .................. 105
BB.   MARSHA CREASEY ..................................................................................... 107
        1.  Initial Essure® Procedure: .............................................................. 107
        2.  Post Essure® Procedure Condition and Treatment: .................. 107
CC.   MARITZA CABRERA ................................................................................... 108
1.    Initial Essure® Procedure: .................................................................... 108
2.    Post Essure® Procedure Condition and Treatment: ........................... 108
DD.   ALEXA A. CALDWELL ................................................................................ 110

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1. Initial Essure® Procedure: ................................................................ 110

2. Post Essure® Procedure Condition and Treatment: ............................... 110

EE.  MELISSA SLAYBACK ..................................................................................111

1. Initial Essure® Procedure: ................................................................ 111

2. Post Essure® Procedure Condition and Treatment: ............................... 111

FF.  JILL POTWIN ...........................................................................................113

1. Initial Essure® Procedure: ................................................................ 113

2. Post Essure® Procedure Condition and Treatment: ............................... 113

GG.  MICHELLE POWERS ..................................................................................114

1. Initial Essure® Procedure: ................................................................ 114

2. Post Essure® Procedure Condition and Treatment: ............................... 114

HH.  CORA CARILLO .......................................................................................116

1. Initial Essure® Procedure: ................................................................ 116

2. Post Essure® Procedure Condition and Treatment: ............................... 116

II.  BRANDIE TABOR .....................................................................................117

1. Initial Essure® Procedure: ................................................................ 117

2. Post Essure® Procedure Condition and Treatment: ............................... 118

JJ.  JESSICA CRUZ .........................................................................................119

1. Initial Essure® Procedure: ................................................................ 119

2. Post Essure® Procedure Condition and Treatment: ............................... 119

KK.  TATESHEA IRVING ...................................................................................121

1. Initial Essure® Procedure: ................................................................ 121

2. Post Essure® Procedure Condition and Treatment: ............................... 121

LL.  TOKI SANDOVAL ......................................................................................122

1. Initial Essure® Procedure: ................................................................ 122

2. Post Essure® Procedure Condition and Treatment: ............................... 123

MM.  SHEYRA LUGO .........................................................................................123

1. Initial Essure® Procedure: ................................................................ 123

2. Post Essure® Procedure Condition and Treatment: ............................... 124

NN.  AMBER SALMON ......................................................................................125

1. Initial Essure® Procedure: ................................................................ 125

2. Post Essure® Procedure Condition and Treatment: ............................... 125

OO.  DENISE NELSON .......................................................................................126

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1.  Initial Essure® Procedure: .................................................. 127

2.  Post Essure® Procedure Condition and Treatment: ................. 127

PP.   LINDA SLAUSON ......................................................... 128

1.  Initial Essure® Procedure: .................................................. 128

2.  Post Essure® Procedure Condition and Treatment: ................. 128

QQ.   JENNIFER COMPTON ................................................... 130

1.  Initial Essure® Procedure: .................................................. 130

2.  Post Essure® Procedure Condition and Treatment: ................. 130

RR.   NIESHA ANDERSON ..................................................... 131

1.  Initial Essure® Procedure: .................................................. 131

2.  Post Essure® Procedure Condition and Treatment: ................. 132

SS.   ALEXIS ARENAS .......................................................... 133

1.  Initial Essure® Procedure: .................................................. 133

2.  Post Essure® Procedure Condition and Treatment: ................. 133

TT.   AMY MCMICHEN .......................................................... 134

1.  Initial Essure® Procedure: .................................................. 134

2.  Post Essure® Procedure Condition and Treatment: ................. 134

UU.   CRYSTAL GASSETT ...................................................... 136

1.  Initial Essure® Procedure: .................................................. 136

2.  Post Essure® Procedure Condition and Treatment: ................. 136

VV.   KERI-ANNE ROGERS ................................................... 138

1.  Initial Essure® Procedure: .................................................. 138

2.  Post Essure® Procedure Condition and Treatment: ................. 138

WW.  JENNIFER LANGLEY ..................................................... 139

1.  Initial Essure® Procedure: .................................................. 139

2.  Post Essure® Procedure Condition and Treatment: ................. 139

XX.   MEARA CANNON .......................................................... 141

1.  Initial Essure® Procedure: .................................................. 141

2.  Post Essure® Procedure Condition and Treatment: ................. 141

YY.   JAMI LOZADA .............................................................. 142

1.  Initial Essure® Procedure: .................................................. 142

2.  Post Essure® Procedure Condition and Treatment: ................. 143

ZZ.   SANDRA NEESE ............................................................ 144

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

|  | 1. | Initial Essure® Procedure: | 144 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 144 |
| **AAA.** | **STACY COOLEY** | | 146 |
|  | 1. | Initial Essure® Procedure: | 146 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 146 |
| **BBB.** | **ERICA PIKE** | | 148 |
|  | 1. | Initial Essure® Procedure: | 148 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 148 |
| **CCC.** | **MELISSA LUKE** | | 150 |
|  | 1. | Initial Essure® Procedure: | 150 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 150 |
| **DDD.** | **SHANNON CHASE** | | 152 |
|  | 1. | Initial Essure® Procedure: | 152 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 152 |
| **EEE.** | **ILIASUE LILLY** | | 154 |
|  | 1. | Initial Essure® Procedure: | 154 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 154 |
| **FFF.** | **JASMIN JEFFERSON** | | 156 |
|  | 1. | Initial Essure® Procedure: | 156 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 156 |
| **GGG.** | **STACI PARKER** | | 157 |
|  | 1. | Initial Essure® Procedure: | 158 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 158 |
| **HHH.** | **BRANDEE CUTTER** | | 159 |
|  | 1. | Initial Essure® Procedure: | 159 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 160 |
| **III.** | **SHANNON SANTORE** | | 161 |
|  | 1. | Initial Essure® Procedure: | 161 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 161 |
| **JJJ.** | **ALISHA DAVIS** | | 162 |
|  | 1. | Initial Essure® Procedure: | 162 |
|  | 2. | Post Essure® Procedure Condition and Treatment: | 162 |
| **KKK.** | **JESSICA MCFARLAND** | | 163 |

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1.  Initial Essure® Procedure: ................................................................ 163

2.  Post Essure® Procedure Condition and Treatment: ............................ 164

LLL.  CAROLYN MORRIS ...........................................................................165

1.  Initial Essure® Procedure: ................................................................ 165

2.  Post Essure® Procedure Condition and Treatment: ............................ 165

MMM.  LUCIDA SAUCEDA .........................................................................167

1.  Initial Essure® Procedure: ................................................................ 167

2.  Post Essure® Procedure Condition and Treatment: ............................ 167

NNN.  STACEY SPRINGFIELD ....................................................................169

1.  Initial Essure® Procedure: ................................................................ 169

2.  Post Essure® Procedure Condition and Treatment: ............................ 169

OOO.  NATACHEE CHANDLER ....................................................................170

1.  Initial Essure® Procedure: ................................................................ 170

2.  Post Essure® Procedure Condition and Treatment: ............................ 171

PPP.  ADRIANNE SUTTON .........................................................................172

1.  Initial Essure® Procedure: ................................................................ 172

2.  Post Essure® Procedure Condition and Treatment: ............................ 172

QQQ.  JANETSY ANDUJAR .........................................................................174

1.  Initial Essure® Procedure: ................................................................ 174

2.  Post Essure® Procedure Condition and Treatment: ............................ 174

RRR.  SARAH CRAWFORD .........................................................................175

1.  Initial Essure® Procedure: ................................................................ 176

2.  Post Essure® Procedure Condition and Treatment: ............................ 176

SSS.  KIMBERLY R. KELSEY .....................................................................177

1.  Initial Essure® Procedure: ................................................................ 177

2.  Post Essure® Procedure Condition and Treatment: ............................ 178

TTT.  JAIME CHANCE ...............................................................................180

1.  Initial Essure® Procedure: ................................................................ 180

2.  Post Essure® Procedure Condition and Treatment: ............................ 180

UUU.  KRISTIN ALMAN ............................................................................181

1.  Initial Essure® Procedure: ................................................................ 181

2.  Post Essure® Procedure Condition and Treatment: ............................ 182

VVV.  KEISHA WISE ................................................................................183

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

        1.  Initial Essure® Procedure: ................................................................. 183
        2.  Post Essure® Procedure Condition and Treatment: ............................... 183
WWW.  STEPHANIE EVANS ...................................................................................185
        1.  Initial Essure® Procedure: ................................................................. 185
        2.  Post Essure® Procedure Condition and Treatment: ............................... 185
XXX.  STEPHANIE (WAY) ENSOR ........................................................................274
        1.  Initial Essure® Procedure: ................................................................. 188
        2.  Post Essure® Procedure Condition and Treatment: ............................... 188
YYY.  MARSHONTRI REID .................................................................................190
        1.  Initial Essure® Procedure: ................................................................. 190
        2.  Post Essure® Procedure Condition and Treatment: ............................... 191
ZZZ.  AMY M. OLSON ......................................................................................192
        1.  Initial Essure® Procedure: ................................................................. 192
        2.  Post Essure® Procedure Condition and Treatment: ............................... 192
AAAA.  MISTI KELLMAN ..................................................................................193
        1.  Initial Essure® Procedure: ................................................................. 193
        2.  Post Essure® Procedure Condition and Treatment: ............................... 194
BBBB.  NAOMI FARMER ...................................................................................195
        1.  Initial Essure® Procedure: ................................................................. 195
        2.  Post Essure® Procedure Condition and Treatment: ............................... 195
CCCC.  DAWN COSTA .......................................................................................196
        1.  Initial Essure® Procedure: ................................................................. 196
        2.  Post Essure® Procedure Condition and Treatment: ............................... 196
DDDD.  KARENA WINKLE ..................................................................................198
        1.  Initial Essure® Procedure: ................................................................. 199
        2.  Post Essure® Procedure Condition and Treatment: ............................... 199
EEEE.  HOLLY KEMBLE ....................................................................................200
        1.  Initial Essure® Procedure: ................................................................. 200
        2.  Post Essure® Procedure Condition and Treatment: ............................... 200
FFFF.  JANASHAYA DENNIS ..............................................................................201
        1.  Initial Essure® Procedure: ................................................................. 201
        2.  Post Essure® Procedure Condition and Treatment: ............................... 202
GGGG.  ANGEL MCCALEY .................................................................................203

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

|  |  |  |
|---|---|---|
| | 1. Initial Essure® Procedure: | 203 |
| | 2. Post Essure® Procedure Condition and Treatment: | 203 |
| HHHH. | CAROLA VALENCIA | 204 |
| | 1. Initial Essure® Procedure: | 204 |
| | 2. Post Essure® Procedure Condition and Treatment: | 204 |
| IIII. | DONNA ANDRUS | 205 |
| | 1. Initial Essure® Procedure: | 205 |
| | 2. Post Essure® Procedure Condition and Treatment: | 206 |
| JJJJ. | SUSAN MAULDIN | 207 |
| | 1. Initial Essure® Procedure: | 207 |
| | 2. Post Essure® Procedure Condition and Treatment: | 207 |
| KKKK. | KIM TROKEY | 210 |
| | 1. Initial Essure® Procedure: | 210 |
| | 2. Post Essure® Procedure Condition and Treatment: | 210 |
| LLLL. | CARRIE GOODE | 210 |
| | 1. Initial Essure® Procedure: | 210 |
| | 2. Post Essure® Procedure Condition and Treatment: | 211 |
| MMMM. | NINA WORLEY | 212 |
| | 1. Initial Essure® Procedure: | 212 |
| | 2. Post Essure® Procedure Condition and Treatment: | 213 |
| NNNN. | CINDY FELTNER | 214 |
| | 1. Initial Essure® Procedure: | 214 |
| | 2. Post Essure® Procedure Condition and Treatment: | 214 |
| OOOO. | SANTANA ROYALS | 215 |
| | 1. Initial Essure® Procedure: | 215 |
| | 2. Post Essure® Procedure Condition and Treatment: | 215 |
| PPPP. | NIYA LLOYD | 217 |
| | 1. Initial Essure® Procedure: | 217 |
| | 2. Post Essure® Procedure Condition and Treatment: | 217 |
| QQQQ. | MICHELLE MITCHOM | 219 |
| | 1. Initial Essure® Procedure: | 219 |
| | 2. Post Essure® Procedure Condition and Treatment: | 219 |

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**VIII.**    **AGENCY, ALTER-EGO, JOINT VENTURE, AND CONSPIRACY** ............ 222

**IX.**    **PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES** ........................ 224

**X.**    **CLAIMS FOR RELIEF** ........................................................................ 224

FIRST CAUSE OF ACTION – Negligence ............................................... 223
SECOND CAUSE OF ACTION – Negligence Per Se ............................... 229
THIRD CAUSE OF ACTION – Negligence – Misrepresentation ............ 232
FOURTH CAUSE OF ACTION – Strict Liability – Failure to Warn ...... 234
FIFTH CAUSE OF ACTION – Manufacturing Defect ............................. 241
SIXTH CAUSE OF ACTION – Common Law Fraud ............................... 249
SEVENTH CAUSE OF ACTION – Constructive Fraud ........................... 252
EIGHT CAUSE OF ACTION – Fraudulent Concealment ....................... 253
NINTH CAUSE OF ACTION – Breach of Express Warranty ................. 255
TENTH CAUSE OF ACTION – Breach of Implied Warranty ................ 258
ELEVENTH CAUSE OF ACTION – Violation of Consumer Protection Laws .... 260
TWELFTH CAUSE OF ACTION – Missouri Products Liability Action ........... 264
THIRTEENTH CAUSE OF ACTION – Violation of the Missouri
        Merchandising Practices Act ................................................... 269
FOURTEENTH CAUSE OF ACTION – Gross Negligence/Punitive Damages .... 271

**XI.**    **PRAYER FOR RELIEF** ...................................................................... 276

**DEMAND FOR JURY TRIAL** ...................................................................... 277

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## PETITION FOR DAMAGES

COME NOW, the above named Plaintiffs by and through their undersigned counsel, and state as their Petition for Damages against BAYER CORPORATION, BAYER HEALTHCARE LLC., BAYER ESSURE, INC., (f/k/a CONCEPTUS, INC.), and BAYER HEALTHCARE PHARMACEUTICALS, INC., (collectively herein referred to as "Bayer" or "Conceptus" or the "Bayer Defendants"), for personal injuries suffered as a result of being prescribed and implanted with the defective and unreasonably dangerous product Essure®:

## I.    INTRODUCTION

1.    This is an action for the serious and permanent injuries incurred by the Plaintiffs resulting from the promotion, sale, and distribution of an unreasonably dangerous and defective medical device known as Essure®.

2.    Conceptus Inc. ("Conceptus") came up with the idea for the Essure® device in 1998.

3.    At that time, Conceptus was in hundreds of millions of dollars of debt.

4.    The marketplace for permanent birth control was and is enormous.  In 2007, Conceptus estimated that 700,000 American women undergo incisional tubal ligation each year. The market presented a huge business opportunity to Conceptus.

5.    The Essure® system consists of two expandable metal coils that are implanted into a woman's fallopian tubes and are intended to elicit tissue growth that causes blockage of the tubes and thus prevents conception.

6.    The device was intended to be promoted as a simple solution to permanent birth control needs, and as safer than all other permanent birth control options.

7.    By the time the FDA approved Essure® for sale in 2002, it was Conceptus' only commercial product.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

8.      Conceptus relied entirely on the success of Essure® to solve its massive debt problems and achieve profitability.

9.      Essure® was a unique contraceptive device and the first of its kind on the market.

10.     As such, Conceptus knew that physicians and patients needed to trust the safety of the device for it to be accepted in the marketplace and compete with other, more established and traditional alternative methods of permanent birth control.

11.     Conceptus knew that any apprehensions about the safety of the Essure® device on the part of physicians or patients could devastate sales and lead to the complete failure of the company.

12.     To promote the perceived safety of the device and gain market acceptance, Conceptus devised and implemented a scheme to defraud physicians and patients, by means of false and fraudulent pretenses, representations and concealment of material facts.

13.     After Essure® came onto the market, thousands of Essure® patients complained of adverse events directly to Conceptus.

14.     Conceptus knew that if those complaints made it to the FDA and became public knowledge, it would inevitably result in changes to the Essure® label, its risk/benefit profile, related physician advice, and patients' decisions.

15.     In short, Conceptus knew that if the true safety risks and consequences were known to the public, sales of the device would plummet.

16.     As a result, Conceptus made a decision to hide these safety risks and consequences from the FDA and the public.

17.     Conceptus was obligated under federal law to report the patients' complaints to the FDA.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

18.     Conceptus withheld the vast majority of those complaints.

19.     At the same time, Conceptus conducted enormous and aggressive marketing campaigns that disseminated what they knew to be false and misleading statements pertaining to the convenience, safety and efficacy of the device.

20.     Conceptus engaged in substantial, widespread and systemic false, misleading and illegal promotional activities to encourage physicians and patients to use the Essure® device.

21.     While Conceptus engaged in substantial, widespread and systemic false, misleading and illegal promotional activities, it violated its duty owed to the physicians and patients, in concealing and failing to warn the physicians and patients of the known serious, increased risks and complications stemming therefrom.

22.     Conceptus knew that the withholding of safety information and adverse events, as well as the dissemination of false and misleading statements pertaining to the Essure® device was illegal.

23.     In fact, the FDA cited Conceptus several times for withholding safety information.

24.     Conceptus knew that manipulating the public's knowledge of safety risks associated with Essure® exposed patients to serious dangers and greatly increased adverse risks.

25.     Despite knowing of these dangers and the illegality of their behavior, Conceptus continued to carry out its false and unlawful marketing and promotional scheme.

26.     These illegal efforts proved to be highly effective, leading to hundreds of millions of dollars in revenue for Conceptus, and an eventual buyout of the company by Bayer for approximately $1.1 billion in 2013.

27.     Bayer continued illegally hiding the true safety risks of Essure®.

28.     Those same tactics would not continue working for Bayer.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

29.    In 2013, the FDA began promoting the use of the MedWatcher app, a system that allowed patients with complaints to report their problems directly to the FDA, as opposed to the manufacturer.

30.    By that time, thousands of women adversely affected by the Essure® device had formed a support group named "Essure Problems" on Facebook, a digital social network.

31.    The group currently consists of over 32,000 members.

32.    Conceptus and Bayer had been able to effectively silence their voices and conceal their complaints for years because the companies controlled what information did and did not make it to the FDA.

33.    However, through the use of the MedWatcher app, in the fall of 2013 these women began to stand up to Bayer and report their problems directly to the FDA.

34.    At that point, Bayer knew Essure® was wreaking havoc on the lives of thousands of women.

35.    Bayer could have chosen to acknowledge the true weight of all of this safety information and stopped promoting the device.

36.    But with over a billion dollars invested in Essure®, Bayer chose to protect its investment and continue promoting the false impression that the device was safe.

37.    Bayer knew that they could no longer hide complaints made through MedWatcher, because those reports were made directly to the FDA.

38.    So Bayer began to employ new tactics to conceal and downplay the true safety risks of Essure®.

39.    Bayer carefully manipulated its reports to the FDA and presented false and misleading information.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

40.     Bayer did this in an effort to maintain the impression that the Essure® device had a positive risk/benefit profile and to guard sales.

41.     The women affected by Essure® and the "Essure Problems" group, however, would not let Bayer continue to mislead the FDA and more women.

42.     They demanded that the FDA take meaningful action to investigate and evaluate the growing of scientific knowledge concerning Essure®.

43.     At their insistence, in September of 2015 the FDA convened a meeting of the Obstetrics and Gynecology Devices Panel of the Medical Devices Advisory Committee to hear concerns from experts and patients, and plan recommendations for the Essure® device.

44.     At the hearing, experts funded by the "Essure Problems" group testified as to the many safety problems they had begun to observe with the device.

45.     Shortly after the hearing, researchers from Cornell University published a study in the British Medical Journal with devastating conclusions about the comparative safety profile of Essure®.

46.     The study compared thousands of women from New York State who had undergone either a traditional tubal ligation or received the Essure® implant, and concluded that women receiving Essure® were ten times more likely to require a corrective reoperation.

47.     Based on the information gathered by the FDA during the advisory process, the FDA realized that "patients are not reliably receiving and/or understanding appropriate information about the device and associated risks prior to making a sterilization decision – for Essure® as well as other sterilization methods,"[1] and the FDA finally took aggressive action.

---

[1]http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/ucm452254.htm

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

48.    In 2016, the FDA required a detailed boxed warning for the Essure® device.

49.    The FDA reserves boxed warnings, commonly referred to as "black box warnings," for only the most serious adverse events.

50.    Boxed warnings indicate the highest level of risk.

51.    The FDA also required that every potential Essure® patient receive and sign a detailed checklist specifically tailored to the risks associated with the device.

52.    The boxed warning and patient decision checklist were approved by the FDA on November 15, 2016.[2]

53.    In its current form, this patient decision checklist requires a patient's initials and signature six separate times.

54.    The checklist specifically warns of device migration and perforation of organs, side effects that Conceptus and Bayer had been cited for hiding from the FDA and the public for years.

55.    Finally, women considering the device will have the chance to be fully informed of its true risks.

56.    Conceptus and Bayer knowingly and purposefully concealed these risks for years.

57.    Unfortunately, Plaintiffs herein were not afforded the knowledge and warnings that would have informed and protected them.

II.    **PARTIES**

A.    **PLAINTIFFS.**

58.    Below is a list of each Plaintiff who is bringing her own case against Defendants:

59.    Plaintiff, Sherangelia McClain, resides in the City of East Saint Louis, Illinois; and she was first injured in the City of St. Louis, Missouri, after she was implanted with the Essure®

---

[2] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P020014S046

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

device during a procedure at Barnes Jewish Hospital in St. Louis, Missouri.

60.    Plaintiff, Amber Hedges, resides in Malvern, Hot Spring County, Arkansas.

61.    Plaintiff, Robin Dooley, resides in Harrisburg, Dauphin County, Pennsylvania.

62.    Plaintiff, Ashley Camp resides in Cartersville, Bartow County, Georgia.

63.    Plaintiff, Brandy LeViere, resides in Wexford, Allegheny County, Pennsylvania.

64.    Plaintiff, Ashely Roberson, resides in Hillsboro, Hill County, Texas.

65.    Plaintiff, Ruth Gonzalez, resides in Las Vegas, Clark County, Nevada.

66.    Plaintiff, Jennifer Miller, resides in Harrisburg, Dauphin County, Pennsylvania.

67.    Plaintiff, Mary Powell, resides in Emmet, Nevada County, Arkansas.

68.    Plaintiff, Betty Killy, resides in Las Vegas, Clark County, Nevada.

69.    Plaintiff, Crystal Burdette, resides in Charleston, Kanawha County, West Virginia.

70.    Plaintiff, Sherri Howard, resides in Glendale, Milwaukee County, Wisconsin.

71.    Plaintiff, Brandy Kelly, resides in Champaign, Champaign County, Illinois.

72.    Plaintiff, Kelly Hainline, resides in Decatur, Benton County, Arkansas.

73.    Plaintiff, Maria Madrid, resides in Orlando, Orange County, Florida.

74.    Plaintiff, Amy Danisavich, resides in Cumbola, Schuylkill County, Pennsylvania.

75.    Plaintiff, Patricia Gardner, resides in Bloomington, Hennepin County, Minnesota.

76.    Plaintiff, Lorraine Segars, resides in Broomall, Delaware County, Pennsylvania.

77.    Plaintiff, Nikkie Swiney, resides in Louisa, Lawrence County, Kentucky.

78.    Plaintiff, Shelia Harden, resides in Blue Mountain, Tippah County, Mississippi.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

79.    Plaintiff, Julie Thompson, resides in Greenville, Greenville County, South Carolina.

80.    Plaintiff, Ashley Runyan, resides in Lowmansville, Lawrence County, Kentucky.

81.    Plaintiff, Reatha Davis, resides in Cincinnati, Hamilton County, Ohio.

82.    Plaintiff, Stephanie Wille, resides in Junction City, Portage County, Wisconsin.

83.    Plaintiff, Kristie Upright, resides in Forsyth, Monroe County, Georgia.

84.    Plaintiff, Eugenia Dantzler, resides in Saint Paul, Ramsey County, Minnesota.

85.    Plaintiff, Lisa Fink, resides in Middletown, Dauphin County, Pennsylvania.

86.    Plaintiff, Marsha Creasey, resides in Lexa, Phillips County, Arkansas.

87.    Plaintiff, Maritza Cabrera, resides in Lawrence, Essex County, Massachusetts.

88.    Plaintiff, Alexa Caldwell, resides in Lodi, Bergen County, New Jersey.

89.    Plaintiff, Melissa Slayback, resides in Trenton, Butler County, Ohio.

90.    Plaintiff, Jill Potwin, resides in Claremont, Sullivan County, New Hampshire.

91.    Plaintiff, Michelle Powers, resides in Dallas, Paulding County, Georgia.

92.    Plaintiff, Cora Carillo, resides in Tucson, Pima County, Arizona.

93.    Plaintiff, Brandie Tabor, resides in Summers, Washington County, Arkansas.

94.    Plaintiff, Jessica Cruz, resides in Willimantic, Windham County, Connecticut.

95.    Plaintiff, Tateshea Irving, resides in Dawson, Terrell County, Georgia.

96.    Plaintiff, Toki Sandoval, resides in St. Thomas, U.S. Virgin Islands.

97.    Plaintiff, Sheyra Lugo, resides in Orlando, Orange County, Florida.

98.    Plaintiff, Amber Salmon, resides in Uniontown, Fayette County, Pennsylvania.

99.    Plaintiff, Denise Nelson, resides in Brown Deer, Milwaukee County, Wisconsin.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

100.    Plaintiff, Linda Slauson, resides in Greenup, Greenup County, Kentucky.

101.    Plaintiff, Jennifer Compton, resides in Anderson, Anderson County, South Carolina.

102.    Plaintiff, Niesha Anderson, resides in Eagan, Dakota County, Minnesota.

103.    Plaintiff, Alexis Arenas, resides in Tucson, Pima County, Arizona.

104.    Plaintiff, Amy McMichen, resides in East Bank, Kanawha County, West Virginia.

105.    Plaintiff, Crystal Gassett, resides in Lakin, Kearny County, Kansas.

106.    Plaintiff, Keri-Anne Rogers, resides in Taunton, Bristol County, Massachusetts.

107.    Plaintiff, Jennifer Langley, resides in Tucson, Pima County, Arizona.

108.    Plaintiff, Jami Lozada, resides in Kissimmee, Osceola County, Florida.

109.    Plaintiff, Sandra Neese, resides in Phoenix, Maricopa County, Arizona.

110.    Plaintiff, Stacy Cooley, resides in Beckley, Raleigh County, West Virginia.

111.    Plaintiff, Erica Pike, resides in Franklin, Heard County, Georgia.

112.    Plaintiff, Shannon Chase, resides in Anchorage, Anchorage Borough, Alaska.

113.    Plaintiff, Iliasue Lilly, resides in Daniels, Raleigh County, West Virginia.

114.    Plaintiff, Jasmin Jefferson, resides in Green Bay, Brown County, Wisconsin.

115.    Plaintiff, Staci Parker, resides in Croydon, Bucks County, Pennsylvania.

116.    Plaintiff, Brandee Cutter, resides in Jaffrey, Cheshire County, New Hampshire.

117.    Plaintiff, Shannon Santore, resides in Uniontown, Fayette County, Pennsylvania.

118.    Plaintiff, Alisha Davis, resides in Hamilton, Butler County, Ohio.

119.    Plaintiff, Jessica McFarland, resides in Mountain Home, Baxter County, Arkansas.

120.    Plaintiff, Carolyn Morris, resides in Tupelo, Lee County, Mississippi.

121.    Plaintiff, Lucida Sauceda, resides in Wautoma, Waushara County, Wisconsin.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

122.    Plaintiff, Stacey Springfield, resides in Castle Rock, Douglas County, Colorado.

123.    Plaintiff, Natachee Chandler, resides in Decatur, Dekalb County, Georgia.

124.    Plaintiff, Adrianne Sutton, resides in Perry, Houston County, Georgia.

125.    Plaintiff, Janetsy Andujar, resides in Hollywood, Broward County, Florida.

126.    Plaintiff, Sarah Crawford, resides in Panama City, Bay County, Florida.

127.    Plaintiff, Kimberly Kelsey, resides in Palmetto, Fulton County, Georgia.

128.    Plaintiff, Jamie Chance, resides in Fort Smith, Sebastian County, Arkansas.

129.    Plaintiff, Kristin Alman, resides in Temple, Carroll County, Georgia.

130.    Plaintiff, Keisha Wise, Pittsburg, Allegheny County, Pennsylvania.

131.    Plaintiff, Stephanie Evans, resides in Winston-Salem, Forsyth County, North Carolina.

132.    Plaintiff, Stephanie (Way) Ensor, resides in Fryburg, Oxford County, Maine.

133.    Plaintiff, Marshontri Reid, resides in Union City, Fulton County, Georgia.

134.    Plaintiff, Misti Kellman, resides in Forest Park, Clayton County, Georgia.

135.    Plaintiff, Naomi Farmer, resides in Marysville, Snohomish County, Washington.

136.    Plaintiff, Dawn Costa, resides in New Bedford, Bristol County, Massachusetts.

137.    Plaintiff, Karena Winkle, resides in Arvada, Jefferson County, Colorado.

138.    Plaintiff, Holly Kemble, resides in Mrytle Beach, South Carolina.

139.    Plaintiff, Janashaya Dennis, resides in Stone Mountain, Dekalb County, Georgia.

140.    Plaintiff, Angel McCaley, resides in Charleston, Kanawha County, West Virginia.

141.    Plaintiff, Carola Valencia, resides in Fort Lauderdale, Broward County, Florida.

142.    Plaintiff, Donna Andrus, resides in Tooele, Tooele County, Utah.

143.    Plaintiff, Susan Mauldin, resides in Goose Creek, Berkeley County, Georgia.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

144.    Plaintiff, Kim Trokey, resies in High Ridge, Jefferson County, Missouri.

145.    Plaintiff, Carrie Goode, resides in Grand Junction, Mesa County, Colorado.

146.    Plaintiff, Nina Worley, resides in Walhalla, Oconee County, South Carolina.

147.    Plaintiff, Cindy Feltner, resides in Lebanon, Laclede County, Missouri.

148.    Plaintiff, Santana Royals, resides in Adel, Cook County, Georgia.

149.    Plaintiff, Niya Lloyd, resides in Aiken, Aiken County, South Carolina.

150.    Plaintiff, Michelle Mitchom, resides in O'Fallon, St. Clair County, Illinois.

151.    Plaintiff, Janae Brown, resides in Dayton, Montgomery County, Ohio.

**B.    DEFENDANTS.**

152.    BAYER CORPORATION is a for-profit corporation incorporated in the state of Indiana with its principal office at 100 Bayer Rd. Building 4, Pittsburgh, PA 15205, and is a wholly-owned subsidiary of Bayer A.G.  Defendant, Bayer Corporation, is a citizen of Pennsylvania and Indiana.  Defendant, Bayer Corp. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

153.    BAYER HEALTHCARE LLC is a for-profit corporation incorporated in the state of Delaware and is a wholly-owned subsidiary of Bayer A.G. Defendant, Bayer Healthcare LLC, has a principal office of 100 Bayer Blvd., Whippany, N.J. 07981.  Defendant, Bayer Healthcare LLC is a citizen of Delaware, Pennsylvania, New Jersey, Germany, and the Netherlands. Defendant, Bayer Healthcare LLC, is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

154.    BAYER ESSURE®, INC. (f/k/a CONCEPTUS, INC.) is a for-profit corporation incorporated in the state of Delaware, and is a wholly-owned subsidiary of Bayer A.G. and/or Bayer HealthCare LLC.  On or about April 28, 2013, Conceptus, Inc. entered into an Agreement and Plan of Merger (the "Merger Agreement") with Bayer HealthCare LLC.  On or about June 5, 2013, pursuant to the Merger Agreement, Conceptus, Inc. became a wholly-owned subsidiary of Bayer HealthCare LLC and/or Bayer A.G., and was thereafter renamed "Bayer Essure® Inc."  For purposes of this Petition, Conceptus, Inc. and Bayer Essure® Inc. are one and the same.  Bayer Essure® Inc.'s headquarters are located at 331 East Evelyn Avenue, Mountain View, California 94041.  Bayer Essure® Inc. is a citizen of Delaware and New Jersey.  Defendant, Bayer Essure® Inc., is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

155.    BAYER HEALTHCARE PHARMACEUTICALS, INC. is a for-profit corporation incorporated in the state of Delaware and is a wholly owned subsidiary of Bayer A.G.  Defendant, Bayer Healthcare Pharmaceuticals, Inc., has a principal office of 100 Bayer Blvd., Whippany, N.J. 07981.  Defendant, Bayer Healthcare Pharmaceuticals, Inc., is a citizen of Delaware and New Jersey.  Defendant, Bayer Healthcare Pharmaceuticals, Inc., is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, and marketing its products, including the Essure® device.

156.    BAYER A.G. is a German for-profit corporation.  At all relevant times, Bayer AG and one or more of its groups or divisions has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the Essure® device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

157.    Defendants Bayer Corp., Bayer Healthcare LLC, Bayer Essure®, Inc. (f/k/a Conceptus), and Bayer Healthcare Pharmaceuticals, Inc., are hereafter collectively referred to as "Bayer" or the "Bayer Defendants."

158.    At all relevant times herein mentioned, Bayer authorized and directed and/or participated in the promotion and sale of Essure®, when they knew, or with the exercise of reasonable care should have known, of the increased risks, hazards and unreasonably dangerous propensities, and thereby actively participated in the tortious conduct which resulted in the serious injuries to the Plaintiffs described herein.

159.    There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between the certain Defendants and other Defendants such that any individuality and separateness between them has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and/or would promote injustice.

160.    At all times herein mentioned, the Bayer Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling the Essure® device.  These products were for use by the Plaintiffs and Plaintiffs' physicians. As such, each of the Bayer Defendants are individually, as well as jointly and severally, liable to the Plaintiffs for their damages.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

161.    The harm caused to Plaintiffs resulted from the conduct of one or various combinations of the Defendants, and through no fault of Plaintiffs.  There may be uncertainty as to which one or which combination of Defendants caused the harm.  Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiffs' injuries.

162.    Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiffs.

## III.    <u>JURISDICTION AND VENUE</u>

163.    The Court has personal jurisdiction pursuant to § 506.500 R.S. Mo., over the Defendants because, at all relevant times, they have engaged in substantial business activities in the State of Missouri. At all relevant times, the Defendants transacted, solicited, and conducted business in Missouri through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in Missouri.

164.    Additionally, the Defendants have established substantial, continuous and systematic contacts with the state of Missouri.  For example, Conceptus chose Chesterfield, Missouri as one of the original eight principal sites in the United States for its Selective Tubal Occlusion Procedure (STOP) 2000 pivotal trial, led by Dr. David Levine at St. Luke's Hospital. [3] Between May 2000 and February 2001, this pivotal trial was one of two pre-market clinical trials Conceptus was required to perform before Essure® could obtain FDA approval. [4]

165.    Further, as a condition of the Essure® PMA approval order, the FDA required

---

[3] *See* Jay M. Cooper, *et al.*, *Microinsert Nonincisional Hysteroscopic Sterilizationn*, 102 ACOG G.J. 59, 59-60 (July 2003), also available online at:
http://journals.lww.com/greenjournal/Fulltext/2003/07000/Microinsert_Nonincisional_Hysteroscopic.14.aspx (last visited Mar. 28, 2017).
[4] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Conceptus to conduct a post-approval study to gather five-year follow up information on the participants from the STOP 2000 pivotal trial.[5] According to Conceptus and Bayer, the Pivotal STOP study, also known as the Phase III study, is one of two studies that form the basis for safety and efficacy data in the FDA approved IFU.[6] Without the success of the STOP 2000 pivotal trial and pivotal study, led by Dr. Levine at St. Luke's Hospital in Chesterfield, Missouri, Essure® would not have been approved for sale in the United States.[7]

166.    The Defendants also engaged in directed marketing and advertising efforts in St. Louis, Missouri, including direct to consumer and direct to physician marketing.

167.    Jurisdiction in this court is also proper because the Defendants committed torts in whole or in part against Plaintiffs in Missouri.  Further, there is no federal subject matter jurisdiction because no federal question is raised, and there is no diversity jurisdiction.

168.    There is no federal diversity jurisdiction, because Plaintiffs, Robin Dooley, Brandy LeViere, Jennifer Miller, Amy Danisavich, Lorraine Segars, Lisa Fink, Amber Salmon, Staci Parker, Shannon Santore, Keisha Wise, and Defendant, BAYER CORP., are Pennsylvania residents.

169.    Likewise, there is no federal diversity jurisdiction because Plaintiff, Alexa Caldwell, and Defendant, BAYER HEALTHCARE LLC, are both New Jersey residents. Additionally, Plaintiffs, Robin Dooley, Brandy LeViere, Jennifer Miller, Amy Danisavich, Lorraine Segars, Lisa Fink, Amber Salmon, Staci Parker, Shannon Santore, Keisha Wise, and

---

[5] *See* Regulatory History, available online at:
https://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/ucm452270.htm (last visited Mar. 28, 2017).
[6] *See* ESSURE System for Permanent Birth Control Executive Summary, available online at:
https://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/ObstetricsandGynecologyDevices/UCM463460.pdf
[7] *St. Louisans try new birth control procedure*, The Berkeley Dailey Planet, (Nov. 15, 2002),
http://www.berkeleydailyplanet.com/issue/2002-11-15/article/16137?headline=St.Louisansdtrydnewdbirthdcontroldprocedure&status=301.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Defendant, BAYER HEALTHCARE LLC, are Pennsylvania residents. Further, there is no federal diversity jurisdiction because Plaintiff, Alexa Caldwell, and Defendant, BAYER ESSURE INC., are both New Jersey residents. There is also no federal diversity jurisdiction because Plaintiff, Alexa Caldwell, and Defendant BAYER HEALTHCARE PHARMACEUTICALS INC. are both New Jersey residents.

170.    Venue is proper in this Court, pursuant to § 508.010(4) R.S. Mo., as the conduct which gave rise to Plaintiff Sherangelia McClain's action occurred in the City of St. Louis.

171.    The Plaintiffs herein are all properly joined in this action pursuant to § 507.040 R.S. Mo. As they assert a right to relief under the same series of occurrences, and questions of law and fact are common to all Plaintiffs in this action.

## IV.    FACTS

### A.    DESCRIPTION OF ESSURE® AND HOW IT WORKS.

172.    Essure® is a Class III medical device manufactured, designed, formulated, tested, packaged, labeled, produced, constructed, assembled, marketed, advertised, promoted, distributed, and sold by Bayer.[8]

173.    In April 2002, Conceptus, the original manufacturer of Essure®, submitted its Premarket Approval Application to the United States Food and Drug Administration ("FDA") for the Essure® system.  The Essure® system was approved by the FDA on November 4, 2002. At the time of approval, Essure® was manufactured and marketed by Conceptus, Inc. (Bayer acquired Conceptus on June 5, 2013).[9]

---

[8] *See* "Essure Permanent Birth Control: Regulatory History," available online at: http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirth Control/ucm452270.htm

[9] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

174.    Essure® is considered a permanent form of female birth control and therefore is not intended to be removed.[10]

175.    The Essure® system consists of three components: (1) two micro-inserts (coils), (2) a disposable delivery system, and (3) a disposable split introducer. All components are intended for single use.

176.    The Essure® micro-inserts are constructed of a stainless steel inner coil, a dynamic outer coil made from a nickel and titanium alloy, called Nitinol, and a layer of polyethylene terephthalate, or polyester fibers, wound between the inner and outer coils.[11]



177.    Essure®'s disposable delivery system consists of a single handle containing a delivery wire, release catheter, and delivery catheter.  The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery, and release.  Physicians are allowed to visualize this complicated process through the hysteroscopic (camera) equipment provided by

---

[10] *See* "Essure Permanent Birth Control," available online at: http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/default.htm
[11] Essure® Micro-Insert shown below in its "Wound-Down Configuration," attached to release catheter.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Bayer.[12]



178.    During the Essure® system implantation procedure, a physician inserts the Essure®

micro-inserts through the vagina and cervix and into the fallopian tubes via Defendants' disposable

delivery system, using a hysteroscope for guidance.

179.    Once the physician has properly positioned the delivery system in the fallopian

tube, the physician releases the micro-insert.   When released, the micro-insert automatically

expands to the contours of the fallopian tube to anchor into the fallopian tube permanently.[13]



180.    After implantation and over a 3-month period, the polyethylene terephthalate (PET)

fibers on the micro-inserts are supposed to elicit tissue growth around the coils, which causes

bilateral occlusion (blockage) of the fallopian tubes.   The build-up of tissue creates a barrier that

---

[12] Essure® Delivery System is pictured below.
[13] Essure® Micro-insert shown below in its "Expanded Configuration."

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

keeps sperm from reaching the eggs, thus preventing conception.[14]  During the 3-month time period, the woman must use another form of birth control while tissue in-growth occurs.

181.    At 3-months following the procedure, the patient is to receive a "Confirmation Test" to determine whether the Essure® micro-inserts have created a complete occlusion in each fallopian tube.  The Confirmation Test used is a HSG, which is performed by slowly adding contrast dye into the uterus until the uterine cornua are distended.  Bayer has admitted that the HSG test is "often painful" and "is also known to be highly inaccurate, with false-positive results in as many as 40% of HSG-diagnosed cases of proximal tubal occlusion ("PTO").  Various factors are believed to be responsible for these false indications of tubal occlusion, including tubal spasm (a natural function of the tubes) and a build-up in the tube of natural cellular debris and mucous."

### B.    MEDICAL DEVICE REGULATORY FRAMEWORK.

182.    To understand the full scope of the allegations contained in this Petition, a brief general background regarding the applicable FDCA provisions is warranted, as well as an application of those laws to the present case.[15]

183.    The United States Food and Drug Administration ("FDA") is the federal agency of the United States of America that is charged with safeguarding the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq. (2012) (the "FDCA").[16]

---

[14] *See* "Essure Permanent Birth Control," available online at: http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirth Control/default.htm

[15] Plaintiffs are not seeking to enforce these provisions in this action.  Likewise, Plaintiffs are not suing merely because the Bayer Defendants' conduct violates these provisions.  Rather Plaintiffs are alleging that the Bayer Defendants' conduct that violates these federal regulations, as well as the PMA obtained for Essure®, also violates parallel state laws.

[16] The ultimate responsibility for the safety of a medical device rests with the manufacturer.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

184.    In 1976, Congress enacted the Medical Device Amendments of 1976 ("MDA") to extend the coverage of the FDCA to medical devices.  The MDA was passed to protect patients, with the idea that medical devices should be subjected to a rigorous approval process for specific indications before medical device manufacturers are allowed to market them. Therefore, the FDA has authority over drugs and medical devices under the FDCA and the MDA.

185.    The MDA established three regulatory classes for medical devices. The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective according to user risk.  Class I Medical Devices pose the least risk, whereas Class III Medical Devices pose the greatest risk to the users.[17]

186.    Class I Medical Devices are subject to "general controls" such as labeling requirements.[18]  Class II Medical Devices are subject not only to "general controls," but also to "special controls" such as "performance standards, post market surveillance, and patient registries."[19]  If a device cannot be determined to provide a reasonable assurance of safety and effectiveness under Class I or II controls, and is either marketed as a life supporting device or may cause an unreasonable risk of illness or injury, then it rises to the level of a Class III Medical Device.[20]

187.    Class III Medical Devices are the most regulated.  The MDA defines a Class III Medical Device as one that supports or sustains human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury.[21]  Class III Medical Devices pose the greatest risk of death or complications and include most implantable surgical devices.

---

[17] 21 U.S.C. § 360c(a)(1) (2012).
[18] 21 U.S.C. § 360c(a)(1)(A) (2012).
[19] 21 U.S.C. § 360c(a)(1)(B) (2012).
[20] 21 U.S.C. § 360c(a)(1)(C) (2012).
[21] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

188.    Essure® is a Class III device and received FDA's most stringent review prior to marketing, using the Premarket Approval (PMA) process.[22]

### 1. Class III Medical Device Pre-Market Approval Requirements.

189.    Before a company can market a Class III Medical Device, the company is required to submit a premarket application to the FDA supported by data that provides the FDA with a reasonable assurance that the medical device is safe and effective for its intended use.[23] In order to show safety and effectiveness, the applicant is required to submit evidence to the FDA, typically in the form of clinical trial results.

190.    A PMA application must contain certain information, which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue.

191.    Once the FDA has approved a medical device through the PMA application process (such as Essure®) the manufacturer/applicant is required to comply with the standards and conditions set forth in the PMA approval letter.[24]

192.    A Class III device that fails to meet the PMA requirements after marketing is considered to be adulterated under § 501(f) of the Federal Food, Drug and Cosmetic Act ("FDCA") and cannot continue to be marketed.

193.    Essure®'s PMA was accompanied by an attachment setting forth the general "Conditions of Approval." Some of the notable conditions made available to the public via the FDA's website required Defendants to:

        A)    Conduct two Post-Approval Studies to: (1) gather five-year follow up information on the participants in the two premarket clinical trial patient

---

[22] *See* "Essure Permanent Birth Control: Regulatory History," available online at: http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/ucm452270.htm

[23] 21 U.S.C. § 360e(a)(2), § 360e(d)(1)(B)(iii), §360e(d)(2)(A) (2012).

[24] 21 C.F.R. § 814.80 (2012).

cohorts (Phase 2 trial and Pivotal Trial) and (2) evaluate bilateral placement rate for newly trained physicians.[25]

B)    Warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.[26]

C)    Submit a PMA supplement when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification.[27]

D)    Submit post-approval reports required under 21 C.F.R. § 814.84 at intervals of 1 year from the date of approval of the original PMA, which shall include: (1) a bibliography and summary of the following information not previously submitted as part of the PMA and that is known to or reasonably should be known to the applicant: (i) unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices include devices which are the same or substantially similar to the applicant's device); and (ii) reports in the scientific literature concerning the device.[28]

E)    Submit 3 copies of a written report identified, as applicable, as an "Adverse Reaction Report" or "Device Defect Report" within 10 days after the applicant receives or has knowledge of information concerning, in part: (1) any adverse reaction side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and: (i) has not been addressed by the device's labeling; or (ii) has been addressed by the device's labeling but is occurring with unexpected severity or frequency;  (2) any significant chemical, physical or other change or deterioration in the device, or any failure of the device to meet the specifications established in the approved PMA that could not cause or contribute to death or serious injury but are not correctable by adjustments or other maintenance procedures described in the approved labeling.[29]

F)    Report to the FDA whenever they receive or otherwise become aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer or importer: (1) may have caused or contributed to a death or serious injury; or (2) has malfunctioned and such device or similar device marketed by the manufacturer or importer would

---

[25] See "Essure Permanent Birth Control: Regulatory History," available online at:
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/ucm452270.htm
[26] See http://www.accessdata.fda.gov/cdrh_docs/pdf2/P020014a.pdf (The FDA specifically states that it does not evaluate information related to contract liability warranties.)
[27] See http://www.accessdata.fda.gov/cdrh_docs/pdf2/P020014a.pdf
[28] Id.
[29] Id.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

be likely to cause or contribute to a death or serious injury if the malfunction were to recur.[30]

194.    The FDA made clear in the PMA order that "[f]ailure to comply with the conditions of approval invalidates this approval order and commercial distribution of a device that is not in compliance with these conditions is a violation of the act."[31]

### 2. <u>General Reporting Duties to the FDA are Required After the PMA Process.</u>

195.    A medical device manufacturer's obligations do not end with the FDA's Premarket Approval ("PMA") process.

196.    Under federal law a medical device manufacturer has a continuing duty to monitor its product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product.[32]

197.    Accurate reporting of adverse events is essential, as it serves to notify the public that a potential problem with the device exists, and can prompt an informed person or organization to develop a solution.  The FDA and others, including the public, rely upon accurate and timely reporting of adverse events. Post-market surveillance by the FDA is hampered when mandatory reporting terminology is not clear, accurate, and consistent.

198.    Manufacturers are required to report to the FDA "no later than 30 calendar days after the day: the manufacturer receives or otherwise becomes aware of information, from any source, that reasonably suggests that a device" marketed by the manufacturer:

A)      may have caused or contributed to death or serious injury; or

---

[30] *Id.*
[31] *Id.*
[32] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

    B)    has malfunctioned in a manner that would likely "cause or contribute to a death or serious injury" if it recurred.[33]

199.    "Becomes aware" means that an employee of the entity required to report has acquired information that reasonably suggests a reportable adverse event has occurred.[34]  A manufacturer is considered to have become aware of an event when any of its employees becomes aware of a reportable event that is required to be reported within 30 calendar days.[35]  A manufacturer is also considered to have become aware of an event when any of its employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable Medical Device Report ("MDR") event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.[36]

200.    "Serious injury" is defined as an injury or illness that: (1) is life-threatening, (2) results in permanent impairment of a body function or permanent damage to a body structure, or (3) necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.  Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage.[37]

201.    "Malfunction" is defined as a failure of a device to meet its performance specifications or otherwise to perform as intended.[38]  Performance specifications include all claims

---

[33] 21 C.F.R. § 803.50(a); *see also* 21 U.S.C. § 360i(a) (further detailing the post approval reporting requirements applicable to device manufacturers).
[34] *See* 21 C.F.R. § 803.3(b) (2012).
[35] *Id.*
[36] *See* 21 C.F.R. § 803.3(b)(2) (2012).
[37] 21 C.F.R. § 803.3 (2012).
[38] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

made in the labeling for the device.[39]  The intended performance of a device refers to the intended use for which the device is labeled or marketed.[40]

202.    A malfunction should be considered reportable if any one of the following is true:

(1)    the chance of a death or serious injury resulting from a recurrence of the malfunction is not remote;

(2)    the consequences of the malfunction affect the device in a catastrophic manner that may lead to a death or serious injury;

(3)    the malfunction causes the device to fail to perform its essential function and compromises the device's therapeutic, monitoring or diagnostic effectiveness which could cause or contribute to a death or serious injury, or other significant adverse device experiences. The essential function of a device refers not only to the device's labeled use, but for any use widely prescribed within the practice of medicine; or

(4)    the malfunction involves a long-term device implant that would prevent the implant from performing its function.[41]

203.    Reporters do not need to assess the likelihood that a malfunction will recur.  The regulation assumes that if a malfunction has occurred once, the malfunction will recur.[42]

204.    "*Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated*, unless such investigation has already been performed for a similar complaint and another investigation is not necessary."[43]

205.    "When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate."[44]

---

[39] *Id.*
[40] *Id.*
[41] See "Medical Device Reporting For Manufacturers," available online at:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm094529.htm#al
[42] *Id.*
[43] 21 C.F.R. § 820.198(c) (2012) (Emphasis added).
[44] 21 C.F.R § 820.198(b) (2012).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

206.    "Any complaint that represents an event which must be reported to FDA under part 803 of the Medical Device Reporting regulations shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified.  In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) [w]hether the device failed to meet specifications; (2) [w]hether the device was being used for treatment or diagnosis; and (3) [t]he relationship, if any, of the device to the reported incident or adverse event."[45]

207.    Manufacturers, such as Defendants, may receive device-related complaints from information from many different sources, including telephone calls or other verbal communication, FAX transmissions, written correspondence, sales representative reports, service representative reports, scientific articles (literature), internal analyses, and legal documents.[46]

208.    Additionally, manufacturers of Class III Medical Devices are required to make periodic reports to the FDA regarding approved devices, which must include summaries of:

A)    unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant; and

B)    reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.[47]

209.    As presented below, Defendants failed to comply with several of the aforementioned conditions of their PMA Order and federal regulations governing medical device manufacturer reporting requirements.

---

[45] 21 C.F.R. § 820.198(d) (2012).
[46] See "Draft Guidance for Industry and Food and Drug Administration Staff: Medical Device Reporting for Manufacturers" available online at:
Http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm359566.pdf
[47] 21 C.F.R. § 814.84(b)(2) (2012).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 3.  **A Manufacturer Must Follow Current Good Manufacturing Practices.**

210.    Under 21 C.F.R. § 820.1(a) of the Quality System (QS) Regulation for Medical Devices, current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation.  The requirements govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use.  The requirements are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the FDCA.[48]   This part establishes basic requirements applicable to manufacturers of finished medical devices.

211.    21 C.F.R. § 820.5 (2012) "Quality Systems", the FDA regulations state: "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

212.    21 C.F.R. § 820.30(i) (2012): "Design controls" states: "(i) Design changes. Each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation."

213.    21 C.F.R. § 820.30(g) (2012): Design validation means establishing by objective evidence that device specifications conform with user needs and intended use(s) and "shall include testing of production units under actual or simulated use conditions."

214.    21 C.F.R. § 820.22 (2012): "Quality Audit" states, in part: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system."

---

[48] *See* 21 C.F.R. § 820.1(a) (2012).

27

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

215.    21 C.F.R. § 820.160(a) (2012): "Distribution" states, in part: "Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed…" In other words, a manufacturer is only permitted to distribute a medical device that is approved.

216.    21 C.F.R. § 820.170(a) (2012): "Installation" states: "Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures.  Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation.  The manufacturer shall distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device."

217.    21 C.F.R. § 803 (2012), requires that manufacturers must include information that is reasonably known to the manufacturer, timely make Medical Device Reporting ("MDR") submissions, define the procedures for implementing corrective and preventative actions, and review sampling methods for adequacy of their intended use.

218.    21 C.F.R. § 820.100 (2012) "Corrective and Preventive Action" states, in part, that Manufacturers shall: "establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

A)    analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

B)    investigating the cause of nonconformities relating to product, processes, and the quality system;

C)    identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

D)    verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; [and]

E)    implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems."[49]

219.    "The purpose of the corrective and preventive action subsystem is to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[50] Implementing corrective and preventive actions "are essential in dealing effectively with product and quality problems, preventing their recurrence, and preventing or minimizing device failures."[51]

220.    As presented below, Defendants failed to comply with several of the aforementioned conditions of their PMA Order and federal regulations governing medical device manufacturing processes.

### 4.   PMA Supplements For Labeling Changes.

221.    Any changes the manufacturer believes could affect the safety and effectiveness of the device must be submitted via a "PMA Supplement," to the FDA for approval.[52]

222.    While the burden for determining whether a supplement is required is primarily on the PMA holder, changes for which an applicant shall submit a PMA supplement include labeling changes if they affect the safety or effectiveness of the device.[53]

223.    Most changes to the labeling of a device after premarket approval require prior FDA approval, but a manufacturer may place into effect:

---

[49] 21 C.F.R. § 820.100 (2012).
[50] *See* http://www.fda.gov/ICECI/Inspections/InspectionGuides/ucm170612.htm
[51] *Id.*
[52] 21 C.F.R. § 814.39(a) (2012).
[53] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

A)  "[l]abeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association;

B)  [l]abeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device, and;

C)  [l]abeling changes that delete misleading, false, or unsupported indications."[54]

224.    Under those regulations, the manufacturer is required to notify the FDA of "Changes Being Effected" (CBE) to a device's labeling.

### 5.  The FDA Prohibits Misleading Or False Promotion And Marketing.

225.    Under the FDCA and FDA's implementing regulations, labeling, promotional advertisements, and making claims about medical devices are deemed misleading if they fail to disclose certain information about the product's risks.

226.    Generally, to comply with the FDCA and FDA's implementing regulations, and therefore the PMA, such promotional pieces: (a) Cannot be false or misleading in any particular;[55] and (b) Must reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in the promotional piece.[56]

227.    The FDA regulates the manufacture, sale, and distribution of medical devices in the United States under the authority of the FDCA.  This authority includes oversight of labeling and advertising for all medical devices.

228.    A medical device shall be deemed to be misbranded if its labeling is false or misleading in any particular.[57]  Labeling or advertising may be considered misleading if it fails to

---

[54] *Id.*
[55] 21 U.S.C. §352(a) (2012).
[56] 21 U.S.C. § 321(n) (2012); 21 C.F.R. § 1.21(2012).
[57] 21 U.S.C. § 352(a) (2012).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in a promotional piece.[58]

229.    Defendant's PMA approval letter for Essure® specifically states that the FDA "[d]oes not evaluate information related to contract liability warranties, however [Defendant] should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."[59]

### 6.   Violations of Federal Statutes or FDA Regulations Void the Federal Preemption Defense.

230.    There is a presumption against federal preemption of state laws that operate in traditional state domains.[60] "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens.  States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."[61]

231.    "Nothing in § 360k denies [the states] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."[62]

232.    As the Supreme Court held in *Riegel v. Medtronic, Inc.*, "State requirements are preempted under the MDA only to the extent that they are "different from, or in addition to" the requirements imposed by federal law. Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements."[63]

---

[58] *See* 21 U.S.C. § 321(n) (2012).
[59] *See* http://www.accessdata.fda.gov/cdrh_docs/pdf2/P020014a.pdf
[60] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).
[61] *Id.* at 475.
[62] *Id.* at 495.
[63] *Riegel v. Medtronic*, 552 U.S. 312, 330 (2008) (internal citations omitted).

233.    "The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of federal law that hurt patients is, to say the least, counterintuitive."[64]

234.    "Medical device manufacturers who subject their Class III devices to the rigorous premarket approval process are protected by federal law from civil liability so long as they comply with federal law.  That protection does not apply where the patient can prove that she was hurt by the manufacturer's violation of federal law."[65]

235.    Claims for failure to warn are not preempted.  "Failure to warn claims are neither expressly nor impliedly preempted by the MDA to the extent that this claim is premised on [the defendant manufacturer]'s violation of FDA regulations with respect to reporting [adverse outcomes] caused by the device."[66]

236.    In *Stengel v. Medtronic, Inc.*, the Supreme Court issued an Order inviting the Solicitor General to submit an Amicus Brief expressing the views of the United States. According to the Solicitor General, only device-specific federal requirements have preemptive force while "by contrast FDA's general manufacturing and labeling regulations do not have preemptive force."[67]

237.    The Solicitor General stated that "federal requirement[s] are applicable to the device within the meaning of Section 360k(a)(1) only when they are applicable to the device in question and, in accordance with FDA regulations, only when they are specific counterpart regulations or specific to a particular device."[68]

---

[64] *Bausch v. Stryker Corp.*, 630 F.3d 546, 549-550 (7th Cir. 2010). *See also, Bausch* quoted with approval by the 9th Circuit in *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1232 (9th Cir. 2013) (en banc).
[65] *Id.* at 550 (italicized emphasis original).
[66] *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 776 (5th Cir. 2011).
[67] U.S. Amicus Br. at 9, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013).
[68] *Id.* at 8-9 (internal citations omitted).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

238.    This reasoning led the Solicitor General to the conclusion that "[i]f a state requirement were preempted absent a specific federal requirement that reflects FDA's weighing of competing considerations on the same subject and specific to the device, the MDA would have the ironic effect of providing less public protection from unsafe and ineffective medical devices than pre-MDA law.[69]

239.    In *Stengel*, and similarly in this Petition, the alleged conduct of the petitioner was governed by general manufacturing and labeling regulations applicable to all medical devices and not the device's pre-market approval.

240.    It is the opinion of the Solicitor General that respondents' failure to warn claims escaped express preemption because "such a claim implicates no preemptive device-specific federal requirement."[70]

241.    In summary, while manufacturers who comply with federal law may be entitled to certain protections, those who violate federal law are not entitled to preemption of state laws/immunity for their tortious conduct and in fact are liable for their conduct that violates federal law.

### C.    CONCEPTUS DEPENDED SOLELY ON ESSURE® SALES TO FIX THEIR PROBLEMS WITH MASSIVE DEBT AND ACHIEVE PROFITABILITY.

242.    Conceptus accumulated hundreds of millions of dollars in debt throughout its existence, never achieved profitability, and looked to sales of the Essure® product as the sole solution.

243.    By the end of 2007, Conceptus had an accumulated deficit of $235.2 million.

---

[69] *Id.* at 11 (internal citations omitted).
[70] *Id.* at 7 (internal citations omitted).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

244. By the end of 2012, after all of its concerted sales efforts, Conceptus still had an accumulated deficit of $154.9 million.[71]

245. By that time, Conceptus had been in a cumulative net loss position for twenty years, since its inception.[72]

246. Conceptus stated that it would remain in an accumulated deficit position unless Essure® sales grew large enough to offset its expenses.[73]

247. Beginning in 1998, Conceptus focused solely on the design, development, and clinical testing of Essure®.

248. By 2002, Conceptus' revenue was derived almost entirely from the sale of Essure® to physicians.

249. By 2007, Essure® was Conceptus' only commercial product. Conceptus was entirely dependent on sales of the Essure® device to survive, as these sales accounted for all of the company's revenues.[74]

250. That year, Conceptus stated that if the Essure® device did not achieve acceptance among physicians and patients, the company would fail to sustain profitability.[75]

**D. MANIPULATING SAFETY INFORMATION ALLOWED CONCEPTUS TO BECOME A VIABLE COMPANY.**

251. In order to profit from Essure® and survive, Conceptus needed to convince physicians and women that the device was safe.

252. Because Essure® was a wholly unique and new form of birth control, Conceptus did not compete with other similar products for share of an existing market.

[71] *See* http://www.sec.gov/Archives/edgar/data/896778/000119312513098624/d444338d10k.htm#toc
[72] *See* http://www.sec.gov/Archives/edgar/data/896778/000119312513098624/d444338d10k.htm#toc
[73] *Id.*
[74] *See* http://www.sec.gov/Archives/edgar/data/896778/000110465907007326/a07-3143_18k.htm
[75] *See* http://www.wikinvest.com/stock/Conceptus_(CPTS)/Filing/10-K/2008/F2331313

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

253. Instead, Conceptus needed to create a new market for its product.

254. Physicians and women needed to accept the safety of Essure® before there could be a demand for it.

255. Therefore, apprehensions about the device's safety have always been the biggest barrier to its success.

256. In 2007, Conceptus stated that if the Essure® system did not achieve acceptance among physicians and patients, the company would fail to sustain profitability.[76]

257. Conceptus committed all of its resources to persuading physicians and patients to accept the Essure® device as a safe method of birth control.

258. Throughout its entire history, Conceptus marketed Essure® aggressively through the use of public relations and targeted advertising in order to create acceptance of the device among general practitioners, women and the broader medical community.[77]

259. In April of 2003, Conceptus introduced Essure® at the annual conference of the American College of Obstetricians and Gynecologists and offered two presentations as well as a Continuing Medical Education accredited symposium with Essure® as the main topic.[78]

260. In June of 2003, Conceptus sent direct mail to 500,000 women, not physicians, in the Atlanta and Chicago areas.

261. The direct mail campaign encouraged those women to contact Conceptus' call centers, who then referred the women to a physician offering Essure® in her area.[79]

262. Conceptus also ran numerous regional advertisements in a variety of magazines, such as *Parents* and *Self*.[80]

---

[76] *See* http://www.wikinvest.com/stock/Conceptus_(CPTS)/Filing/10-K/2008/F2331313
[77] *See* http://www.sec.gov/Archives/edgar/data/896778/000089161804000719/f96941e10vk.htm
[78] *Id.*
[79] *Id.*
[80] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

263.    Conceptus continuously fought to achieve market acceptance for Essure®.

264.    In 2008, Conceptus targeted women directly again in a marketing campaign that incorporated print media, radio and television advertising.  The company claimed that the campaign was meant to drive patient awareness and increase physician office utilization.[81]

265.    Conceptus also employed a robust sales force whose primary goals were to persuade a growing base of physicians to offer the device.[82]

266.    Conceptus repeatedly treated its warning label as a tool to promote market acceptance and manipulated it to achieve those goals.

267.    In 2008, Conceptus stated that it intended to make labeling improvements to Essure® in order to increase the adoption of the Essure® procedure.[83]

268.    At one point, Conceptus' CEO described certain adequate warning information as merely a barrier to more success in sales.

269.    Despite mounting complaints of allergic reactions to Essure®, in 2011, Conceptus drastically altered the warning label and removed sections that encouraged women to confirm their tolerance to nickel by use of a skin test.

270.    Conceptus did not change anything about the device itself or its nickel contents.

271.    Afterward, the president and CEO of Conceptus stated that the label change would strengthen the company's standing in the permanent birth control market by diminishing Essure®'s biggest competitive disadvantage.

272.    Conceptus then reaffirmed its ultimate goal of gaining market acceptance by stating its intentions to aggressively present the label change to the OB/GYN community. The company

---

[81] *See* http://www.wikinvest.com/stock/Conceptus_(CPTS)/Filing/10-K/2008/F2331313
[82] *See* http://www.sec.gov/Archives/edgar/data/896778/000119312513098624/d444338d10k.htm
[83] *See* http://www.wikinvest.com/stock/Conceptus_(CPTS)/Filing/10-K/2008/F2331313

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

planned to target those physicians who were promoting other methods of birth control because of potential safety issues with the Essure® device.

### E.    CONCEPTUS AND BAYER CONTINUOUSLY SPREAD FALSE AND MISLEADING INFORMATION TO ALTER PERCEPTIONS OF ESSURE®'S SAFETY RISKS.

273.    Conceptus and Bayer advertised, promoted and marketed on its websites, and in its print and/or video advertisements, brochures and fact sheets, the following representations about Essure®:

A)    The Essure® patient brochure stated that Essure® was the "only FDA approved female sterilization procedure to have zero pregnancies in the clinical trials." However, there were actually four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience. Between 1997 and 2005, there were 64 pregnancies reported to Defendants. Additionally, there were 631 reports of pregnancies according to the FDA as of December 31, 2015. Furthermore, a recent study indicates that women implanted with Essure® have a *ten times* greater risk of pregnancy after one year than those who use laparoscopic sterilization. At ten years, the risk of pregnancy is almost four times greater. Defendants concealed this information from Plaintiffs and Plaintiffs' physicians, yet promoted Essure® as a more effective form of permanent sterilization than a tubal ligation.

B)    The Essure® website, print advertising, and patient brochure describes Essure® as "worry free," and as a "simple procedure performed in your doctor's office" that takes "less than 10 minutes" and "requires no downtime for recovery" and that "eliminates the risks, discomfort, and recovery time associated with surgical procedures." However, Defendants actively concealed and failed to report complaints of perforations and pain, which occurred as a result of the Essure® procedure. Additionally, Essure® is not worry free because there is an increased risk that the Essure® implants will cause women serious, life-altering complications including but not limited to debilitating pain, heavy bleeding necessitating medication and/or additional surgical intervention, allergic reactions (including but not limited to rashes, itching, bloating, swelling, headaches, tooth- loss, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications.

C)    The Essure® website, print advertising, and patient brochure stated, "the Essure® inserts stay secure, forming a long protective barrier against pregnancy. They also remain visible outside your tubes, so your doctor can

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

confirm that they're properly in place." However, the micro-inserts do not
necessarily remain securely in the fallopian tubes and can migrate and be
expelled by the body, as evidenced by the over 850 reports of device
migration as of December 31, 2015.[84]

D)      The Essure® website, print advertising, and patient brochure stated, "the
Essure® inserts are made from the same trusted, silicone free material used
in heart stents." However, the micro-inserts are not made from the same
material as heart stents, which do not elicit tissue growth. The micro-inserts
are made of PET fibers, which trigger inflammation and scar tissue growth.
PET fibers degrade and leach carcinogens when placed in temperatures over
65 degrees, and the human body stays at about 98 degrees. As such, PET
fibers are not designed or manufactured for use in human implantation.
However, the PET fibers are made of the same materials as the PVT
material in some vaginal meshes, which have a high rate of expulsion.

E)      The Essure® website, print advertising, and patient brochure stated,
"Essure® eliminates the risks, discomfort, and recovery time associated with
surgical procedures." However, Essure® does not eliminate the risks,
discomfort, and recovery time associated with surgical procedures (i.e. tubal
ligations) because many women who undergo the Essure® procedure,
including Plaintiffs, have never and will never fully recover from the
Essure® implant procedure, which has caused them serious, life-altering
complications including but not limited to debilitating pain, heavy bleeding
necessitating medication and/or additional surgical procedures, allergic
reactions (including but not limited to rashes, itching, bloating, swelling,
headaches, tooth-loss, and hair loss), autoimmune disorders, dyspareunia,
hysterectomy, and other complications.

F)      The Essure® website, print advertising, and patient brochure stated,
"Essure® is the most effective permanent birth control available, even more
effective than tying your tubes or a vasectomy" or words to that effect. Yet,
Defendants' SEC Form 10-K filing shows that Defendants never did a
comparison to a vasectomy or tubal ligation. Specifically, Defendants stated
they "did not conduct a clinical trial to compare the Essure® procedure to
laparoscopic tubal ligation."[85]

274.    Plaintiffs and Plaintiffs' physicians relied on these representations by Conceptus

and Bayer in recommending and undergoing the Essure® procedure.

---

[84] *See* http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/Essure
PermanentBirthControl/ucm452254.htm
[85] Conceptus, Inc., Annual Report (Form 10-k) (Mar. 15, 2004).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

275.    Conceptus and Bayer advertised, promoted and marketed on its websites, in its print and/or video advertisements, brochures, and fact sheets the following about physicians performing the Essure® procedure, while failing to report the actual material facts:

A)    "[p]hysicians must be signed-off to perform Essure® procedure." However, Defendants failed to adequately train the implanting physician and "signed off" on implanting physicians who did not have the requisite training.

B)    "An Essure® trained doctor inserts spring-like coils, called micro-inserts." However, implanting physicians who implanted the devices were not adequately trained.

C)    "The Essure® training program is a comprehensive course designed to provide information and skills necessary to select appropriate patients, perform competent procedures and manage technical issues related to the placement of Essure® micro- inserts for permanent birth control." However, Defendants failed to adequately train the implanting physicians.

D)    "[i]n order to be trained in Essure® you must be a skilled operative hysteroscopist. You will find the procedure easier to learn if you are already proficient in operative hysteroscopy and management of the awake patient. If your skills are minimal or out of date, you should attend a hysteroscopy course before learning Essure®." However, Defendants "signed off" on physicians who were not skilled operative hysteroscopists, in order to monopolize and capture the market, including implanting physicians.

E)    "[i]n order to be identified as a qualified Essure® physician, a minimum of one Essure® procedure must be performed every 6–8 weeks." However, Defendants "signed off" on "Essure® physicians" who did not perform the procedure every 6–8 weeks.

F)    "[t]he PET fibers are what caused the tissue growth," and Essure® "works with your body to create a natural barrier against pregnancy." However, during a PMA meeting with the FDA in 2002, Defendants represented that the trauma caused by the expanding coil hitting the fallopian tubes is what causes the inflammatory response of the tissue.

276.    Plaintiffs and Plaintiffs' implanting physicians relied on these representations by Conceptus and Bayer in recommending and undergoing the Essure® procedure.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

F.    **CONCEPTUS AND BAYER HAVE ALWAYS KNOWN THAT ESSURE® IS DANGEROUS.**

1.    **Conceptus Was Charged With Early Regulatory Violations.**

277.    From the beginning of the sale of the Essure® device, Conceptus has repeatedly been cited by regulatory authorities for continuous violations that impacted patient safety.

278.    In July of 2002, the FDA conducted a Directed PMA Data Inspection/Audit of Conceptus. At the conclusion of the inspection, the FDA inspector cited Conceptus for failing to report adverse events identified by patients during unscheduled visits in the data submitted for the Essure® PMA.

279.    In June and July of 2003, the FDA conducted a Post Market Approval Inspection of Conceptus.  The FDA cited Conceptus for failing to adequately analyze all quality data sources to identify existing and potential causes of non-conforming product and other quality problems, and failing to follow procedures for the control of products that do not conform to specifications.

280.    In June of 2008, the California Department of Public Health, Medical Device Safety Section ("CDPH"), conducted an inspection of Conceptus' location in Mountain View, California. The CDPH issued a Notice of Violation to Conceptus for failing to obtain a valid license to manufacture medical devices and failing to maintain procedure for inventory transfer.

2.    **Conceptus Knew About A Myriad Of Manufacturing Problems.**

281.    Subsequent to obtaining its PMA, Conceptus became aware of potential quality and failure modes associated with the Essure® devices.  For example, Conceptus became aware that the following failures could occur with the device and lead to adverse consequences for the patient:

A)    the stainless steel used in the device could become unpassivated, which can cause the device to rust;

B)    the nitinol could have a nickel rich oxide which the body attacks;

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

C)    the no-lead solder could in fact have trace lead in it;

D)    the Galvanic action between the metals used to manufacture Essure®, which causes the encapsulation of the product within the fallopian tubes, could be a continuous irritant to some patients;

E)    the nitinol in the device can degrade due to High Nickel Ion release, increasing the toxicity of the product for patients;

F)    latent manufacturing defects such as cracks, scratches, and other disruption of the smooth surface of the metal coil, may have existed in the finished product, causing excess nickel to leach into the surrounding tissues after implantation;

G)    PET fibers degrade at 65 degrees, therefore considerable degradation is expected at 98 degrees in the human body and degradation products of the PET used in the implant could be toxic to patients, inciting both chronic inflammation and possible autoimmune issues;

H)    the mucosal immune response to nickel is different than the immune response in non-mucosal areas of the body;

I)    there was an inadequate solder joint between the inner and outer coils of the micro-insert which could cause the micro-insert to fracture/break apart, and which Bayer admits is or could be a reason for device breakage, and;

J)    the central axis was not fully adhered to the spring which could cause the micro- insert to fracture/break apart, and which Bayer admits is or could be a reason for device breakage.

**3.  Conceptus Concealed Thousands of Migration and Perforation Reports From the FDA.**

282.    Conceptus knew of thousands of instances where the Essure® device had migrated in a woman or perforated a woman's organs, failed to report all of them, and then fought the FDA on its reporting obligations once the agency discovered the problem.

283.    In the years before 2011, Conceptus had accumulated thousands of reports from women that their devices had migrated throughout their bodies or punctured one of their organs.

284.    To protect the marketability of the device, Conceptus chose not to report the vast majority of them.

41

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

285. Then, in December of 2010 the FDA conducted a "for cause" inspection of Conceptus and its reporting procedures.

286. At the conclusion of the inspection, the FDA inspector cited Conceptus for four conditions which he found objectionable and/or violations of the FDCA and federal regulations.

287. Three of the four objectionable conditions pertained to Medical Device Reporting deficiencies and/or violations and included:

> A)   Conceptus' failure to submit Medical Device Reporting ("MDR") determinations to the FDA within 30 days for reports of a serious injury involving the Essure® device including 2 (two) reports of bowel perforation, and 1 (one) report of pain and the Essure® device breaking into pieces immediately following implant;

> B)   Conceptus' failure to submit MDR's to the FDA within 30 days for reports of a serious injury involving the Essure® device including, but not limited to 5 (five) reports of the Essure® coils perforating the fallopian tubes and penetrating the peritoneal cavity; and

> C)   Conceptus' failure to include a failure mode for perforation itself and for the Essure® micro-inserts migrating into the peritoneal cavity in their latest Risk Analysis Design FMEA for Essure®, despite having documented at least 508 complaints of perforation between January 1, 2009 and December 8, 2010, and at least 177 complaints of perforation where the micro-insert was found in the peritoneal cavity between January 1, 2009 and January 4, 2011.

288. Specifically, the FDA inspector discovered that Conceptus was not reporting complaints of Essure® coils being seen inside the patients' abdominal cavity and not opening a corrective and preventive action ("CAPA") when they became aware of these complaints.

289. The FDA discovered that Conceptus submitted MDRs and reported complaints of the coils migrating into the peritoneal or abdominal cavity only if the patient was complaining of pain and a second procedure was required to remove the device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

290.    Conceptus concealed such complaints if the coil was subsequently removed during a laparoscopic tubal ligation surgery that was performed due to a failure of occlusion of the fallopian tubes.

291.    The FDA inspector demanded that Conceptus report these incidents because a migrated coil was inherently likely to lead to an injury.  Conceptus' own complaint files contained hundreds of instances where this condition led to a serious complication.

292.    Conceptus did not agree with FDA's position that physicians and women had a right to know about all dangerous events associated with the device.

293.    Instead, Conceptus officials attempted to persuade the FDA inspector that they should not be forced to report such adverse events and make them publicly available.

294.    Conceptus officials argued that a coil falling out of the fallopian tube was not technically a "malfunction" of the device, and therefore it did not need to be reported.

295.    The FDA inspector explained that because the coil was designed to remain inside the fallopian tube, a coil that migrates out of the fallopian tube represents a situation where the Essure® device is not functioning as it was designed and intended.

296.    There was no medical reason to withhold this information from the public. Conceptus concealed these reports specifically to mislead physicians and women about the safety of the Essure® device.

297.    The size and scope of Conceptus' failure to report adverse events up until that time was enormous.

298.    Just between January 1, 2008 and December 6, 2010, Conceptus received at least 16,581 complaints relating to Essure®.

299.    Of these 16,581 complaints, 16,399 were never reported to the FDA.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

300.    Conceptus had compiled a spreadsheet of 2,752 complaints about Essure® received from July 20, 2010 through December 10, 2010.  Not a single one of these that indicated perforation of a patient's organs was reported to the FDA.

301.    In fact, during that time period Conceptus reported only 182 complaints total to the FDA.[86]

302.    At the close of the inspection on January 6, 2011, the FDA inspector made it abundantly clear to Conceptus officials that an abdominally located coil was the precursor to becoming symptomatic in all cases in which an intra-abdominal coil had to be removed surgically.

303.    Nonetheless, Conceptus continued to conceal complaints if a patient had a coil in her peritoneal cavity but was asymptomatic.

304.    Conceptus revealed in this inspection that it had no intention of keeping physicians and women fully informed.

305.    Conceptus' sole purpose was to maintain the marketability of its device by concealing as much adverse safety information related to its device as it could.

306.    Conceptus' fraudulent scheme to conceal reports of device migration and perforation was undertaken in conscious disregard of the health and safety of all Essure® patients, and in violation of federal law, the PMA, and parallel state law.

307.    Thousands of vulnerable and unsuspecting patients, including the Plaintiffs herein, have been seriously and/or permanently injured as a result of Conceptus' wrongful, illegal and immoral actions.

**4.  <u>Conceptus Demonstrated A Continuing Pattern of Concealing Safety Complaints.</u>**

308.    In 2013, several years after being cited by the FDA for withholding safety

---

[86] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/results.cfm

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

information, the FDA discovered again that Conceptus had been concealing thousands of complaints from the agency and the public.

309.    Between May and June of 2013, the FDA conducted another inspection of Conceptus' Mountain View, CA facility.  This inspection included an evaluation of Conceptus' complaint handling and adverse event reporting practices.

310.    The FDA's review revealed 16,047 complaints Conceptus had received regarding Essure® between January 2011 and the date of the inspection.

311.    Of these 16,047 complaints, Conceptus withheld 15,712 from the FDA, ensuring that they would not be made public.[87]

312.    Out of those 16,047, the FDA inspector reviewed 18 random complaints that contained the key words "peritoneal" or "abdominal" with "pain" or "pregnancy" and discovered that none of the complaints stating that one or more of the coils were imaged outside the fallopian tubes were reported to the FDA if the patient had not reported pain at last contact.

313.    Conceptus did not provide an explanation as to why the patient had stopped reporting pain, such as possible removal of the device.

314.    Conceptus withheld thousands of complaints of side effects from the FDA for years because it needed to protect the perception that its device was safe.

315.    If Essure® was ever perceived as unsafe, or not as safe as alternative birth control methods, then the device would not have achieved acceptance in the marketplace and the company would fail.

---

[87] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/results.cfm

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**5. Trends in FDA Reports Prove That Conceptus and Bayer Withheld An Enormous Amount of Safety Information.**

316.    Alarming trends in the FDA's database exist because Conceptus and Bayer chose not to report adverse events to the FDA as required by federal law.

317.    The FDA did not receive accurate numbers of safety reports concerning Essure® until Conceptus and Bayer no longer controlled the information.

318.    The FDA learned of an overwhelming number of Essure® adverse events only after women were no longer forced to report their problems directly to Conceptus or Bayer.

319.    Between Essure®'s inception in 2002 and through to 2015, the FDA received approximately 9,900 medical device reports (MDRs) related to safety problems with the device.[88]

320.    Of those 9,900 MDRs, only 943 were made between 2002 and October 25, 2013. The FDA received the remaining 8,950 reports between October 26, 2013 and December 31, 2015.[89]

321.    Therefore, approximately 90% of all Essure® related adverse events reported through the year 2015 were reported after late October 2013.[90]

322.    The rate at which women suffered adverse events associated with the Essure® device did not change. The device itself did not change. Only the reporting mechanisms changed.

323.    Up until late October 2013, women adversely affected by Essure® had no convenient method of reporting their problems directly to the FDA. These women were thus forced to report their problems solely to Conceptus or Bayer.

---

[88] *See* http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/Essure PermanentBirthControl/ucm452254.htm
[89] *See* http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/Essure PermanentBirthControl/ucm452254.htm
[90] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

324.    Around that time, the FDA introduced a new method of reporting adverse events named "MedWatcher."

325.    MedWatcher is an app that allows individuals to submit their reports of serious medical device problems directly to the FDA through the convenient use of their smart phone or tablet, thus disposing of the need to contact a device manufacturer first.[91]

326.    Authors studying Essure® adverse event reporting recently concluded that the ability for women to report Essure® related complaints via the MedWatcher app resulted in a massive increase in Essure® related MDRs reported to the FDA since October 26, 2013.[92]

327.    The study, entitled *Increasing Patient Engagement in Pharmacovigilance Through Online Community Outreach and Mobile Reporting Applications: An Analysis of Adverse Event Reporting for the Essure Device in the US*, examined voluntary patient adverse event reporting directly to the FDA using the FDA's new MedWatcher app.[93]

328.    The study began by encouraging women in an Essure® support group who had been adversely affected by the device to file a report using MedWatcher.[94]

329.    The Essure® support group was a Facebook group named "Essure Problems" consisting of women who underwent the Essure® procedure and began experiencing severe pain and problems related to the device. Currently, the group has over 32,000 members.[95]

---

[91] *See* http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/ucm385880.htm
[92] *Id.*
[93] *See* "Increasing Patient Engagement in Pharmacovigilance Through Online Community Outreach and Mobile Reporting Applications: An Analysis of Adverse Event Reporting for the Essure Device in the US" available online at: http://link.springer.com/article/10.1007/s40290-015-0106-6/fulltext.html
[94] *See* "Increasing Patient Engagement in Pharmacovigilance Through Online Community Outreach and Mobile Reporting Applications: An Analysis of Adverse Event Reporting for the Essure Device in the US" available online at: http://link.springer.com/article/10.1007/s40290-015-0106-6/fulltext.html
[95] *See* https://www.facebook.com/groups/Essureproblems/

330.    In October 2013, a representative from the MedWatcher app development team joined the "Essure Problems" group to provide technical support to patients filing adverse event reports via the MedWatcher app.

331.    This change in reporting mechanisms directly caused the explosion of adverse event reports that became public after October of 2013.

332.    According to "Essure Problems" group administrators, many women with Essure® reported these same complaints directly to Conceptus for many years prior to October of 2013.

333.    Those women were never contacted for follow-up investigations and Conceptus and Bayer chose not to report the vast majority of those complaints to the FDA.

334.    As a result, while Conceptus maintained growing complaint files detailing thousands of problems experienced with the device, the FDA and the public only became aware of a fraction of them.

335.    Conceptus and Bayer successfully concealed thousands of reports of adverse events associated with Essure® from the FDA and the public because they controlled the information for years.

### 6.  Bayer Misled the FDA About Rates of Essure® Breaking.

336.    Despite knowing about hundreds of instances of the Essure® device breaking, Bayer has repeatedly reported to the FDA that only single cases exist.

337.    Between May 29, 2014 and January 20, 2016, Bayer received at least 462 complaints that a patient's Essure® coils had broken apart.

338.    When forwarding the first few complaints, Bayer notified the FDA that "single cases have been reported of Essure® breakage."

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

339.    However, as reports of breakage continued to mount, Bayer continued to submit to the FDA that only single cases of breakage had been reported.

340.    After 100 individual reports of breakage accumulated, Bayer submitted to the FDA that only single cases of breakage had been reported.

341.    After 200 individual reports of breakage accumulated, Bayer submitted to the FDA that only single cases of breakage had been reported.

342.    After 462 individual reports of breakage accumulated, Bayer submitted to the FDA that only single cases of breakage had been reported.

343.    In fact every single report of device fracture or breakage included a statement by Bayer to the FDA stating that "single cases have been reported of Essure® breakage."

344.    Bayer did this because it knew that the FDA would not discover the trend in the data on its own.

345.    Bayer knows that multiple FDA analysts read the individual MDRs that it submits, and they do not necessarily communicate with each other or compare data.

346.    Therefore, when multiple FDA analysts read separate reports that each state "single cases have been reported of Essure® breakage," it causes each individual analyst to falsely believe that instances of device breakage are extremely rare.

347.    Bayer's MDRs regarding device breakage were inaccurate, misleading, and not in compliance with MDR reporting requirements.

348.    Bayer did this to withhold knowledge from the public and to prevent the FDA from requiring it to make changes to its label concerning device breakage, a condition with potentially life-threatening consequences.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

7. **Now The Medical Community Is Discovering What Conceptus And Bayer Knew For Years: Essure® Is Dangerous.**

a. **Women with Essure® Are Ten Times More Likely to Undergo Subsequent Surgical Re-Operation than Women Who Undergo a Tubal Ligation**

349.   The Essure® device leads to far more complications than alternative permanent birth control methods. It is significantly less safe than the traditional alternative method of undergoing a tubal ligation.

350.   On October 13, 2015, the British Medical Journal ("BMJ") published a study entitled *Safety and efficacy of hysteroscopic sterilization compared with laparoscopic sterilization: an observational cohort study,* in which Dr. Art Sedrakyan of Weill Cornell Medicine in New York and his colleagues analyzed data from women who had received either the Essure® implant or undergone a traditional tubal ligation between 2005 and 2013 in New York State.[96]

351.   The data included 8,048 women who underwent the Essure® procedure and 44,278 women who had undergone a tubal ligation.

352.   This study used data collected from the New York State Department of Health Statewide Planning and Research Cooperative System, which is a database that collects patient and treatment information for every hospital discharge, outpatient service, ambulatory surgery, and emergency department records in New York State.[97]

353.   This study is the first large comparative cohort study ever to have been conducted to compare the efficacy and safety of the implant based hysteroscopic procedure with the traditional laparoscopic procedure.[98] It is the largest collection of data related to Essure® that was not controlled by Conceptus or Bayer.

---

[96] *See* "Safety and efficacy of hysteroscopic sterilization compared with laparoscopic sterilization: an observational cohort study" available online at: http://www.bmj.com/content/351/bmj.h5162
[97] *Id.*
[98] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

354.    The study found that women who used Essure® as a means for permanent sterilization were ten times more likely to undergo re-operation due to device related complications and injuries compared to women who underwent tubal ligation.[99]

355.    The study reported that although Essure® is advertised as a surgery-free alternative to the minimally invasive laparoscopic surgery, women who had the Essure® implant often required a subsequent major surgery due to complications resulting from Essure®, and at far greater rates than the traditional option.[100]

356.    The authors also analyzed the Essure® MAUDE data and indicated that most of the adverse events reported by patients with Essure® were for injuries that would require and did require a subsequent surgical operation.[101]  Such injuries included pelvic pain, hemorrhage, and device migration or incompatibility.

357.    Reports of chronic pain, hemorrhage, and device migration, which necessitate surgical intervention, are indeed serious injuries and are therefore reportable events.[102]

358.    Conceptus and Bayer did not submit any MDR reportable events derived from this study to the FDA.

359.    Bayer still falsely claims to this day that Essure® is safer than undergoing tubal ligation.

### b.    Essure® Is Not As Effective As Alternative Methods

360.    Women with Essure® are more likely to get pregnant than women who undergo a tubal ligation.

---

[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] 21 C.F.R. § 803.3 (2012).

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

361.    In March of 2014, the online medical journal <u>Conception</u> published a study entitled *Probability of pregnancy after sterilization: a comparison of hysteroscopic versus laparoscopic sterilization*, which compared the expected probability of pregnancy after hysteroscopic sterilization (Essure®) with laparoscopic sterilization based on available data using decision analysis.[103]

362.    The study analysis took into account uncertainties in successful placement of coils, return for follow-up confirmation testing and successful blockage of tubes. Using real-life circumstances, the authors concluded that at all points in time after the sterilization procedure, the initial and cumulative risk of pregnancy after sterilization is higher in women who undergo hysteroscopic sterilization than either laparoscopic band or bipolar sterilization.[104]

363.    The study found that the expected pregnancy rates per 1000 women at 1 year are 57, 7 and 3 for hysteroscopic sterilization, laparoscopic silicone rubber band application and laparoscopic bipolar coagulation, respectively.  At 10 years, the cumulative pregnancy rates per 1000 women are 96, 24 and 30, respectively.[105]

364.    This means that the probability of getting pregnant at 1 year and over 10 years is higher in women who receive Essure® as compared to laparoscopic sterilization.[106]

365.    Essure® sterilization failure rates after typical use in the community by a variety of physicians on a variety of patients are significantly higher than the failure rates reported to the FDA by the manufacturer in its own highly controlled study.

---

[103] *See* "Probability of pregnancy after sterilization: a comparison of hysteroscopic versus laparoscopic sterilization" available at:  http://www.contraceptionjournal.org/pb/assets/raw/Health%20Advance/_journals/contra/CON-8309-FINAL.pdf
[104] *Id.*
[105] *Id.*
[106] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

366.    However, Bayer still falsely claims to this day that Essure® is more effective than undergoing tubal ligation.

### c.    Leading Practitioners Have Criticized Conceptus for Its Lack of Transparency

367.    Experts in the field of gynecology disapprove of Conceptus' and Bayer's failure to provide information to the public.

368.    On September 23, 2015, the New England Journal of Medicine published an article entitled *Revisiting Essure – Toward Safe and Effective Sterilization*. Authored by several prominent gynecologists, the article expressed concerns about the inadequacy of Essure®'s premarketing and postmarketing studies.[107]

369.    More specifically, the authors identified problems relative to incomplete follow-up with patients and biased results.

370.    Ultimately, the authors concluded that many of the Essure® adverse events and safety concerns, along with problems with the device's effectiveness, might have been detected sooner or avoided altogether if there had been higher-quality premarketing and postmarketing evaluations and more timely and transparent dissemination of study results by the manufacturers.[108]

371.    Coinciding with other developing understandings, the article notes that evidence suggests that Essure® is neither as effective nor as safe as the premarketing-approval evaluation indicated.[109]

---

[107] *See* "Revisiting Essure – Toward Safe and Effective Sterilization" available online at: http://www.nejm.org/doi/full/10.1056/NEJMp1510514
[108] *Id.*
[109] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**8.  The Revelation Of Safety Information In The Public Leads To The Inevitable: FDA Mandates Major Changes To Essure® Sales.**

372.    As thousands of reports about Essure®'s true safety risks became public recently, the FDA forced drastic changes to the product's warning label and took aggressive measures to ensure that patients are fully informed of the risks.

373.    Patients and physicians have reported to the FDA upwards of 9,000 adverse events related to Essure® since October 2013.  This significant increase prompted the FDA to convene a meeting of the Obstetrics and Gynecology Devices Panel of the Medical Devices Advisory Committee to examine safety concerns about Essure® raised by patients and cited in MDRs.

374.    The meeting was held on September 24, 2015 and the FDA heard available scientific data pertaining to Essure®'s safety and effectiveness, expert scientific and clinical opinions on the risks and benefits of Essure®, and concerns and experiences of women implanted with the device.

375.    On February 29, 2016 the FDA announced that it would force a major change to the Essure® warning label and also require all women considering Essure® to fill out a "Patient Decision Checklist" to ensure that they are fully informed of the true risks.[110]

376.    The FDA stated that such warnings are needed for a woman to understand the risks as compared to alternative options and then decide whether the product is right for her.[111]

377.    The new warning and checklist were approved on November 15, 2016, and will change the risk/benefit profile of Essure® for all potential patients.  It will reveal the alternatives as far better choices for many women.  It will lead to far less patients choosing to use the Essure® system.

---

[110] *See* http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm488313.htm
[111] *Id.*

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

378.    This result is why Conceptus and Bayer withheld safety information from the FDA and the public for years.

379.    Conceptus and Bayer knew that if the true risks of Essure® were known to the FDA, then they would inevitably be communicated to physicians and women.

380.    Conceptus and Bayer knew that if physicians and women understood the true risks of Essure®, then sales of the device would be devastated.

381.    Conceptus and Bayer withheld thousands of complaints of adverse events from the FDA for years to protect and promote the false perception that the Essure® device was safe.

382.    If Essure® was ever perceived as unsafe, or not as safe as alternative birth control methods, then the device would not have achieved market acceptance and the company would fail.

383.    To protect sales and revenue, Conceptus and Bayer purposefully ignored their mandatory federal reporting requirements and actively hid safety information from the public for as long as they could.

a.    **FDA Orders Bayer to Give Warnings Indicating the Highest Level of Risk**

384.    In February of 2016 the FDA determined that a boxed warning needed to be a part of the Essure® warning label.

385.    The FDA reserves boxed warnings for only the most serious adverse events, and they indicate the highest level of risk.

386.    On March 4, 2016, the FDA noted that it would receive public input for the following suggested warning:

> **WARNING: Some patients implanted with the Essure System for Permanent Birth Control have reported adverse events, including perforation of the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions. Some of these reported events resulted in device removal that required abdominal**

55

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

surgery.  **This information should be shared with patients considering sterilization with the Essure device during discussion of the benefits and risks of the device.**[112]

387.     On October 31, 2016, the FDA issued the following final guidance, "Labeling for Permanent Hysteroscopically-Placed Tubal Implants Intended for Sterilization," which stated that "a boxed warning should be part of the labeling for a permanent, hysteroscopically-placed tubal implant for sterilization…"  The FDA stated that this warning should:

- Note the types of significant and/or common adverse events that may be associated with the device and its insertion, use, and/or removal procedure, including those noted in clinical trials, as well as those reported in other device use experience.
- Include a statement noting that these risks should be conveyed to the patient during the decision-making process.[113]

388.     The October 2016 Boxed Warning Example issued by the FDA was implemented in November 2016, and states as follows:

> **WARNING: Some patients implanted with the Essure System for Permanent Birth Control have experienced and/or reported adverse events, including perforation of the uterus and/or fallopian tubes, identification of inserts in the abdominal or pelvic cavity, persistent pain, and suspected allergic or hypersensitivity reactions.  If the device needs to be removed to address such an adverse event, a surgical procedure will be required.  This information should be shared with patients considering sterilization with the Essure System for Permanent Birth Control during discussion of the benefits and risks of the device.**[114]

389.     This boxed warning directly addresses side effects that Conceptus and Bayer had been cited for hiding from the FDA and the public for years.

---

[112] FDA Draft Guidance on Labeling for Permanent Hysteroscopically-Placed Tubal Implants Intended for Sterilization, issued March 4, 2016.

[113] *See* "Labeling for Permanent Hysteroscopically-Placed Tubal Implants Intended for Sterilization," at http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM488020.pdf

[114] *Id*. at pg. 9; *see also* http://labeling.bayerhealthcare.com/html/products/pi/essure_pib_en.pdf; *and see* http://labeling.bayerhealthcare.com/html/products/pi/essure_ifu.pdf

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

390.    The advent of this warning illustrates the significance of Conceptus' and Bayer's illegal and immoral behavior.

391.    Conceptus and Bayer hid from patients safety information about the most serious adverse events and the highest levels of risk.

392.    If Conceptus and Bayer had not violated federal reporting requirements, the public would have known about these safety risks years earlier.  Thousands of women who decided to receive the Essure® device would have received the knowledge that they deserved, and thousands of injuries could have been prevented.

393.    Conceptus and Bayer could have prevented this problem by updating their warnings to patients.

394.    The Essure® warning label has never been adequate.

395.    Conceptus and Bayer did all in their power to keep serious side effects and warnings off of the Essure® label for years.

396.    Over the course of many years, despite knowing of hundreds of instances where the Essure® device had migrated from its proper position, Conceptus did not warn of this potential problem.

397.    After being caught by the FDA in 2011 for not reporting migration events, the company still refused to warn about this problem on its label.

398.    It was not until 2013 that Conceptus even acknowledged migration events on the Essure® label.

399.    At that time, Conceptus changed the warning label to state only that "There are reports of the Essure® insert migrating."

400.    This warning gravely downplayed the true incidence of risk that a woman's Essure®

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

coils might migrate.

401.    Conceptus should have been adequately informing women about migrations.

402.    This issue illustrates Conceptus' policy of deliberately refusing to provide adequate warnings to physicians and patients.

403.    For years Conceptus and Bayer have downplayed on the Essure® warning label the true risks of migration, as well as perforation, persistent pain, allergy or hypersensitivity reactions, autoimmune-like reactions, the likelihood of reoperation, and other serious side effects.

404.    The FDA has now forced what could and should have been done years ago.

**b.    FDA Takes Drastic Measures to Ensure Patients Are Fully Informed**

405.    Because Conceptus and Bayer denied thousands of women the information that they deserved, every potential Essure® patient is now required to receive and sign a detailed checklist specifically tailored to the risks associated with the device.

406.    The Patient Decision Checklist requires a patient's initials and signature six separate times.

407.    The checklist specifically warns of device migration and perforation of organs, side effects that Conceptus and Bayer had been cited for hiding from the FDA and the public for years.

408.    The checklist also specifically warns that some women may develop allergic reactions following implantation of Essure®, which could cause symptoms such as rashes or itching.

409.    Most importantly, the checklist describes the review of this form as a critical step in deciding whether to have the Essure® device implanted, and suggests that a woman should carefully consider the risks before making the decision.

410.    The checklist has a major impact on the risk/benefit profile of the device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

G.    **CONCEPTUS' AND BAYER'S PARTICIPATION IN THE COVERING UP AND FAILURE TO ADEQUATELY WARN OF SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH ESSURE® CAUSED PLAINTIFFS' INJURIES**

411.    A manufacturer has the duty to provide adequate and timely warnings regarding increased risks and dangers associated with the foreseeable uses of its product.

412.    Conceptus and Bayer grossly failed to satisfy their duties mandated by federal law, the Essure® PMA, and state common law duties.

413.    Conceptus and Bayer did not provide adequate and timely warnings or instructions regarding the true risks of Essure®.

414.    Conceptus and Bayer disseminated misleading and false information concerning the true risks of Essure®.

415.    Conceptus and Bayer purposefully concealed the serious increased risks and complications associated with Essure®.

416.    Conceptus and Bayer failed to take the required actions when they learned that Essure® was causing thousands of problems in patients.

417.    Bayer cannot and should not be permitted to absolve itself from liability by pointing to the FDCA or the MDA, claiming preemption, when it was Conceptus and Bayer who chose to deliberately conceal their knowledge of the increased risks, complications, and the serious and dangerous adverse side effects associated with Essure®.

418.    Bayer cannot and should not be permitted to absolve itself from liability when it was Conceptus and Bayer who, in violation of federal law and the PMA, concealed and failed to report the true number of adverse events being reported by women with Essure®.

419.    A medical device manufacturer only receives the benefits afforded by federal law, i.e. the FDCA and MDA, when it abides by federal law.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

420.    Federal law requires that a manufacturer report all known adverse events associated with a medical device to the FDA.

421.    Not only did Conceptus and Bayer not provide the Plaintiffs' physicians nor Plaintiffs with the necessary information in order to make an informed decision in the best interests of Plaintiffs' health, but they purposefully deceived Plaintiffs' physicians and the Plaintiffs as to the safety and efficacy of Essure®.

422.    Conceptus and Bayer did not discharge their duty, required by federal law, the Essure® PMA, and state common law, to adequately and fully warn and inform Plaintiffs' physicians and Plaintiffs of the known dangers and increased risks associated with the use of Essure®.

423.    Plaintiffs' physicians and Plaintiffs reasonably relied, and did rely, on Conceptus' and Bayer's misrepresentations and concealments.

424.    Moreover, Plaintiffs would not have consented to undergo the Essure® procedure had they each been fully informed of its increased dangers, risks, and adverse consequences.

425.    As a direct and proximate result of Conceptus' and Bayer's fraudulent concealment and misrepresentations concerning material health and safety risks associated with Essure®, Plaintiffs were injured and suffered and will continue to suffer injuries, damages, and economic loss.

426.    As a direct and proximate result of Conceptus' and Bayer's fraudulent concealment and misrepresentations concerning material health and safety risks associated with Essure®, Plaintiffs have been injured and incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the quality and enjoyment of life as a result.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## V.     EQUITABLE TOLLING/FRAUDULENT CONCEALMENT

427.   Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

428.   Conceptus' and Bayer's failure to report, document, or follow up on the known adverse event complaints, and concealment of adverse events, known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiffs herein. Plaintiffs herein have therefore satisfied applicable statutes of limitations and statutes of repose.

429.   Bayer is estopped from relying on any statute of limitations defense because it continued to refute and deny reports and studies questioning the safety of Essure®, actively and intentionally concealed the defects, suppressed reports and adverse information, sponsored and paid for studies which falsely characterized the risks and benefits of Essure®, failed to satisfy FDA and PMA requirements, failed to satisfy FDA and PMA notification requirements, and failed to disclose known dangerous defects and serious increased risks and complications to physicians and the Plaintiffs.

430.   Instead, Conceptus and Bayer continued/continues to represent that Essure® was/is safer, more effective and the best alternative for permanent female sterilization, all the while they knew that this is absolutely false and not true, even after the recent Cornell study was published and patient complaints accumulated in the thousands.

431.   Conceptus and Bayer did the above acts which were and are illegal under federal law, the PMA and parallel state law, to effectively market Essure® and encourage physicians, including Plaintiffs' physicians, to recommend and perform the Essure® procedure.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

432.    Conceptus and Bayer did the above acts which were and are illegal under federal law, the PMA and parallel state law, to encourage patients, including Plaintiffs, to undergo the Essure® procedure rather than choose an alternative procedure, such as a traditional tubal ligation.

433.    At all relevant times, Conceptus and Bayer were under a continuing duty under federal law, the PMA and parallel state laws to disclose the true character, quality, and nature of the increased risks, adverse events, and dangers associated with Essure®.

434.    As a result of Conceptus' and Bayer's concealment of the true character, quality and nature of their product, they are estopped from relying on any statute of limitations defense.

435.    Conceptus and Bayer furthered their fraudulent concealment through acts and omissions, including misrepresenting known dangers and/or defects in Essure® and/or arising out of the use of Essure®, and a continued and systematic failure to disclose and/or cover-up such information from/to the Plaintiffs, Plaintiffs' physicians, and the public.

436.    Conceptus' and Bayer's acts and omissions, before, during and/or after the acts causing Plaintiffs' injuries, prevented Plaintiffs and/or Plaintiffs' physicians from discovering the injuries or cause thereof until recently.

437.    Conceptus' and Bayer's conduct, because it was purposely committed, was known or should have been known by them to be dangerous, heedless, reckless, and without regard to the consequences or the rights and safety of the Plaintiffs.

## VI.    GENERAL ALLEGATIONS

438.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

439.    At all relevant times, Essure® was researched, developed, manufactured, marketed, promoted, advertised, sold and distributed by Conceptus and Bayer.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

440.    Conceptus and Bayer negligently, carelessly, and/or recklessly manufactured, marketed, advertised, promoted, sold and distributed Essure® as a safe and effective device to be used for permanent female sterilization.

441.    Conceptus and Bayer knew, and/or had reason to know, that Essure® was defective, unreasonably dangerous and not safe because of the thousands of adverse events that both companies knew about.

**<u>Representations</u>**

442.    Conceptus and Bayer negligently, carelessly, recklessly, and/or intentionally promoted Essure® to physicians and patients, including the Plaintiffs and Plaintiffs' physicians.

443.    Conceptus and Bayer downplayed to physicians and patients, including Plaintiffs and Plaintiffs' physicians, the dangerous side effects of Essure®.

444.    Conceptus and Bayer misrepresented the safety of Essure® to physicians and patients, including Plaintiffs and Plaintiffs' physicians.

445.    Conceptus and Bayer willfully and/or intentionally failed to warn and/or alert physicians and patients, including Plaintiffs and Plaintiffs' physicians, of the increased risks and significant dangers resulting from being implanted with the Essure® device.

446.    Conceptus and Bayer knew and/or had reason to know, that their representations and suggestions to physicians that Essure® was safe and more effective than alternative permanent sterilization methods were materially false and misleading such that physicians and patients, including Plaintiffs and Plaintiffs' physicians, would rely on such representations.

447.    Conceptus and Bayer knew or should have known and/or recklessly disregarded the materially incomplete, false, and misleading nature of the information that they caused to be

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

disseminated to the public and to physicians, including Plaintiffs and Plaintiffs' physicians, as part of their surreptitious campaign to promote Essure®.

448.    Any warnings Conceptus and Bayer may have issued concerning the risks and dangers of Essure® were inadequate and insufficient in light of their contradictory prior, contemporaneous and continuing illegal promotional efforts of Essure® to hide or downplay the true risks and serious dangers of the device.

449.    The ongoing scheme described herein could not have been perpetrated over a substantial period of time, as has occurred here, without knowledge and complicity of personnel at the highest levels of Conceptus and Bayer, including the corporate officers and directors.

450.    Conceptus and Bayer knew and/or had reason to know of the likelihood of serious injuries caused by the promotion, sale, and distribution of Essure®, but they concealed this information and did not warn the FDA, Plaintiffs or Plaintiffs' physicians, preventing Plaintiffs and Plaintiffs' physicians from making informed choices in selecting alternative sterilization procedures prior to Plaintiffs' Essure® implantation procedure and preventing Plaintiffs and Plaintiffs' physicians from timely discovering Plaintiffs' injuries.

**Causation**

451.    Plaintiffs would not have consented to undergo the Essure® procedure had Plaintiffs known of or been fully and adequately informed by Conceptus and Bayer of the true increased risks, hazards, and serious dangers of Essure®.

452.    Plaintiffs and Plaintiffs' physicians reasonably relied on Defendants' representations and omissions regarding the safety and efficacy of Essure®.

453.    Plaintiffs and Plaintiffs' physicians did not know of the specific increased risks and serious dangers, and/or were misled by Conceptus and Bayer, who knew or should have known of

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

the true risks and dangers, but consciously chose not to inform Plaintiffs or their physicians of those risks and to actively misrepresent those risks and dangers to the Plaintiffs and Plaintiffs' physicians. Conceptus' and Bayer's promotion and marketing of Essure® caused Plaintiffs' physicians to decide to recommend and implant Essure® in Plaintiffs. Plaintiffs' physicians would not have recommended and performed the Essure® procedure in the absence of Conceptus' and Bayer's false and misleading promotion.

## Damages

454.     Plaintiffs have suffered serious personal injuries as a direct and proximate result of Conceptus' and Bayer's illegal misconduct.

455.     As a direct and proximate result of Conceptus' and Bayer's illegal conduct, Plaintiffs have suffered and will continue to suffer from severe injuries and damages, including but not limited to auto-immune-like reactions, irregular heavy menstrual cycle bleeding, organ perforation, and severe chronic pain which required surgical intervention to remove the Essure® coils and/or will require surgical intervention to remove the Essure® coils in the future.

456.     As a result of Conceptus' and Bayer's failure to warn of the risks, dangers, and adverse events associated with Essure® as manufactured, promoted, sold and supplied by both companies, and as a result of the negligence, callousness, and other wrongdoing and misconduct of Conceptus and Bayer as described herein:

> A)     Plaintiffs have been injured and suffered and will continue to suffer injuries to their body and mind, the exact nature of which are not completely known to date;
>
> B)     Plaintiffs have sustained and will continue to sustain economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown;

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

C)      Plaintiffs have incurred and will be required to incur additional medical expenses in the future to care for themselves as a result of the injuries and damages Plaintiffs have suffered;

D)      Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interests thereon and costs.

457.    Plaintiffs had no reason until recently to suspect that their injuries were caused by Essure®.  Thus, Plaintiffs did not know and could not have known and through the exercise of reasonable diligence, that the Essure® device caused their injuries.

458.    Plaintiffs herein bring their causes of action within the applicable statutes of limitation.  Specifically, Plaintiffs bring their actions within the prescribed time limits following their injuries and their knowledge of the wrongful cause.  Prior to such time, Plaintiffs did not know nor had reason to know of their injuries and/or the wrongful cause thereof.

459.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

## VII.    SPECIFIC PLAINTIFF ALLEGATIONS

460.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further alleges as follows:

### A.      SHERANGELIA MCCLAIN

461.     Plaintiff McClain is thirty-four (34) years old and resides in East Saint Louis, Illinois.

### 1.    Initial Essure® Procedure:

462.    On or around October 8, 2012, Plaintiff McClain was implanted with the Essure® device at Barnes Jewish Hospital in St. Louis, Missouri.

463.    According to Plaintiff McClain's medical records, she was placed under general anesthesia for her Essure® implant procedure.

2. **Post Essure® Procedure Condition and Treatment:**

464.    Plaintiff experienced injuries, such as blister-like rashes on her skin, irregular and heavy bleeding, abdominal and pelvic pain, and hair loss following her Essure® implantation.

465.    In 2014, Plaintiff McClain treated twice for blisters on her arms and back at Centegra Hospital in McHenry, Illinois.  She experienced another outbreak in 2015, and treated at home with Benadryl.

466.    Plaintiff McClain also experienced changes in her menstrual cycle after her Essure® implant, including heavy and extremely painful periods.  Before Essure®, her cycles were once a month, lasted five days, and were minimally painful.  She recently treated for these symptoms at the hospital because her cycle was late and she thought she might be pregnant.  She was not pregnant, but has not been able to otherwise treat for these symptoms because she no longer has health insurance.

467.    Plaintiff continues to experience abdominal pain, rashes, hair loss, joint pain, and heavy, irregular menstrual cycles as a result of her Essure® device.

B.    AMBER HEDGES

468.    Plaintiff Hedges is thirty-six (36) years old and resides in Malvern, Hot Spring County, Arkansas.

1. **Initial Essure® Procedure:**

469.    On or around April 5, 2007, Plaintiff Hedges underwent the Essure® procedure, under general anesthesia, at National Park Medical Center in Hot Springs, Arkansas.

470.    Dr. Leo Yang implanted the Essure® device in Plaintiff Hedges.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

471.    Plaintiff Hedges was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

**2.    Post Essure® Procedure Condition and Treatment:**

472.    Plaintiff Hedges' post-procedure course has been marked by heavy abnormal bleeding, pelvic pain and fatigue.

473.    Plaintiff Hedges presented to Dr. Caldwell for her annual examination on or around September 26, 2016 with complaints of pelvic pain and irregular menses.  She was diagnosed with abnormal uterine bleeding and pelvic pain, and a transvaginal ultrasound was ordered to evaluate her symptoms.

474.    In December of 2016, Plaintiff Hedges underwent a total vaginal hysterectomy with bilateral salpingectomy and a left oophorectomy at Saline Memorial Hospital in Benton, Arkansas, which was performed by Dr. Caldwell.

475.    Plaintiff Hedges was not aware that Bayer's device was defective until she saw an ad on social media in the fall of 2016 that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

**C.    ROBIN DOOLEY**

476.    Plaintiff Dooley is forty-three (43) years old and resides in Harrisburg, Dauphin County, Pennsylvania.

**1.    Initial Essure® Procedure:**

477.    On or around July 31, 2014 and September 18, 2014, Plaintiff Dooley underwent the Essure® procedure at Partners in Women's Healthcare in Lemoyne, Pennsylvania.  Prior to her

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

implant, Plaintiff Dooley was told by her physician that the device would not require general anesthesia and could be performed in office, contrary to a tubal ligation.

478.    According to Plaintiff Dooley's medical records, during the July 31, 2014 procedure, the right ostia could not be cannulated, possibly due to a tubal spasm.  The same reporting was made during her September 18, 2014 procedure.

479.    Dr. Del Rosario implanted the Essure® device in Plaintiff Dooley.

### 2. Post Essure® Procedure Condition and Treatment:

480.    On or around October 23, 2014, Plaintiff Dooley underwent a hysterosalpingogram ("HSG") at Pinnacle Health System in Harrisburg, Pennsylvania, which confirmed the position of the Essure® implant and determined that occlusion of the bilateral fallopian tubes had occurred. The left tube was occluded due to the Essure® implant.  According to the medical records, the right tube was "consistent with previous occlusion or surgical absence of the right tube."

481.    Plaintiff Dooley's post-procedure period has been marked by severe migraines with nausea and vomiting, sensitivity to light and auditory hallucinations, in addition to abdominal pain and irregular bleeding.  Prior to being implanted with Essure®, when she was not on birth control, her menstrual cycle was only seven days in duration.

482.    Following her Essure® implant, Plaintiff Dooley started to experience severe migraines that sometimes lasted more than twenty days.  For example, on or around February 11, 2015, Plaintiff Dooley complained to her physician of a migraine that had lasted a month, with frequent vomiting.  On or around February 12, 2015, Plaintiff Dooley presented to her neurologist with complaints of a thirty-three day migraine with associated dizziness, memory impairment, nausea, vomiting, phonophobia, photophobia, and vomiting.

483.    She was unable to control these migraines with medication.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

484.    Prior to being implanted with Essure®, Plaintiff Dooley experienced migraines about once a month, with a duration of three to four days, which were controlled with medication.

485.    For nearly a year, Plaintiff Dooley had many doctor and emergency room visits to address her migraines.

486.    During this time, she missed work due to her symptoms, and required assistance from her family members to drive her to work when she was able to go due to the medication she was on for her migraines.

487.    Despite consistent medical treatment, medication, Botox injections, acupuncture, massages, and essential oils, Plaintiff Dooley's symptoms persisted.  Her mood became more agitated, she was unable to sleep, and her anxiety worsened.  Further, Plaintiff Dooley was vomiting so consistently that she required a daily Phenergan suppository.  Plaintiff Dooley was unable perform many daily activities, including participation in gatherings with her family and friends, and her relationships suffered.

488.    On or around December 29 2015, Plaintiff Dooley's neurologist was unable to determine the cause of her migraines, despite running numerous tests and prescribing medication.

489.    Plaintiff Dooley researched the Essure® device and sought guidance from her gynecologist to determine if it could be causing her severe symptoms.  On or around January 16, 2016, her gynecologist recommended removal of the device due to persistent migraines refractory to medications.

490.    On or around February 12, 2016, Plaintiff Dooley underwent a bilateral salpingectomy to have the Essure® device removed.

491.    After the removal of the Essure® device Plaintiff Dooley's symptoms have substantially improved.  Over a year later, she has experienced only a few migraines, which are

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

controlled by medication.  In fact, on or about April 27, 2016, Plaintiff's medical records indicate that she was free of migraines for seventy-six days.

492.    Plaintiff Dooley has been able to return to her normal daily activities.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

**D.    ASHLEY CAMP**

493.    Plaintiff Camp is twenty-eight (28) years old and resides in Cartersville, Bartow County, Georgia.

**1.    Initial Essure® Procedure:**

494.    On or around March 29, 2013, Plaintiff Camp underwent the Essure® procedure, under general anesthesia, at Cartersville Medical Center in Cartersville, Georgia.

495.    Dr. David Warren implanted the Essure® device in Plaintiff Camp.

**2.    Post Essure® Procedure Condition and Treatment:**

496.    On or around August 6, 2013, Plaintiff Camp underwent a HSG at Cartersville Medical Center which confirmed the position of the Essure® implants and determined that occlusion of the bilateral fallopian tubes had occurred.

497.    Plaintiff Camp's post-procedure period has been marked by abdominal pain, irregular bleeding and autoimmune-like/allergic symptoms.  Prior to being implanted with Essure®, she was not on birth control for over four years and her menstrual cycle was only three to four days in duration, moderate in flow with minimal cramping.

498.    Following her Essure® implant, Plaintiff Camp's menstrual cycles became severe. She started using ultra tampons and had to use them at a greater frequency.  Plaintiff Camp also

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

experienced menstrual cramping and abdominal pain that was so bad she had to call into work at times or ask friends to take care of her children.

499.    Unfortunately, Plaintiff Camp lost her medical insurance following her implant, and has been unable to treat for her symptoms at times due to the expense.  However, she recently presented to the emergency room for pelvic pain, and continues to experience pain.

500.    In the past six months, Plaintiff Camp has experienced bumps on her arms and legs. She can't wear "costume"[115] jewelry because it causes a skin reaction, which may be due to a nickel allergy.

501.    Plaintiff Camp did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

502.    Plaintiff Camp intends to have her Essure® coils removed to address her symptoms.

**E.    BRANDY LEVIERE**

503.    Plaintiff LeViere is forty (40) years old and resides in Wexford, Allegheny County, Pennsylvania.

### 1.    Initial Essure® Procedure:

504.    On or around August 16, 2011, Plaintiff LeViere underwent the Essure® procedure, under general anesthesia, at Magee-Womens Hospital of UPMC in Pittsburgh, Pennsylvania.

505.    Dr. Sungran Sonya Noh implanted the Essure® device in Plaintiff LeViere.

---

[115] "Costume" jewelry as referred to in this Petition refers to jewelry that is typically made from inexpensive materials, such as nickel.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2. **Post Essure® Procedure Condition and Treatment:**

506.    On or around November 18, 2011, Plaintiff LeViere underwent a HSG at Magee-Womens Imaging-Oakland which confirmed the position of the Essure® implants and determined that occlusion of the bilateral fallopian tubes had occurred.

507.    Plaintiff LeViere's post-procedure period has been marked by chronic pelvic/abdominal pain and abnormal uterine bleeding.

508.    Before Essure®, Plaintiff LeViere's menstrual cycles were regular and moderate to light.  After she was implanted with Essure®, her cycles became very heavy, to the point where she was doubling up on protection and having to change it every hour.  She also had breakthrough bleeding during her cycle, and passed material that resembled tissue.

509.    Further, Plaintiff LeViere suffered from severe pelvic pain with pressure, which spanned her entire abdomen.

510.    On or around February 17, 2012, Plaintiff LeViere underwent a pelvic ultrasound to investigate her symptoms.

511.    Plaintiff LeViere's symptoms persisted, and on or around April 27, 2016, Plaintiff LeViere underwent a laparoscopic hysterectomy and bilateral salpingectomy due to abnormal uterine bleeding and chronic pelvic pain.

512.    Since her removal surgery, Plaintiff LeViere's symptoms have resolved.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

F.    **ASHLEY ROBERSON**

513.    Plaintiff Roberson is thirty-one (31) years old and resides in Hillsboro, Hill County, Texas.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1. Initial Essure® Procedure:

514.    On or around March 21, 2014, Plaintiff Roberson underwent the Essure® procedure, at Family Diagnostic Medical Center in Hillsboro, Texas.

515.    Dr. Wesley C. Marshall implanted the Essure® device in Plaintiff Roberson.

### 2. Post Essure® Procedure Condition and Treatment:

516.    On or around June 25, 2014, Plaintiff Roberson underwent a HSG which confirmed the position of the Essure® implants and determined that occlusion of the bilateral fallopian tubes had occurred.

517.    Plaintiff Roberson's post-procedure period has been marked by chronic pelvic/abdominal pain, blister-like rashes, heavy and irregular menses, headaches, dizziness and fatigue.

518.    On or around February 10, 2015, Plaintiff Roberson presented to her physician with complaints of lesions on her face, neck, chest and back for two months.  On or around June 25, 2015, Plaintiff Roberson again complained of a painful, raised, red rash.

519.    Further, Plaintiff Roberson's depression increased following her Essure® implant, and she experienced dizziness, weakness, and fatigue.  According to her medical records, Plaintiff Roberson was also experiencing a bi-temporal and retro-orbital headache with pain that was pounding and throbbing, and nausea and photophonophobia.

520.    Plaintiff Roberson also treated for heavy and irregular periods following her implant.  According to her medical records, Plaintiff Roberson suffered from heavy cramping, abdominal pain, loose bowel movements and dyspareunia.  Prior to Essure®, her periods were only three to four days, and were not heavy.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

521.    Plaintiff Roberson desires removal of her Essure® coils to address her ongoing symptoms.

G.    RUTH GONZALEZ

522.    Plaintiff Gonzalez is forty-four (44) years old and resides in Las Vegas, Clark County, Nevada.

1.    **Initial Essure® Procedure:**

523.    On or around January 7, 2008, Plaintiff Gonzalez underwent the Essure® procedure at Summerlin Hospital Medical Center in Las Vegas, Nevada.

524.    Dr. Heber Becker implanted the Essure® device in Plaintiff Gonzalez.

2.    **Post Essure® Procedure Condition and Treatment:**

525.    Plaintiff Gonzalez's post-procedure course has been marked by pelvic pain, heavy and irregular periods with blood clots, migraines, hair loss, rashes and dyspareunia.

526.    Prior to Essure®, Plaintiff Gonzalez's menstrual cycles were three to four days, normal and regular.  Following her implant, they became irregular, and were at times as frequent as every two and a half weeks.  They were also heavier; and she passed blood clots.

527.    Additionally, Plaintiff Gonzalez suffered from migraines and significant hair loss following her Essure® implant.  She also developed rashes, which she treated with over-the-counter cream.

528.    Plaintiff Gonzalez is unaware if she has a nickel allergy, but "costume" jewelry causes her to break out in rashes.

529.    Plaintiff Gonzalez did not realize, until she saw a legal advertisement in 2016, that her symptoms were also being experienced and suffered by thousands of other women who had

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

been implanted with the Essure® device.  It was at this time that she considered that her symptoms might be related to Essure®.

530.    On or around August 31, 2016, Plaintiff Gonzalez followed up with her physician for worsening pelvic pain, especially over the past two years.  According to her medical records, her pain was moderate to severe.  A pelvic ultrasound was ordered to evaluate her symptoms.

531.    On or around September 28, 2016, Plaintiff Gonzalez did undergo a transabdominal pelvic sonogram, which showed that the right coil was protruding into the endometrium.

532.    According to her medical records, Plaintiff Gonzalez discussed her symptoms of sharp pain with intercourse and walking with her physician, and was notified that the right coil was embedded in the endometrium.  Plaintiff Gonzalez was then scheduled for a hysterectomy to remove the Essure® devices.

533.    On or around October 14, 2016, Plaintiff Gonzalez underwent a laparoscopic assisted vaginal hysterectomy with a bilateral salpingectomy.

534.    Since her removal surgery, Plaintiff Gonzalez's symptoms have resolved, with the exception of her migraines, which are significantly improved.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

**H.    JENNIFER MILLER**

535.    Plaintiff Miller is thirty-eight (38) years old and resides in Harrisburg, Dauphin County, Pennsylvania.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1.    Initial Essure® Procedure:

536.    On or around February 26, 2009, Plaintiff Miller underwent the Essure® procedure, under laryngeal mask airway anesthesia, at PinnacleHealth Harrisburg Hospital in Harrisburg, Pennsylvania.

537.    Dr. Michelle Vasko implanted the Essure® device in Plaintiff Miller.

### 2.    Post Essure® Procedure Condition and Treatment:

538.    On or around May 28, 2009, Plaintiff Miller underwent a HSG at PinnacleHealth Harrisburg Hospital, which demonstrated bilateral tubal occlusion.

539.    Plaintiff Miller's post-procedure period has been marked by unusually heavy and irregular menstrual periods, clotting, cramping, rashes, weight gain, and joint pain.  Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control. Her menstrual periods were normal and she had no problem with going about her daily life.

540.    On or around December 2, 2014, March 8, 2016, and May 19, 2016, Plaintiff Miller presented Dr. George Kosco, III with complaints of rashes.  Unfortunately, Dr. Kosco was not able find the cause of her symptoms.

541.    On or around March 8, 2016, Plaintiff Miller's medical records reflect that she was diagnosed with excessive and frequent menstruation.

542.    Plaintiff Miller continues to suffer with heavy and irregular menstrual cycles and joint pain cause by her Essure® device.

### I.    MARY POWELL

543.    Plaintiff Powell is twenty-nine (29) years old and resides in Emmet, Nevada County, Arkansas.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1.  Initial Essure® Procedure:

544.    On or around November 4, 2015, Plaintiff Powell underwent the Essure® procedure at the offices of Baptist Health Women's Clinic in Arkadelphia, Arkansas.

545.    Dr. Alexis Nicole McCollum implanted the Essure® device in Plaintiff Powell.

### 2.  Post Essure® Procedure Condition and Treatment:

546.    Plaintiff Powell's post-procedure course has been marked by heavy, abnormal uterine bleeding, dyspareunia and pelvic pain.  Plaintiff Powell also experiences severe headaches which she never experienced prior to the implant.

547.    On or about March 17, 2016, Plaintiff Powell underwent a HSG which demonstrated bilateral tubal occlusion.

548.    Plaintiff Powell sought treatment from Dr. McCollum in 2016 for her dysmenorrhea and menorrhagia, as well as "stabbing" pain.  Dr. McCollum tried to treat her symptoms by prescribing Aygestin.

549.    Plaintiff Powell also sought treatment for severe headaches from Jennifer L. Rowe, a licensed Nurse Practitioner.  Plaintiff Powell underwent testing to determine the cause of the headaches that have developed since the implant, without any true answer.  Plaintiff Powell is now on medication to treat these headaches.

550.    On or around December 13, 2016, Plaintiff Powell underwent a transvaginal ultrasound at the offices of Baptist Health Women's Clinic in Arkadelphia to evaluate her symptoms of irregular bleeding and dysmenorrhea.

551.    Plaintiff Powell continues to experience consistent heavy bleeding, spotting and cramping.

552.    Plaintiff Powell was not aware that Bayer's device was defective until she saw an ad on social media in 2016 that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

**J.    BETTY KILLY**

553.    Plaintiff Killy is thirty-four (34) years old and resides in Las Vegas, Clark County, Nevada.

### 1.    Initial Essure® Procedure:

554.    On or around July 3, 2014, Plaintiff Killy underwent the Essure® procedure at UP-Smiley Lane Clinics in Columbia, Missouri.

555.    Dr. Courtney Leigh Barnes implanted the Essure® device in Plaintiff Killy.

### 2.    Post Essure® Procedure Condition and Treatment:

556.    On or around October 8, 2014 Plaintiff Killy underwent a HSG at Womens and Childrens Hospital in Columbia, Missouri, which confirmed the position of the Essure® implants and determined that occlusion of the bilateral fallopian tubes had occurred.

557.    Plaintiff Killy's post-procedure course has been marked by pelvic pain and dysfunctional uterine bleeding.

558.    For the year after her HSG, Plaintiff Killy was unable to seek treatment for her symptoms because she lost her health insurance when she moved from Missouri to Nevada.

559.    On or around December 14, 2015, Plaintiff Killy complained to Dr. Liu in Las Vegas, Nevada of the heavy uterine bleeding and severe pelvic pain that she had been enduring since the implant of the Essure® device.  Dr. Liu recommended a hysteroscopy D&C with an endometrial ablation.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

560.    On or around February 26, 2016, Plaintiff Killy underwent a diagnostic laparoscopy and bilateral salpingectomy, hysteroscopy D&C and a NovaSure endometrial ablation at the Las Vegas Surgery Center due to her heavy uterine bleeding and pelvic pain, during which both Essure® coils were successfully removed.  According to her medical records, there was evidence of bleeding in the endometrial cavity noted during her surgery.

561.    After the removal of the Essure® device all of Plaintiff Killy's symptoms resolved. Her menstrual periods are normal and her heavy vaginal bleeding has ceased.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device. After the removal, the cause of her problems became obvious, due to their resolution.

**K.    CRYSTAL BURDETTE**

562.    Plaintiff Burdette is thirty-seven (37) years old and resides in Charleston, Kanawha County, West Virginia.

**1.    Initial Essure® Procedure:**

563.    On or around May 24, 2011, Plaintiff Burdette underwent the Essure® procedure at CAMC Women and Children's Hospital in Charleston, West Virginia.

564.    Dr. David Patton implanted the Essure® device in Plaintiff Burdette.

**2.    Post Essure® Procedure Condition and Treatment:**

565.    Plaintiff Burdette's post-procedure course has been marked by pelvic pain, dysfunctional uterine bleeding, chronic anemia, hair loss, fatigue and headaches.  Before Essure®, Plaintiff had not experienced this combination of symptoms.  Her menstrual periods were normal after the birth of her children and she had no problem with going about her daily life.

566.    For the next several years, Plaintiff Burdette was unable to seek treatment for her symptoms because she lost her health insurance.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

567.    On or around March 8, 2016, Plaintiff Burdette complained to the Emergency Department of CAMC Women and Children's Hospital of heavy bleeding and pelvic pain.  She was admitted to the hospital due to the severe bleeding, cramping, dizziness and being nauseous.  Plaintiff Burdette was given 4 units of blood to treat her severe anemia and dysfunctional uterine bleeding, and to return her hemoglobin to a normal level.

568.    On or around February 28, 2017, Plaintiff Burdette underwent a laparoscopy with bilateral salpingectomy at the CAMC Women and Children's Hospital by Dr. Williams due to her heavy uterine bleeding, chronic anemia and pelvic pain during which Plaintiff had to undergo additional blood transfusions.

569.    Plaintiff Burdette was told directly after the surgery that her body was reacting to the metal in the device.  Plaintiff Burdette did not understand that the device was made of Nickel prior to the implant.  If she did, she would not have had the Essure® device implanted because as a child she could not wear jewelry made with nickel or "cheap" jewelry because it would cause her to have a rash.

**L.    SHERRI HOWARD**

570.    Plaintiff Howard is forty-five (45) years old and resides in Glendale, Milwaukee County, Wisconsin.

**1.    Initial Essure® Procedure:**

571.    On or around April 2009, Plaintiff Howard underwent the Essure® procedure at the offices of Dr. Michael Gilman in Glendale, Wisconsin.

572.    Dr. Michael Gilman implanted the Essure® device in Plaintiff Howard.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2.  **Post Essure® Procedure Condition and Treatment:**

573.    Plaintiff Howard's post-procedure course has been marked by severe pelvic pain and heavy menstrual cycles.  Before Essure®, Plaintiff had not experienced this combination of symptoms.  Her menstrual periods were normal after the birth of her children and she had no problem with going about her daily life.

574.    On or around August 11, 2009, Plaintiff Howard underwent a HSG at Wheaton Franciscan Medical Group – Glendale which showed that bilateral tubal occlusion was present.

575.    On or around April 22, 2015, Plaintiff Howard complained to Dr. Gilman about her excessive menstrual bleeding and severe cramps but was offered no treatment.

576.    Plaintiff Howard continues to suffer from excessive menstrual bleeding where she wears three sanitary pads at a time for four out of the five days that her cycle lasts per month. Plaintiff also wears two pairs of pants so that she does not bleed through her clothes. Plaintiff Howard also misses work at least one day each month due to the extreme pelvic pain that she experiences the first day of her cycle.  She has never experienced anything like this prior to the Essure® device.

577.    Plaintiff Howard is currently seeking a doctor who will remove Bayer's Essure® device.

M.    **BRANDY KELLY**

578.    Plaintiff Kelly is thirty five (35) years old and resides in Champaign, Champaign County, Illinois.

1.  **Initial Essure® Procedure:**

579.    On or around January 15, 2016, Plaintiff Kelly underwent the Essure® procedure at Carle Foundation Hospital in Urbana, Illinois.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

580.    Michael S. Smith, M.D. implanted the Essure® device in Plaintiff Kelly.

## 2.    Post Essure® Procedure Condition and Treatment:

581.    Plaintiff Kelly's post-procedure course has been marked by abdominal pain, severe cramping, and pain radiating into her buttocks.  Plaintiff Kelly uses hydrocodone and muscle relaxers to control the pain.  Before Essure®, Plaintiff Kelly had not experienced this combination of symptoms while not on birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

582.    Plaintiff Kelly underwent a HSG on or about May 3, 2016, which showed Essure® coils were in the appropriate place and bilateral occlusion was demonstrated.

583.    On March 16 and June 7, 2016, Plaintiff Kelly complained of dysmenorrhea to Dr. Simone Hampton.

584.    On May 20, 2016, Plaintiff Kelly complained to Dr. Smith of "cramping" almost every day.  Dr. Smith advised Plaintiff Kelly that the issues are likely the lack of Depo-Provera rather than the presence of the Essure® coils.  Dr. Smith advised Plaintiff Kelly that going back on the Depo-Provera could potentially help, but Plaintiff Kelly was reluctant.  Dr. Smith advised that doing a hysterectomy would likely solve the issue.

585.    Plaintiff Kelly is seeking a physician who will remove Bayer's device in order to address her symptoms in the near future.

586.    Plaintiff Kelly still suffers from abdominal pain, severe cramping, and pain radiating into her buttocks. She uses pain medication to control the symptoms.

587.    Plaintiff Kelly has suffered from these symptoms for over one year, and yet her physician told her that her pain is not being caused by the Essure® device but by the lack of Depo-Provera.  Plaintiff Kelly did not realize, until she saw a legal advertisement, that her symptoms

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

N.    **KELLY HAINLINE**

588.    Plaintiff Hainline is thirty-one (31) years old and resides in Decatur, Benton County, Arkansas.

1.    **Initial Essure® Procedure:**

589.    On or around January 20, 2015, Plaintiff Hainline underwent the Essure® procedure at the Siloam Springs Women's Center in Siloam Springs, Arkansas because Plaintiff Hainline was told that it was her only option for permanent birth control per her health insurer.

590.    Dr. Chad Hill implanted the Essure® device in Plaintiff Hainline.

2.    **Post Essure® Procedure Condition and Treatment:**

591.    Plaintiff Hainline's post-procedure course has been marked by severe pelvic pain and heavy menstrual cycles.

592.    On or around March 8, 2016, Plaintiff Hainline underwent a HSG at Siloam Springs Regional Hospital which showed that bilateral tubal occlusion was present.

593.    During two (2) office visits in March of 2016, Plaintiff Hainline complained to Dr. Hill about her excessive menstrual bleeding and severe cramps.  Dr. Hill prescribed birth control pills to Plaintiff to control the bleeding.

594.    On or around June 26, 2016, Plaintiff Hainline reported to Dr. Hill that she had to discontinue the birth control pills per recommendation of her primary care physician, Dr. David J. Tucker, due to harmful interaction with other medications that she takes daily.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

595.    On or around July 13, 2016, Plaintiff Hainline underwent a diagnostic cystoscopy, D&C, and endometrial Novasure ablation at Siloam Springs Regional Hospital to address Plaintiff's dysfunctional uterine bleeding and abdominal pain.

596.    Upon information and belief, Plaintiff Hainline was diagnosed with a Nickel allergy when she was a child.  Plaintiff Hainline was never informed that the Essure® device was made of Nickel.

597.    Plaintiff Hainline is currently pursing removal of Bayer's Essure® device.

**O.    MARIA MADRID**

598.    Plaintiff Madrid is forty-eight (48) years old and resides in Orlando, Orange County, Florida.

**1.    Initial Essure® Procedure:**

599.    On or around January 14, 2013 Plaintiff Madrid underwent the Essure® procedure at The Women's Center of Orlando, Osceola County, Florida.

600.    Douglas Gearity, MD implanted the Essure® device in Plaintiff Madrid.

**2.    Post Essure® Procedure Condition and Treatment:**

601.    Plaintiff Madrid's post-procedure course has been marked by sharp pain in her left side, vaginal rashes, vaginal irritation, vaginal discharge, pelvic pain, and heavy menstrual cycles. Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control.  Her menstrual cycles were normal and she had no problem with going about her daily life.

602.    Plaintiff Madrid underwent a HSG on or about February 20, 2013, which showed left and right tube occlusion.  At her HSG appointment, Plaintiff Madrid complained of pelvic pain.  An ultrasound was performed which revealed a left ovarian cyst.  A follow up test was

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

performed May 22, 2013 which revealed that the complex cyst seen in February was no longer there.

603.    After Essure®, Plaintiff Madrid's bleeding was so heavy during her menstrual cycles that she frequently changed pads every hour to avoid leakage.  She has been prescribed medications to control the bleeding.

604.    Since Essure® was implanted, Plaintiff Madrid has experienced some painful rashes in the vaginal area, neck and body.  Plaintiff Madrid believes that she is allergic to nickel and is scheduling a nickel test to confirm.

605.    From February 17, 2013 through September 22, 2016, Plaintiff Madrid was seen at Women's Center of Orlando at least eighteen times with complaints of vaginal rash, discharge, irritation, itchiness, and infection.  Plaintiff's doctor continues to diagnose her with vaginal infections.

606.    Plaintiff Madrid continues to suffer from these symptoms as the Essure® device is still located in her body, causing her ongoing symptoms.

607.    Plaintiff Madrid is presently seeking a physician who will remove Bayer's Essure® device in order to address her symptoms.

608.    Plaintiff Madrid has suffered from these symptoms for over four years, and yet her physicians keep telling her that her pain is not being caused by the Essure® device. Plaintiff Madrid did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**P.**    **AMY DANISAVICH**

609.    Plaintiff Danisavich is forty (40) years old and resides in Cumbola, Schuylkill County, Pennsylvania.

### 1.    Initial Essure® Procedure:

610.    On or around April 10, 2006, Plaintiff Danisavich underwent the Essure® procedure, under general anesthesia, at The Pottsville Hospital and Warne Clinic in Pottsville, Schuylkill County, Pennsylvania.

611.    Dr. David P. Krewson implanted the Essure® device in Plaintiff Danisavich.

612.    Plaintiff Danisavich went to Dr. Krewson to inquire about permanent birth control, such as bilateral tubal ligation, but Dr. Kiper directed Plaintiff towards Essure®.  He told Plaintiff Danisavich that Essure® was a quick procedure with little-to-no downtime.

### 2.    Post Essure® Procedure Condition and Treatment:

613.    Plaintiff Danisavich's post-procedure course has been marked by pain, rashes, hair loss, night sweats, severe dysmenorrhea, and menometrorrhagia.  Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control.  Her menstrual cycles were normal and she had no problem with going about her daily life.

614.     For the next three years, Plaintiff Danisavich repeatedly sought treatment for her symptoms, but no physician was able to determine their cause.

615.    For example, on or around December 3, 2009, Plaintiff Danisavich presented for an office visit with Dr. Whitney Pollock with complaints of menorrhagia and menopausal symptoms.  The medical records show that Dr. Pollock ordered a pelvic ultrasound and presented Plaintiff Danisavich with Novasure literature.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

616.    On or around December 17, 2009, Plaintiff Danisavich presented for a follow-up visit with Dr. Pollock.  The medical records show that Plaintiff Danisavich was experiencing heavy menstrual cycles with cramping and she was to begin Loestrin FE 24.  The ultrasound report showed a thickened endometrium, and Dr. Pollock scheduled a D&C and possible ablation.

617.    On or around January 25, 2010, Plaintiff Danisavich underwent a diagnostic hysteroscopy, D&C, and paracervical block, performed by Dr. Pollock.  The medical records show that only the left Essure® coil visualized, and her right Essure® coil was not seen.

618.    Plaintiff Danisavich presented for a post-operative visit with Dr. Pollock on or around February 15, 2010.  A CT of the abdomen revealed that "[t]he coil on the right appears to project at a grossly identical height referable to the sacrum allowing for technical differences.  The coil on the left projects slightly lower and more lateral…"  Dr. Pollock instructed Plaintiff Danisavich to continue her birth control pills for the excessive menstruation.

619.    On or around March 2, 2010, Plaintiff Danisavich presented for a visit with Dr. Pollock.  The medical records show that Plaintiff Danisavich experienced right lower quadrant pain, leg cramps and vertigo due to the misplaced right Essure® coil.  Dr. Pollock scheduled Plaintiff Danisavich for a laparoscopic-assisted vaginal hysterectomy with unilateral oophorectomy.

620.    Finally, on or around May 10, 2010, Plaintiff Danisavich underwent a laparoscopic-assisted vaginal hysterectomy and right salpingo-oophorectomy.

621.    Plaintiff Danisavich's symptoms continued after her explant surgery, and she suffered from headaches, pelvic pain and migraines until 2014.  In all probability, the left Essure® coil is still located in her body, causing her ongoing symptoms.  Plaintiff Danisavich is seeking additional treatment to confirm the possibility that an Essure® coil may still be in her.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

622.    Plaintiff Danisavich was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

623.    Plaintiff Danisavich was not aware that Bayer's device was defective until Plaintiff Danisavich saw an advertisement on television in 2016 and learned that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

**Q.    PATRICIA GARDNER**

624.    Plaintiff Gardner is forty-two (42) years old and resides in Bloomington, Hennepin County, Minnesota.

**1.    Initial Essure® Procedure:**

625.    On or around May 23, 2007, Plaintiff Gardner underwent the Essure® procedure, under general anesthesia, at Hennepin County Medical Center in Minneapolis, Hennepin County, Minnesota.  Dr. Christine Braun implanted the Essure® device in Plaintiff Gardner.

626.    Plaintiff Gardner went to Dr. Braun inquiring about permanent birth control and Dr. Braun directed Plaintiff towards Essure®.  She told Plaintiff Gardner that Essure® was permanent, wouldn't leave scars, and was easier, safer and more effective than a tubal ligation.

**2.    Post Essure® Procedure Condition and Treatment:**

627.    Plaintiff Gardner's post-procedure course has been marked by abdominal pain, fatigue, rashes, severe dysmenorrhea and menometrorrhagia.  Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

628.    After Essure®, Plaintiff Gardner's pain and bleeding were so heavy that she was unable to leave her home for extended periods of time for the fear of soiling her pants with her menses.

629.    For the next several years, Plaintiff Gardner repeatedly sought treatment for her symptoms but no physician could determine their cause.

630.    For example, on or around November 12, 2007, Plaintiff Gardner presented for a follow up with Dr. Jeanette Thomas and the medical records show that a HSG test confirmed bilateral tubal occlusion.  Plaintiff Gardner complained of spotting and heavy bleeding for the past month during this appointment.

631.    On or around February 19, 2008, Plaintiff Gardner reported to Dr. Michelle Johnson that her periods had become more irregular.

632.    On or around March 3, 2008, Plaintiff Gardner presented for a follow up visit with Dr. Thomas where it was discussed that her menstrual cycle was irregular and she was having abdominal pain.  Her medical records show that Plaintiff Gardner described her menstrual cycle as becoming so heavy that she had to wear a pad and tampon simultaneously and changed them eight times a day.

633.    A laparoscopic examination of the pelvic organs was performed on or around March 18, 2008, to verify the placement of Essure®.  Plaintiff Gardner's medical records show there was no evidence of protrusion or erosion of Essure® at that time and the ovaries were normal with functional cysts.

634.    On or around March 26, 2009, Plaintiff Gardner reported to Dr. Gregg Teigen that she was experiencing facial break outs, irregular bleeding, and very heavy periods with large clots. Dr. Teigen prescribed Plaintiff Gardner birth control pills to control her menorrhagia.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

635.    A transvaginal ultrasound that was performed on or around April 2, 2009, showed fluid in part of Plaintiff Gardner's uterus, Nabothian cysts and normal ovaries.

636.    On or around August 5, 2011, and Plaintiff Gardner reported an itching, warm to touch, and painful body rash to Dr. Teigen.

637.    On or around October 18, 2011, Plaintiff Gardner reported to Dr. Teigen that the birth control pills were no longer controlling her frequent menstruation.

638.    These abnormalities have continued to the present to such an extent that, despite having Essure®, Plaintiff Gardner was put on other hormonal methods of birth control to control the bleeding.

639.    Finally, on or around November 18, 2011, Dr. Teigen performed a hysteroscopy, D&C and NovaSure endometrial ablation on Plaintiff Gardner.

640.    Plaintiff Gardner has sought years of treatment for her abdominal pain of unknown origin.  Unfortunately, her physicians were not able to find the cause of her symptoms, as they persisted despite constant treatment and medicinal therapy.

641.    Plaintiff Gardner was not aware that Bayer's device was defective until she saw an ad on television in 2016 which advised Plaintiff Gardner that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

642.    Plaintiff Gardner was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

643.    Plaintiff Gardner continues to suffer from symptoms caused by Essure®. Additionally, Plaintiff Gardner has noticed an increase in her rashes.  Plaintiff Gardner is seeking additional treatment to verify a nickel allergy.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**R.     LORRAINE SEGARS**

644.    Plaintiff Segars is forty-five (45) years old and resides in Broomall, Delaware County, Pennsylvania.

**1.   Initial Essure® Procedure:**

645.    On or around April 8, 2010, Plaintiff Segars underwent the Essure® procedure at Delaware County Memorial Hospital in Drexel Hill, Pennsylvania.

646.    Dr. Richard Gersh implanted the Essure® device in Plaintiff Segar.

**2.   Post Essure® Procedure Condition and Treatment:**

647.    Plaintiff Segars' post-procedure course has been marked by irregular menses, abdominal pain and migraine headaches.

648.    On or about March 22, 2011, Plaintiff Segar underwent a HSG at Delaware County Memorial Hospital, which demonstrated "Essure® device in the bilateral fallopian tubes preventing any flow of contrast medium."

649.    During Plaintiff Segars' yearly gynecological exam, she complained about having an irregula cycle.  The Plaintiff will not have a menstrual cycle for several months, but in its place will have a severe migraine headache.  When she does have a cycle, it will last anywhere from three to seven days with severe abdominal pain that the Plaintiff has a difficult time controlling with over-the-counter medications.  Prior to the Essure® device, Plaintiff never experienced these symptoms.

650.    Plaintiff Segars continues to suffer with pain, irregular menstrual cycles and migraine headaches.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

651.    Plaintiff Segars never suspected that the Essure® device was causing her symptoms until she saw an ad in the Summer of 2016 and realized that thousands of other women had been experienced symptoms similar to hers after receiving the Essure® implant.

**S.    NIKKIE SWINEY**

652.    Plaintiff Swiney is twenty-six (26) years old and resides in Louisa, Lawrence County, Kentucky.

**1.    Initial Essure® Procedure:**

653.    On or around January 23, 2013, Plaintiff Swiney underwent the Essure® procedure at the Pikeville Medical Center in Pikeville, Kentucky.

654.    Dr. Rebecca McCowan implanted the Essure® device in Plaintiff Swiney.

**2.    Post Essure® Procedure Condition and Treatment:**

655.    Plaintiff Swiney's post-procedure period has been marked by irregular menses, dyspareunia, abdominal pain, rashes, nausea and migraine headaches.

656.    For several months following the implant of the Essure® device, Plaintiff Swiney complained to Dr. McCowan about her headaches, abdominal pain and irregular menses.

657.    On or about April 30, 2013, Plaintiff Swiney underwent a HSG at the Pikeville Medical Center, which demonstrated "intact uterine occlusion devices without evidence of contrast extravasation."

658.    On or about April 15, 2015, Plaintiff Swiney complained to Dr. Rebecca Hobbs, at her annual gynecological exam, about her irregular period which involved heavy bleeding occurring up to twice a month.  A transvaginal ultrasound was performed on May 6, 2015 to evaluate her symptoms.  Dr. Hobbs diagnosed the Plaintiff with dysfunctional uterine bleeding and prescribed birth control pills.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

659.    Additionally, Plaintiff Swiney has noticed a rash on her arms and chest over the last few months.  She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, due to skin irritation.

660.    Plaintiff Swiney continues to suffer with pain, heavy and irregular bleeding, dyspareunia, migraine headaches and rashes.

661.    Plaintiff Swiney wants to have her coils removed and is currently looking for a doctor to remove Bayer's Essure® device.

**T.    SHELIA HARDEN**

662.    Plaintiff Harden is forty-four (44) years old and resides in Blue Mountain, Tippah County, Mississippi.

**1.    Initial Essure® Procedure:**

663.    Upon information and belief, on or around 2008, Plaintiff Harden underwent the Essure® procedure at New Albany OB/GYN Clinic in New Albany, Union County, Mississippi.

664.    Dr. Gregory Mitchell implanted the Essure® device in Plaintiff Harden.

**2.    Post Essure® Procedure Condition and Treatment:**

665.    Plaintiff Harden's post-procedure course has been marked by abdominal pain, abnormal discharge, continuous vaginal infections, hot flashes, headaches, nausea, severe dysmenorrhea and menometrorrhagia.  Before Essure®, Plaintiff had never experienced this combination of symptoms, and had never relied on oral contraceptives or other forms of birth control to regulate her menstrual cycle.  Her menstrual cycles were normal and she had no problem going about her daily life.

666.    For the next several years, Plaintiff Harden repeatedly sought treatment for her symptoms but no physician could determine their cause.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

667.    For example, on or around November 6, 2013, Plaintiff Harden treated with Dr. Mitchell for vaginal discharge and irregular and heavy menses beginning eight months prior.  She underwent a transvaginal ultrasound to evaluate her symptoms.

668.    On or around April 27, 2015 Plaintiff Harden reported having heavy menses and vaginal discharge.  Dr. Mitchell scheduled Plaintiff Harden for an endometrial biopsy.

669.    An endometrial biopsy was performed on Plaintiff Harden on or around May 20, 2015, for her dysfunctional uterine bleeding.  The biopsy revealed a benign interval endometrium.

670.    On or around June 3, 2015, Plaintiff Harden underwent a laparoscopically assisted vaginal hysterectomy with bilateral salpingo-oophorectomy for her abnormal uterine bleeding, irregular menses and hot flashes.

671.    Plaintiff Harden was not aware that Bayer's device was defective until she saw an ad on television in 2016 which advised Plaintiff Harden that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

672.    After the removal of the Essure® device, Plaintiff Harden's vaginal infections, cramps, discharge, pain, migraines and bleeding resolved.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious due to their resolution.

U.    **JULIE THOMPSON**

673.    Plaintiff Thompson is thirty-seven (37) years old and resides in Greenville, Greenville County, South Carolina.

1.    **Initial Essure® Procedure:**

674.    On or around June 2011, Plaintiff Thompson underwent the Essure® procedure at Greenville Health System OB/GYN Center in Greenville, Greenville County, South Carolina.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2. **Post Essure® Procedure Condition and Treatment:**

675.    Plaintiff Thompson's post-procedure course has been marked by extreme abdominal pain, heavy uterine bleeding, worsened migraines, joint pain, anemia, and hair loss. Prior to placement of the Essure® device Plaintiff Thompson did not have a menstrual period since January 2011 as a result of taking Depo-Provera for birth control and migraine management. Prior taking Depo-Provera, Plaintiff Thompson's menstrual cycle was regular and otherwise unremarkable.

676.    Post Essure®, Plaintiff Thompson experienced one and a half months of abnormal uterine bleeding.

677.    On or around December 26, 2012, Plaintiff Thompson underwent a diagnostic laparoscopy and abdominal supracervical hysterectomy as a result of dysmenorrhea and menometrorrhagia.

678.    Plaintiff Thompson continues to suffer from abdominal pain, worsened migraines, joint pain, skin rashes and hair loss, as the Essure® coils are possibly still inside her body

679.    Plaintiff Thompson was not aware that Bayer's device was defective until she saw a legal advertisement in August, 2016, and that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device. It was at this time that she truly understood that her symptoms were related to Essure®.

680.    Plaintiff Thompson still has the Essure® device surgically implanted.

**V.    ASHLEY RUNYAN**

681.    Plaintiff Runyan is twenty-eight (28) years old and resides in Lowmansville, Lawrence County, Kentucky.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1.  **Initial Essure® Procedure:**

682.    On or around March 24, 2014, Plaintiff Runyan underwent the Essure® procedure under general anesthesia at Three Rivers Medical Center, Louisa, Lawrence County, Kentucky.

683.    Dr. Curt Edens implanted the Essure® device in Plaintiff Runyan.

2.  **Post Essure® Procedure Condition and Treatment:**

684.    Plaintiff Runyan's post-procedure course has been marked by extreme cramping, heavy uterine bleeding lasting for months, and severe abdominal pain.  Prior to placement of the Essure® device, Plaintiff Runyan was on Depo-Provera for birth control.  Plaintiff Runyan's menstrual cycles prior to Essure® were normal and  lasted five (5) days, without extreme cramping or heavy bleeding.

685.    Plaintiff Runyan underwent a HSG at Three Rivers Medical Center which showed that bilateral tubal occlusion was present.

686.    On or around November 22, 2015, Plaintiff Runyan presented to Three Rivers Medical Center ER complaining of lower abdominal pain, bloating and dysfunctional uterine bleeding.  She was treated with morphine and Phenergan and was advised to contact Dr. Edward Moran for follow-up.

687.    Plaintiff Runyan is scheduled on or around April 17, 2017 for a vaginal ultrasound to determine if a hysterectomy is necessary to treat her symptoms.

688.    Plaintiff Runyan continues to have cramping and pain in her abdomen, and also suffers from hair loss.

689.    Plaintiff Runyan was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

other women who had been implanted with the Essure® device.  It was at this time that suspected that her symptoms were related to Essure®.

690.    Further, Plaintiff Runyan was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

691.    Plaintiff Runyan still has the Essure® device surgically implanted.

**W.    REATHA DAVIS**

692.     Plaintiff Davis is twenty-eight (28) years old and resides in Cincinnati, Hamilton County, Ohio.

**1.    Initial Essure® Procedure:**

693.    On or around September 30, 2010, Plaintiff Davis underwent the Essure® procedure at The Christ Hospital in Cincinnati, Ohio while under general anesthesia.

694.    Dr. Gary J. Kanter implanted the Essure® device in Plaintiff Davis.

**2.    Post Essure® Procedure Condition and Treatment:**

695.    Plaintiff Davis post-procedure course has been marked by irregular heavy menses, abdominal pain and dyspareunia.

696.    On or around August 31, 2011, Plaintiff Davis discovered that she was pregnant and delivered on March 9, 2012.

697.    On or around May of 2012, Plaintiff Davis underwent a HSG to find out why she was able to get pregnant.  The HSG report showed that the right coil was visualized outside of the right fallopian tube.

698.    On or around May 30, 2012, Plaintiff Davis underwent a laparoscopic bilateral tubal ligation with Filshie clips.  The Operative Report has no mention of the right Essure® coil

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

being seen or located during this procedure. The left coil is confirmed as being in the left fallopian tube.

699.    Plaintiff Davis continues to experience heavy, irregular bleeding and abdominal pain, but does not know exactly where the right coil is or if it is, in fact, still located within her body. She lacks the financial ability to seek potential removal of the remaining Essure® coil at this time.

700.    Plaintiff Davis was not aware that Bayer's device was defective until she saw an ad in 2016 that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

X.    STEPHANIE WILLE

701.    Plaintiff Wille is thirty-three (33) years old and resides in Junction City, Portage County, Wisconsin.

### 1.  Initial Essure® Procedure:

702.    On or around November 12, 2013, Plaintiff Wille underwent the Essure® procedure at Ministry Medical Group-Illinois Avenue in Stevens Point, Portage County, Wisconsin.

703.    Dr. Tzvetan Fatchikov implanted the Essure® device in Plaintiff Wille.

704.    On or around December 2013, Plaintiff Wille underwent a second Essure® procedure to implant a coil in her right fallopian tube by Dr. John A. Keegan, D.O. at Ministry Medical Group in Stevens Point, Portage County, Wisconsin.

### 2.  Post Essure® Procedure Condition and Treatment:

705.    Plaintiff Wille's post-procedure course has been marked by severe abdominal pain and cramping, pain during intercourse, post-coital bleeding and unusually heavy menstrual periods. Prior to Essure® placement, Plaintiff Wille's menstrual cycle was regular with

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

unremarkable menstrual periods.  She relied upon oral contraceptives only to prevent pregnancy and not to regulate her menstrual cycle. She was then prescribed Depo-Provera injections for contraception prevention until the Essure® procedure was confirmed to occlude both fallopian tubes.

706.    On or around January 22, 2014, Plaintiff Wille contacted Dr. Tzvetan Fatchikov's office complaining of persistent abnormal uterine bleeding and cramping following the Essure® procedures.  Plaintiff Wille was advised to keep her appointment for her next Depo-Provera injection.

707.    On or around November 4, 2014, Plaintiff Wille presented at Dr. Fatchikov's office for a well woman exam.  She was continued on Depo-Provera for contraception because her right fallopian tube was not yet occluded according to a HSG test conducted on April 4, 2014.  Medical records note that Plaintiff Wille suffered from right sided pain during intercourse at all times and from post-coital bleeding for two to three days.  Records also noted that the post-coital bleeding was heavy enough to require a tampon.

708.    On or around December 9, 2014, Plaintiff Wille underwent a HSG test for confirmation of tubal occlusion that showed a normal configuration without any focal defects and no contrast outside the uterus.

709.    Plaintiff Wille has suffered from severe abdominal pain and cramping, pain during intercourse, post-coital bleeding and unusually heavy menstrual periods for over three (3) years, and her physicians keep telling her that her pain is not being caused by the Essure® device.

710.    Plaintiff Wille did not realize until she read an article in July 2016 that her symptoms were also being experienced and suffered by thousands of other women who had been

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

711.    Plaintiff Wille still has the Essure® device surgically implanted.

**Y.    KRISTIE UPRIGHT**

712.    Plaintiff Upright is forty-four (44) years old and resides in Forsyth, Monroe County, Georgia.

**1.  Initial Essure® Procedure:**

713.    On or around February 5, 2008, Plaintiff Upright underwent the Essure® procedure at Women's Specialty Care in Macon, Macon-Bibb County, Georgia.

714.    Surgeon John T. Slocumb, M.D. implanted the Essure® device in Plaintiff Upright.

**2.  Post Essure® Procedure Condition and Treatment:**

715.    Plaintiff Upright's post-procedure course has been marked by extreme cramping and heavy, abnormal uterine bleeding accompanied with large clotting.

716.    On or around February 13, 2008, Plaintiff Upright presented to Women's Specialty Care complaining of heavy bleeding with clots following the Essure® procedure.

717.    On or around August 4, 2008, Plaintiff Upright had a HSG test which showed occlusion in her right fallopian tube.  The left-sided Essure® device did not appear to be within or immediately adjacent to the left fallopian tube.  Plaintiff Upright was prescribed Seasonique for birth control.

718.    On or around November 5, 2008, Plaintiff Upright underwent a second HSG test which showed occlusion on both her right and left fallopian tubes.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

719.    On or around February 25, 2009, Plaintiff Upright, presented to Women's Specialty Care and pregnancy was confirmed by positive HCG test.  After the birth of her child on October 12, 2009, Plaintiff Upright was prescribed Ortho-Cyclen for birth control.

720.    On or around March 23, 2010, Plaintiff Upright had a repeat HSG test at Women's Specialty Care which showed a patent left fallopian tube with appropriately occluded right fallopian tube.

721.    On or around April 6, 2010, Plaintiff Upright underwent a diagnostic laparoscopy, removal of Essure® device, and bilateral tubal ligation with electrocautery at the Medical Center of Central Georgia under Dr. John T. Slocumb.  During this procedure, the left corneal region was noted to have about four to five coils of Essure® sticking through.  The Essure® device on the right side could not be removed and remains implanted to this day.

722.    Plaintiff Upright continued to have pelvic pain, menorrhagia, and dysmenorrhea causing her to undergo Hydro-Thermal Ablation on or around February 13, 2013 by Dr. John Slocumb.  Plaintiff Upright continues to suffer from hair loss and fatigue.

723.    Plaintiff Upright has suffered from these symptoms for over nine years, and her physicians keep telling her that her pain is not being caused by the Essure® device.  Plaintiff Upright was not aware that Bayer's device was defective until she saw a legal advertisement in 2016 that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

**Z.    EUGENIA DANTZLER**

724.    Plaintiff Dantzler is forty (40) years old and resides in Saint Paul, Ramsey County, Minnesota.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1.  **Initial Essure® Procedure:**

725.    On or around February 20, 2009, Plaintiff Dantzler underwent the Essure® procedure at Women's Health Consultants in Minneapolis, Hennepin County, Minnesota.

726.    Dr. Judith Levitan, M.D. implanted the Essure® devices in Plaintiff Dantzler.

727.    According to the operative report:

> …Later in the day a fiat plate of the pelvis showed one device on the right and two on the left. Hence the first device was successfully deployed, too deep, but may still cause successful tubal closure into the right side. The second device was deployed likely quite deep in the left tube, and although intratubal today, will be at risk of falling into pelvis if it doesn't scar into place or isn't entangled with the 4th device which has OK placement. The 3rd device was removed from the cavity at the conclusion of the case. The fifth device was never deployed. The second inserter with the faulty release coils trailing from the delivery system will be returned to the company.

728.    On or around February 20, 2009, an x-ray of Plaintiff Dantzler's pelvis was done at the office of Dr. Judith Levitan to confirm placement of the Essure® device.  The findings from this x-ray were that the occlusion wire device was present in the pelvis in the right pelvic side wall, and two Essure® devices were noted in the left pelvic side wall.

2.  **Post Essure® Procedure Condition and Treatment:**

729.    Plaintiff Dantzler's post-procedure period has been marked by severe abdominal pain and right knee, wrist, elbow, and shoulder joint pain.

730.    On or around May 21, 2009, Plaintiff Dantzler presented at Abbot Northwestern Hospital Medical Imaging for a HSG, which showed the Essure® devices present and confirmed occlusion of the fallopian tubes.

731.    On or around December 2, 2016, Plaintiff Dantzler presented to Dr. David Weinberg for a gastroenterology consult with complaints of continued lower left quadrant pain.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Dr. Weinberg recommended that Plaintiff Dantzler have a colonoscopy and follow up with Dr. Jennifer Peoples for possible referral to a general surgeon.

732.    On or around December 15, 2016, Plaintiff Dantzler presented to Maplewood Endoscopy Center for a colonoscopy. The findings from the colonoscopy were normal.

733.    Plaintiff Dantzler has suffered from severe abdominal pain and joint pain for over eight years.  Plaintiff Dantzler did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**AA.    LISA FINK**

734.    Plaintiff Fink is forty-four (44) years old and resides in Middletown, Dauphin County, Pennsylvania.

**1.    Initial Essure® Procedure:**

735.    On or around November 27, 2006, Plaintiff Fink underwent the Essure® procedure under general anesthesia at Penn State Milton S. Hershey Medical Center in Hershey, Dauphin County, Pennsylvania.

736.    Dr. George Olt implanted the Essure® device in Plaintiff Fink.

737.    Plaintiff Fink went to Dr. Olt inquiring about permanent birth control and Dr. Olt directed Plaintiff towards Essure®.  He told Plaintiff Fink that Essure® was a quick procedure and did not have any complications.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## 2.   Post Essure® Procedure Condition and Treatment:

738.    Plaintiff Fink's post-procedure course has been marked by abdominal pain, severe menorrhagia, dysmenorrhea and metrorrhagia.  Since Essure® placement, Plaintiff Fink has suffered from abnormal uterine bleeding lasting as long as four weeks.

739.    On or around March 1, 2007, Plaintiff Fink underwent a HSG  at Penn State Milton S. Hershey Medical Center, which demonstrated bilateral tubal occlusion with bilateral migration of the Essure® coils into the fallopian tubes towards the ovaries.

740.    On or around March 6, 2008, Plaintiff Fink treated with Dr. Gwendolyn Curry and she complained of severe menstrual cramps and heavy bleeding that has worsened over the past two months.  Plaintiff Fink was then scheduled for a pelvic ultrasound.

741.    On or around March 7, 2008, a transvaginal ultrasound revealed several physiologic sized follicles on Plaintiff Fink's right ovary, but no follicular cyst or fluid in the right adnexa. The left ovary could not be identified.

742.    On or around March 8, 2008, Plaintiff Fink presented to Dr. Christopher Stark at the Penn State Milton S. Hershey Medical Center Emergency Department for abdominal pain that had worsened over the course of three months.

743.    Plaintiff Fink followed up with Dr. Gwendolyn Curry on or around March 18, 2008, and according to her medical records, Plaintiff has been experiencing heavy bleeding and frequent right pelvic discomfort that has been increasing in intensity.

744.    On or around April 4, 2008, Plaintiff Fink reported to Dr. Olt that since her Essure® coils were implanted, her periods had become increasingly heavy and caused her problems.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

745.    A hysteroscopy, D&C and NovaSure endometrial ablation were performed on Plaintiff Fink on or around May 5, 2008 by Dr. George Olt at Penn State Milton S. Hershey Medical Center.  No polyps or fibroids were noted.

746.    During a follow up visit with Dr. Olt on or around June 3, 2008, Plaintiff Fink reported that since the ablation and D&C, she continued to have irregular bleeding.

747.    On or around June 12, 2008, Plaintiff Fink reported to the Penn State Milton S. Hershey Medical Center Emergency Department for ongoing vaginal bleeding and pelvis pain.

748.    On or around June 20, 2008, Plaintiff Fink reported to Dr. Matthew Davies that her bleeding is irregular and occurs periodically.

749.    Due to her severe menorrhagia, on September 9, 2008, Plaintiff Fink underwent a total laparoscopic hysterectomy and right salpingo-oopherectomy at Penn State Milton S. Hershey Medical Center performed by surgeon Dr. Matt Davies.

750.    Plaintiff Fink was not aware that Bayer's device was defective until she saw an ad on television in 2016 which advised Plaintiff Fink that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

751.    Plaintiff Fink was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

752.    After the removal of the Essure® device, Plaintiff Fink's symptoms resolved.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious due to their resolution.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**BB.    MARSHA CREASEY**

753.    Plaintiff Creasey is thirty-one (31) years old and resides in Lexa, Phillips County, Arkansas.

**1.    Initial Essure® Procedure:**

754.    On or around February 10, 2014 Plaintiff Creasey underwent the Essure® procedure at Women's Clinic of Forrest City, St. Francis County, Arkansas.

755.    Dr. Cem Sarinoglu implanted the Essure® device in Plaintiff Creasey.

**2.    Post Essure® Procedure Condition and Treatment:**

756.    Plaintiff Creasey's post-procedure has been marked by severe dysmenorrhea and menometrorrhagia, abdominal pain, a perforated right ovary, fallopian tube infections, extreme fatigue, headaches and weight fluctuation.  Before Essure®, Plaintiff had not experienced this combination of symptoms.  Her menstrual cycles were normal and she had no problem going about her daily life.

757.    For the next several years following the Essure® procedure, Plaintiff Creasey repeatedly sought treatment for her symptoms but no physician could determine their cause.

758.    For example, on or around December 25, 2015, Plaintiff Creasey presented to the emergency room at Helena Regional Medical Center in Helena, Arkansas, for abdominal pain. The medical records show that Plaintiff Creasey's Essure® coil had eroded to the sub serosal cornual site.

759.    Because the right Essure® coil punctured Plaintiff Creasey's right ovary, on or around December 31, 2015, she underwent a right oophorectomy surgery.

760.    On or around February 12, 2016, Plaintiff Creasey underwent a transabdominal pelvic ultrasound to evaluate her continuing complaints.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

761.    On or around July 15, 2016, Plaintiff Creasey presented to Helena Regional Medical Center for salpingitis and nausea.  Plaintiff Creasey was hospitalized for five days.

762.    Plaintiff Creasey was not aware that Bayer's device was defective until she saw an ad on television in 2016 which advised Plaintiff Creasey that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

763.    Plaintiff Creasey continues to suffer from injuries, including but not limited to pain and cramping cause by the implantation of the Essure® device.  Plaintiff Creasey believes that her remaining Essure® coil will have to be removed by additional surgery in the near future.

## CC.  MARITZA CABRERA

764.    Plaintiff Cabrera is forty (40) years old and resides in Lawrence, Essex County, Massachusetts.

### 1.  Initial Essure® Procedure:

765.    On or around June 15, 2007 Plaintiff Cabrera underwent the Essure® procedure in Middlesex County, Massachusetts.

766.    Byungyol Chun, MD implanted the Essure® device in Plaintiff Cabrera.

### 2.  Post Essure® Procedure Condition and Treatment:

767.    Plaintiff Cabrera's post-procedure course has been marked by vaginal itching, vaginal irritation, vaginal discharge, pelvic pain, menorrhagia, and irregular menstrual cycles. Before Essure®, Plaintiff had not experienced this combination of symptoms and had never relied on oral contraceptives to regulate her menstrual cycle.  Her menstrual cycles were normal and she had no problem with going about her daily life.

768.    Plaintiff Cabrera underwent a HSG on or about April 22, 2008, which showed that her fallopian tubes are occluded.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

769.    For the next several years, Plaintiff Cabrera repeatedly sought treatment for her symptoms but no physician could determine with certainty their cause.

770.    For example, from February 11, 2008 – March 21, 2011, Plaintiff Cabrera was seen at Greater Lawrence Family Health Center at least eight times with complaints of vaginal rash, discharge, irritation, itchiness, and pelvic pain.  Plaintiff's doctor continued to diagnose her with vaginal infections.

771.    From January of 2010 through May of 2014, Plaintiff Cabrera consistently treated for her symptoms of pelvic pain.

772.    On or around March 29, 2011, due to complaints of menorrhagia, Plaintiff Cabrera underwent a pelvic transvaginal ultrasound which revealed an Essure® device in the left fundal region of the uterus.

773.    On or around May 19, 2011, Plaintiff Cabrera underwent a CT scan of her abdomen and pelvis which revealed a linear device in the endometrial cavity extending to the left fundal serosa.  This was the same area of Plaintiff Cabrera's pain.  Dr. Elton Fennell was uncertain if the displaced Essure® device was the cause of her pain and suggested hormonal treatment.  The medical records show Dr. Fennell prescribed Plaintiff Cabrera oral contraceptives.

774.    On or around May 21, 2013, Plaintiff Cabrera underwent a transabdominal and transvaginal ultrasound which indicated that the left-sided Essure® device was in place and the right-sided Essure® device had migrated into the anterior peritoneum to the level of the umbilicus.

775.    On or around March 27, 2014, Plaintiff Cabrera underwent a surgical laparoscopy by Dr. Elton Fennell at Lawrence General Hospital for removal of the displaced Essure® device. Plaintiff Cabrera's pelvic pain improved after the removal.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

776.    Plaintiff Cabrera's other symptoms continued, and she still suffers from headaches, leg pain and intermittent pelvic pain.  In all probability, one Essure® coil is still located in her body, causing her ongoing symptoms.

**DD.    ALEXA A. CALDWELL**

777.    Plaintiff Caldwell is forty two (42) years old and resides in Lodi, Bergen County, New Jersey.

### 1.    Initial Essure® Procedure:

778.    On or around June 22, 2009, Plaintiff Caldwell underwent the Essure® procedure at Brielle Obstetrics & Gynecology, Manasquan, Monmouth County, New Jersey.

779.    Deborah Saez-Lacy, MD implanted the Essure® device in Plaintiff Caldwell.

### 2.    Post Essure® Procedure Condition and Treatment:

780.    Plaintiff Caldwell's post-procedure course has been marked by abdominal pain and cramping.  Before Essure®, Plaintiff had not experienced this combination of symptoms while on birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

781.    After Essure®, Plaintiff Caldwell describes her menstrual periods as painful with heavy bleeding, cramping and clotting.

782.    On or around August 24, 2009 and August 31, 2009, Plaintiff Caldwell saw Dr. Saez-Lacy and complained of lower abdominal cramps and pain since Essure®.

783.    Plaintiff Caldwell continues to suffer from injuries, including but not limited to abdominal pain, cramping, heavy bleeding and clotting, caused by the implantation of the Essure® device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

784.    Plaintiff Caldwell has suffered from these symptoms for over approximately eight (8) years, and was unaware that her pain could be caused by the Essure® device.  Plaintiff Caldwell did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

785.    Plaintiff is presently seeking a physician who will remove Bayer's Essure® device in order to address her symptoms.

**EE.    MELISSA SLAYBACK**

786.    Plaintiff Slayback is forty-six (46) years old and resides in Trenton, Butler County, Ohio.

**1.    Initial Essure® Procedure:**

787.    On or around December 28, 2009, Plaintiff Slayback underwent the Essure® procedure at Atrium Medical Center, Franklin, Warren County, Ohio.  During the same procedure, Plaintiff Slayback underwent a hysteroscopy, D&C, and a ThermaChoice global endometrial ablation.

788.    Judith J. Burichin, M.D. implanted the Essure® device in Plaintiff Slayback.

**2.    Post Essure® Procedure Condition and Treatment:**

789.    Plaintiff Slayback's post-procedure course has been marked by amenorrhea, low back and pelvic pain, migraines, anemia, heavy bleeding, joint pain and hair loss.

790.     Until 2011, Plaintiff Slayback had regular menstrual periods, but suffered from lower back pain, pelvic pain, and migraines.  Thereafter, Plaintiff Slayback began to suffer from anemia, heavy bleeding, joint pain and hair loss.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

791.    On or around June 22, 2010, Plaintiff Slayback underwent a HSG test which indicated occlusion of both fallopian tubes.

792.    For the next several years following the Essure® procedure, Plaintiff Slayback repeatedly sought treatment for her symptoms, but no physician could determine their cause.

793.    For example, on November 29, 2011, Plaintiff Slayback presented to Dr. Jewel Stevens with complaints of lower back pain, cramping and pelvic pain.

794.    On August 29, 2012, Plaintiff again met with Dr. Jewel Stevens to discuss her severe pelvic pain that had persisted for eight months.

795.    Throughout 2015, Plaintiff Slayback presented to Dr. Jewel Stevens for follow-up for her pelvic pain, abnormal uterine bleeding, migraines and anemia.

796.    Plaintiff Slayback is scheduled on or around April 17, 2017 for a vaginal ultrasound to determine if a hysterectomy will be necessary to treat her symptoms.

797.    Plaintiff Slayback continues to suffer from lower back pain, pelvic pain, migraines, anemia, heavy bleeding, joint pain and hair loss.

798.    Plaintiff Slayback was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

799.    Plaintiff Slayback was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**FF.    JILL POTWIN**

800.    Plaintiff Potwin is forty-two (42) years old and resides in Claremont, Sullivan County, New Hampshire.

### 1.  Initial Essure® Procedure:

801.    On or around March 8, 2007, Plaintiff Potwin underwent the Essure® procedure at Valley Regional Hospital in Claremont, New Hampshire.

802.    Dr. Ellen Joyce implanted the Essure® device in Plaintiff Potwin.

### 2.  Post Essure® Procedure Condition and Treatment:

803.    Plaintiff Potwin's post-procedure period has been marked by irregular menses, abdominal pain, menorrhagia, joint pain, and fibromyalgia.  Before Essure®, Plaintiff had not experienced this combination of symptoms and she had no problem with going about her daily life.

804.    On or around November 18, 2010, Plaintiff Potwin presented to the Valley Regional Hospital emergency room with abdominal pain and menorrhagia.

805.    On or around May 19, 2014, Plaintiff Potwin presented to Dr. Elaine Silverman with complaints of irregular menses (every two weeks) and advised that she had a uterine ablation the previous year with no relief.

806.    Plaintiff Potwin repeatedly sought treatment for her symptoms but no physician could determine with certainty their cause.

807.    On or around December 8, 2014, Plaintiff Potwin presented with pain in multiple joints.  She could not "get up and walk" without pain.  Plaintiff Potwin's, pain continued and she was diagnosed with fibromyalgia by Dr. Silverman.

808.    Plaintiff Potwin continues to suffer with pain and irregular menstrual cycles.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

809.    Plaintiff Potwin was not aware that Bayer's device was defective until she saw a legal advertisement in the Summer of 2016 and learned that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**GG.   MICHELLE POWERS**

810.    Plaintiff Powers is forty-one (41) years old and resides in Dallas, Paulding County, Georgia.

### 1.   Initial Essure® Procedure:

811.    On or around July 17, 2013, Plaintiff Powers underwent the Essure® procedure at the Associates for Women's Medicine ("AWM") in North Syracuse, Onondaga County, New York.

812.    Dr. James E. Brown implanted the Essure® device in Plaintiff Powers.

### 2.   Post Essure® Procedure Condition and Treatment:

813.    Plaintiff Powers' post-procedure course has been marked by severe abdominal pain, cramping and fatigue.

814.    On or around March 26, 2014, Plaintiff Powers presented to St. Joseph Hospital in Syracuse, New York, for a HSG, which showed both Essure® coils were properly located and bilateral tubal occlusion.

815.    On or around December 3, 2014, Plaintiff Powers spoke with Nurse Romancik at AWM with complaints of migraine headaches for the past six months.  Plaintiff Powers asked if the migraines could be associated with the Essure® procedure.  Nurse Romancik assured Plaintiff Powers that there was no association of headaches with Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

816.    On or around December 24, 2014, Plaintiff Powers again called AWM and spoke with Nurse Mabie for complaints of lower pelvic pain for many months.  She described the pain as being a constant sharp stabbing "where my tubes are."  She also complained of large clots during her menses.

817.    A pelvic ultrasound was performed on or around January 12, 2015 at AWM, which was normal.  At Plaintiff Powers' follow-up appointment at AWM on or around January 15, 2015, she complained of increased cramping and clotting during menses.  At this appointment, Dr. James Tucker reassured Plaintiff Powers that the Essure® was not causing her current complaints.

818.    On or around November 16, 2016, Plaintiff Powers presented to Dr. Curtis Cheek's office complaining of fatigue.  Dr. Cheek gave Plaintiff Powers a referral to Dr. Vincent S. Scott for a routine gynecological consult.

819.    On or around November 23, 2016, Plaintiff Powers presented to Dr. Vincent Scott's office with complaints of severe pelvic pain associated with her menstruation.  Dr. Scott ordered a urinalysis and a pelvic ultrasound.

820.    On or around December 5, 2016, Plaintiff Powers presented for follow up visit with Dr. Scott.  Medical records indicate that Plaintiff Powers suffered from painful menstruation for three months and that she felt the Essure® coils when bending or lifting.  She expressed her desire to have Essure® coils surgically removed.

821.    On or around January 13, 2017, Plaintiff Powers presented Dr. Cheek's office for a well-woman exam.  The Plaintiff complained of pelvic pain on both sides around menstruation and pressure due to Essure®.

822.    On or around February 8, 2017, Plaintiff Powers underwent a bilateral salpingectomy at WellStar Paulding Hospital in Hiram, Georgia.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

823.    Plaintiff Power's symptoms resolved only after removal of her Essure® device. Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  In fact, her doctors and nurses reassured Plaintiff Powers that the Essure® had nothing to do with her complaints.  After the removal, the cause of her problems became obvious, due to their resolution.

**HH.    CORA CARILLO**

824.    Plaintiff Carillo is forty (40) years old and resides in Tucson, Pima County, Arizona.

### 1.    Initial Essure® Procedure:

825.    On or around October 2, 2014, Plaintiff Carillo underwent the Essure® procedure, under general anesthesia, at Tucson Medical Group in Tucson, Pima County, Arizona.

826.    Walter H. Brewer, M.D. implanted the Essure® device in Plaintiff Carillo.

827.    Plaintiff Carillo was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

### 2.    Post Essure® Procedure Condition and Treatment:

828.    Plaintiff Carillo's post-procedure course has been marked by menorrhagia, dysmenorrhea, bloating and headaches.  Before Essure®, Plaintiff Carillo had not experienced this combination of symptoms before.  Her menstrual periods were normal and she had no problem going about her daily life.

829.    After Essure®, Plaintiff Carillo's pain and headaches were so severe that she would miss work.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

830.    On or around February 5, 2016, Plaintiff Carillo presented to Dr. Marina Ganem complaining of pelvic pain.

831.    On or around February 11, 2016, Plaintiff Carillo reported lower abdomen wall pain.  Plaintiff Carillo was then scheduled for a pelvic ultrasound.

832.    On or around February 12, 2016, Plaintiff Carillo underwent a HSG at Tucson Medical Center, which confirmed bilateral tubal occlusion.

833.    Plaintiff Carillo underwent a pelvic ultrasound on or around March 2, 2016, which showed that her left fallopian tube was collecting fluid.

834.    On or around May 26, 2016, Plaintiff Carillo followed up with Dr. Herrera and was diagnosed with chronic pelvic inflammatory disease.

835.    Additionally, Plaintiff Carillo has started to notice the frequency in rashes across her stomach.  She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, due to skin irritation, swelling and itching.

836.    Plaintiff Carillo continues to suffer from injuries, including but not limited to pain and rashes.  Plaintiff Carillo has an appointment with Dr. Herrera on or around March 27, 2017, to discuss the removal of her Essure® devices.

II.    **BRANDIE TABOR**

837.    Plaintiff Tabor is twenty-seven (27) years old and resides in Summers, Washington County, Arkansas.

1.    **Initial Essure® Procedure:**

838.    On or around April 19, 2016, Plaintiff Tabor underwent the Essure® procedure at Parkhill Clinic for Women, Johnson, Washington County, Arkansas.

839.    Scott Bailey, M.D. implanted the Essure® device in Plaintiff Tabor.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2.  **Post Essure® Procedure Condition and Treatment:**

840.    Plaintiff Tabor's post-procedure course has been marked by menorrhagia, dysmenorrhea, anemia and weakness.  Prior to placement of the Essure® device Plaintiff Tabor had Nexplanon implanted for birth control.  Plaintiff Tabor's menstrual cycle prior to Essure® usually lasted five to seven days.

841.    On or around June 8, 2016, Plaintiff Tabor called Dr. Bailey's office complaining of bleeding for five months, severe cramping, and heavy bleeding for one month.  Plaintiff Tabor followed up with Dr. Scott Bailey at Parkhill Clinic for Women that day complaining of persistent abnormal uterine bleeding for one month, chronic pelvic pain and generalized weakness.  Plaintiff Tabor received an order to undergo an abdominal ultrasound.

842.    On or around July 21, 2016, Plaintiff Tabor presented to Dr. Jason Hurt to complain of irregular and heavy menstrual periods, dyspareunia, and post-coital bleeding.

843.    Plaintiff Tabor presented on or around July 28, 2016 to Creekside Center for Women to follow up with Dr. Jason Hurt post abdominal ultrasound.  The ultrasound revealed a simple cyst in the left ovary and possible adenomyosis.  Plaintiff Tabor reported midline pain that was worse since her last visit.  Records note that for months, Plaintiff Tabor's menstrual periods were unpredictable, heavy with clots and accompanied by severe cramping with occasional intermenstrual spotting.

844.    On or around August 23, 2016, Plaintiff Tabor's Nexplanon was removed at Creekside Center for Women by Dr. Jason Hurt.

845.    On or around, September 7, 2016, Plaintiff Tabor underwent a total laparoscopic hysterectomy, bilateral salpingectomy and cystoscopy at Northwest Medical Center in Springdale, Arkansas due to dysfunctional uterine bleeding, pelvic pain and dyspareunia.  The surgery was

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

performed by Dr. Jason Hurt, and according to her medical records, her Essure® coils were removed.

846.    Plaintiff Tabor was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**JJ.    JESSICA CRUZ**

847.    Plaintiff Cruz is thirty-nine (39) years old and resides in Willimantic, Windham County, Connecticut.

**1.    Initial Essure® Procedure:**

848.    On or around November 6, 2009, Plaintiff Cruz underwent the Essure® procedure at the Windham Community Memorial Hospital in Willimantic, Windham County, Connecticut.

849.    Robert Gildersleeve, M.D. implanted the Essure® device in Plaintiff Cruz.

**2.    Post Essure® Procedure Condition and Treatment:**

850.    On or around June 7, 2010, Plaintiff Cruz underwent a HSG, at Windham Community Memorial Hospital, which demonstrated bilateral tubal occlusion.

851.    Plaintiff Cruz's post-procedure course has been marked by severe abdominal pain, increased headaches, abdominal cramping, and joint pain.

852.    On or around December 30, 2009, Plaintiff Cruz treated for her migraines at Generations Family Health Center.  She was prescribed Imitrex and Topamax.  Although Plaintiff Cruz had migraines prior to her implantation with Essure®, Plaintiff Cruz had not required medication for the management of her migraines since she was fifteen years old.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

853.    On or around April 24, 2012, Plaintiff Cruz underwent a transvaginal ultrasound to evaluate her symptoms, which was normal.

854.    On or around May 7, 2012, Plaintiff Cruz presented to Dr. Saima Khalid, with complaints of continued abdominal pain and headaches.  Dr. Khalid scheduled Plaintiff Cruz for a CT of the head and ultrasound of her abdomen.

855.    On or around May 24, 2012, Plaintiff Cruz underwent another abdominal ultrasound to evaluate her symptoms.  According to her medical records, it was "essentially normal."

856.    On or around January 10, 2013, Plaintiff Cruz presented to the emergency department for abdominal pain.  A CT scan of Plaintiff Cruz's abdomen showed a new small right-sided ovarian cyst which was likely the corpus luteum cyst from a recent miscarriage.

857.    On or around February 19, 2013, Plaintiff Cruz treated with Dr. Khalid for her migraines.  She was prescribed Amitriptyline to help control the pain.

858.    Plaintiff Cruz treated for her headaches with her primary care physician, Dr. DiGeronimo, on or around September 1, 2015, and with a neurologist, Dr. Barry Gordon, on or around December 9, 2015.

859.    On or around April 19, 2016, Plaintiff Cruz reported persistent headaches and lower abdominal pain for three weeks.

860.    Since her Essure® implantation, Plaintiff Cruz has suffered two miscarriages.  Further she has become pregnant and given birth to two children.

861.     Plaintiff Cruz began to suspect that Essure® was a source of her pain symptoms after she was informed by her doctor in 2016 that her symptoms might be related to Essure® and ordered testing.  Prior to that time, Plaintiff Cruz had no notice that Bayer's device was defective.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

862.   Plaintiff Cruz continues to suffer from injuries, included but not limited to pain and headaches.  Plaintiff Cruz is currently searching for a physician to remove her Essure® coils.

**KK.   TATESHEA IRVING**

863.   Plaintiff Irving is thirty-eight (38) years old and resides in Dawson, Terrell County, Georgia.

### 1.   Initial Essure® Procedure:

864.   On or around November 20, 2013, Plaintiff Irving underwent the Essure® procedure at The Veranda Medical Center in Albany, Doughtery County, Georgia.

865.   James Reed, M.D. implanted the Essure® device in Plaintiff Irving.

866.   Plaintiff Irving chose the Essure® procedure over a Bilateral Tubal Ligation ("BTL") due to the information provided by her physician that the Essure® procedure was less painful and less expensive than a surgical BTL and Plaintiff would not require an absence from work for recovery.

### 2.   Post Essure® Procedure Condition and Treatment:

867.   Plaintiff Irving's post-procedure course has been marked by heavy menstruation, metrorrhagia, and severe cramping.

868.   Prior to the Essure® procedure, Plaintiff Irving's menstrual cycle was regular with only mild cramping.

869.   On or around January 13, 2014, Plaintiff Irving presented to Dr. James Reed's office for a post-operative follow-up after the Essure® procedure with complaints of vaginal discharge and spotting varying from bright red to brown in color.  Plaintiff Irving was prescribed Diflucan and told to continue Generess for two more months.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

870.    On or around February 19, 2014, Plaintiff Irving presented to Dr. Reed's office complaining of metrorrhagia.  At this time Plaintiff Irving was offered medical options such as an ablation, hysterectomy, and an IUD.

871.    On or around February 25, 2014, Plaintiff Irving presented to Dr. Reed's office for a follow-up appointment.  She was still experiencing metrorrhagia and expressed a desire for a hysterectomy.

872.    On or around March 25, 2014, Plaintiff Irving presented to Phoebe Putney Memorial Hospital in Albany, Georgia for a supracervical laparoscopic hysterectomy.  According to her medical records, pathology confirmed the removal of two metallic coiled wires.

873.    During the period of time that Essure® was implanted, Plaintiff Irving also experienced hair loss in addition to metrorrhagia and severe cramping.

874.    After the removal of the Essure® coils in the hysterectomy, Plaintiff Irving's symptoms resolved.

875.    Plaintiff Irving was not aware that Bayer's device was defective until 2016 when she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.

**LL.    TOKI SANDOVAL**

876.    Plaintiff Sandoval is forty-five (45) years old and resides in St. Thomas, U.S. Virgin Islands.

### 1.   Initial Essure® Procedure:

877.    On or around August 15, 2011, Plaintiff Sandoval underwent the Essure® procedure under general anesthesia at Advocate Sherman Hospital in Elgin, Kane County, Illinois.

878.    Brad Epstein, M.D. implanted the Essure® device in Plaintiff Sandoval.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2.  **Post Essure® Procedure Condition and Treatment:**

879.    Plaintiff Sandoval's post-procedure course was marked by immediate cramping, heavy uterine bleeding, large clots, tachycardia, anemia and weakness.

880.    On or around August 20, 2011, Plaintiff Sandoval presented to Advocate Sherman Hospital complaining of the aforementioned symptoms since the Essure® procedure.  Plaintiff Sandoval was admitted for observation and care.

881.    On or around August 21, 2011, Dr. Brad Epstein determined that Plaintiff Sandoval suffered from severe menorrhagia causing anemia and unstable vital signs.  She required a blood transfusion and an emergency D&C with the possibility of hysterectomy.

882.    On or around August 21, 2011, Plaintiff Sandoval underwent a video hysteroscopy that revealed a uterine rupture.  As a result, she also underwent a total vaginal hysterectomy and bilateral salpingectomy.

883.    Plaintiff Sandoval did not realize until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

MM.  **SHEYRA LUGO**

884.    Plaintiff Lugo is thirty-seven (37) years old and resides in Orlando, Orange County, Florida.

1.  **Initial Essure® Procedure:**

885.    On or around May 4, 2007, Plaintiff Lugo underwent the Essure® procedure at Orlando Regional Healthcare System in Orlando, Orange County, Florida.

886.    Douglas Gearity, M.D. implanted the Essure® device in Plaintiff Lugo.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

887.    Plaintiff Lugo went to Dr. Gearity inquiring about permanent birth control.  Dr. Gearity directed the patient towards Essure®.  He told the Plaintiff that Essure® was a procedure that would have no downtime, no surgical incision, and would be less painful and less complicated than a tubal ligation.

### 2.   Post Essure® Procedure Condition and Treatment:

888.    Plaintiff Lugo's post-procedure period has been marked by heavy menstruation, abdominal pain, bloating, frequent vaginal infections, back and joint pain, dysuria, hair loss and pain/bleeding during intercourse.

889.    On or around April 7, 2008, Plaintiff Lugo presented to Dr. Gearity's office after having a positive home pregnancy test.  Plaintiff Lugo's pregnancy was confirmed, and her son was born on November 21, 2008.

890.    On or round January 2, 2009, Plaintiff Lugo called Dr. Gearity, with complaints of heavy menstruation.

891.    On or around January 16, 2009, Plaintiff Lugo presented to Orlando Health in Orlando, Florida for a HSG test.  Records indicate that the right coil was appropriately located with tubal occlusion but the left tube showed apparent migration of Essure®.

892.    On or around December 13, 2012, Plaintiff Lugo presented for an office visit with Dr. Pamela Cates-Smith in Winter Park, Florida, for a consult for bilateral tubal ligation as she did not wish to get pregnant again.  On or around December 28, 2012, the Plaintiff presented to Same Day Surgicenter of Orlando in Orlando, Florida for a bilateral tubal ligation with Filshie clips.

893.    On or around November 18, 2015, Plaintiff Lugo presented to Dr. Cates-Smith office complaining of pain and bleeding during intercourse.  Dr. Cates-Smith ordered a pelvic ultrasound which showed the left Essure® device located partially into the endometrial cavity.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

894.    Plaintiff Lugo continues to have abdominal pain, frequent vaginal infections, heavy menstruation, joint pain, dysuria, and pain/bleeding associated with intercourse.  Plaintiff Lugo still suffers from hair loss.

895.    Plaintiff Lugo has suffered from these symptoms for over nine years, and her physicians keep telling her that her pain is not being caused by the Essure® device.  Plaintiff Lugo did not realize, until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly suspected that her symptoms were related to Essure®.

896.    Plaintiff Lugo still has the Essure® device surgically implanted in her right side fallopian tube and migration of her left side Essure® into her endometrial cavity.  She wants the Essure® devices removed, but cannot afford the removal procedure at this time.

**NN.    AMBER SALMON**

897.    Plaintiff Salmon is thirty-one (31) years old and resides in Uniontown, Fayette County, Pennsylvania.

**1.    Initial Essure® Procedure:**

898.    On or around February 17, 2011, Plaintiff Salmon underwent the Essure® procedure at Southwest Women's Health, Uniontown, Fayette County, Pennsylvania.

899.    Rajnikant Popat, M.D. implanted the Essure® device in Plaintiff Salmon.

**2.    Post Essure® Procedure Condition and Treatment:**

900.    Plaintiff Salmon's post-procedure period has been marked by menorrhagia, dysmenorrhea, and painful intercourse.  Prior to placement of the Essure® device, Plaintiff Salmon relied upon Depo-Provera for birth control.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

901.    On or around March 29, 2011, Plaintiff Salmon followed up with Dr. Rajnikant Popat at Southwest Women's Health, complaining of abnormal uterine bleeding, chronic pelvic pain, painful intercourse and right-sided abdominal pain.  Plaintiff Salmon was unable to undergo a HSG test due to her insurance declining coverage.

902.    On or around March 11, 2013, Plaintiff Salmon followed up at Southwest Women's Health and stated she was having painful intercourse and pain in her left lower quadrant.

903.    On or around September 3, 2013, Plaintiff Salmon had a follow-up visit at Southwest Women's Health where she complained of lower abdominal pain that radiated to the right side of her body, as well as painful intercourse.

904.    On or around October 31, 2013, Plaintiff Salmon underwent a total vaginal hysterectomy, bilateral hemi-salpingectomy and excision of Essure® coils at Uniontown Hospital in Uniontown, Pennsylvania due to chronic pelvic pain and dyspareunia.  Dr. Rod Hojat performed the surgery.  Dr. Hojat noted that the Essure® coil was protruding from the right hand tube, which he excised, then removed the remaining portion of the tube which had a part of the Essure® coil in it.

905.    Plaintiff Salmon's cramping, and pelvic pain resolved after Essure® was removed.

906.    Plaintiff Salmon was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**OO.    DENISE NELSON**

907.    Plaintiff Nelson is thirty-eight (38) years old and resides in Brown Deer, Milwaukee County, Wisconsin.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1.   Initial Essure® Procedure:

908.    On or around January 6, 2009, Plaintiff Nelson underwent the Essure® procedure at Aurora Sinai Women's Health Center in Milwaukee, WI.

909.    Gina M. Kleist, M.D. implanted the Essure® device in Plaintiff Nelson.

### 2.   Post Essure® Procedure Condition and Treatment:

910.    Plaintiff Nelson's post-procedure period has been marked by severe abdominal pain and cramping, headaches, high blood pressure, rashes, unusually heavy menstruation and unusually large blood clots.  Plaintiff Nelson's menstruation was so heavy at times that she had a puddle of blood in her bed after sleeping or in the seat of her car when driving somewhere.

911.    On or around May 25, 2012, Plaintiff Nelson presented to Dr. Dennis Baumgardner with complaints of headaches and elevated blood pressure.

912.    On or around February 1, 2015, Plaintiff Nelson presented to Dr. Knox Kjersti's office in Milwaukee, Wisconsin, complaining of abdominal cramping and headaches.

913.    On or around April 11, 2016, Plaintiff Nelson presented to Dr. Jasmine Wiley's office complaining of vaginal bleeding with large clots with menstruation that are tennis ball size. Records indicate that the Plaintiff was also experiencing spotting in between her menstruation.

914.    On or around May 11, 2016, Plaintiff Nelson presented to Dr. Kjersti Knox's office with continued complaints of migraines and excessive bleeding.  Dr. Knox discussed with the Plaintiff that 2% of patients experience menorrhagia.  Dr. Knox recommended a colonoscopy.

915.    On or around June 14, 2016, Plaintiff Nelson presented for a colonoscopy and a cervical biopsy with Dr. Lisa Sullivan Vedder for increased menstrual bleeding and cramping since the placement of Essure®.

916.    Plaintiff Nelson continues to have severe abdominal pain and cramping, headaches, high blood pressure, rashes, unusually heavy menstruation and unusually large blood clots.

917.    Plaintiff Nelson has suffered from these symptoms for over eight years, and her physicians have consistently provided alternate causes for her symptoms than Essure®.  Plaintiff Nelson did not realize, until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**PP.    LINDA SLAUSON**

918.    Plaintiff Slauson is forty-seven (47) years old and resides in Greenup, Greenup County, Kentucky.

### 1.    Initial Essure® Procedure:

919.    On or around December 19, 2013, Plaintiff Slauson underwent the Essure® procedure at Southern Ohio Medical Center in Portsmouth, Ohio.

920.    George Pettit, M.D. implanted the Essure® device in Plaintiff Slauson.

### 2.    Post Essure® Procedure Condition and Treatment:

921.    Plaintiff Slauson's post-procedure course has been marked by menorrhagia, dysmenorrhea, cramping, bloating, extreme fatigue, depression, suicidal thoughts, brain fog, vaginal yeast infections, rashes, irritability, changes in taste/smell, Vitamin D deficiency and pre-menopausal symptoms.  Prior to Essure®, Plaintiff Slauson was competing in body building contests, working out twice a day, and had no major health issues.  Plaintiff Slauson's menstrual cycle prior to Essure® was every 28 days with no excessive bleeding.

922.    Based upon information and belief, on or around May 8, 2014, Plaintiff Slauson had a HSG test at Southern Ohio Medical Center by Dr. George Pettit.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

923.    On or around March 24, 2014 to October 21, 2016, Plaintiff Slauson, presented to Bellefonte Family Medicine, Dr. Ryan Sandlin, Midwest Allergy Associates, Cincinnati Arthritis, Dr. Kelly Rath, and Ohio Health Grant for treatment of fatigue, joint pain, rashes, inflammatory arthritis, degenerative disc disease, osteoarthritis involving multiple joints, back pain and was found to be ANA positive.

924.    On or around February 2, 2015, Plaintiff Slauson presented to Dr. Sandlin with questions about her Essure procedure and complaining of heavy menses every month, joint pain, and fatigue.

925.    On or around May 29, 2015, Plaintiff Slauson underwent a total abdominal hysterectomy, bilateral salpingectomy for menorrhagia, pain post Essure® placement under general anesthesia performed by Dr. Kelly Rath.

926.    Despite suffering from these symptoms for a year and a half, Plaintiff Slauson's symptoms resolved only after the removal of her Essure® device during her total hysterectomy. Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

927.    Plaintiff Slauson did not realize that she had a legal remedy due to her injuries from Essure®, until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure® and the legal options available to her.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**QQ. JENNIFER COMPTON**

928.    Plaintiff Compton is forty-four (44) years old and resides in Anderson, Anderson County, South Carolina.

### 1. Initial Essure® Procedure:

929.    On or around February 9, 2010, Plaintiff Compton underwent the Essure® procedure under general anesthesia at Oconee Ob/Gyn in Seneca, Oconee County, South Carolina.

930.    Plaintiff Compton was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

931.    Plaintiff Compton was directed toward Essure® due to the fact that there was no downtime and it was an office procedure.  She was assured that Essure® was as safe or safer than tubal ligation, was as effective as tubal ligation and involved less pain and recovery time.

### 2. Post Essure® Procedure Condition and Treatment:

932.    Plaintiff Compton's post-procedure period has been marked by abdominal and pelvic pain, dysfunctional uterine bleeding, painful intercourse, weight loss, and fatigue.

933.    On or around August 2, 2011, Plaintiff Compton presented to AnMed Health OB/GYN due to irregular bleeding since April.  She described heavy, prolonged periods lasting up to two or three weeks.  Plaintiff Compton reported taking progesterone cream daily to manage the uterine bleeding.

934.    On or around August 3, 2011, Plaintiff Compton underwent an ultrasonography to evaluate her abnormal intrauterine bleeding.  It did not reveal any abnormalities.

935.    On or around April 2, 2012, Plaintiff Compton presented to AnMed Health OB/GYN to again discuss her heavy, irregular menstrual periods.  She reported that she continues

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

to take progesterone cream daily, but, despite this, she continues to have periods that last twelve to fourteen days with clotting.  Plaintiff Compton desired to have an ablation procedure at this time.

936.    On or around April 4, 2012, Plaintiff Compton underwent a hysteroscopy, D&C, and endometrial ablation at AnMed OB/GYN to evaluate and treat her abnormal uterine bleeding. Plaintiff Compton was told by her doctor that the Essure® coils had been removed during the ablation.

937.    Almost four weeks later, on or around April 27, 2012, Plaintiff Compton presented to the emergency room with complaints of vaginal bleeding and abdominal cramping.

938.    Plaintiff Compton was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

939.    Plaintiff Compton is scheduling an appointment for a pelvic x-ray to confirm the Essure® device has been removed.

**RR.    NIESHA ANDERSON**

940.    Plaintiff Anderson is thirty-two (32) years old and resides in Eagan, Dakota County, Minnesota.

### 1.    Initial Essure® Procedure:

941.    On or around June 3, 2011, Plaintiff Anderson underwent the Essure® procedure at Associates in Women's Health, Hennepin County, Minnesota.

942.    Dr. Jill Rusterholz implanted the Essure® device in Plaintiff Anderson.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2.  **Post Essure® Procedure Condition and Treatment:**

943.    Plaintiff Anderson's post-procedure course has been marked by rashes and a burning sensation on her arms and neck, hair loss, fatigue, abdominal pain and painful intercourse. Prior to Essure® placement, Plaintiff Anderson relied upon oral contraceptives for birth control purposes.

944.    Plaintiff Anderson underwent a HSG test on or about September 23, 2011, which showed that the fallopian tubes were occluded bilaterally.

945.    Almost immediately following her Essure® procedure, Plaintiff Anderson suffered from fatigue, insomnia, and painful intercourse. She also experienced rashes on her arms and neck and a burning sensation on her arms beginning approximately one year after her Essure® implant.

946.    On or around December 9, 2015, Plaintiff Anderson presented at Fairview Clinic for vaginitis.

947.    From May 17, 2016 through January 3, 2017, Plaintiff Anderson treated consistently for abdominal pain. Plaintiff Anderson was hospitalized at North Memorial Hospital for one week on or around May of 2016. A stent was implanted in her bile duct on or around September 2016, but the stent was later found to be unnecessary and contributed toward pancreatitis. The stent was removed, and Plaintiff Anderson's abdominal pain continued.

948.    On or around February 14, 2017, Plaintiff Anderson presented to Dr. Ruth Merid to discuss removal of her Essure® device due to a plethora of symptoms including sharp pelvic pain, bleeding after intercourse, painful intercourse, chronic abdominal pain, hair loss, and weight loss.

949.    Plaintiff Anderson underwent Essure® explant surgery on March 9, 2017, by Dr. Ruth Merid at Regence Hospital in St. Paul, Minnesota.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

950.    It is still too early to determine whether Plaintiff Anderson's symptoms will resolve following her explant surgery.  Until she saw a legal advertisement, Plaintiff Anderson did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**SS.    ALEXIS ARENAS**

951.    Plaintiff Arenas is twenty-six (26) years old and resides in Tucson, Pima County, Arizona.

**1.    Initial Essure® Procedure:**

952.    On or around November 30, 2012, Plaintiff Arenas underwent the Essure® procedure at Ironwoods OB/GYN, Pima County, Arizona under general anesthesia.

953.    Kathryn Landherr, MD, implanted the Essure® device in Plaintiff Arenas.

**2.    Post Essure® Procedure Condition and Treatment:**

954.    Plaintiff Arenas' post-procedure course has been marked by pelvic pain, fatigue, menorrhagia, rashes, joint pain and painful intercourse.  Plaintiff Arenas had not experienced this combination of symptoms prior to Essure®.

955.    On or around March 12, 2014, Plaintiff presented with stomach pain, dizzy spells, and a late menstrual period at Tucson Clinica Medica Familia.

956.    Following, on or around April 4, 2014, Plaintiff Arenas presented at Tucson Clinica Medica Familia with complaints of a rash below the right side of her breast.

957.    On or around June 10, 2015, Plaintiff Arenas underwent a pelvic ultrasound at Tucson Clinica Medica Familia.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

958.    On or around May 25, 2016, Plaintiff Arenas presented to Ironwood OB/GYN with complaints of body aches, fatigue, irregular heavy menstrual periods with clotting, and painful intercourse.  At this time, Plaintiff Arenas requested the Essure® be removed.

959.    On or around July 8, 2016, Plaintiff Arenas once again presented to Ironwood OB/GYN with complaints of pelvic pain, dysmenorrhea, and abnormal bleeding.

960.    On or around July 13, 2016, Plaintiff Arenas underwent a laparoscopic bilateral salpingectomy and removal of the Essure® coils bilaterally at Ironwoods OB/GYN due to pelvic pain and fatigue.

961.    Despite suffering from these symptoms for over three years, Plaintiff Arenas' symptoms resolved only after removal of her Essure® device.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious due to their resolution.

**TT.    AMY MCMICHEN**

962.    Plaintiff McMichen is thirty-six (36) years old and resides in East Bank, Kanawha County, West Virginia.

### 1.    Initial Essure® Procedure:

963.    On or around December 3, 2010, Plaintiff McMichen underwent the Essure® procedure at Dr. David Patton's office in Charleston, Kanawha County, West Virginia.

964.    David Patton, M.D. implanted the Essure® device in Plaintiff McMichen.

### 2.    Post Essure® Procedure Condition and Treatment:

965.    Plaintiff McMichen's post-procedure course has been marked by severe abdominal pain and cramping, unusually heavy menstruation, and frequent vaginal infections.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

966.    On or around January 17, 2011, Plaintiff McMichen presented to Charleston Area Medical Center Emergency Room ("CAMC ER") in Charleston, West Virginia complaining of pelvic pain since the Essure® procedure.  Plaintiff McMichen informed the doctors that she has gotten lightheaded but has never passed out.  Pain was rated at 6/10 and nothing made it better. Plaintiff McMichen was diagnosed with dysfunctional uterine bleeding and discharged home.

967.    On or around September 19, 2011, Plaintiff McMichen underwent an ultrasound to evaluate her symptoms.  The results of the ultrasound indicated an unremarkable uterus and left ovary, the right ovary was not visualized.

968.    On or around March 24, 2012, Plaintiff McMichen presented to CAMC ER complaining of abdominal pain.  An ultrasound revealed a complex left ovarian cyst.  Records indicate that the Plaintiff had a vaginal infection. The Plaintiff was prescribed Flagyl and told to follow up with her primary care physician.

969.    On or around January 28, 2013, Plaintiff McMichen presented to CAMC ER with complaints of intermenstrual bleeding and cramping.  Records indicate that it was the Plaintiff's third menstruation that month and she had used twelve pads in two days. Plaintiff was diagnosed with dysfunctional uterine bleeding and bacterial vaginosis and was prescribed Flagyl and Naprosyn.

970.    On or around March 2, 2015, Dr. Patton performed a laparoscopically assisted vaginal hysterectomy and bilateral salpingo-oophorextomy on Plaintiff McMichen at Charleston Area Medical Center due to her chronic pelvic pain.

971.    Additionally, although Plaintiff McMichen has not been tested for a nickel allergy, she cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation.

972.    Plaintiff McMichen was not aware that Bayer's device was defective until she saw an ad on television in 2016 and advised Plaintiff McMichen that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

UU.  **CRYSTAL GASSETT**

973.    Plaintiff Gassett is thirty five (35) years old and resides in Lakin, Kearny County, Kansas.

1.  **Initial Essure® Procedure:**

974.    On or around April 7, 2015 Plaintiff Gassett underwent the Essure® procedure, under monitored anesthesia care ("MAC") anesthesia with local, at Kearney County Hospital, Kearney County, Kansas.

975.    Bret Heskett, M.D. implanted the Essure® device in Plaintiff Gassett.

2.  **Post Essure® Procedure Condition and Treatment:**

976.    Plaintiff Gassett's post-procedure course has been marked by extremely heavy menstruation lasting more than a week with severe cramping, rashes, joint pain and hair loss.  Dr. Heskett advised that the cramping was normal.

977.    On or around May 26, 2015, Plaintiff Gassett presented for an office visit with Dr. Tamara Meisel with complaints of heavy menstrual bleeding that began two weeks prior, blood clots, and cramping for two days.  According to her medical records, Plaintiff Gassett went through a box of twenty tampons in two days.  Plaintiff Gassett had not experienced this combination of symptoms while not on birth control.  Before Essure®, her menstrual periods were normal and she had no problem with going about her daily life

978.    On or around May 27, 2015, Plaintiff Gassett underwent a pelvic ultrasound that showed a thickened endometrium.  According to her medical records, the pathology report states

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

"tissue passed per vagina: Hemorrhagic and necrotic decidua accompanied by organized blood clot."

979.    On or around June 2, 2015, Plaintiff Gassett present for an office visit with Dr. Meisel with complaints of heavy menstrual bleeding off and on.

980.    Plaintiff Gassett underwent a HSG on or about June 24, 2015, which showed both fallopian tubes are occluded.

981.    On or around September 3, 2015, Plaintiff Gassett had an office visit with Dr. Lisa Gilbert with complaints of a rash/lesion noticed approximately a week ago.  The rash/lesion was described as raised, red, and puffy lesion/rash with sensitively to touch and painful.  She was diagnosed with Folliculitis and prescribed Bactrim.

982.    On or around February 1, 2016, Plaintiff Gassett had an office visit with Dr. Gilbert with complaints of heavy periods and menstrual cramps.  Dr. Gilbert's notes indicate that Plaintiff Gassett's symptoms had been present for four months.  He also notes that Plaintiff reports having the pain since Essure® placement in April 2015, and that it has increasingly gotten worse.  Dr. Gilbert advised Plaintiff Gassett to return to Dr. Heskett who implanted the Essure® device for evaluation.

983.    On or around August 4, 2016, Plaintiff Gassett had an office visit with Dr. Jonathan Peters for complaints of constant low abdominal pain.  A transvaginal pelvic ultrasound was ordered.  On or around August 12, 2016, after review of the transvaginal pelvic ultrasound, Dr. Peters referred Plaintiff Gassett to Dr. Hall/Dr. West for trial OCP.

984.    For almost two years, Plaintiff Gassett repeatedly sought treatment for her symptoms, but no physician was able to determine the cause.  After Essure®, her cramping is so

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

severe Plaintiff Gassett has trouble taking care of her two-year old daughter.  Moreover, Plaintiff continues to experience joint pain and hair loss.

985.    Plaintiff Gassett is presently seeking a physician who will remove Bayer's device in order to address her symptoms.

**VV.    KERI-ANNE ROGERS**

986.    Plaintiff Rogers is thirty-one (31) years old and resides in Taunton, Bristol County, Massachusetts.

1. **Initial Essure® Procedure:**

987.    On April 30, and May 24, 2015, Plaintiff Rogers was counseled regarding Essure® by Dr. Maria Molina.  At that time, Plaintiff Rogers understood Essure® to be as safe as or safer than tubal ligation, with the same or less side effects and without the need for surgery and a quicker recovery time.

988.    On May 19, 2015, Plaintiff Rogers signed a standard "Informed Consent" without any of the long term risks specific to Essure® being listed.

989.    On or around May 28, 2015, Plaintiff Rogers underwent the Essure® procedure at Morton Hospital, Taunton, MA. She underwent general anesthesia for the procedure.

990.    Maria Molina, M.D. implanted the Essure® device in Plaintiff Rogers.

2. **Post Essure® Procedure Condition and Treatment:**

991.    Plaintiff Rogers' post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, pain after intercourse, joint pain in left shoulder/neck, rashes, hair loss and worsening asthma.  These are all symptoms that Plaintiff Rogers' were unaware may be caused by Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

992.    Plaintiff Rogers is currently seeking a new doctor to discuss undergoing a hysterectomy to relieve her symptoms but nothing is scheduled.

993.    Plaintiff Rogers has not been tested for a nickel allergy but she has experienced joint pain, hair loss, and rashes subsequent to her Essure® implantation.

994.    Plaintiff Rogers was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

995.    Essure® is still implanted in Plaintiff Rogers.

**WW.  JENNIFER LANGLEY**

996.    Plaintiff Langley is twenty-seven (27) years old and resides in Tucson, Pima County, Arizona.

1.  **Initial Essure® Procedure:**

997.    On or around October 5, 2007, Plaintiff Langley underwent the Essure® procedure at Grant Medical Center in Columbus, Franklin County, Ohio under general anesthesia.

998.    Dr. Alan Sacolick implanted the Essure® device in Plaintiff Langley.  Plaintiff Langley opted for Essure® versus tubal ligation because she was told that Essure® could be inserted without surgery, that the recovery time from the procedure was quicker and less painful and that Essure® was as safe and effective or more safe and more effective than tubal ligation with the same or less side effects.

2.  **Post Essure® Procedure Condition and Treatment:**

999.    Plaintiff Langley's post-procedure course has been marked by fatigue, insomnia, dysmenorrhea, menometrorrhagia, headaches, joint pain, hair loss, and weight gain.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1000.  Prior to Essure® placement, Plaintiff Langley menstrual cycle was normal and regular, and she did not rely on oral contraceptives or other forms of birth control to manage her menstrual cycle.

1001.  On or around February 9, 2016, Plaintiff Langley presented for a well woman visit with Dr. Amol Arora. Records indicate that she suffered from pelvic pain, back pain, dysmenorrhea, menorrhagia with regular cycles, headaches, insomnia and lower extremity edema beginning three years prior. Dr. Arora discussed the possibility that these symptoms were related to Essure® with Plaintiff Langley at this time.

1002.  Plaintiff Langley underwent an ultrasound of the pelvis on February 29, 2016 in which the left Essure® coil was seen medially abutting the endometrium. The right Essure® coil was not visualized.  Thereafter, Plaintiff Langley underwent an HSG test on or about March 10, 2016, which showed that bilateral fallopian tube occlusion and noted bilateral fallopian tube occlusion devices.

1003.  On April 12, 2016, Plaintiff Langley met with Dr. Arora to discuss her menorrhagia, pelvic pain, back pain, bloating, cramps, diarrhea, fatigue, nausea, forgetfulness.

1004.  Plaintiff Langley underwent Essure® explant surgery on April 25, 2016 at Mount Carmel St. Ann's Hospital in Westerville, Ohio under Dr. Arora due to her menorrhagia, pelvic pain, and the uterine foreign body. The procedure included a robotic-assisted total laparoscopic hysterectomy and bilateral salpingectomy. The operative report noted the left Essure® coil protruding into the endometrial cavity, but stated that the right Essure® coil could not be located within the right fallopian tube.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1005.   On or around April 27, 2016, Plaintiff Langley was evaluated for a possible retained right Essure® coil. Radiology could not identify any retained coils, despite the fact that on February 29, 2016 both coils were found via the HSG test.

1006.   Until she saw a legal advertisement, Plaintiff Langley did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

## XX.   MEARA CANNON

1007.   Plaintiff Cannon is thirty-two (32) years old and resides in Saunderstown, Rhode Island.

### 1.   Initial Essure® Procedure:

1008.   On or around April 8, 2010, Plaintiff Cannon underwent the Essure® procedure at South County Hospital, Wakefield, Rhode Island.

1009.   Steven Schneider, M.D. implanted the Essure® device in Plaintiff Cannon at the same time he performed a hysteroscopy with polypectomy, placement of suburethral sling and cystourethroscopy under general anesthesia.    For Plaintiff Cannon, Essure® offered no real advantage over tubal ligation.  She still underwent recovery time equivalent to a tubal ligation; nevertheless, she underwent the procedure with the believe that Essure® was as effective as tubal ligation for permanent birth control, as safe or safer than tubal ligation and had the same or less side effects as tubal ligation.

### 2.   Post Essure® Procedure Condition and Treatment:

1010.   Plaintiff Cannon's post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, and pain after intercourse.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1011.   Plaintiff Cannon presented to Dr. Steven Schneider in early 2012 complaining of irregular, painful, heavy menses.  Plaintiff reported to Dr. Schneider that she had been having irregular painful menses for the past five months. An endometrial biopsy was performed that was determined to be normal.

1012.   As a result of these heavy, painful periods, on March 29, 2012, Plaintiff Cannon underwent a diagnostic hysteroscopy and endometrial ablation with NovaSure under laryngeal mask airway anesthesia.  During the procedure, Dr. Schneider noted that no Essure® coils were jutting through the ostia from her previous Essure® tubal.

1013.   Plaintiff Cannon plans to discuss with her physicians undergoing a hysterectomy to relieve her symptoms but nothing is scheduled.

1014.   Plaintiff Cannon was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1015.   Plaintiff Cannon still has the Essure® device surgically implanted.

**YY.    JAMI LOZADA**

1016.   Plaintiff Lozada is twenty-nine (29) years old and resides in Kissimmee, Florida.

**1.   Initial Essure® Procedure:**

1017.   On or around November 21, 2014, Plaintiff Lozada underwent the Essure® procedure at Sand Lake Surgery Center, Orlando, Florida.  Plaintiff Lozada signed a "standard" surgical gynecological consent form for this procedure with no risks specific to Essure® outlined.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1018.   Ruben Santiago, M.D. implanted the Essure® device in Plaintiff Lozada under general anesthesia.  Plaintiff Lozada reports that an Essure® sales representative was present during the procedure.

1019.   Further, Plaintiff Lozada was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

1020.   Plaintiff Lozada chose Essure® versus tubal ligation because she believed that Essure® was as safe as or safer than tubal ligation, with the same or less side effects, and less recovery time.

**2.   Post Essure® Procedure Condition and Treatment:**

1021.   Plaintiff Lozada's post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, pain after intercourse, bloating, migraines, weight gain, joint pain, itching, fatigue and hair loss.

1022.   At times, after Essure®, Plaintiff's bleeding was so heavy that she would use a box of tampons in a day.

1023.   Plaintiff Lozada presented to Orlando Health on January 30, 2015 for a HSG test which showed blocked tubes.

1024.   On or about April 22, 2016, Plaintiff Lozada presented to Dr. Le-Chu Su complaining of hair loss, shaky sensation, tiredness and fatigue.   During that visit Plaintiff informed Dr. Su that she had suffered hair falling out, dry mouth, nausea, fatigue and dizzy spells.

1025.   Plaintiff has suffered from hair loss, fatigue, itching, and joint pain after her Essure® procedure.  While she has not been tested for a nickel allergy, she is unable to wear costume jewelry as it discolors her skin.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1026.   Plaintiff Lozada has suffered from these symptoms since her Essure® procedure but her physicians assured her that her problems were not caused by the Essure® device. Plaintiff Lozada was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1027.   Plaintiff Lozada still has the Essure® device surgically implanted and still suffers from these symptoms.

**ZZ.    SANDRA NEESE**

1028.   Plaintiff Neese is thirty-nine (39) years old and resides in Phoenix, Maricopa County, Arizona.

**1.   Initial Essure® Procedure:**

1029.   On or around April 2014, Plaintiff Neese underwent the Essure® procedure at Arrowhead Hospital, Glendale, Maricopa County, Arizona.

1030.   Dr. Hatel Shah implanted the Essure® device in Plaintiff Neese.

1031.   Plaintiff Neese was told that Essure® was as safe or safer than tubal ligation and had the same as or less side effects, without the need for surgical intervention and with less recovery time.

**2.   Post Essure® Procedure Condition and Treatment:**

1032.   Plaintiff Neese's post-procedure course has been marked by stabbing pelvic pain, menorrhagia, brain fog, hair loss, and painful intercourse.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1033.   After Essure®, Plaintiff Neese experienced a menstrual cycle of twenty-eight days, with seven days of heavy bleeding, which she did not experience before.  She would use one-hundred super plus tampons in a week and would flow out a super plus tampon in thirty minutes.

1034.   Plaintiff Neese underwent HSG testing on or about July 15, 2014 at Arrowhead Hospital in Glendale, Arizona, which showed occlusion of the fallopian tubes following the Essure® procedure.

1035.   Following, Plaintiff Neese met with Dr. Hetal Shah to discuss dysfunctional uterine bleeding and cramping that onset following the Essure® procedure.

1036.   On or around June 16, 2015, Plaintiff Neese presented with dyspareunia, pelvic pain, menorrhagia, itching and vaginal discharge.

1037.   During a follow-up visit on or around June 22, 2015, Plaintiff Neese's provider could not determine the cause of her dyspareunia. She was advised to use lubricant and change positions during intercourse.

1038.   On or around July 9, 2015, Plaintiff Neese met with Dr. Hetal Shah with complaints of vaginitis and bilateral pelvic pain for more than six months following the Essure® procedure. Records indicate that this pain was aggravated by intercourse and her menstrual periods.

1039.   On a follow up visit on or around August 11, 2015, Plaintiff complained of menorrhagia and pelvic pain following the Essure® procedure.

1040.   On or around August 19, 2015, Plaintiff Neese underwent an Essure® explant procedure that included a bilateral salpingectomy under Dr. Hetal Shah.

1041.   Plaintiff Neese's symptoms have not resolved follow her explant surgery.

1042.   Additionally, although Plaintiff Neese has not been tested for a nickel allergy, she cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1043.   Until she saw a legal advertisement, Plaintiff Langley did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**AAA.  STACY COOLEY**

1044.   Plaintiff Cooley is thirty-nine (39) years old and resides in Beckley, Raleigh County, West Virginia.

**1.   Initial Essure® Procedure:**

1045.   On or around November 1, 2006, Plaintiff Cooley underwent the Essure® procedure at Raleigh General Hospital in Beckley, WV under general anesthesia.

1046.   Juddson Lindley, M.D. implanted the Essure® device in Plaintiff Cooley.

1047.   Plaintiff Cooley was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

1048.   Plaintiff Cooley chose the Essure® procedure over surgical means of tubal ligation due to its marketed minimal recovery time.  She was told that Essure® was as safe as or safer than tubal ligation with the same or less side effects, and without the need for a surgical procedure.

**2.   Post Essure® Procedure Condition and Treatment:**

1049.   Plaintiff Cooley's post-procedure period has been marked by pelvic pain, excessive bleeding, pain after intercourse, fatigue, heavy menstruation and severe cramps.

1050.   On January 29, 2007, Plaintiff Cooley had a HSG which confirmed blockage of the fallopian tubes for a successful Essure® procedure.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1051.  On April 2, 2012, Plaintiff Cooley presented at the Emergency Room at Raleigh General Hospital complaining of left flank pain. She was discharged with an impression of kidney stones due a prior history.

1052.  On May 27, 2012, Plaintiff Cooley presented again at the Emergency Room at Raleigh General Hospital complaining of left flank pain.  Plaintiff stated that she was told two month prior that her kidney stones had passed.  Plaintiff was discharged with an impression of abdominal pain and pelvic pain.  A CT of the abdomen done on this date was negative for kidney stones or urinary tract obstruction.

1053.  On June 6, 2012, Plaintiff Cooley presented to Dr. Lindley at AccessHealth complaining of a twelve week history of pelvic pain.  Plaintiff noted that the pain is located in the lower left quadrant and described it as sharp and intermittent.

1054.  Plaintiff Cooley returned to AccessHealth on January 22, 2015 and saw Dr. Martha Khalil.  Plaintiff complained of pain with intercourse since birth of her last child which had gotten worse in the last three months.  Plaintiff also complained that her menstrual cycles were becoming more frequent and that pain and bleeding she is having is interfering with her life.  Dr. Khalil referred the Plaintiff to physical therapy.

1055.  On January 13, 2016, Plaintiff returned to AccessHealth again complaining of pelvic discomfort, dyspareunia and irregular bleeding.  At that time, Dr. Khalil informed Plaintiff Cooley that her problems may be due to her Essure®.

1056.  On February 25, 2016, Plaintiff Cooley underwent a robotically assisted total laparoscopic hysterectomy with bilateral salpingo-oophorectomy at the Raleigh General Hospital performed by Dr. Gina Jereza-Harris.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1057.  After the removal of the Essure® coils in the hysterectomy, Plaintiff Cooley's symptoms resolved.  Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

1058.  Further, it was not until Plaintiff saw an advertisement on television in April 2016 that Plaintiff Cooley was informed that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

**BBB.  ERICA PIKE**

1059.  Plaintiff Pike is thirty (30) years old and resides in Franklin, Heard County, Georgia.

### 1.  Initial Essure® Procedure:

1060.  On or around March 10, 2009, Plaintiff Pike underwent the Essure® procedure in Peach Tree City, Fayette County, Georgia.

1061.  Dr. Charles McCord implanted the Essure® device in Plaintiff Pike.

1062.  Plaintiff Pike was told that Essure® was as safe or safer than tubal ligation, with the same or less side effects and without then need for a surgical procedure.

### 2.  Post Essure® Procedure Condition and Treatment:

1063.  Plaintiff Pike's post-procedure course has been marked by menorrhagia, dysmenorrhea, pelvic/abdominal pain, hair loss, rashes, brittle teeth, back pain, and painful intercourse. Prior to Essure®, Plaintiff Pike experienced regular menstrual cycles and did not rely on oral contraceptives to regulate her menses.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1064.   Immediately following the procedure, on or around March 14, 2009, Plaintiff Pike presented to Dr. Christopher Nichols and complained of itchiness and a rash on her arms and hands. She was diagnosed with scabies and prescribed Elimite cream.

1065.   On or around April 24, 2009, Plaintiff Pike presented to the Piedmont Newman Hospital Emergency Department with complaints of pain in her left lower quadrant of her abdomen.

1066.   On or around May 5, 2009, Plaintiff Pike returned to the Piedmont Newman Hospital Emergency Department with severe pain to her left flank, nausea, vomiting and diaphoresis.

1067.   On or around April 1, 2010, Plaintiff Pike presented to the Piedmont Newman Hospital Emergency Department with complaints of hives, rash and itching that had been ongoing for several days.

1068.   On or around August 31, 2012, Plaintiff Pike reported during her annual exam with Dr. McCord that she experienced spotting in between periods and right pelvic pain. A pelvic ultrasound later showed a possible endometrioma on her right ovary.

1069.   On or Around November 4, 2012, Plaintiff Pike met with Dr. McCord for follow-up for her ultrasound. Dr. McCord notes that Plaintiff Pike continues to suffer from right sided pelvic pain despite antibiotics. Thereafter, Plaintiff Pike was prescribed Lo-Ovral oral contraceptive and Vicodin.

1070.   On or around July 15, 2013, Plaintiff Pike presented to Dr. Michael Brackett with complaints of weakness and fatigue.

1071.   On or around April 2, 2015, Plaintiff Pike presented to Dr. James McGowan with complaints of lower right abdominal pain and discharge. She also noted that her periods have

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

become increasingly heavy over the prior two months and she suffers from fatigue. Dr. McGowan suggested that Plaintiff Pike's pain may be a result of her Essure® procedure.

1072.   Until she saw a legal advertisement, Plaintiff Pike did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

### CCC. MELISSA LUKE

1073.  Plaintiff Luke is thirty-five (35) years old and resides in Nashville, Berrian County, Georgia.

### 1.  Initial Essure® Procedure:

1074.   On or around September 28, 2010, Plaintiff Luke underwent the Essure® procedure at Orange Park Medical Center, Orange Park, Florida.

1075.   Sarah Paschall, M.D. implanted the Essure® device in Plaintiff Luke under general anesthesia.

1076.   Plaintiff Luke was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

### 2.  Post Essure® Procedure Condition and Treatment:

1077.    Plaintiff Luke's post-procedure period has been marked by dysmenorrhea, pelvic pain, pain after intercourse, allergic reaction symptoms, brain fog, joint pain, fatigue and hair loss.

150

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1078.    Plaintiff Luke presented to South Georgia Medical Center ER on or around June 30, 2013, December 4, 2013 and January 21, 2014 complaining of dysmenorrhea, low abdominal pain, pelvic pain and cramping.

1079.    On or around February 3, 2014, Plaintiff Luke presented to Azalea Women's Center with complaints of severe pelvic pain and cramping, intermittent over the past year.

1080.    On or around February 5, 2014, Plaintiff Luke underwent diagnostic laparoscopy, ablation of endometriosis, D&C, and hysteroscopy due to pelvic pain and dysmenorrhea.  John M. Sharon, M.D. performed this procedure at South Georgia Medical Center, Valdosta, Georgia under general anesthesia.  Post-operative diagnoses include pelvic pain and dysmenorrhea.

1081.    Plaintiff Luke presented to Barrien Family Medical Center, Nashville, Georgia on or around January 8, 2016, and March 29, 2016, complaining of joint pain, rash, and hives on her face, back and knees.  She was referred to Dr. Mossell in Tipton, Georgia for rheumatoid arthritis (RA) and autoimmune disorder tests.

1082.   To date, upon information and belief, autoimmune testing results have been negative.   Additionally, although Plaintiff Luke has not been tested for a nickel allergy, she cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation.

1083.   Plaintiff Luke was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1084.   Plaintiff Luke still has the Essure® device implanted.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### DDD.  SHANNON CHASE

1085.  Plaintiff Chase is forty-five (45) years old and resides in Anchorage, Anchorage Borough, Alaska.

#### 1.  Initial Essure® Procedure:

1086.  On or around April 26, 2006, Plaintiff Chase underwent the Essure® procedure at Alaska Native Medical Center, Anchorage, Anchorage Borough, Alaska, under general anesthesia.

1087.  Dr. Elizabeth Crow implanted the Essure® device in Plaintiff Chase.

#### 2.  Post Essure® Procedure Condition and Treatment:

1088.  Plaintiff Chase's post-procedure course has been marked by severe abdominal and pelvic pain, migraines, and abnormal uterine bleeding.  Prior to Essure®, Plaintiff Chase experienced normal menstrual cycles and did not rely on oral contraceptives or Norplant to regulate her menses.

1089.  Plaintiff Chase underwent a HSG on July 29, 2006, at Alaska Native Medical Center which showed bilateral tubal occlusion.

1090.  Thereafter, on or around December 16, 2013, Plaintiff Chase presented to Dr. Daniel Hartman with complains of worsening dysmenorrhea and heavy menorrhagia following the Essure® procedure in 2006.

1091.  On or around December 30, 2013, Plaintiff Chase presented to Matthew Malouf, P.A., with complaints of left lower quadrant pain beginning one year prior that had gradually worsened.

1092.  On or around January 7, 2014, Plaintiff Chase presented to Dr. Stephanie Caywood for follow-up.  Plaintiff Chase complained of a burning sensation over her lower abdomen and a cramping over the left lower and upper side of the abdomen.  She stated that previously, the pain

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

was occurring with menses but now the pain is constant.  She also noted that her menstrual period was heavy, and wished to proceed with a Mirena IUD insertion.

1093.   On or around January 27, 2014, Plaintiff Chase underwent a Mirena IUD insertion for pelvic pain.

1094.   On or around February 7, 2014, Plaintiff Chase underwent a diagnostic laparoscopy and lysis of adhesions to treat pelvic pain.

1095.   One week later, on or around December 13, 2014, Plaintiff Chase returned to the emergency department at Alaska Native Medical Center with complaints of throbbing, aching and constant pain in her abdomen.

1096.   During her follow up visit on or around December 18, 2014, with Dr. Caywood, Plaintiff Chase stated that her left upper abdominal pain that was previously constant had resolved but her left pelvic pain continued.

1097.   On or around June 9, 2014, Plaintiff Chase's Mirena IUD was removed due to pain, spotting and abnormal uterine bleeding lasting six to eight weeks.

1098.   From June 19, 2014 through May 14, 2015, Plaintiff Chase treated consistently for her abdominal pain, menorrhagia and abnormal uterine bleeding.

1099.   On or around May 21, 2015, Plaintiff Chase underwent a total laparoscopic hysterectomy, diagnostic laparoscopy, and bilateral salpingectomy due to dysmenorrhea, menorrhagia and pelvic pain at Alaska Native Medical Center.  The pathology report states there is silver-colored metal present in both of the proximal oviducts.

1100.   Since the hysterectomy, Plaintiff Chase's symptoms have largely resolved, with the exception of her body rashes.   Plaintiff Chase takes allergy medicine to control the

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

symptoms.   While she has not been tested for a nickel allergy, she is unable to wear costume jewelry as it causes itching and rashes on her skin.

1101.   Until she saw a legal advertisement, Plaintiff Chase did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**EEE.  ILIASUE LILLY**

1102.   Plaintiff Lilly is thirty-eight (38) years old and resides in Daniels, Raleigh County, West Virginia.

**1.   Initial Essure® Procedure:**

1103.   On or around January 11, 2008, Plaintiff Lilly underwent the Essure® procedure at Raleigh General Hospital, Beckley, West Virginia.

1104.   Ammar Shammaa, M.D. implanted the Essure® device in Plaintiff Lilly under general anesthesia.

1105.   Plaintiff Lilly was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

1106.   Plaintiff Lilly chose the Essure® procedure other over sterilization methods due to her doctor's recommendation and information that it was as safe as or safer than a tubal ligation, that recovery time was faster and that it had the same or less side effects.

**2.   Post Essure® Procedure Condition and Treatment:**

1107.   Plaintiff Lilly's post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, and pain after intercourse. In July, 2009, Plaintiff Lilly presented to

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

her physicians at AccessHealth complaining of heavy and painful menstrual flow with bleeding between periods.   Plaintiff Lilly's prior menstrual cycle prior to Essure® was marked by its absence.

1108.   An ultrasound performed on September 2, 2009 due to menometrorrhagia described the Essure® devices as identified but appear to be primarily in the uterine cavity.

1109.   On or around September 3, 2009, Plaintiff Lilly underwent a HSG test at Raleigh General Hospital, Beckley, West Virginia.   Norman Siegel, M.D. performed this test and it showed successful occlusion of both uterine tubes.

1110.   Plaintiff Lilly continues to suffer from menometrorrhagia, dysmenorrhea, pelvic pain, abdominal pain, excessive bleeding, and pain after intercourse.   Prior to the device, Plaintiff Lilly menstruation was irregular and sometimes would go years without a period. Periods would last 3-4 days with a heavy flow.   After having Essure implanted, menstruation became irregular and Plaintiff would anywhere from one to three periods per month lasting eight days with a heavy flow and extreme cramps.   She would wear a pad and a tampon both and will still bleed through both of these.

1111.   Plaintiff Lilly was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.   It was at this time that she truly understood that her symptoms were related to Essure®.

1112.   Plaintiff Lilly still has the Essure® device surgically implanted.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**FFF. JASMIN JEFFERSON**

1113.  Plaintiff Jefferson is thirty-two (32) years old and resides in Green Bay, Brown County, Wisconsin.

**1. Initial Essure® Procedure:**

1114.  On or around August 21, 2012, Plaintiff Jefferson underwent the Essure® procedure at Prevea Health Center in Green Bay, Brown County, Wisconsin.

1115.  Dr. Erich Metzler implanted the Essure® device in Plaintiff Jefferson.

**2. Post Essure® Procedure Condition and Treatment:**

1116.  Plaintiff Jefferson's post-procedure course has been marked by abnormal uterine bleeding, rashes, intermittent joint pain, pelvic and abdominal pain, and painful intercourse.  Prior to Essure®, Plaintiff Jefferson experienced normal menstrual cycles and did not suffer from the aforementioned symptoms.

1117.  On or around September 10, 2012, Plaintiff Jefferson called to complain that she was experiencing abnormal uterine bleeding since her Essure® procedure. Plaintiff Jefferson was advised that this bleeding was related to the Depo Provera injection.

1118.  Plaintiff Jefferson underwent a HSG test on November 21, 2012, at St. Vincent Hospital in Green Bay, Wisconsin, which showed bilateral tubal blockage.

1119.  On or around January 2, 2013, Plaintiff Jefferson complained to Dr. Metzler of irregular bleeding since Essure®, and that she has had constant uterine bleeding for nearly two weeks with severe clotting.  Plaintiff Jefferson was again advised that this bleeding was related to the Depo Provera injection, and offered oral contraceptives for treatment.

1120.  On or around October 18, 2013, Plaintiff Jefferson presented to Prevea Health and complained of left lower abdominal pain and was diagnosed with left ovarian cyst.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1121.  From May 7, 2014 through December 29, 2016, Plaintiff Jefferson presented to Prevea Health and was treated for vaginal discharge, itching, burning and dysuria.

1122.  On or around September 30, 2015, Plaintiff Jefferson presented to Prevea Health and complained of lower abdominal pain, a low backache and heavier menstrual flow.

1123.  On or around December 4 through December 16, 2015, Plaintiff Jefferson presented to Prevea Health and complained of abdominal pain.

1124.  On or around February 23, 2016, Plaintiff Jefferson presented to Prevea Health and complained of chronic pelvic pain, menometrorrhagia symptoms, chronic headaches, abdominal bloating, back pain, and skin rashes soon after the Essure implants were inserted in 2012.  Plaintiff Jefferson requested that the Essure® coils be removed.

1125.  On or around April 4, 2016, Plaintiff Jefferson underwent a laparoscopic assisted vaginal hysterectomy with left salpingectomy under Dr. Erich Metzler at St. Vincent Hospital in Green Bay, Wisconsin due to irregular heavy uterine bleeding and pelvic discomfort.  The operative report indicate that the fallopian tube and ovary were absent on right side and that Essure® implants were found in left fallopian tube and right uterine cornua.

1126.  Since the hysterectomy, Plaintiff Jefferson's abdominal pain has resolved, but she continues to suffer from rashes.  While she has not been tested for a nickel allergy, she is unable to wear costume jewelry as it causes a reaction on her skin.

**GGG.  STACI PARKER**

1127.  Plaintiff Parker is thirty-five (35) years old and resides in Croydon, Bucks County, Pennsylvania.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1. Initial Essure® Procedure:

1128.    On or around May 8, 2009, Plaintiff Parker underwent the Essure® procedure, under general anesthesia at the Aria Health in Philadelphia, Pennsylvania.

1129.    Gregory Bolton, M.D. implanted the Essure® device in Plaintiff Parker.

1130.    Plaintiff Parker went to Dr. Bolton to inquire about permanent birth control, such as bilateral tubal ligation, but Dr. Bolton directed Plaintiff towards Essure®.    He told Plaintiff Parker that Essure® was easier and safer than a tubal ligation.

1131.    Plaintiff Parker was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

### 2. Post Essure® Procedure Condition and Treatment:

1132.    Plaintiff Parker's post-procedure period has been marked by body rashes, cramping, hair loss, menorrhagia and metrorrhagia.

1133.    On or around September 2, 2009, Plaintiff Parker presented at Aria Health for her HSG test, which showed bilateral tubal occlusion.

1134.    On or around February 25, 2015, Plaintiff Parker presented to Dr. Jill Kane's office for body rashes.

1135.    On or around March 11, 2015, Plaintiff Parker presented to Dr. Heather Gottlieb's office and complained of very heavy bleeding and spotting between her menstrual cycle.

1136.    Plaintiff Parker again reported rashes on or around September 20, 2015.  Plaintiff Parker was prescribed Hydrocortisone cream 2.5% and instructed to follow up with dermatology.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1137.   On or around March 8, 2016, Plaintiff Parker had a follow up visit with Dr. Aaron Hasiuk and they discussed a hysteroscopy and endometrial ablation for her abnormal uterine bleeding.

1138.   On or around March 30, 2016, Plaintiff Parker had a D&C, hysteroscopy, NovaSure, endometrial ablation, and removal of foreign body was performed.  Upon completion of the NovaSure procedure, Dr. Hasiuk discovered that one of Plaintiff Parker's Essure® coils remained on the NovaSure system.

1139.   Plaintiff Parker continues to suffer from injuries, including but not limited to pain, significant hair loss and an increase in her body rashes, caused by the implantation of the Essure® device.  She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, due to skin irritation and swelling.

1140.   Until she saw a legal advertisement, Plaintiff Parker did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

### HHH.  BRANDEE CUTTER

1141.   Plaintiff Cutter is thirty-nine (39) years old and resides in Jaffrey, Cheshire County, New Hampshire.

### 1.  Initial Essure® Procedure:

1142.   On or around August 3, 2011, Plaintiff Cutter underwent the Essure® procedure at Monadnock Community Hospital, Peterborough, Hillsborough County, New Hampshire.

1143.   Pamela Stetzer, M.D., implanted the Essure® device in Plaintiff Cutter under MAC anesthesia with a local anesthetic.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1144.   Three attempts were made using three different coils before an Essure® implant was successfully placed in the right fallopian tube.

1145.   Plaintiff Cutter was directed by her doctor to choose Essure® believing that she would avoid surgery and suffer no complications.

### 2.   Post Essure® Procedure Condition and Treatment:

1146.   Plaintiff Cutter's post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, pain after intercourse, joint pain, hair loss, severe weight loss, fatigue, abdominal pain, diarrhea, cystic acne, anxiety and depression.

1147.   On or around November 14, 2011, Plaintiff Cutter underwent an HSG test at Monadnock Community Hospital.  Gary Confer, M.D. performed this test which showed successful occlusion of both fallopian tubes.

1148.   On or around October 29, 2012, Plaintiff Cutter spoke with a nurse at Manchester VA for complaints of dysmenorrhea.

1149.   On or around November 4, 2013, Plaintiff Cutter underwent a transvaginal ultrasound performed by Edward Daly, M.D. which showed only a right-sided Essure® coil in satisfactory position likely accounting for the palpable abnormality.  The left cornua of the uterus is not well seen and no second Essure® coil can be confirmed.

1150.   On or around October 8, 2014, Plaintiff Cutter consulted with Dr. Gale Furey regarding her worsening cystic acne which has become worse in the last four years.

1151.   On or around June 21, 2016, Plaintiff Cutter consulted with Dr. David Conway regarding the continuing problems she was experiencing since her Essure® procedure.  She was diagnosed with hypermenorrhea, pelvic pain/status post Essure® procedure and weight loss.  Dr. Conway discussed removing the Essure® devices and what would be involved in removing the

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

coils.  Dr. Conway advised the client that ongoing medical trials were being done to discover if there is a relationship between Essure® and symptoms being experienced by patients.

1152.   On or around October 31, 2016, Plaintiff Cutter underwent total laparoscopic hysterectomy, bilateral salpingectomy, cystoscopy to remove the Essure® devices.  Jon Einarsson, M.D. performed the surgery and both implants were found in the fallopian tubes.  The pathology report for the procedure noted that the Essure® coils in each fallopian tube were "dramatically stretched."

1153.   Although Plaintiff Cutter has not been diagnosed with a nickel allergy, she cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation.

1154.   Despite suffering from these symptoms for over five years, Plaintiff Cutter's symptoms resolved only after removal of her Essure® device.  Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

### III.   SHANNON SANTORE

1155.   Plaintiff Santore is thirty two (32) years old and resides in Uniontown, Fayette County, Pennsylvania.

#### 1.   Initial Essure® Procedure:

1156.   On or around July 5, 2012, Plaintiff Santore underwent the Essure® procedure, under general anesthesia, at Uniontown Hospital, Uniontown, Fayette County, Pennsylvania.

1157.   Rajnikant Popat, M.D., implanted the Essure® device in Plaintiff Santore.

#### 2.   Post Essure® Procedure Condition and Treatment:

1158.   Plaintiff Santore's post-procedure course has been marked by pelvic pain, abdominal pain, irregular menstrual with heavy bleeding, clotting, and pain during intercourse.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Before Essure®, Plaintiff had not experienced this combination of symptoms. Her menstrual cycles were normal and she had no problem with going about her daily life.

1159. On or around August 24, 2012, Plaintiff Santore presented to Dr. Rajnikant Popat suprapubic sharp pain and pelvic pain.

1160. Plaintiff Santore underwent a HSG on or about October 1, 2012, which showed the bilateral fallopian tubes are occluded.

1161. Over the next four years, Plaintiff repeatedly sought treatment for her symptoms. It wasn't until July 2016, after an ultrasound of her abdomen was performed, that Dr. Hojat related Plaintiff Santore's symptoms to the Essure® placement in her fallopian tubes.

1162. After Essure®, the pain during intercourse has been so severe Plaintiff Santore could not function normally and had to rest for an hour before pain would resolve.

1163. Plaintiff Santore still suffers from pelvic pain, abdominal pain, irregular menstrual cycles with heavy bleeding, clotting, and pain during intercourse. Plaintiff Santore plans to have the Bayer's device removed in the near future in order to address her symptoms.

**JJJ. ALISHA DAVIS**

1164. Plaintiff Davis is forty one (41) years old and resides in Hamilton, Butler County, Ohio.

**1. Initial Essure® Procedure:**

1165. On or around June 8, 2010 Plaintiff Davis underwent the Essure® procedure, under general anesthesia, at UC-University Hospital, Cincinnati, Hamilton County, Ohio.

1166. Amy Thompson, M.D. implanted the Essure® device in Plaintiff Davis.

**2. Post Essure® Procedure Condition and Treatment:**

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1167.   Plaintiff Davis' Essure® procedure had some complications.  Dr. Thompson had to perform the procedure twice.  After the first attempt, there were greater than eighteen coils that were visualized in the uterine cavity so the coils were then removed and a second device threaded through the hysteroscope and the device was then deployed without complication.  There were approximately eight micro coils remaining in the uterine cavity.

1168.   Plaintiff Davis' post-procedure course has been marked by extremely heavy bleeding, irregular menstrual, clotting, severe cramping, chronic pain in lower back and right side, headaches, eczema, and hair loss.  Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

1169.   Plaintiff Davis underwent a HSG approximately six weeks after the device was implanted and the physician advised Plaintiff Davis that procedure was successful.

1170.   Plaintiff Davis has suffered from these symptoms for the past six years, and yet her physicians keep telling her that her pain is not being caused by the Essure® device.  Plaintiff Davis did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**KKK.  JESSICA MCFARLAND**

1171.   Plaintiff McFarland is twenty-six (26) years old and resides in Mountain Home, Baxter County, Arkansas.

**1.  Initial Essure® Procedure:**

1172.   On or around March 26, 2015, Plaintiff McFarland underwent the Essure® procedure at the office of Chris Taylor, M.D. in Harrison, Boone County, Arkansas.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1173.  Dr. Chris Taylor implanted the Essure® device in Plaintiff McFarland, who was only twenty-four (24) years old at the time of her sterilizations procedure.

1174.   Plaintiff McFarland opted for Essure® after being told that it was safer and more effective than tubal ligation, with less pain and less potential side effects.

### 2.  Post Essure® Procedure Condition and Treatment:

1175.  Plaintiff McFarland's post-procedure period has been marked by abdominal pain, abnormal vaginal bleeding, menometrorrhagia, dyspareunia, hair loss, fatigue, bloating, and weight gain. Before Essure®, Plaintiff McFarland had not experienced this combination of symptoms. She had no problem with going about her daily life.

1176.  After Essure®, the bleeding during her menstrual period was so heavy that she soiled her clothing through tampons and sanitary pads.

1177.  On or around June 3, 2015, Plaintiff McFarland presented at Regional Family Medicine with complaints of continuous, heavy, uterine bleeding, abdominal pain, and fatigue since she had been implanted with the Essure® device.

1178.  On June 5, 2015, Plaintiff McFarland again presented to Regional Family Medicine with complaints of menometrorrhagia and abnormal vaginal bleeding.

1179.  Plaintiff McFarland repeatedly sought treatment for her symptoms, but no physician was able to determine their cause.

1180.  Additionally, Plaintiff McFarland has noticed hair loss, fatigue, and bloating. She has not been tested for a nickel allergy, but has never been able to wear jewelry with nickel in it. Plaintiff McFarland is actively seeking a nickel test to evaluate her symptoms.

1181.  Plaintiff McFarland's symptoms have continued and she stills suffers abdominal pain, abnormal vaginal bleeding, menometrorrhagia, dyspareunia, hair loss, fatigue, bloating, and

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

weight gain. The Essure® device is still implanted in her body. Plaintiff McFarland was not aware that Bayer's device was defective until she saw a legal advertisement in July of 2016. It was at that time that she truly understood her symptoms were related to Essure®.

**LLL.  CAROLYN MORRIS**

1182.   Plaintiff Morris is thirty-five (35) years old and resides in Tupelo, Lee County, Mississippi.

**1.  Initial Essure® Procedure:**

1183.   Upon information and belief, on or around 2009, Plaintiff Morris underwent the Essure® procedure in Grand Rapids, Michigan.

**2.  Post Essure® Procedure Condition and Treatment:**

1184.   Plaintiff Morris's post-procedure course has been marked by severe abdominal pain and cramping, menometrorrhagia, menorrhagia, dysmenorrhea and painful intercourse.  Before Essure®, Plaintiff Morris had not experienced this combination of symptoms.

1185.   After Essure®, Plaintiff Morris's pain and bleeding were so heavy during her menstrual cycle that she could not get out of bed and would miss work.

1186.   On or around November 26, 2010, Plaintiff Morris presented at Northern Mississippi Medical Center for abdomen pain that started three days ago.  An ultrasound showed bilateral complex ovarian cysts and a mild amount of free pelvic fluid.

1187.   On or around December 1, 2010, Plaintiff Morris treated with her family physician, Dr. Grace Seecharan for her abdomen pain, dyspareunia and passing of menstrual clots.  Plaintiff Morris was then prescribed oral contraceptive pills.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1188.   On or around June 7, 2011, Plaintiff Morris treated at the emergency room for her heavy menstruation and clotting.  Medical records show that Plaintiff Morris was prescribed Anaprox and was diagnosed with menorrhagia.

1189.   On or around June 5, 2012, Plaintiff Morris presented to the Sanders Clinic for Women for her pelvic pain and dysmenorrhea.  According to her medical records, she also gave a history of pain with intercourse, pain with menses, and a vaginal discharge with odor.

1190.   On or around August 28, 2012, Plaintiff Morris underwent an endometrial thermal ablation.

1191.   Plaintiff Morris continued to seek treatment for her symptoms, but no physician could determine their cause.

1192.   Finally, on or around November 18, 2013, Plaintiff Morris presented to Northern Mississippi Medical Center for a laparoscopic hysterectomy.

1193.   Plaintiff Morris suffered complications from her hysterectomy causing her to have a vaginal cuff revision surgery performed by Dr. Gregg Willis on or around March 24, 2014 at North Mississippi Medical Center.

1194.   After the removal of the Essure® device all of Plaintiff Morris's symptoms resolved. Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

1195.   However, Plaintiff Morris realized that her symptoms were not isolated or rare only after she found out that her complaints were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device and were filing lawsuits alleging

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

that the Essure® device is a defective product. It was at this time that she truly understood that her symptoms were related to Essure®.

### MMM.     LUCIDA SAUCEDA

1196. Plaintiff Lucida Sauceda is thirty-one (31) years old and resides in Wautoma, Waushara County, Wisconsin.

#### 1.   <u>Initial Essure® Procedure:</u>

1197. On or about October 3, 2014, Plaintiff Sauceda underwent the Essure® procedure at Aurora Medical Center in Oshkosh, Wisconsin.

1198. Holly Ray, D.O. implanted the Essure® device in Plaintiff Sauceda. She told Plaintiff Sauceda that the Essure® procedure was safer, faster and much easier than a traditional tubal ligation. In fact, Plaintiff Sauceda's implant procedure was long and painful.

#### 2.   <u>Post Essure® Procedure Condition and Treatment:</u>

1199. On or around March 25, 2015, Plaintiff Sauceda underwent an HSG at Aurora Medical Center, which demonstrated bilateral tubal occlusion.

1200. Plaintiff Miller's post-procedure course has been marked by unusually heavy and prolonged menstrual periods, pelvic pain, weight gain and hair loss.

1201. Prior to the Essure® implantation, even when not on birth control, Plaintiff Sauceda's periods were normal, lasting only approximately five days, and she did not experience pain.

1202. Plaintiff Sauceda first began experiencing pelvic pain within months of her implant. At that time, she contact Dr. Ray's office and was advised by a nurse that pelvic pain was normal.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1203.   At her annual physical in January of 2016 with Sheryl Thomsen, ARNP, Plaintiff Sauceda described her periods as occurring regularly but lasting a prolonged period of time, and discussed that she was experiencing pelvic pain.

1204.   Plaintiff Sauceda again complained of pelvic pain and irregular menses when she saw Sheryl Thomsen, ARNP in April, 2016.  She was advised to follow up with her gynecologist for these symptoms.

1205.   On or about May 17, 2016, Plaintiff Sauceda presented to Dr. Holly Ray's office for evaluation of her pelvic pain and prolonged periods.  She reported that the pain was present all the time, not just during her menses, which could last two to three weeks at a time.  Plaintiff Sauceda was diagnosed with pelvic floor dysfunction and physical therapy was ordered.  Dr. Ray advised that she did not believe Essure® was the cause of her symptoms.

1206.   On or about June 9, 2016, Plaintiff Sauceda followed up with Sheryl Thomsen, ARNP to follow up on her complaints of depression and anxiety.  ARNP Thomsen noted the complaints of pain and that she had undergone a pelvic ultrasound.

1207.   Plaintiff Sauceda presented to Dr. Ray again on March 20, 2017 with the same complaints of pelvic pain, prolonged and irregular menses, hair loss and weight gain.  She discussed removal of the Essure® coils with Dr. Ray.

1208.   Plaintiff Sauceda is currently scheduled to undergo a bilateral salpingectomy for removal of the Essure® coils on April 20, 2017 with Dr. Ray at Aurora Medical Center.

1209.   Plaintiff Sauceda continues to suffer with heavy, irregular and prolonged menstrual cycles and pelvic pain cause by her Essure® device.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### NNN. STACEY SPRINGFIELD

1210.   Plaintiff Springfield is thirty-two (32) years old and resides in Castle Rock, Douglas County, Colorado.

#### 1. Initial Essure® Procedure:

1211.   On or around April 19, 2013, Plaintiff Springfield underwent the Essure® procedure at Lone Tree Obstetrics and Gynecology, Lone Tree, Douglas County, Colorado.

1212.   Susan McConaughy, CNM implanted the Essure® device in Plaintiff Springfield.

#### 2. Post Essure® Procedure Condition and Treatment:

1213.   Plaintiff Springfields's post-procedure course has been marked by menorrhagia, dysmenorrhea, pelvic pain, pain after intercourse, joint pain in her hip, and fatigue.

1214.   On or around May 9, 2013, Plaintiff Springfield presented at Lone Tree Obstetrics and Gynecology and complained of pelvic pain, abnormal bleeding, and irregular spotting since the Essure® procedure.  She noted inguinal pain when walking.

1215.   On or around July 29, 2016, Plaintiff Springfield presented to the emergency department of Castle Rock Adventist Hospital complaining of bilateral lower quadrant abdominal pain and vaginal bleeding for two weeks that has worsened over the past three days.  Plaintiff Springfield was diagnosed with dysfunctional uterine bleeding.   Plaintiff Springfield returned to the same provider on or around August 17, 2016 with the same symptoms.

1216.   Plaintiff Springfield underwent an abdomen/pelvis CT on or around August 16, 2016 at Health Images South Denver.

1217.   During that period, on or around on August 15, 2016, Plaintiff Springfield presented again to Lone Tree Obstetrics and Gynecology and stated that after taking doxycycline, her pain was not alleviated.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1218.  On or around August 16, 2016, Plaintiff Springfield presented to Lone Tree Obstetrics and Gynecology for dysfunctional uterine bleeding and abdominal pain. She underwent a transvaginal ultrasound at that time.

1219.  Plaintiff Springfield returned on or around August 18, 2016, and stated that her menstrual period had begun and it was heavy, painful and clotted.  She continued to experience pain in her lower abdomen.

1220.  Plaintiff Springfield underwent a hysteroscopy and diagnostic laparoscopy at Castle Rock Adventist Hospital on or around August 26, 2016 performed by Dr. Wayne Furr. According to her operative note, the left Essure® coils was located near the serosa, and there were adhesion between the bowel on the left and the left round ligament and left pelvic sidewall.  Lysis was performed, and Plaintiff Springfield's symptoms resolved after this procedure.

1221.  Plaintiff Springfield was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

**OOO.** **NATACHEE CHANDLER**

1222.  Plaintiff Chandler is thirty-three (33) years old and resides in Decatur, Dekalb County, Georgia.

**1.  Initial Essure® Procedure:**

1223.  On or around June 5, 2013, Plaintiff Chandler underwent the Essure® procedure at Atlanta Medical Center, Atlanta, Georgia.

1224.  Donna Sinclair, M.D. implanted the Essure® device in Plaintiff Chandler under general anesthesia on the left side only.  The right fallopian tube was cut, tied and burned during

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

a C-section with the birth of her child on or about August 24, 2012.  Plaintiff Chandler's doctor was unable to complete the procedure on the left side due to extensive blood loss suffered by our client.

1225.   Plaintiff Chandler was informed that the Essure® implantation on her left side was her only option for tubal ligation due to scar tissue and adhesions.

### 2.   Post Essure® Procedure Condition and Treatment:

1226.   Plaintiff Chandler's post-procedure course has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, pain after intercourse, joint pain, hair loss, and rashes.

1227.   Plaintiff Chandler was advised by the implanting doctor that she did not need to come back for a HSG test so she did not undergo this procedure.

1228.   On or about July 8, 2015, Plaintiff Chandler discovered she was pregnant with her fourth child.   The Essure® device was identified during several ultrasounds throughout the pregnancy.

1229.   On or about October 14, 2015, Plaintiff Chandler gave birth to her fourth child via C-Section performed by Dr. Dorothy L. Floyd.  Immediately after delivering the baby, Dr. Floyd continued to perform a tubal ligation on Plaintiff by removing both tubes.

1230.   Plaintiff Chandler was informed that the doctor believed that all of the Essure® coil was removed but could not be sure.  Plaintiff was also informed that the Essure® coil was found in the uterus with the fetus.

1231.   Although Plaintiff Chandler has not been tested for a nickel allergy, she cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation.

1232.   Despite suffering from these symptoms for over three years, Plaintiff Chandler's symptoms resolved only after removal of her Essure® device.  Until the removal, neither she nor

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

her doctors could clearly correlate her problem as being associated with the device. After the removal, the cause of her problems became obvious, due to their resolution.

**PPP.  ADRIANNE SUTTON**

1233.  Plaintiff Sutton is thirty-three (33) years old and resides in Perry, Houston County, Georgia.

### 1.  Initial Essure® Procedure:

1234.  On or around November 30, 2010, Plaintiff Sutton underwent the Essure® procedure at Rockdale Medical Center, Conyers, Georgia.

1235.  Mohamad Attar, M.D. implanted the Essure® device in Plaintiff Sutton under general anesthesia.

1236.  Plaintiff Sutton was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

1237.  Plaintiff Sutton was directed toward Essure® due to the fact that there was no downtime and it was an office procedure. She was assured that Essure® was as safe or safer than tubal ligation, that it had the same or less side effects, was as effective as tubal ligation and involved less pain and recovery time.

### 2.  Post Essure® Procedure Condition and Treatment:

1238.  Plaintiff Sutton's post-procedure period has been marked by menometrorrhagia, dysmenorrhea, pelvic pain, joint pain, hair loss, hair loss, weight gain, fatigue, abdominal pain and frequent vaginal infections.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1239.   On or around March 18, 2011, Plaintiff Sutton underwent a HSG at Rockdale Medical Center.  Dr. Attar performed this test and it showed successful occlusion of both fallopian tubes.

1240.   On or around February 23, 2012, Plaintiff Sutton at Womens Health Care PC at Warner Robins, GA seeking birth control pills to help with her heavy menses and irregular menses.  Plaintiff also complained of increasing dysmenorrhea.  Plaintiff indicated that she was changing a super pad and a super tampon every two to three hours.

1241.   On or around January 21, 2014, Plaintiff Sutton returned to Womens Health Care, PC complaining that she now has heavy unmanageable menses since her Essure® procedure and would like to discuss a NovaSure ablation procedure.

1242.   On or around August 20, 2014, Plaintiff Sutton was seen at Womens Health Care, PC complaining of irregular bleeding.  Plaintiff was suffering from two periods a month and requested a NovaSure ablation procedure.

1243.   On or around August 26, 2014, Plaintiff Sutton underwent a hysteroscopy, D&C and NovaSure ablation in office at Women's Healthcare, Warner Robbins, Georgia.  Tan-Loc Nyuyen, M.D. performed the procedure.  After the ablation, Plaintiff Sutton's symptoms due to menometrorrhagia improved, and her cycles completely stopped.

1244.   Since her ablation, Plaintiff continues to experience pelvic pain that impacts her activities of daily living.  She also continues to experience the other symptoms, listed above.

1245.   Plaintiff Sutton was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1246.  Plaintiff Sutton still has the Essure® device surgically implanted, but is seeking its removal.

**QQQ. JANETSY ANDUJAR**

1247.  Plaintiff Andujar is thirty-nine (39) years old and resides in Hollywood, Broward County, Florida.

**1.  Initial Essure® Procedure:**

1248.  On or around December 19, 2008, Plaintiff Andujar underwent the Essure® procedure at Montefiore Medical Center in Bronx, New York.

1249.  Dr. Mark Levie implanted the Essure® device in Plaintiff Andujar.  Dr. Levie confirmed that this procedure would be quick and simple, and would not require any time off work to recover, which is why Plaintiff Andujar opted to move forward with it.

**2.  Post Essure® Procedure Condition and Treatment:**

1250.  On or around May 20, 2009 Plaintiff Andujar underwent an HSG at Montefiore Medical Center, which confirmed the position of the Essure® implants and bilateral occlusion of the fallopian tubes.

1251.  Plaintiff Andujar's post-procedure course has been marked by abdominal and pelvic pain, and menorrhagia.  Before Essure®, Plaintiff had not experienced this combination of symptoms, either while on or off birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

1252.  Prior to June of 2016, Plaintiff Andujar presented multiple times to the Emergency Room at Kendell Regional Hospital with complaints of pelvic pain, but no cause was ever determined.  As her problems got progressively worse, she sought out a new gynecologist for evaluation and treatment.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1253.   On June 2, 2016, Plaintiff Andujar saw Dr. Hoa Nguyen at Gynecologic Oncology Associates, Inc. in Hollywood, Florida, to evaluate her complaints of severe dysmenorrhea and menorrhagia that had been ongoing since the implant in 2008.  The medical records show that Dr. Nguyen prescribed Plaintiff oral contraceptives to try to control her menstrual bleeding.  Plaintiff Andujar was unable to continue the oral contraceptives due to a reaction with her thyroid medications that caused her to go to the emergency room.

1254.   On or around July 14, 2016, Plaintiff Andujar presented to the emergency room with complaints of heavy bleeding with clots and sharp abdominal pain.  An ultrasound on that date noted the presence of "echo-free areas in the myometrium of the uterus near the fundus."  She was advised to follow-up with her gynecologist.

1255.   On or around September 9, 2016, Plaintiff Andujar underwent an exploratory laparotomy with total abdominal hysterectomy and bilateral salpingectomy.   The pathology report following the procedure noted "on sectioning through the myometrial tissue tow Essure coils are embedded within the cornus."

1256.   After the removal of the Essure® device all of Plaintiff Andujar's symptoms resolved. Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

**RRR.  SARAH CRAWFORD**

1257.   Plaintiff Crawford is twenty-eight (28) years old and resides in Panama City, Bay County, Florida.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**1.   Initial Essure® Procedure:**

1258.   On or around September 10, 2015, Plaintiff Crawford underwent the Essure® procedure at the All About Women OB GYN clinic in Panama City, Florida.

1259.   Timothy Ramsden, M.D. implanted the Essure® device in Plaintiff Crawford's right fallopian tube. Records indicate that Dr. Ramdsen was unable to advance the Essure® coil into left fallopian tube.

**2.   Post Essure® Procedure Condition and Treatment:**

1260.   Plaintiff Crawford's post-procedure period has been marked by severe abdominal pain, painful intercourse, hair loss, joint pain, headaches, fatigue, menometrorrhagia and dysmenorrhea.   Before Essure®, Plaintiff Crawford had not experienced this combination of symptoms.

1261.   After Essure®, Plaintiff Crawford's pain and bleeding became so severe that she began to miss work and could not get out of bed until the symptoms decreased.

1262.   Only eighteen days after the Essure® procedure, Plaintiff Crawford reported worsening right side pelvic pain in which she was unable to walk, on or around September 28, 2015.

1263.   On or around December 7, 2015, Plaintiff Crawford had a follow up visit and reported severe, sharp and stabbing, cramping for two to three weeks. Plaintiff Crawford was then prescribed Minastrin 24 Fe 1mg.

1264.   On or around January 5, 2016, Plaintiff Crawford presented to All About Women OB GYN, for the HSG, which showed bilateral tubal occlusion even though only her left fallopian tube was implanted with Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1265.   On or around June 16, 2016, Plaintiff Crawford presented for an office visit at All About Women OB GYN, and reported pelvic pain and pain with intercourse.  Medical records show that Plaintiff Crawford was willing to try Depo Provera to aid her painful menstruation.

1266.   On or around September 20, 2016, Plaintiff Crawford returned for her pelvic pain and menorrhagia.  Plaintiff Crawford reported constant bleeding since starting the Depo Provera four months before this appointment.

1267.   On or around October 31, 2016, Plaintiff Crawford underwent a laparoscopic hysterectomy with bilateral salpingectomy.

1268.   Plaintiff Crawford was not aware that Bayer's Essure® device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device. It was at this time, that she truly understood that her symptoms were related to Essure®.

1269.   Additionally, Plaintiff Crawford has noticed significant hair loss over the past few years and increased joint pain. She has not been tested for a nickel allergy, but cannot wear "fake" (or "costume") jewelry, which often has nickel in it, due to skin irritation and itching.

**SSS.   KIMBERLY R. KELSEY**

1270.   Plaintiff Kelsey is thirty-three year (33) years old and resides in Palmetto, Fulton County, Georgia.

**1.   Initial Essure® Procedure:**

1271.   After the birth of her youngest child on August 20, 2008, Plaintiff Kelsey saw her OB/GYN, Dr. Eric L. Brown, at GYN-CARE Women's Healthcare Center in Smyrna, Georgia on November 13, 2008.  At that time, she requested permanent birth control via a tubal ligation.  Dr. Brown reviewed various types of birth control methods with her, but recommended Essure® over

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

tubal ligation.  Dr. Brown maintained that Essure® was as safe as or safer than a tubal ligation with the same or less side effects, could be inserted with a simple office visit, without anesthesia or surgical intervention, and with reduced recovery time.  On this basis, Plaintiff Kelsey opted for Essure®.

1272.  On November 19, 2008, Plaintiff Kelsey underwent the Essure® procedure at Dr. Brown's office.  The entire procedure took certainly less than an hour.

### 2.   Post Essure® Procedure Condition and Treatment:

1273.  Plaintiff Kelsey's post-procedure course has been marked by stabbing pelvic pain, bad back pain in her lower back menorrhagia, headaches, dysmenorrhea, swelling down the right front of her bottom by her fallopian tubes, extreme fatigue and two pregnancies after implantation of Essure® resulting in miscarriages.  The pelvic pain and headaches began soon after Essure® was implanted.

1274.  Before Essure®, Plaintiff's menses were light, lasted five days, and she had minimal pain.  She had been on birth control pills before having her last children.  While she was off birth control, the discomfort and inconvenience from her cycle had been minimal.

1275.  After Essure®, she experienced five days of heavy bleeding with severe pain in the first two days.  The first part of her cycle became so severe that many days she become bed ridden.  This has continued since she had the device implanted.

1276.  After Essure®, Plaintiff Kelsey experienced a menstruation cycle of twenty-eight days, with seven days of heavy bleeding, which she did not experience before.  She would use one-hundred super plus tampons in a week and would flow out of a super plus tampon in thirty minutes.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1277.   After the implantation, she tried to see Dr. Brown again to report these symptoms. Unfortunately, her insurance had been cut of and all she could afford were emergency room visits to South Fulton Hospital on Cleveland Street, now Wellstar Atlanta Medical Center South, and Wellstar Atlanta Medical Center on Parkway Drive NE in Atlanta, Georgia.

1278.   On September 7, 2011, she presented to the South Fulton Medical Center reporting that she was at least eleven weeks pregnant according to a home pregnancy test, and passing clots. She was admitted with a diagnosis of a miscarriage.  The ultrasound taken showed no material but the nurses and doctors reassured her that she had passed the material.

1279.   On July 14, 2015, she presented to Atlanta Medical Center complaining of pelvic pain.  On this occasion, she presented to the ER because she began to suffer the same type of severe pain she experienced during her menstrual cycles.  At that point, the ER consulted with Dr. Brown and tried to arrange an office visit.  But Plaintiff Kelsey emphasized that she could not afford the visit and had no insurance.

1280.   Earlier this year, Plaintiff Kelsey went to old National GYN off of Old National Highway in in College Park, Georgia.  This is a women's clinic but it also an abortion clinic.  Either the end of last year or beginning of this year, she believed she was pregnant but she began to bleed so severely that she believed she miscarried again.  At the Old Nation Clinic, she had an Ultrasound that confirmed a spontaneous miscarriage.

1281.   Until she saw a legal advertisement less than a year ago, Plaintiff Kelsey did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  At the time of implant, Dr. Brown assure her that Essure® would be pain free, like tubal ligation and just as effective at preventing pregnancies.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

It was only after she saw the legal advertisement that she truly understood that her symptoms were related to Essure® and that the device and its warnings were defective.

1282.   Plaintiff Kelsey has not been diagnosed with a nickel allergy, but fake or "costume" jewelry causes her ears to be sore.

1283.   Unfortunately, she has not been able to afford surgery to remove Essure®.

**TTT. JAIME CHANCE**

1284.   Plaintiff Chance is forty-on (41) years old and resides in Fort Smith, Sebastian County, Arkansas.

### 1. Initial Essure® Procedure:

1285.   On or around August 19, 2008, Plaintiff Chance underwent the Essure® procedure in the office of Ernest Carlton, M.D., Women's Specialty Care in Macon, Georgia.

1286.   Following the birth of her second child, Plaintiff Chance inquired about permanent birth control and Dr. Carlton directed Plaintiff Chance towards Essure®, advising that it was permanent, safe, effective, and did not require general anesthesia or a long recovery time.  He advised that it would be a simple procedure done in his office.  For these reasons, Plaintiff Chance elected to have the Essure® implanted.

### 2. Post Essure® Procedure Condition and Treatment:

1287.   Following the implant, Plaintiff Chance almost immediately began experiencing bleeding and cramping.  At first, her doctor advised this was normal after the procedure, but when it did not subside, Dr. Carlton believed it may have been a hormonal response and so adjusted her oral contraceptive pills.  This did not resolve the bleeding and cramping.

1288.   On or around November 18, 2008, Plaintiff Chance underwent an HSG at The Medical Center in Macon, Georgia.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1289. The HSG noted that no contrast was identified adjacent to or distal to the left fallopian tube Essure® device; however, the right device did not extend into the fallopian tube and appeared "to reside partially within the uterine cornu and perhaps partially extending into the fundal myometrium."

1290. Due to the migration of the right Essure® device, Plaintiff Chance was forced to undergo a hysteroscopy with removal of the Essure device and a diagnostic laparoscopy with bilateral tubal ligation under general anesthesia. During this procedure on November 26, 2008, Dr. Carlton noted that the majority of the Essure® device on the right was in the uterine cavity, with a portion embedded into the endometrium or myometrium.

1291. Following the removal, Plaintiff Chance's ongoing bleeding and cramping resolved. However, since that time, she has experienced heavier and much more painful periods, as well as consistently abnormal pap smears, which she did not experience prior to the Essure®.

1292. Plaintiff Chance was not aware that Bayer's device was defective until she saw an ad on Facebook in August of 2016.

**UUU. KRISTIN ALMAN**

1293. Plaintiff Alman is twenty-seven (27) years old and resides in Temple, Carroll County, Georgia.

**1. Initial Essure® Procedure:**

1294. On or around April 15, 2014, Plaintiff Alman underwent the Essure® procedure at Carollton Obstetrics and Gynecology in Carrollton, Georgia.

1295. Dr. Christopher R. Jewell implanted the Essure® device in Plaintiff Alman.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**2. Post Essure® Procedure Condition and Treatment:**

1296.   Plaintiff Alman's post-procedure period has been marked by severe pelvic pain, abnormal uterine bleeding, extreme fatigue, joint pain and headaches.

1297.   On or around February 17, 2016, Plaintiff Alman presented for an office visit with Dr. Sheri Campbell with complaints of dyspareunia and pelvic pain that began gradually one year prior. The medical records show that Plaintiff Alman self-reported a nickel allergy that was discussed on this date of service.  Upon learning of Plaintiff's nickel allergy, Dr. Campbell began discussions of Essure® removal.

1298.   On or around March 7, 2016, Plaintiff Alman presented to Dr. Campbell for follow-up on her complaints of menometrorrhagia.

1299.   On or around April 5, 2016, Plaintiff Alman underwent laparoscopic bilateral salpingectomies.  The pathology report dated April 8, 2016, states that the right and left fallopian tubes both had "focal mild chronic inflammation" and identified the Essure® coils.

1300.   Plaintiff Alman's symptoms partially resolved after having the Essure® coils surgically removed.  She continues to have ongoing symptoms from her Essure® implantation, including heavy uterine bleeding, severe bloating and occasional dyspareunia.

1301.   Plaintiff Alman was not aware that Bayer's device was defective until she saw an ad on social medial in August of 2016 that thousands of other women had similar problems and were bringing lawsuits regarding their injuries.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**VVV.  KEISHA WISE**

1302.  Plaintiff Wise is thirty-four (34) old and resides in Pittsburg, Allegheny County, Pennsylvania.

**1.  Initial Essure® Procedure:**

1303.  On or around August 16, 2011, Plaintiff Wise underwent the Essure® procedure at Magee Women's Hospital in Pittsburg, Allgheny County, Pennsylvania.

1304.  Dr. Harati Tatineni performed the Essure® procedure while Plaintiff Wise was under general anesthesia.

**2.  Post Essure® Procedure Condition and Treatment:**

1305.  Plaintiff Wise's post-procedure course has been marked by abdominal pain, back pain, menorrhagia, dysmenorrhea, irregular menstrual cycles, bloating, frequent urinary tract infections, and vaginal infections.  She never experienced this combination of symptoms prior to Essure®.

1306.  Before Essure®, Plaintiff's menses were light, lasted three to five days, and she had minimal pain.

1307.  After Essure, she experienced constant heavy bleeding with clots and cramping. There were times Plaintiff Wise had trouble getting out of bed.  Her bleeding was so heavy that she had to change an overnight pad every one to two hours.

1308.  Plaintiff Wise underwent a HSG on or about December 27, 2011, which showed that both of her fallopian tubes were occluded.

1309.  On July 26, 2013, she presented to Womancare Associates – Doubletree Hotel reporting a change in her menstrual period character, frequent urinary tract infections, and vaginal discharge and odor.  She was getting her periods more than once a month and the flow was darker.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1310.  On August 17, 2013, Plaintiff Wise underwent a transabdominal ultrasound to evaluate her irregular bleeding.

1311.  On August 26, 2013, Plaintiff Wise again presented to Womancare Associates – Doubletree Hotel for irregular menstruation. The cause of her bleeding could not be determined and she was prescribed hormonal birth control pills to regulate her cycles.

1312.  On January 13, 2014, she presented to Western Pennsylvania OBGYN Associates complaining of vaginal discharge and possible urinary tract infection.  It is noted in records that her active problems include bacterial vaginosis, irregular menstrual cycles, and menorrhagia.

1313.  On February 5, 2015, Plaintiff Wise again presented to Western Pennsylvania OBGYN Associates for her irregular bleeding.  According to her medical records, she stated that she had ongoing menses for six weeks.  Plaintiff Wise was again prescribed hormonal birth control pills.

1314.  After not receiving answers from her previous physicians, Plaintiff Wise sought treatment from Dr. Arthur Signorella in December of 2016.

1315.  On or around March 9, 2017, Plaintiff underwent a partial hysterectomy at St. Clair Hospital in Pittsburg, PA.  Plaintiff Wise's symptoms have resolved since her explant surgery. Until the removal, neither she nor her doctors could clearly correlate her problems as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

1316.  Until she saw a legal advertisement less than a year ago, Plaintiff Wise did not realize that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was only after she saw the legal advertisement that she truly understood that the device and its warnings were defective.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### WWW.    STEPHANIE EVANS

1317.  Plaintiff Evans is forty-two (42) years old and resides in Winston-Salem, Forsyth County, North Carolina.

#### 1.  Initial Essure® Procedure:

1318.  On or around October 8, 2004, Plaintiff Evans underwent the Essure® procedure at Forsyth Medical Center, Winston-Salem, Forsyth County, North Carolina.  Dr. Robert Clark Henderson implanted the Essure® device in Plaintiff Evans.

1319.  Plaintiff Evans went to Dr. Hendreson inquiring about permanent birth control and Dr. Henderson directed Plaintiff towards Essure®.  Dr. Henderson told Plaintiff Evans that Essure® was permanent, effective and safer than a tubal ligation.

#### 2.  Post Essure® Procedure Condition and Treatment:

1320.  Plaintiff Evans's post-procedure course has been marked by heavy menstrual periods, severe hair loss, weight fluctuation, painful intercourse, vaginal infections, joint pain, fatigue, and autoimmune symptoms.  Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control.  Her menstrual periods were normal and she had no problem with going about her daily life.

1321.  One month following the Essure® procedure, on or around November 19, 2004, Plaintiff Evans had a follow-up visit with Dr. James W. Hoekstra at Wake Forrest University Baptist Medical Center ("Wake Forrest").  According to her medical records, she stated that beginning a few weeks prior, she had been suffering from crampy, intermittent lower abdominal pain, similar to menstrual cramps or labor pains.  Plaintiff Evans also began to experience intermenstrual bleeding beginning November 1, 2004.  She was diagnosed with dysfunctional uterine bleeding and lower abdominal pain, possibly secondary to a Depo-Provera injection.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1322.   On or around January 4, 2005, Plaintiff Evans underwent a HSG at Wake Forrest which showed bilateral tubal occlusion.  It also showed that the right Essure® coil had advanced or migrated deeper into the fallopian tube.

1323.   On or around April 1, 2005, Plaintiff Evans presented to Dr. David Martin Cline at the Wake Forrest emergency room complaining of abdominal pain and worsening cramping and pain from menses.  She was diagnosed with dysmenorrhea and instructed to use Ibuprofen and Vicodin to treat her pain.

1324.   Plaintiff Evans underwent a second HSG study on or around April 12, 2005, at Wake Forrest which indicated that the Essure® coils were unchanged and her fallopian tubes were occluded bilaterally.  Plaintiff Evans wished to discontinue Depo-Provera injections and was prescribed Seasonale.

1325.   On or around June 17, 2005, Plaintiff Evans returned to Dr. Hoekstra at the Wake Forrest emergency room with complaints of crampy, sharp lower abdominal pain that would cause her to double over in pain.  Plaintiff Evans was given Dilaudid 3 mg IM, Ibuprofen 800 mg and two Vicodin.  She was diagnosed with acute dysmenorrhea with abdominal cramping.

1326.   Plaintiff Evans presented to Dr. Donald Pittaway at Forsyth Medical Center on or around September 19, 2006, and complained of dysmenorrhea and right lower quadrant pain.  Dr. Pittaway planned for Plaintiff Evans to undergo laparoscopy with a laparoscopic assisted vaginal hysterectomy.

1327.   Plaintiff Evans underwent a laparoscopically-assisted vaginal hysterectomy on or around September 21, 2006 due to dysmenorrhea and pelvic pain of uterine etiology under Dr. Pittaway at Forsyth Medical Center.  Plaintiff Evan's fallopian tubes, Essure® coils and ovaries

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

were not removed.    The pathology report revealed adenomyosis, a small benign endocervical polyp and acute chronic cervicitis.

1328.    On or around July 27, 2017, Plaintiff Evans presented to Dr. Kristen Hairston at Wake Forrest with complaints of hair breaking, mood swings and anxiousness.  She was diagnosed with hyperthyroidism.

1329.    On or around December 14, 2007, Plaintiff Evans presented to Dr. Christen Fisher to complain of upper extremity pain, swelling, and altered sensations.  She was diagnosed with left wrist tendonitis.

1330.    On or around October 2010, Plaintiff Evans presented to the emergency room of Wake Forrest with complaints of abdominal pain.

1331.    On or around April 30, 2015, Plaintiff Evans presented to Southside United Health and Wellness Center with complaints of her hair falling out and cramping stomach pain.

1332.    On or around October 23, 2015, Plaintiff Evans presented to Forsyth Medical Center with complaints of a rash and itching.  She was diagnosed with scabies and prescribed Elimite cream.  Two days later, Plaintiff Evans presented to Dr. Richard Lord at Southside United Health and Wellness Center for follow-up.  She continued to complain of a patchy, raised, pruritic rash along her forehead, underarms, breast folds, and wrist.

1333.    Plaintiff Evans has sought years of treatment for her symptoms of unknown origin. Unfortunately, her physicians were not able to find the cause of her symptoms, as they persisted despite constant treatment and medicinal therapy.

1334.    Plaintiff Evans was not aware that Bayer's device was defective until she saw an ad in July 2016 which advised Plaintiff Evans that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1335.   Plaintiff Evans continues to suffer from symptoms caused by Essure®.  Plaintiff Evans is seeking additional treatment to verify a nickel allergy.  Further, Plaintiff Evans cannot wear "fake" jewelry, which often has nickel in it, because it causes swelling and irritation to her skin.

### XXX.   STEPHANIE (WAY) ENSOR

1336.   Plaintiff Stephanie (Way) Ensor is forty-five (45) years old and resides in Fryburg, Oxford County, Maine.

### 1.   Initial Essure® Procedure:

1337.   On or around March 27, 2015, Plaintiff Ensor underwent the Essure® procedure at Franklin General Hospital, Franklin, New Hampshire under general anesthesia.

1338.   Dr. W. Michael Tovell, M.D. implanted the Essure® device in Plaintiff Ensor.

1339.   Plaintiff Ensor chose Essure® at the recommendation of her physician Dr. Tovell due to his concerns over comorbities such as high blood pressure and Type II diabetes mellitus. Dr. Tovell reported: "I discussed multiple options to her including the laparoscopic approach and the hysteroscopic approach.  I think the hysteroscopic approach would be safer in a long-term is less likely to fail."

1340.   Plaintiff Ensor was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

### 2.   Post Essure® Procedure Condition and Treatment:

1341.   Plaintiff Ensor's post-procedure period has been marked by menorrhagia, dysmenorrhea, headaches, hair loss, weight gain, joint pain, and severe pelvic pain.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1342.   Prior to Essure®, Plaintiff Ensor suffered from irregular periods due to polycystic ovarian syndrome.  However, she was previously able to regulate her periods with medication (Metformin).  After the Essure® procedure, Plaintiff's periods would become longer, with heavy cramping and clotting.  They were also an abnormal red color.  She went from having to change a regular pad every four hours to changing an overnight maxi pad every two hours.

1343.   On or around July 29, 2015, Plaintiff Ensor underwent a HSG test to confirm the success of her Essure® procedure.  The HSG showed that the Essure® devices appear to be in good position bilaterally with no evidence of fallopian tube visualization.

1344.   On or around January 6, 2016, Plaintiff Ensor went to Dr. Tovell to discuss her painful heavy menses.  Plaintiff stated that the last several months her periods have been heavy, painful and more frequent.

1345.   Sometime prior to her next visit on March 18, 2016, Plaintiff saw a legal advertisement regarding Essure® and went to discuss her heavy, painful menses with Dr. Tovell.  Dr. Tovell noted that he performed Plaintiff's Essure® procedure prior to the possible adverse effects published in September 2015.  Dr. Tovell offered Plaintiff a Mirena IUD for consideration, which Plaintiff declined and requested that the Essure® devices be removed.  Dr. Tovell agreed and scheduled her removal for July 2016.

1346.   On or about July 20, 2016, Plaintiff went to her preoperative appointment with Dr. Tovell.  Dr. Tovell advised her that her removal surgery would be technically difficult.  A review of the HSG showed that the right Essure® device on the ostia of the cornea.  Dr. Tovell then cancelled her surgery and recommended that she consult a specialist for removal.

1347.   Finally, in November of 2016, Plaintiff Ensor underwent her first of two surgeries to remove the Essure® devices.  Dr. Regan N. Theiler performed the surgeries at Dartmouth-

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Hitchock Medical Center in New Hampshire.  Upon information and belief, during the first removal surgery, it was revealed that one coil was stuck in her uterus.  Plaintiff Ensor was informed that when Dr. Theiler attempted the remove the right Essure® coil, the coil broke and a piece remained in her uterus.  During her first removal surgery, only the right fallopian tube and part of the right Essure® coil were able to be removed.

1348.   In January of 2017, Plaintiff Ensor underwent her second removal surgery.  At that time Dr. Theiler was able to remove the uterus, the left fallopian tube (with Essure® device) and cervix, and the remaining piece of the right Essure® coil.

1349.   Plaintiff Ensor has not been tested for a nickel allergy. However, she believes that some of her symptoms while she had the Essure® devices implanted are related to a possible allergy.  Plaintiff is currently planning to get tested for a nickel allergy.

1350.   Plaintiff Ensor's symptoms resolved only after removal of her Essure® device. Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

**YYY. MARSHONTRI REID**

1351.   Plaintiff Reid is thirty-five (35) years old and resides in Union City, Fulton County, Georgia.

**1. Initial Essure® Procedure:**

1352.   On or around December 10, 2010, Plaintiff Reid underwent the Essure® procedure at the Women's Center in LaGrange, Troup County, Georgia.

1353.   Dr. James Bendell implanted the Essure® device in Plaintiff Reid.

190

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1354.   Plaintiff Reid was directed toward Essure® because there was no downtime and it was an in-office procedure.  She was assured that Essure® was as safe as or safer than tubal ligation and unlikely to cause any side effects.

### 2.   Post Essure® Procedure Condition and Treatment:

1355.   Plaintiff Reid's post-procedure period has been marked by dysfunctional uterine bleeding, extreme fatigue, pelvic pain, painful intercourse, joint pain, rashes, and weight gain.

1356.   On or around March 15, 2011, Plaintiff Reid underwent a HSG test that showed bilateral tubal occlusion.  Records note that the right Essure® device showed distal entry into the fallopian tube at the level of the cornu.  The majority of the device was in the right posterior lateral endometrial cavity.

1357.   From January 27, 2012, through June 11, 2013, Plaintiff complained of heavy periods to The Women's Center.  She described heavy bleeding with clotting and fatigue during her menstrual period.  Furthermore, she stated she missed work and social events because of her heavy periods, and tended to stay home during her period.

1358.   On March 15, 2016, Plaintiff Reid presented to Peach Tree Clinic and complained of a rash, fatigue, irregular heavy menses with clotting, and severe pelvic pain.

1359.   Plaintiff Reid's symptoms have not resolved.  Plaintiff Reid continues to suffer from injuries, including but not limited to dysfunctional uterine bleeding, extreme fatigue, pelvic pain, painful intercourse, and weight gain caused by the implantation of the Essure® device.

1360.   Further, Plaintiff Reid has continued to suffer from rashes and joint pain. She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, due to skin irritation, blistering and redness.

1361.   Plaintiff Reid was not aware that Bayer's device was defective until she saw a legal

191

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device. It was at this time that she truly suspected that her symptoms were related to Essure®.

1362. Plaintiff Reid still has the Essure® device surgically implanted.

**ZZZ.  AMY M. OLSON**

1363.    Plaintiff Olson is thirty nine (39) years old and resides in Detroit Lakes, Becker County, Minnesota.

### 1.  Initial Essure® Procedure:

1364. On or around April 20, 2012, Plaintiff Olson underwent the Essure® procedure, under local anesthesia with sedation, at Essentia Health St. Mary's – Detroit Lakes Clinic, Becker County, Minnesota.

1365. James M. Christensen, M.D. implanted the Essure® device in Plaintiff Olson.

### 2.  Post Essure® Procedure Condition and Treatment:

1366. Plaintiff Olson underwent a HSG on or about July 16, 2012, which showed that both fallopian tubes are occluded.

1367. Plaintiff Olson's post-procedure course has been marked by abdominal pain, diarrhea, nausea, pelvic pain, excessive menstruation, bloating feeling, night sweats and hot flashes, rashes, hair loss, decreased libido, and right sided pain before and after menses. Before Essure®, Plaintiff had not experienced this combination of symptoms while not on birth control. Her menstrual periods were normal and she had no problem with going about her daily life.

1368. On or around October 13, 2015, Plaintiff Olson presented Nicole L. Strand, MD with complaints of feeling hot all the time, and decreased libido.

1369. On or around July 1, 2016, Plaintiff Olson presented James M. Christensen, MD

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

with complaints of abdominal bloating, skin changes and allergic type reactions.

1370. On or around October 24, 2016, Plaintiff Olson underwent a Laparoscopic Supracervical Hysterectomy, Bilateral Salpingectomy and Cysto by James Byron Prethus, M.D. at the Fairview Hospital for the pelvic pain due to the Essure® device. The pre-operative diagnosis was pelvic pain due to Essure® device and menorrhagia.

1371. After the removal of the Essure® device all of Plaintiff Olson's symptoms resolved. Despite suffering from these symptoms for over three years, Plaintiff Olson's symptoms resolved only after removal of her Essure® device. Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device. After the removal, the cause of her problems became obvious, due to their resolution.

### AAAA.    MISTI KELLMAN

1372. Plaintiff Kellman is thirty (30) years old and resides in Forest Park, Clayton County, Georgia.

#### 1. Initial Essure® Procedure:

1373. On or around March 31, 2010, Plaintiff Kellman underwent the Essure® procedure under at My OBGYN in Riverdale, Clayton County, Georgia.

1374. Letitia D. Royster, M.D. implanted the Essure® device in Plaintiff Kellman.

1375. Plaintiff Kellman was directed toward Essure® because there was no downtime and it was an in-office procedure. She was assured that Essure® was as safe as or safer than tubal ligation and less invasive.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

2.  **Post Essure® Procedure Condition and Treatment:**

1376.  Plaintiff Kellman's post-procedure period has been marked by unusually heavy menstrual periods, extreme fatigue, back pain, hair loss, brittle teeth, painful intercourse, and pelvic inflammatory disease.

1377.  On or around April 21, 2010, Plaintiff Kellman presented to My OBGYN with complains of irregular uterine bleeding since the Essure® procedure.

1378.  On or around May 26, 2010, Plaintiff Kellman presented to Piedmont Henry Hospital with acute parametritis and pelvic cellulitis.  She was diagnosed with pelvic inflammatory disease.  Plaintiff Kellman reported abdominal pain once per week, and the pain could be so severe that she had difficulty walking.  The pain radiated to her flank area.  A CT conducted at that time was normal and a pelvic ultrasound revealed a thickening of the endometrium.

1379.  On or around January 19, 2011, Plaintiff Kellman presented at Southern Regional Medical Center with complaints of back pain and vaginal discharge.

1380.  On or around June 10, 2015, Plaintiff Kellman presented to Atlanta Medical Center and complained of left flank pain that radiated to her left leg, vaginal discharge for over six months, and abdominal pain.  According to her medical records, Plaintiff stated she had been in pain for four days with pain in her ovaries.

1381.  On or around October 17, 2015, Plaintiff Kellman presented to Southern Regional Medical Center with complains of pelvic pain that radiated to her lower back.  This pain lasted for over two months and worsened at night.  She also was experiencing clear vaginal discharge.

1382.  Plaintiff Kellman's symptoms have not resolved.  Plaintiff Kellman continues to suffer from injuries, including but not limited to unusually heavy menstrual periods, extreme

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

fatigue, back pain, hair loss, brittle teeth, painful intercourse, and pelvic inflammatory disease caused by the implantation of the Essure® device.

1383.   Further, Plaintiff Kellman has continued to suffer from rashes and joint pain.  She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, because it causes itchiness, redness and rashes.

1384.   Plaintiff Kellman was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1385.   Plaintiff Kellman still has the Essure® device surgically implanted.

**BBBB. NAOMI FARMER**

1386.   Plaintiff Farmer is thirty-five (35) years old and resides in Marysville, Snohomish County, Washington.

### 1.   Initial Essure® Procedure:

1387.   On or around September 3, 2014, Plaintiff Farmer underwent the Essure® procedure at The Everett Clinic in Everett, Washington.

1388.   Dr. Quan Dau performed the implant of the Essure® on Plaintiff Farmer.

### 2.   Post Essure® Procedure Condition and Treatment:

1389.   Plaintiff Farmer's post-procedure period has been marked by abdominal pain and abnormal uterine bleeding.

1390.   On or around October 31, 2014, Plaintiff Farmer underwent an ultrasound to evaluate her symptoms of prolonged spotting.

195

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1391.   On or around November 3, 2014, Plaintiff Farmer presented for an office visit with Dr. Quan Dau with complaints of abdominal pain and vaginal bleeding.

1392.   On or around November 21, 2014, Plaintiff Farmer underwent a robotic assisted hysterectomy and bilateral salpingectomy.

1393.   Since the removal of the Essure® device, Plaintiff Farmer's symptoms have completely resolved.

1394.   Plaintiff Farmer was not aware that Bayer's device was defective until she saw an ad on social medical in the summer of 2016 that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

### CCCC.        DAWN COSTA

1395.   Plaintiff Costa is forty-two (42) years old and resides in New Bedford, Bristol County, Massachusetts.

#### 1.   Initial Essure® Procedure:

1396.   On or around May 2, 2007, Plaintiff Costa underwent the Essure® procedure under general anesthesia at Southcoast Hospital Group in New Bedford, Bristol County, Massachusetts.

1397.   Dr. Suzanne Caron implanted the Essure® device in Plaintiff Costa.

1398.   Plaintiff Caron was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

#### 2.   Post Essure® Procedure Condition and Treatment:

1399.   Plaintiff Costa's post-procedure period has been marked by unusually heavy and long menstrual periods, headaches, bloating, fatigue, joint pain in her knees, and painful intercourse.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1400.   On or around August 27, 2007, Plaintiff Costa underwent a HSG exam which showed bilateral tubal occlusion.

1401.   On or around December 10, 2008, Plaintiff Costa returned to Healthcare for Women with complaints of sharp and severe pain associated with her periods, and for vaginal discharge.   According to her medical records, she stated she had been suffering with painful periods for one year and suspected the pain may be related to Essure® implants.   Plaintiff was diagnosed with dysmenorrhea and a pap smear was ordered.

1402.   On or around August 4, 2010, Plaintiff Costa presented at Healthcare for Women for evaluation for severe, sharp pain associated with her periods for the preceding two years.   She also complained of increased bloating with her menstrual period.

1403.   On or around July 27, 2011, Plaintiff Costa presented to Healthcare for Women for a well woman exam.   Records indicate that Plaintiff Costa complained of pelvic pain since her Essure® procedure four years prior.   She stated that she had begun to experience pelvic pain three days before her menstrual period, and that the pain had become worse over the past year.   She also stated she had begun to experience irregular cycles, in which she would skip a cycle or have menstrual periods twice per month.

1404.   On or around August 14, 2013, Plaintiff Costa presented to Healthcare for Women for a routine well woman exam, and complained of lower back pain and pain in her fallopian tubes with menses.

1405.   On or around October 15, 2013, Plaintiff Costa presented to Healthcare for Women and complained of severe cramping, vaginal discharge, and pain and bleeding with intercourse.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1406.  On or around April 25, 2014, Plaintiff Costa presented to Healthcare for Women and complained of severe pelvic pain that radiated to her lower back, cramping, abdominal distention, diarrhea and dysuria.  A pelvic ultrasound was ordered to rule out cystitis.

1407.  On or around May 1, 2014, Plaintiff Costa underwent a transvaginal ultrasound at Healthcare for Women.  It revealed a heterogeneous uterus with a possible low uterine segment fibroid.  Simple cysts were noted on both the left and right ovary.

1408.  On or around August 25, 2014, Plaintiff Costa presented to Healthcare for Women for a routine well woman exam.  She complained of migraines and swelling to her legs bilaterally.

1409.  Plaintiff Costa's symptoms have not resolved.  Plaintiff Costa continues to suffer from injuries, including but not limited to irregular menstrual bleeding, headaches, bloating, fatigue, joint pain in her knees, and painful intercourse caused by the implantation of the Essure® device.

1410.  Further, Plaintiff Costa has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, because it causes rashes.

1411.  Plaintiff Costa consistently received alternate potential causes for her symptoms from her physicians.  Plaintiff Costa was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1412.  Plaintiff Costa still has the Essure® device surgically implanted.

**DDDD.      KARENA WINKLE**

1413.  Plaintiff Winkle is thirty-three (33) years old and resides in Arvada, Jefferson County, Colorado.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 1.   Initial Essure® Procedure:

1414.   On or around March 4, 2011, Plaintiff Winkle underwent the Essure® procedure at Westside Women's Care, Wheat Ridge, Colorado.

1415.   Bonita Kolrud, M.D. implanted the Essure® device in Plaintiff Winkle.   Dr. Kolrud also removed Plaintiff Winkle's Mirena IUD at the same time as the Essure® implantation.

### 2.   Post Essure® Procedure Condition and Treatment:

1416.   Plaintiff Winkle's post-procedure period has been marked by pelvic pain, pain after intercourse, fatigue, irritability, hair loss, weight gain, headaches, abdominal pain, cramping and constant bacterial/yeast infections.

1417.   Plaintiff Winkle on or around June 14, 2011 underwent a HSG test at Advanced Medical Imaging which showed satisfactory positioning of the Essure® devices with tubal occlusion bilaterally.

1418.   On June 28, 2012, Plaintiff Winkle presented at the Westside Women's Care Medicine complaining of bloating and cramping.  Plaintiff stated that her periods seem to be worse with more cramping.

1419.   On or around April of 2016, Plaintiff Winkle saw a legal advertisement regarding the Essure® device, and realized that the symptoms she has been experiencing could possibly be related to Essure®.  Plaintiff began researching on the Essure® website and social media.

1420.   On June 1, 2016, Plaintiff Winkle saw Dr. Lisa Lewis complaining of recurrent bacterial and yeast infections and pelvic pain.  Plaintiff discussed the recent information she had received about Essure® device and requested that the Essure® devices be removed.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1421.   Plaintiff Winkle underwent a vaginal hysterectomy and bilateral salpingectomy on September 15, 2016 performed by Lisa Lewis, M.D. at Lutheran Medical Center, Wheat Ridge, Colorado.

1422.   Despite suffering from these symptoms for over five (5) years, Plaintiff Winkle's symptoms resolved only after removal of her Essure® device.  At her post-operative appointment, Plaintiff informed her doctors that she was feeling great.  Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

### EEEE.    HOLLY KEMBLE

1423.   Plaintiff Kemble is thirty-eight (38) years old and resides in Mrytle Beach, Horry County, South Carolina.

### 1.   Initial Essure® Procedure:

1424.   On or around August 23, 2012, Plaintiff Kemble underwent the Essure® procedure at Coastal Carolina OBGYN in Conway, Horry County, South Carolina.

1425.   Dr. Amanda M. McAleer implanted the Essure® device in Plaintiff Kemble.

### 2.   Post Essure® Procedure Condition and Treatment:

1426.   Plaintiff Kemble's post-procedure period has been marked by unusually heavy menstrual bleeding and persistent skin rashes.

1427.   On or around November 11, 2012, Plaintiff Kemble underwent a HSG at Conway Medical Center which revealed bilateral tubal occlusion.

1428.   On or around February 18 2013, less than six months after her Essure® procedure, Plaintiff Kemble presented at CPG- Family Medicine and Urgent Care at Socastee with complaints

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

of a skin rash. The rash was characterized as red and raised with itching, and had spread over her entire body.

1429.   On or around May 8, 2013, Plaintiff Kemble again presented at CPG-Family Medicine and Urgent Care at Socastee with complaints of a skin rash that had been "occurring for months."   According to her medical records, Plaintiff Kemble reported that she saw a dermatologist and had two failed rounds of antibiotics.

1430.   Plaintiff Kemble underwent labs, but her physicians could not determine the cause of her symptoms.

1431.   Plaintiff Kemble's symptoms persisted and, on or around May 23, 2016, she again presented at CPG- Family Medicine and Urgent Care at Socastee with a reported rash, already two to three weeks in duration, located on her chest, abdomen, and back.

1432.    Plaintiff Kemble has suffered from these symptoms for over three years, and yet her physicians have never been able to determine the cause. Plaintiff Kemble did not realize, until she saw a legal advertisement, that her symptoms were being experienced thousands of other women who had been implanted by the Essure® device. It was at that time that she truly suspected that her symptoms were related to Essure®.

**FFFF. JANASHAYA DENNIS**

1433.   Plaintiff Dennis is thirty-two (32) years old and resides in Stone Mountain, Dekalb County, Georgia.

**1.   Initial Essure® Procedure:**

1434.   On or around 2010, Plaintiff Dennis underwent the Essure® procedure in Georgia.

1435.   Dr. Rodney Dourron, M.D. implanted the Essure® device in Plaintiff Dennis.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

**2.  Post Essure® Procedure Condition and Treatment:**

1436.  Plaintiff Dennis's post-procedure course has been marked by menorrhagia, abdominal pain, and severe pelvic pain.

1437.  On or around June 28, 2012, Plaintiff Dennis presented at the Dekalb Medical Center complaining of abdominal pain and pelvic pain.  She was treated and diagnosed with pelvic pain, cervicitis and left ruptured ovarian cyst.

1438.  On or around June 24, 2013, Plaintiff Dennis presented at the Dekalb Medical Center complaining of hematuria.  Plaintiff indicated that she had blood and some clots in her urine.  She was treated and discharged with a diagnosis of possible cystitis.

1439.  On or around January 21, 2014, Plaintiff Dennis presented at the Dekalb Medical Center complaining of abdominal pain that radiated into her back.

1440.  On or around December 21, 2016, Plaintiff Dennis presented at the Dekalb Medical Center complaining of abdominal pain, pelvic pain, and perineal pain.  Upon review of an ultrasound, doctors determined that Plaintiff's "IUD" (which was actually the Essure® device) had migrated into the right side of her uterine wall.

1441.  On or around January 26, 2017, Plaintiff Dennis underwent a total abdominal hysterectomy due her complaints of dysmenorrhea, menorrhagia, and severe pelvic pain, at the DeKalb Medical Center performed by Dr. Rodney Dourron.  The surgical report indicates that the right Essure® coil was protruding through the right cornual region.

1442.  Despite suffering from these symptoms for over six years, Plaintiff Dennis' symptoms resolved only after removal of her Essure® device.  Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their resolution.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

#### GGGG.    ANGEL MCCALEY

1443.   Plaintiff McCaley is thirty-three (33) years old and resides in Charleston, Kanawha County, West Virginia.

##### 1.   Initial Essure® Procedure:

1444.   On or around May 7, 2014, Plaintiff McCaley underwent the Essure® procedure at Charleston Area Medical Center ("CAMC"), Charleston, Kanawha County, West Virginia.

1445.   Paul Dietz, M.D. attempted implantation of the Essure® device in Plaintiff McCaley.   Dr. Dietz implanted the Essure® device in the left fallopian tube, but was unable to successfully implant the right Essure® device because the uterine cavity collapsed.   Dr. Dietz attempted to identify and cannulate the right ostia multiple times, but failed.   He then made the decision to stop the procedure.

##### 2.   Post Essure® Procedure Condition and Treatment:

1446.   On or around, May 10, 2014, Plaintiff McCaley presented to the CAMC Emergency Room complaining of severe abdominal, pelvic and lower back pain, vaginal bleeding with large clots, back pain, and discomfort with urination.   Plaintiff McCaley underwent a physical examination and an x-ray of the abdomen.   She was assessed as experiencing pain and vaginal bleeding as a result of trauma to the endometrium during the failed Essure® procedure.   Plaintiff McCaley was prescribed Flagyl and Percocet.

1447.   Plaintiff McCaley returned to CAMC on or around, May 13, 2014, with the complaints of abdominal pain, back pain, heavy bleeding, and dysuria.   A pelvic exam revealed excoriation of her external genitalia and a white rash over the vulva bilaterally extending around the anus.   She underwent a CT scan and was given Diflucan and Lidocaine cream.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1448.   The next day, on or around, May 14, 2014, Plaintiff McCaley was seen by Dr. Robert T. DePond at CAMC for left-sided pelvic pain that radiated to her back and vulvovaginitis.

1449.   Plaintiff McCaley on or around May 16, 2014 underwent a diagnostic laparoscopy, bilateral partial salpingectomy, adhesiolysis and Essure® coil removal at CAMC under Dr. Robert T. DePond.

1450.   Plaintiff McCaley was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure® device.

### HHHH.    CAROLA VALENCIA

1451.   Plaintiff Valencia is thirty-two (32) years old and resides in Fort Lauderdale, Broward County, Florida.

#### 1.   Initial Essure® Procedure:

1452.   On or around December 3, 2013, Plaintiff Valencia underwent the Essure® procedure at Broward Health Medical Center, Fort Lauderdale, Florida under general anesthesia.

1453.   Renee Alexis, M.D. implanted the Essure® device in Plaintiff Valencia.

1454.   Plaintiff Valencia was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

#### 2.   Post Essure® Procedure Condition and Treatment:

1455.   Plaintiff Valencia's post-procedure period was marked by severe lower pelvic pain and heavy bleeding.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1456.   Plaintiff Valencia on or around March 14, 2014 underwent a HSG test at Broward Health Medical Center which showed that successful closure of the fallopian tubes by the Essure® devices.

1457.   On or about August 10, 2015, Plaintiff Valencia sought treatment from Dr. Herman Epstein in Lauderdale Lake, Florida for severe lower pelvic pain and heavy bleeding.  Plaintiff states that the pain was excruciating and was not related to menses.  The pain was constant, not cyclic.

1458.   On or about August 21, 2015, Plaintiff Valencia underwent a total laparoscopic hysterectomy, bilateral salpingectomy, and extensive pelvic adhesiolysis performed by Dr. Epstein at the Florida Medical Center in Fort Lauderdale, Florida.

1459.   Plaintiff Valencia's symptoms improved after removal of her Essure® device.  Until the removal, neither she nor her doctors could clearly correlate her problem as being associated with the device.  After the removal, the cause of her problems became obvious, due to their improvement.

**IIII.        DONNA ANDRUS**

1460.   Plaintiff Andrus is forty-four (44) years old and resides in Tooele, Tooele County, Utah.

**1.   Initial Essure® Procedure:**

1461.   On or around November 26, 2013, Plaintiff Andrus underwent the Essure® procedure at Healthcare for Women in Tooele, Utah.

1462.   Dr. Eldad Vered implanted the Essure® device in Plaintiff Andrus.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

### 2.  Post Essure® Procedure Condition and Treatment:

1463.  Plaintiff Andrus' post-procedure period has been marked by abdominal pain, menometrorrhagia, and fatigue.  Prior to her Essure® implantation, her menstrual cycles were regular, heavy and three to five days long.  Following Essure® they became more frequent, up to two times a month, and were much heavier, requiring her to use double protection.

1464.  On or around December 6, 2013, Plaintiff Andrus presented for a pre-operative visit with Dr. Eldad Vered.  Her records show complaints of pelvic pain and menometrorrhagia, which Dr. Vered recommended treating with an endometrial ablation.  According to her medical records, her menorrhagia was so severe that she was changing her protection every hour with "accidents."

1465.  In December of 2013 Plaintiff Jones underwent the endometrial ablation.  Unfortunately, the ablation did not resolved her heavy bleeding.  Instead, her bleeding worsened, and she suffered from intermittent, sharp pain.  According to her medical records, she was bleeding so heavily in February that she could not leave the house.

1466.  On or around March 17, 2016, Plaintiff Andrus underwent an ultrasound to evaluate her symptoms of pelvic pain.

1467.  On or around May 4, 2016, Plaintiff Andrus underwent a laparoscopic hysterectomy and bilateral salpingo-oophorectomy.  According to the operative report: "[t]here seemed to be additional vascularity next to the uterus and the Essure® on the left has perforated through the wall of the uterus, possibly through the wall of the tube."

1468.  Plaintiff Andrus continues to suffer from pain and injury caused by the implantation of the Essure® device.  While her symptom of heavy bleeding as resolved, she is still suffering from pain and is scheduled to follow up with her physician for further testing.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1469.   Plaintiff Andrus suffers from menopausal symptoms due to her hysterectomy, and is unable to take hormones due to her history of cancer.

**JJJJ.  SUSAN MAULDIN**

1470.   Plaintiff Mauldin is forty-three (43) years old and resides in Goose Creek, Berkeley County, Georgia.

### 1.   Initial Essure® Procedure:

1471.   On or around May 1, 2015, Plaintiff Mauldin underwent the Essure® procedure at Roper Hospital in Charleston, South Carolina.

1472.   Dr. Steven McLees implanted the Essure® device in Plaintiff Mauldin while she was under general anesthesia.

### 2.   Post Essure® Procedure Condition and Treatment:

1473.   Plaintiff Mauldin's post-procedure course has been marked by abdominal pain, menorrhagia, irregular menses, dyspareunia, extreme fatigue, extreme anxiety, increased agitation, and memory "fog."  Prior to Essure®, she had never experienced this combination of symptoms.

1474.   Before Essure®, Plaintiff's menstrual cycle was light, lasted five days, and she had minimal pain.  She had no problems going about her daily life.

1475.   After Essure®, she experienced seven days of heavy bleeding.  Her bleeding was so heavy that she often soiled her clothing through a tampon and a pad.

1476.   On or around May 10, 2016, Plaintiff Mauldin underwent a HSG at Mount Pleasant Radiology which confirmed bilateral tubal occlusion.

1477.   On October 15, 2015, Plaintiff Mauldin presented to Partners OBGYN reporting increased irritability and anxiety for the past several weeks.  While she had suffered from anxiety

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

in the past, she had not needed to take medication for the past two years.  Molly Graves, PA, prescribed Celexa to manage Plaintiff Mauldin's anxiety.

1478.  On November 17, 2015, she presented at Mary Jenkins Center for Behavioral Health complaining of anxiety, trouble concentrating, panic attacks, and mood swings.

1479.  On January 5, 2016, Plaintiff Mauldin again presented at Mary Jenkins Center for Behavioral Health complaining of increased anxiety since her Essure® implant.  On this occasion, her medication was adjusted and she was prescribed Celexa and Xanax to manage her anxiety.

1480.  On March 2, 2016, Plaintiff Mauldin presented at Healthfirst reporting extreme fatigue.  A comprehensive metabolic panel was ordered and it was discovered that she had developed a Vitamin B12 deficiency.  She followed up on March 6, 2016 with continuing symptoms.

1481.  Plaintiff Mauldin's fatigue continued and, on April 26, 2016, she presented at Tidewater Neurology.  Her fatigue was so significant that she didn't even have the energy to get out of bed.

1482.  On May 2, 2016, Plaintiff Mauldin returned to Mary Jenkins Center for Behavioral Health and her anxiety medication was again adjusted and she was now prescribed Cymbalta and Xanax.

1483.  On June 9, 2016, Plaintiff Mauldin presented at Tidewater Neurology with fatigue, headaches, and vertigo.

1484.   Even after a battery of tests, the cause of Plaintiff Mauldin's symptoms could not be determined.  Plaintiff Mauldin received a false positive for Lyme Disease and was forced to find an infectious disease specialist.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1485.   Her fatigue became so bad that she was let go from her position as a paralegal in August of 2016 because of decreased productivity.  In her thirteen years as a paralegal, she had never been terminated from a job.

1486.   On July 26, 2016, she presented at Partners OBGYN complaining of chronic fatigue, anxiety, memory lapses, and heavy bleeding that lasted seven days.  She continued to receive treatment for these symptoms until her hysterectomy.

1487.   On September 21, 2016, Plaintiff Mauldin underwent a total abdominal hysterectomy with bilateral salpingectomy at St. Francis Xavier Hospital by Dr. Steven McLees. It was noted that the Essure® coils were in place in the fallopian tubes.

1488.   Unfortunately for Plaintiff Mauldin, her post-surgical period was not without complication.  On October 4, 2016, she presented at St. Francis Hospital Emergency Department with post-surgical bleeding at her incision.  She was discharged with wound care instructions.

1489.   After having to evacuate her home to Columbia, South Carolina due to Hurricane Matthew, Plaintiff Mauldin began to feel very ill.  On October 8, 2016, she presented to Lexington Medical Center complaining that her incision was swollen, painful, and hot to the touch.  A CT scan of her abdomen and pelvis indicated a postoperative seroma/hematoma.  She then had to undergo an abdominal wound incision and drainage revealing frank pus and necrotic tissue.

1490.   On October 11, 2016, the removed tissue tested positive for MRSA.

1491.   Additionally, while Plaintiff Mauldin has not been tested for a nickel allergy, she cannot wear jewelry containing nickel as it causes her to have a reaction.  She is actively seeking a nickel allergy test to help evaluate her symptoms.

1492.   Plaintiff Mauldin's symptoms eventually resolved following her explant surgery. Despite suffering from these extreme symptoms for over a year, Plaintiff Mauldin's symptoms

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

resolved only after removal of her Essure® device.  Until the removal, neither she nor her doctors could clearly correlate her problems became obvious, due to their resolution.

### KKKK.              KIM TROKEY

1493.   Plaintiff Kim Trokey is 49 years old and resides in High Ridge, Missouri.

#### 1.   Initial Essure® Procedure:

1494.   On or around May 17, 2010, Plaintiff Kim Trokey underwent the Essure® procedure at Missouri Baptist Medical Center, in St. Louis County, Missouri.

1495.   Dr. James Probst implanted the Essure® device in Plaintiff Kim Trokey.

#### 2.   Post Essure® Procedure Condition and Treatment:

1496.   Plaintiff Trokey's post-procedure course has been marked by pain, cysts, bloating, a burning sensation in her abdomen, painful bowel movements and painful intercourse.

1497.   Plaintiff Trokey underwent a HSG on or about September 24, 2010, which showed occlusion.

1498.   Following, Plaintiff Kim Trokey experienced her first onset of symptoms.

1499.   On or around November of 2012, Plaintiff Trokey presented for pelvic pain.

1500.   From November of 2012 through the present, Plaintiff Trokey treated consistently for her symptoms of pelvic pain.

1501.   Plaintiff Trokey only first became aware of a potential connection between her symptoms and the Essure® device at a doctor's visit in September of 2016.

### LLLL. CARRIE GOODE

1502.   Plaintiff Goode is thirty-six (36) years old and resides in Grand Junction, Mesa County, Colorado.

#### 1.   Initial Essure® Procedure:

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1503.   On or around April 7, 2006 Plaintiff Goode underwent the Essure® procedure at Parkview – Women's Health Center, in Pueblo, Pueblo County, Colorado.

1504.   Eldad Vered, MD implanted the Essure® device in Plaintiff Goode.

### 2.   Post Essure® Procedure Condition and Treatment:

1505.   Plaintiff Goode's post-procedure course has been marked by abdominal pain in lower pelvic area and right lower quadrant of abdomen.

1506.   On or around May 9, 2006, Plaintiff Goode presented to Dr. Vered with complaints of abdominal pain in lower pelvic area and right lower quadrant of abdomen.  Dr. Vered prescribed Levaquin 500 mg.

1507.   On or around June 1, 2006, Plaintiff Goode presented to Dr. Vered with complaints of abdominal pain, starting after Essure, constant on right side of right fundus/right tubal.  Dr. Vered noted that he will contact Essure® trainer and discuss plan of action probable laparoscopy.

1508.   On or around June 5, 2006, Plaintiff Goode telephoned Dr. Vered with complaints of pelvic pain and right lower quadrant of abdomen rating pain 8 out of 10.  Dr. Vered noted that after detailed discussion of options with Dr. Don Nichols, the principal investigator for Essure® clinical trials, and with Plaintiff Goode, the situation is untenable as Plaintiff Goode was unable to live with her pain.  Dr. Vered advised Plaintiff Goode of a Hysteroscopy, Laparoscopy and Chromopertubation.

1509.   On or around June 07, 2006, Plaintiff Goode presented to Dr. Vered with complaints of right adnexal pain temporary related to Essure® placement April 4, 2006.  Dr. Vered notes that after his discussion with Dr. Don Nichols at Kentucky, the principal investigator for Essure® clinical trials, that there had been a handful of cases with unilateral or bilateral persistent

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

pain reported to Conceptus, some were related to perforation and others were present with proper placement of Essure.

1510.  On or around June 14, 2006 Plaintiff Goode underwent a diagnostic laparoscopy, followed by laparoscopically assisted vaginal hysterectomy, followed by cystoscopy, and a chromotubation which documented occlusion of both tubes.

1511.  Plaintiff Goode's still suffers from cysts on her ovaries that rupture on their own that cause severe abdominal and pelvic pain.

1512.  Plaintiff Goode was not aware that Bayer's device was defective until she saw a legal ad on Facebook and realized that thousands of other women had experienced the same or similar problems and were bringing lawsuits regarding their injuries.

### MMMM.    NINA WORLEY

1513.  Plaintiff Worley is thirty-four (34) years old and resides in Walhalla, Oconee County, South Carolina.

#### 1.   Initial Essure® Procedure:

1514.  On or around October 8, 2009, Plaintiff Worley underwent the Essure® procedure at Oconee Medical Center, Seneca, Oconee County, South Carolina.

1515.  Vance Pirkle, M.D. implanted the Essure® device in Plaintiff Worley under general anesthesia.

1516.  Plaintiff Worley was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## 2.  Post Essure® Procedure Condition and Treatment:

1517.   Plaintiff Worley's post-procedure period has been marked by dysmenorrhea, pelvic and abdominal pain, irregular menses, premenstrual syndrome, menorrhagia, joint pain, headaches, itchiness, and painful intercourse.

1518.   On or around May 18, 2010, Plaintiff Worley presented to Dr. Linda Booth complaining of increased premenstrual syndrome, dysmenorrhea and pelvic pain.

1519.   On or around June 30, 2010, Plaintiff Worley presented to Dr. Linda Booth complaining of premenstrual syndrome, pelvic pain and abdominal pain since the Essure® procedure. The following week, on or around July 8, 2010, Dr. Booth referred Plaintiff Worley to Oconee Physician Practices due to her abdominal pain following the Essure® procedure.

1520.   On or around July 4, 2010, Plaintiff Worley underwent an ultrasound of the right upper quadrant of the abdomen.

1521.   On or around December 8, 2014, Plaintiff Worley presented to Dr. Linda Booth complaining of irregular menses and menometrorrhagia.  She stated she suffered a heavy menstrual flow for prolonged periods.

1522.   On or around May 23, 2016, Plaintiff Worley presented to Dr. Linda Booth complaining of dysmenorrhea with worsening cramps during her menstrual cycle.

1523.   Plaintiff Worley was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1524.   Further, Plaintiff Worley has continued to suffer from joint pain. She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, because it irritates and itches her skin.

1525.   Plaintiff Worley still has the Essure® device surgically implanted.

**NNNN.**     **CINDY FELTNER**

1526.   Plaintiff Feltner is twenty nine (29) years old and resides in Lebanon, Laclede County, Missouri.

**1.   Initial Essure® Procedure:**

1527.   On or around May 13, 2015 Plaintiff Feltner underwent the Essure® procedure at Mercy Hospital Lebanon, Laclede County, Missouri.

1528.   Denis E. Percell, M.D. implanted the Essure® device in Plaintiff Feltner.

**2.   Post Essure® Procedure Condition and Treatment:**

1529.   Plaintiff Feltner's post-procedure course has been marked by abdominal pain, vaginal discharge, sever cramping, bloating, hair loss, and pain during sexual intercourse.

1530.   On or around May 20, 2015, Plaintiff Feltner went to Mercy Hospital Emergency Department with complaints of vaginal discharge, abdominal pain.

1531.   On or around August 1, 2015, Plaintiff Feltner presented to Mercy Hospital with complaints of back pain and abdominal pain.

1532.   Plaintiff Feltner underwent an HSG test on or about August 25, 2015, which showed the right and left fallopian tubes appear to be occluded.

1533.   From August 2015 to July 2016, Plaintiff Feltner went to Mercy Hospital Emergency Department approximately eighteen times with complaints of back pain, abdominal pain, and pelvic pain.  Before Essure®, Plaintiff had not experienced this combination of symptoms

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

while not on birth control. Her menstrual periods were normal and she had no problem with going about her daily life.

1534. For the next two years, Plaintiff Feltner repeatedly sought treatment for her symptoms, but no physician was able to determine their cause.

1535. Plaintiff Feltner's still suffers abdominal pain, vaginal discharge, severe cramping, bloating, hair loss, and pain during sexual intercourse.

1536. Plaintiff Feltner has suffered from these symptoms for over two years. Plaintiff Feltner did not realize, until she saw a legal advertisement, that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device. It was at this time that she truly understood that her symptoms were related to Essure®.

OOOO.        SANTANA ROYALS

1537. Plaintiff Royals is thirty (30) years old and resides in Adel, Cook County, Georgia.

1. **Initial Essure® Procedure:**

1538. On or around May 6, 2009, Plaintiff Royals underwent the Essure® procedure at Tifton Women's Center in Tifton, Tift County, Georgia.

1539. Dr. Nathan Mordel implanted the Essure® device in Plaintiff Royals.

2. **Post Essure® Procedure Condition and Treatment:**

1540. Plaintiff Royals' post-procedure period has been marked by unusually heavy menstrual periods, extreme fatigue, pelvic and abdominal pain, painful intercourse, brittle teeth, migraines, and hair loss.

1541. Plaintiff Royals underwent a HSG test on or around August 10, 2009 at Tifton Women's Center that showed bilateral tubal occlusion.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1542.   On or around September 4, 2009, Plaintiff Royals presented at Tifton Women's Center and complained of pelvic pain and heavy, irregular vaginal bleeding.  A transvaginal ultrasound noted a small cyst on the right ovary but was otherwise unremarkable.

1543.   On or around August 2, 2010, Plaintiff Royals presented to the emergency room of South Georgia Medical Group with complaints of abdominal pain that had been ongoing for two days.

1544.   On or around October 18, 2010, Plaintiff Royals returned to the South Georgia Medical Group emergency room with similar complaints of lower abdominal pain, heavy vaginal bleeding with clots, and nausea. She was diagnosed with dysfunctional uterine bleeding.  She underwent a CT of the abdomen and pelvic that same day.  The Essure® devices were noted, as well as a small right ovarian cyst, but no abnormalities were noted.

1545.   On or around July 24, 2011, Plaintiff Royals presented to Tifton Regional Medical Center with complaints of abdominal pain.  An abdominal CT revealed no acute intra-abdominal findings.

1546.   On or around December 23, 2012, Plaintiff Royals presented to the emergency room of South Georgia Medical Group with complaints of right lower quadrant pain and abdominal pain that was constant and worse when she walked.  Plaintiff Royals underwent a pelvic ultrasound and CT of the abdomen and pelvis.

1547.   On or around March 16, 2016 through December 30, 2016, Plaintiff Royals frequently presented to Tifton Regional Medical Center, Tifton Woman's Center, and South Georgia Medical group with complaints of severe pelvic pain, with occasional complaints of heavy uterine bleeding.  Radiology could not identify a cause for her symptoms.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1548.   Plaintiff Royals' symptoms have not resolved.  Plaintiff Royals continues to suffer from injuries, including but not limited to unusually heavy menstrual periods, extreme fatigue, pelvic and abdominal pain, painful intercourse, brittle teeth, migraines, and hair loss caused by the implantation of the Essure® device.

1549.   Plaintiff Royals was not aware that Bayer's device was defective until she saw a legal advertisement that her symptoms were also being experienced and suffered by thousands of other women who had been implanted with the Essure® device.  It was at this time that she truly understood that her symptoms were related to Essure®.

1550.   Further, Plaintiff Royals has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, because it causes swelling and rashes.  Plaintiff Royals has been advised by her medical providers that she requires a hysterectomy. At this time, however, Plaintiff Royals still has the Essure® device surgically implanted.

**PPPP. Niya Lloyd**

1551.   Plaintiff Lloyd is thirty-seven (37) years old and resides in Aiken, South Carolina.

**1.   Initial Essure® Procedure:**

1552.   On or around May 27, 2008, Plaintiff Lloyd underwent the Essure® procedure in Augusta, Georgia.

1553.   Dr. Bipin Chudgar implanted the Essure® device in Plaintiff Lloyd.

**2.   Post Essure® Procedure Condition and Treatment:**

1554.   Plaintiff Lloyd's post-procedure period has been marked by menorrhagia, abdominal pain, fatigue, anxiety, and repeated vaginal infections.  Prior to Essure®, Plaintiff Lloyd had not experienced this combination of symptoms while not on birth control. Her menstrual cycles were regular and she had no trouble going about her daily life.

217

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1555.   After Essure®, Plaintiff Lloyd began experiencing extremely heavy bleeding.  Her bleeding was so heavy that she had to change an overnight pad every two hours to prevent soiling her clothing.  Her symptoms were so severe that she often missed work and ultimately lost her job. She and her children had to move to a new state to live with her parents.

1556.   On June 11, 2012, Plaintiff Lloyd presented at Doctors Hospital complaining of abdominal pain. She underwent a CT scan of her abdomen and pelvis to evaluate her symptoms. Bilateral fallopian tube occluding devices were noted and no free fluid collections were present.

1557.   On March 19, 2013, Plaintiff Lloyd presented again at Doctors Hospital complaining of abdominal pain and vaginal bleeding. Her lab results were normal and she was released with a diagnosis of dysfunctional uterine bleeding.

1558.   On March 15, 2016, Plaintiff Lloyd presented at C.W. Williams Community Health Center complaining of spotting during intercourse and a possible vaginal infection or urinary tract infection.

1559.   On April 26, 2016, Plaintiff Lloyd again presented at C.W. Williams Community Health Center complaining of menorrhagia with baseball sized clots.  Her symptoms started in 2008 and she is experiencing persistent weakness, fatigue, and right lower abdominal pain.

1560.   On April 29, 2016, Plaintiff Lloyd returned to C.W. Williams Community Health Center with continuing bacterial vaginosis. She also reported increased anxiety, depression, and fatigue.  She was prescribed Celexa to help manage her anxiety.

1561.   On September 20, 2016, Plaintiff Lloyd again visited C.W. Williams Community Health Center suffering from bacterial vaginosis, moderate depression, and menorrhagia.

1562.   Additionally, Plaintiff Lloyd has noticed significant fatigue and anxiety.  She has not been tested for a nickel allergy, but cannot wear "costume" jewelry, which often contains

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

nickel in it, due to having a reaction. She is actively seeking a nickel allergy test to evaluate her symptoms.

1563.   Plaintiff Lloyd's symptoms have continued and she still suffers from menorrhagia, abdominal pain, fatigue, anxiety, and repeated vaginal infections. Plaintiff Lloyd has suffered from these symptoms for years, and yet no physician was able to determine their cause. She did not realize, until she saw a legal advertisement in July of 2016, that her symptoms were also being experienced by thousands of other women who had been implanted with the Essure® device. It was at this time that she truly understood her symptoms were related to Essure®.

1564.   Plaintiff Lloyd is actively seeking a physician to remove the Essure® device.

### QQQQ.    MICHELLE MITCHOM

1565.   Plaintiff Mitchom is forty (40) years old and resides in O'Fallon, Illinois.

**1.   Initial Essure® Procedure:**

1566.   On or around July of 2014, Plaintiff Michelle Mitchom underwent the Essure® procedure at Mercy Hospital, St. Louis County, Missouri.

1567.   David Super implanted the Essure® device in Plaintiff Michelle Mitchom.

**2.   Post Essure® Procedure Condition and Treatment:**

1568.   Plaintiff Michelle Mitchom's post-procedure course has been marked by brain fog, pain and cramping, spotting, irregular cycles, rashes, neuropathy, inflammation, dental problems, gum swelling, blurred vision, migraines, night sweats and insomnia.

1569.   Following, Plaintiff Michelle Mitchom experienced first onset of symptoms.

1570.   On or around April 26, 2016, Plaintiff Michelle Mitchom presented for pelvic pain. On or around August of 2016, Plaintiff Michelle Mitchom underwent a laparoscopic hysterectomy and bilateral salpingo-oophorectomy by Dr. David Super.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

RRRR.    JANAE BROWN

1571.  Plaintiff Brown is thirty-six (36) years old and resides in Dayton, Montgomery County, Ohio.

1.  Initial Essure® Procedure:

1572.  On or around March 4, 2014, Plaintiff Brown underwent the Essure® procedure, under general anesthesia, at the Sycamore Medical Center in Miamisburg, Montgomery County, Ohio.

1573.  Jenifer Cova, M.D. implanted the Essure® device in Plaintiff Brown.

1574.  Plaintiff Brown went to Dr. Cova inquiring about permanent birth control, such as bilateral tubal ligation, but Dr. Cova directed Plaintiff towards Essure®.  She told Plaintiff Brown that Essure® was easier, less invasive and had a quicker recovery time than tubal ligation procedures.

2.  Post Essure® Procedure Condition and Treatment:

1575.  Upon information and belief, on or around June of 2014, Plaintiff Brown underwent a HSG, which demonstrated bilateral tubal occlusion.

1576.  Plaintiff Brown's post-procedure period has been marked by severe abdominal pain and cramping, weight gain, bloating, menorrhagia, painful intercourse, unusually heavy menstrual periods and hair loss.  Before Essure®, Plaintiff had not experienced this combination of symptoms.

1577.  On or around March 12, 2014, Plaintiff Brown presented at Dr. Cova's office and reported spotting since the Essure® procedure.

1578.  On or around April 14, 2014, Plaintiff Brown reported abnormal heaving bleeding since the Essure® procedure.  Plaintiff Brown was given another Depo Provera shot.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1579.     On or around May 28, 2014, Plaintiff Brown presented to Dr. Cova for a follow-up and menorrhagia

1580.     On or around November 6, 2015, Plaintiff Brown presented to Dr. Christina Carter, her primary care physician for hair loss.

1581.     Plaintiff Brown was scheduled for a pelvic ultrasound after reporting heavier than normal menstrual cycles on or around March 23, 2016.

1582.     On or around April 13, 2016, Plaintiff Brown's medical records show that she has had persistent bleeding since March 17, 2016 and she is concerned about heavy periods and persistent bleeding.  The pelvic ultrasound revealed a simple left ovarian cyst.  Dr. Cova prescribed Plaintiff Brown 200mg of Prometrium to control the heavy bleeding.

1583.     During a follow-up visit with Dr. Cova on or around May 19, 2016, Plaintiff Brown was instructed to switch medications to Aygestin due to the Prometrium being ineffective. Plaintiff Brown was also scheduled for an endometrial ablation.

1584.     On or around June 10, 2016, Plaintiff Brown underwent an endometrial ablation to control her heavy and irregular menstrual cycles.

1585.     Plaintiff Brown was not informed that the Essure® procedure as marketed was not intended to take place under general anesthesia and that the balance of risks and benefits of Essure® versus tubal ligation was unfavorable to Essure® under such circumstances.

1586.     Plaintiff Brown continues to suffer from injuries, including but not limited to pain, cramping and hair loss, caused by the implantation of the Essure® device.

1587.     Additionally, Plaintiff Brown has noticed significant hair loss over the past couple of years. She has not been tested for a nickel allergy, but cannot wear "fake" jewelry, which often has nickel in it, due to skin irritation and swelling.

1588.    To date, despite suffering from these symptoms for over two years, no physician has ever informed Plaintiff Brown that her symptoms might be related to Essure®.  It was not until Plaintiff Brown was informed by a friend in 2016 about recent articles about Essure® and Plaintiff began researching Essure® on her own and made the correlation between her symptoms and the implantation of the Essure® device.

## VIII.    AGENCY, ALTER-EGO, JOINT VENTURE, AND CONSPIRACY

1589.    At all times herein mentioned, the Defendants were fully informed of the actions of their agents, representatives, contractors, and/or employees, and thereafter, no officer, director or managing agent of the Defendants repudiated those actions.  The failure to repudiate constituted adoption and approval of said actions, and all Defendants and each of them thereby ratified those actions.

1590.    At all times mentioned herein, there existed (and still exists) a unity of interest between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased, and these Defendants are the alter-egos of the other certain Defendants and exerted control over those Defendants.  Bayer AG controlled its wholly owned subsidiaries to such a degree and in such a manner as to render them more business units and to make them merely an agency, instrumentality, adjunct, or its alter ego.  Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege, sanction a fraud, and/or promote injustice.

1591.    Each of the Bayer Defendants herein expressly or impliedly agreed to work with and assist each other Defendant and unnamed parties, toward the common purpose of promoting, recommending, and selling Essure® and toward the common interest of pecuniary gain.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1592.  Each of the Bayer Defendants herein performed the acts and omissions described herein in concert with the other Bayer Defendants herein and/or pursuant to a common design with the other Defendants herein.

1593.  Each of the Bayer Defendants herein knew the acts and omissions of the other Bayer Defendants herein constituted a breach of duty, and yet, each Bayer Defendant provided each other Bayer Defendant substantial assistance and/or encouragement.

1594.  Each of the Bayer Defendants herein provided substantial assistance to the other Bayer Defendants herein in accomplishing the intentional and tortious conduct described herein, and each Bayer Defendants' conduct, even when separately considered, constitutes a breach of duties owed to the Plaintiffs.

1595.  At all times herein mentioned, each of the Bayer Defendants was engaged in the business of and/or was a successor in interest to and/or affiliated with/associated with/indistinguishable from entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing, advertising for sale, and/or selling Essure® device for use by the Plaintiffs and the Plaintiffs' physicians.  As such, each of the Bayer Defendants is individually, as well as jointly and severally, liable to the Plaintiffs for the Plaintiffs' damages.

1596.  The conduct of the Defendants herein caused the Plaintiffs' harm as described herein.  The Plaintiffs' harm is not in any way attributable to any fault of the Plaintiffs.  Uncertainty may exist regarding which Defendant(s) and/or combination of Defendants caused the Plaintiffs' harm.  The Defendants possess superior knowledge and information regarding which Defendant(s) and/or combination of Defendants caused the Plaintiffs' injuries.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1597.  Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiffs.

1598.  Due to the above, each Cause of Action named below is asserted against each Defendant herein, jointly and severally, even if each and every Defendant herein is not specifically identified as to each and every count.

## IX.  PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES

1599.  Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1600.  As a result of Conceptus' and Bayer's oppression, fraudulent concealment, wantonness, malice, and reckless disregard for Plaintiffs' safety, Plaintiffs are entitled to punitive or exemplary damages to the fullest extent necessary as plead in detail below.

## X.  CLAIMS FOR RELIEF

No action alleged below depends on the violation of federal law as an element of the cause of action.  Instead, by violating federal duties, parallel state laws were violated, as those federal duties are not different from or in addition to parallel state law duties.  Plaintiffs are alleging that the Bayer Defendants' conduct that violates these federal regulations, as well as the PMA obtained for Essure®, also violates parallel state laws.

### FIRST CAUSE OF ACTION
### Negligence

1601.  Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1602.  Conceptus and Bayer were and are under a continuing duty to comply with federal requirements, including the PMA, its Supplements, the Conditions of Approval, and with the

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

FDCA in the manufacture, development, design, marketing, labeling, distributing, and sale of Essure® and its implementing.

1603.   Conceptus and Bayer concealed material information related to the safety of the Essure® device and deceptively and falsely underreported the dangerous propensities and increased risks of Essure®.

1604.   Defendants' Conditions of Approval expressly provided that "continued approval of this PMA is contingent upon the submission of post-approval reports required under 21 C.F.R. § 814.84…"

1605.   The information required to be submitted included, in part, information that is known or reasonably should be known to the applicant and shall include "unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices."

1606.   It was the duty of Conceptus and Bayer to comply with federal law, the FDCA, the MDA and the regulations; notwithstanding this duty, Conceptus and Bayer violated federal law, the FDCA, the MDA, and the regulations, including but not limited to, in one or more of the following ways:

A)    21 U.S.C. § 352(a) because Conceptus and Bayer promoted for sale misbranded and adulterated products because the Essure® label is false and misleading because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

B)    21 U.S.C. § 331(a) because Conceptus and Bayer introduced into interstate commerce a medical device that was misbranded, for the reasons set forth herein.

C)    21 U.S.C. § 352(q) because Conceptus and Bayer created and distributed false and

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

misleading advertising for Essure® which is a "Restricted Device" because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

D)    21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Conceptus and Bayer failed to comply with the general quality control standards found in these regulations.

E)    21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Conceptus and Bayer failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury.

F)    21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Conceptus and Bayer failed to report new clinical investigations and/or scientific studies concerning the Essure® device about which Conceptus and Bayer knew or reasonably should have known about, including but not limited to the Cornell study, the article published in the online medical journal Conception, and the eight (8) articles describing 12 cases of Essure® abdominal migration published between January 2002 and December 2013 that were never reported to the FDA.

G)    21 U.S.C. §§ 360(q); 360(r) because Conceptus and Bayer created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of Essure® in order to convince physicians and patients to use Essure® over other methods of permanent birth control, thereby gaining market share.

H)    21 C.F.R. § 820.198 because Conceptus and Bayer failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, long-term chronic pain, and other quality problems associated with the Essure® device.

I)    21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Conceptus and Bayer (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration outside of the fallopian tubes and/or device

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

fracture/breakage, which strongly indicated the Essure® device was malfunctioning or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiffs' fallopian tubes, and (2) Conceptus and Bayer continued to sell Essure® into the stream of interstate commerce when they knew, or should have known, that Essure® was malfunctioning or otherwise not responding to its Design Objective Intent.

J)    21 C.F.R. § 814.80 because Conceptus and Bayer manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K)    21 C.F.R. § 820.30 because Conceptus and Bayer failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

L)    21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Conceptus and Bayer: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M)    21 C.F.R. § 820.70 because Conceptus and Bayer failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Essure® device.

N)    21 C.F.R. § 814.39 because Conceptus and Bayer failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the thousands of reported and unreported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

227

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1607.  As a direct and proximate result of Conceptus' and Bayer's violations of one or more of the above federal statutory and regulatory standards of care, the Essure® device was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

1608.  Conceptus and Bayer failed to exercise reasonable care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of Essure®.

1609.  Plaintiffs do not bring the underlying action as an implied statutory cause of action but rather Plaintiffs are pursuing parallel state common law claims based on Conceptus' and Bayer's violations of the applicable federal regulations.  Plaintiffs are not seeking to enforce these provisions in this action.  Likewise, Plaintiffs are not suing merely because Conceptus' and Bayer's conduct violates these provisions.  Rather Plaintiffs are alleging that Conceptus' and Bayer's conduct that violates these provisions also violates parallel state laws.

1610.  Conceptus' and Bayer's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

1611.  Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a monetary damages remedy under state common law.

1612.  Conceptus and Bayer owed Plaintiffs and Plaintiffs' physicians the duty to exercise reasonable or ordinary care under the circumstances, in light of the generally-recognized and prevailing best scientific knowledge.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1613.   Conceptus and Bayer had a confidential and special relationship with Plaintiffs due to their vastly superior knowledge of the health and safety risks relating to Essure®.

1614.   As a result, Conceptus and Bayer had an affirmative duty to fully and adequately warn Plaintiffs and Plaintiffs' physicians of the true health and safety risks related to the use of Essure®.  Independent of any special relationship of confidence or trust, Conceptus and Bayer had a duty not to conceal the dangers of Essure® from Plaintiffs and Plaintiffs' physicians.

1615.   Misrepresentations made by Conceptus and Bayer about the health and safety of Essure® independently imposed a duty upon Conceptus and Bayer to fully and accurately disclose to Plaintiffs and Plaintiffs' physicians the true health and safety risks related to Essure®.

1616.   Through the conduct described in the foregoing and subsequent paragraphs of this Petition, Conceptus and Bayer breached their duties to Plaintiffs and to Plaintiffs' physicians.

1617.   The following sub-paragraphs summarize, *inter alia*, Conceptus' and Bayer's breaches of duties to Plaintiffs and Plaintiffs' physicians and describe categories of acts or omissions constituting breaches of duty by Conceptus and Bayer.  Each and/or any of these acts or omissions establishes an independent basis for their liability in negligence:

A)    Unreasonable and improper promotion and marketing of Essure® to physicians;

B)    Failure to warn the FDA, Plaintiffs and Plaintiffs' physicians of the dangers associated with the increased risks and dangers of Essure®; or

C)    Failure to exercise reasonable care by not complying with federal law and regulations applicable to the manufacture, sale, and marketing of Essure®.

1618.   Under federal law, Conceptus and Bayer had a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences that are or may be attributable to the product.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1619.   Conceptus and Bayer violated its duties under federal law to report adverse event information to the FDA. Because Conceptus and Bayer failed to comply with their duty under federal law, they breached their duty to use reasonable care under parallel state laws.

1620.   Settled state common laws protect the safety and health of its citizens by imposing a general duty of reasonable care on product manufacturers. Moreover, state common laws include causes of action for failure to warn.  A product is unreasonably dangerous in the absence of adequate warnings under applicable state common laws.

1621.   Conceptus and Bayer failed to use reasonable care and failed to adequately warn as to the increased risks and dangers of Essure®.  As a result of these wrongful actions, the Plaintiffs were caused to suffer severe injuries and to incur significant damages.

1622.   Conceptus and Bayer knew, or should have known, that due to their failure to use reasonable care, Plaintiffs and Plaintiffs' physicians would use and did use Essure® to the detriment of Plaintiffs' health, safety and well-being.

1623.   As the direct, producing, proximate and legal cause and result of Conceptus' and Bayer's negligence, Plaintiffs suffered severe injuries.

1624.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1625.   Conceptus' and Bayer's conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## SECOND CAUSE OF ACTION
### Negligence Per Se

1626.   Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1627.   It was the duty of Conceptus and Bayer to comply with federal law, the FDCA, the MDA and the regulations, notwithstanding this duty, Conceptus and Bayer violated federal law, the FDCA, the MDA, and the regulations, including but not limited to, in one or more of the following ways:

A)   21 U.S.C. § 352(a) because Conceptus and Bayer promoted for sale of misbranded and adulterated products because the Essure® label is false and misleading because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

B)   21 U.S.C. § 331(a) because Conceptus and Bayer introduced into interstate commerce a medical device that was misbranded, for the reasons set forth herein.

C)   21 U.S.C. § 352(q) because Conceptus and Bayer created and distributed false and misleading advertising for Essure® which is a "Restricted Device" because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

D)   21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Conceptus and Bayer failed to comply with the general quality control standards found in these regulations.

E)   21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Conceptus and Bayer failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

F)   21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Conceptus and Bayer failed to report new clinical investigations and/or scientific studies concerning the Essure® device about which Conceptus and Bayer knew or reasonably should have known about, including but not limited to the Cornell study, the article published in the online medical journal Conception, and the eight (8) articles describing 12 cases of Essure® abdominal migration published between January 2002 and December 2013 that were never reported to the FDA.

G)   21 U.S.C. §§ 360(q); 360(r) because Conceptus and Bayer created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of Essure® in order to convince physicians and patients to use Essure® over other methods of permanent birth control, thereby gaining market share.

H)   21 C.F.R. § 820.198 because Conceptus and Bayer failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, long-term chronic pain, and other quality problems associated with the Essure® device.

I)   21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Conceptus and Bayer (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration outside of the fallopian tubes and/or device fracture/breakage, which strongly indicated the Essure® device was malfunctioning or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiffs' fallopian tubes, and (2) Conceptus and Bayer continued to sell Essure® into the stream of interstate commerce when they knew, or should have known, that the Essure® was malfunctioning or otherwise not responding to its Design Objective Intent.

J)   21 C.F.R. § 814.80 because Conceptus and Bayer manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K)   21 C.F.R. § 820.30 because Conceptus and Bayer failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

L)   21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Conceptus and Bayer: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to

232

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M)   21 C.F.R. § 820.70 because Conceptus and Bayer failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Essure® device.

N)   21 C.F.R. § 814.39 because Conceptus and Bayer failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the thousands of reported and unreported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

1628.   As a direct and proximate result of Conceptus' and Bayer's violations of one or more of the above federal statutory and regulatory standards of care, the Essure® device was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.

1629.   Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

1630.   Conceptus and Bayer failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1631.   Plaintiffs are not seeking to enforce these federal provisions in this action. Likewise, Plaintiffs are not suing merely because Conceptus' and Bayer's conduct violates these

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

provisions. Rather Plaintiffs are alleging that Conceptus' and Bayer's conduct that violates these provisions also violates parallel state laws.

1632. Conceptus' and Bayer's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

1633. Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1634. Conceptus' and Bayer's violations of these federal statutes and regulations caused Plaintiffs' injuries.

1635. Plaintiffs' injuries resulted from an occurrence the laws and regulations were designed to prevent.

1636. Plaintiffs are persons whom these statutes and regulations were meant to protect.

1637. Conceptus' and Bayer's violations of these statutes or regulations constitutes negligence per se.

### THIRD CAUSE OF ACTION
### Negligence - Misrepresentation

1638. Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1639. Specific defects in the Essure® device, as specified above in this Petition, rendered it defective and unreasonably dangerous.

1640. Conceptus and Bayer made untrue representations and omitted material information to the FDA, Plaintiffs and Plaintiffs' physicians by sponsoring biased medical trials, reports, and articles that concluded that the risks and dangers of Essure® did not exist or were significantly less than the actual dangers.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1641.   Had Conceptus and Bayer complied with their duties to the FDA as described under the Medical Device Reporting procedure, 21 C.F.R. § 803, the necessary and resultant actions by the FDA and/or appropriate government agencies, would have precluded the use of Essure®.

1642.   Plaintiffs and their physicians would not have chosen the Essure® procedure as a method of permanent sterilization had they known of the true safety risks related to Essure®.

1643.   Conceptus and Bayer were negligent in making the untrue misrepresentations and omitting material information because Defendant knew, or had reason to know, of the actual, unreasonable dangers and defects in their Essure® device.

1644.   Conceptus and Bayer intended to induce Plaintiffs and their physicians to rely on their misrepresentations and omissions to use Essure® over the alternative methods of permanent sterilization.

1645.   Plaintiffs and their physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Essure® in deciding to undergo the Essure® procedure for permanent sterilization.

1646.   Plaintiffs and Plaintiffs physicians were justified in their reliance on Conceptus' and Bayer's representations and marketing.  Plaintiffs actually did undergo the Essure® implant procedure, which ultimately caused Plaintiffs serious physical injury.

1647.   In agreeing to undergo a procedure whereby Essure® was implanted, Plaintiffs and Plaintiffs' physicians justifiably relied on such misrepresentations by Conceptus and Bayer.  As the direct, producing, proximate and legal cause and result of Conceptus' and Bayer's misrepresentations, Plaintiffs have suffered severe physical pain, medical and hospital expenses, pain and suffering, and pecuniary loss.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1648.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1649.   Conceptus' and Bayer's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Strict Liability – Failure to Warn**

1650.   Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1651.   Conceptus and Bayer designed, formulated, tested, packaged, labeled, produced, created, assembled, advertised, manufactured, sold, distributed, marketed, and promoted Essure®, including the Essure® devices that were implanted into Plaintiffs.

1652.   Conceptus and Bayer at all times herein were medical device manufacturers and subject to the Medical Device Reporting regulations under 21 C.F.R. § 803.

1653.   Conceptus and Bayer had a duty to warn the FDA about the dangers of the Essure® device, which they knew, or in the exercise of ordinary care, should have known, at the time the Essure® device left their control, pursuant to 21 C.F.R. § 803.50.

1654.   Conceptus and Bayer did know of these increased risks and serious dangers and breached their duty by failing to warn the FDA of same.

1655.   Conceptus and Bayer also had a "continuing obligation" to use "the exercise of reasonable care" in warning of potential dangers under parallel state law duties, which includes warning the FDA of dangers and adverse events associated with the Essure® device that were known, or should have been known by Conceptus and Bayer at the time of distribution.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1656.  At the time the Essure® device left control of Conceptus and Bayer when it was implanted into Plaintiffs, it was unreasonably dangerous due to non-compliance by both companies with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

A)    21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Conceptus and Bayer failed to comply with the general quality control standards found in these regulations.

B)    21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Conceptus and Bayer failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury. Defendants' failure to report such events is evidenced by the 2011 FDA Form 483 and by the fact that there were only approximately 900 MDRs reported to the FDA between November 2002 and October 2011, with the majority of those being reported by the manufacturer, but once the MedWatcher app became available and utilized, over 9,000 MDRs were reported directly to the FDA between October 2013 and December 2015, primarily by women with Essure®.

C)    21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Conceptus and Bayer failed to report new clinical investigations and/or scientific studies concerning the Essure® device about which Conceptus and Bayer knew or reasonably should have known about, including but not limited to the Cornell study, the article published in the online medical journal Conception, and the eight (8) articles describing 12 cases of Essure® abdominal migration published between January 2002 and December 2013 that were never reported to the FDA.

D)    21 C.F.R. § 820.198 because Conceptus and Bayer failed to establish and maintain procedures for implementing corrective and preventative action in response to, inter alia, complaints of, but not limited to, device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, long-term chronic pain, and other quality problems associated with the Essure® device.

E)    21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Conceptus and Bayer (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration outside of the fallopian tubes and/or device fracture/breakage, which strongly indicated the Essure® device was malfunctioning

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiffs' fallopian tubes, and (2) Conceptus and Bayer continued to sell Essure® into the stream of interstate commerce when they knew, or should have known, that the Essure® was malfunctioning or otherwise not responding to its Design Objective Intent.

F)    21 U.S.C. §§ 360(q); 360(r) because Conceptus and Bayer created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of Essure® in order to convince physicians and patients to use Essure® over other methods of permanent birth control, thereby gaining market share.

G)    21 C.F.R. § 814.80 because the Essure® device was manufactured, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

H)    21 C.F.R. § 820.30 because defendant failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

I)    21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Conceptus and Bayer: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

J)    21 C.F.R. § 820.70 because Conceptus and Bayer failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Essure® device.

K)    21 U.S.C. § 352(a) because Conceptus and Bayer promoted the sale of misbranded and adulterated products because the Essure® label is false and misleading because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure®

238

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

L) 21 U.S.C. § 352(q) because Conceptus and Bayer created and distributed false and misleading advertising for Essure® which is a "Restricted Device" because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

M) 21 C.F.R. § 814.39 because Conceptus and Bayer failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the thousands of reported and unreported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

1657.  As a direct and proximate result of Conceptus' and Bayer's violations of one or more of the above federal statutory and regulatory standards of care, the Essure® device was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.

1658.  Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

1659.  Conceptus and Bayer failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1660.  Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Conceptus' and Bayer's conduct violates these provisions.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Rather Plaintiffs are alleging that Conceptus' and Bayer's conduct that violates these provisions also violates parallel state laws.

1661.   Conceptus' and Bayer's violations of the aforementioned federal statutes and regulations establish a prima facie case of strict liability in tort under state common law.

1662.   Thus, for violations of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries, there already exists a money damages remedy under state common law.

1663.   The warnings accompanying the Essure® device did not adequately warn Plaintiffs and Plaintiffs' physicians, in light of Conceptus' and Bayer's scientific and medical knowledge at the time, of the increased risks and serious dangers associated with the Essure® device, including but not limited to persistent and chronic pain, severe cramping, long menstrual cycles (polymenorrhea), heavy bleeding (menorrhagia) necessitating medication and/or additional surgical procedures, painful intercourse (dyspareunia), allergic reactions (including but not limited to rashes, itching, abdominal bloating, swelling, headaches, tooth-loss, and hair loss), autoimmune disorders, hysterectomy, salpingectomy, loss of libido, severe long lasting migraines, organ perforation, coil migration, coils becoming embedded in other tissues and organs, coil fracture/breakage, coil expulsion, chronic fatigue, pregnancy, excessive weight gain, and poorer global outcomes than alternative options.

1664.   In direct violation of 21 C.F.R. § 803.50 as well as State regulations and/or common law, Conceptus and Bayer either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to Essure® when reporting to the FDA, including but not limited to these risks of persistent and chronic pain, severe cramping, long menstrual cycles (polymenorrhea), heavy bleeding (menorrhagia) necessitating medication and/or additional

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

surgical procedures, painful intercourse (dyspareunia), allergic reactions (including but not limited to rashes, itching, abdominal bloating, swelling, headaches, tooth-loss, and hair loss), autoimmune disorders, hysterectomy, salpingectomy, loss of libido, severe long lasting migraines, organ perforation, coil migration, coils becoming embedded in other tissues and organs, coil fracture/breakage, coil expulsion, chronic fatigue, pregnancy, excessive weight gain, and poorer global outcomes than alternative options.

1665.   The FDA was unaware of Conceptus' and Bayer's omissions and this led to Plaintiffs and Plaintiffs' physicians' reliance on Conceptus' and Bayer's inadequate warnings in deciding to use Essure®.

1666.   Plaintiffs and Plaintiffs' physicians' did not and could not know of the specific increased risks and serious dangers of Essure®, and/or were misled by Conceptus and Bayer, who knew of or should have known of the true risks and dangers of Essure® based on the number of complaints reported directly to them as well as the reports in the medical and scientific literature that they knew or should have known about.

1667.   Conceptus and Bayer consciously chose not to inform the FDA, thereby preventing Plaintiffs and Plaintiffs' physicians' from having the information necessary to make an informed decision when deciding to recommend and undergo the Essure® procedure.

1668.   The FDA publishes adverse events and MDRs in a public, searchable database called MAUDE and updates the report monthly with all reports received prior to the update.  The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices. For example, Dr. Dhruva, et al., published a study in the New England Journal of Medicine entitled *Revisiting Essure – Toward Safe and Effective Sterilization*, which assessed the safety and effectiveness of Essure®. This study was based in part on a search and

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

analysis of the MAUDE database.  The study concluded that the increase in reported Essure® related adverse event complaints since mid-2013 led the FDA to update Essure®'s patient label in 2014 to include information about risks of chronic pelvic pain and device migration into the lower abdomen and pelvis, and led to the FDA's decision to reconvene its Obstetrics and Gynecology Devices Panel to reassess Essure®'s safety and effectiveness on September 24, 2015.

1669.  Similarly, a study published in November 2013 in The Journal of Minimally Invasive Gynecology entitled *Analysis of Adverse Events With Essure Hysteroscopic Sterilization Reported to the Manufacturer and User Facility Device Experience Database*, utilized the FDA's MAUDE database.  The study objective stated that the MAUDE database is useful for clinicians using an FDA approved medical device to identify the occurrence of adverse events and complications. The study analyzed and investigated reports associated with the Essure® hysteroscopic sterilization system using the MAUDE database.

1670.  If Conceptus and Bayer had met their duties under federal law and parallel state law, the FDA would have had the information necessary to warn the public, including Plaintiffs and Plaintiffs' physicians, of the increased risks and serious dangers associated with Essure® in time to have lessened or prevent Plaintiffs' injuries.

1671.  Additionally, if Conceptus and Bayer had met their duty under 21 C.F.R. § 803.50, such information would have been made available to Plaintiffs and Plaintiffs' treating physician, which would have allowed Plaintiffs' treating physician to properly and/or timely diagnose the cause of Plaintiffs' health problems.

1672.  As a direct and proximate result of one or more of the above listed dangerous conditions and defects, and of Defendants' failure to provide adequate warnings about them, as

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

required under 21 C.F.R. § 803.50, Plaintiffs sustained serious injuries of a personal and pecuniary nature.

1673. Plaintiffs have sustained extreme pain, suffering, and anguish from the date of Plaintiffs' Essure® implant procedure until present and have otherwise suffered serious injuries and damages.

1674. Conceptus' and Bayer's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

### FIFTH CAUSE OF ACTION
### Strict Liability – Manufacturing Defect

1675. Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1676. A manufacturing defect cause of action is a claim that the product sold to the plaintiff was defective because it deviated from the original design and in its defective condition it caused the Plaintiffs injuries.

1677. The original design for a Class III medical device is the product that is approved by the FDA. This FDA approval includes not only the physical components of the product, but the labeling and intended use of the product as well.

1678. Under federal regulations, a product that does not comply with the FDA approval is considered "adulterated" and/or "misbranded." Under state law, a product that does not comply with the FDA approval is considered a "manufacturing defect." Therefore, any product sold that is not incompliance with the FDA approval is both misbranded and/or adulterated under federal law and considered a manufacturing defect under State common law. Therefore, the same

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

underlying defect and/or actions of the manufacturer that have given rise to a federal violation are also a parallel state violation.

1679.   There are multiple manufacturing defects in the Essure® device that were implanted into Plaintiffs which caused Plaintiffs' devices to migrate and/or break/fracture apart and/or caused Plaintiffs to experience heavy menstrual cycle bleeding and long-term chronic pain amongst other side effects, all which became known to Conceptus and Bayer, including but not limited to:

A)   the stainless steel used in the device became unpassivated, which can cause the device to rust;

B)   the nitinol could have a nickel rich oxide which the body attacks;

C)   the no-lead solder could in fact have trace lead in it;

D)   the Galvanic action between the metals used to manufacture Essure®, which causes the encapsulation of the product within the fallopian tubes, could be a continuous irritant to some patients;

E)   the nitinol in the device can degrade due to High Nickel Ion release, increasing the toxicity of the product for patients;

F)   latent manufacturing defects such as cracks, scratches, and other disruption of the smooth surface of the metal coil, may have existed in the finished product, causing excess nickel to leach into the surrounding tissues after implantation;

G)   PET fibers degrade at 65 degrees, therefore considerable degradation is expected at 98 degrees in the human body and degradation products of the PET used in the implant can be toxic to patients, inciting both chronic inflammation and possible autoimmune issues;

H)   the mucosal immune response to nickel is different than the immune response in non-mucosal areas of the body;

I)   there was an inadequate solder joint between the inner and outer coils of the micro-insert which can cause the micro-insert to fracture/break apart, and which Conceptus and Bayer admit is or could be a reason for device breakage; and

J)   the central axis was not fully adhered to the spring which can cause the micro-insert to fracture/break apart, and which Conceptus and Bayer admit is or could be a reason for device breakage.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1680.  As part of the FDA approval, a manufacturer must abide by general reporting requirements that are included in the conditions for approval.  These conditions include reporting to the FDA any adverse events or new scientific findings about the product that are later learned of. The failure to do so violates the FDA approval.  Given the nature of the information that is required to be reported in the conditions of approval and the relationship of the manufacturer to the FDA and ultimately to the consumer, reporting to the FDA provides reasonable assurance that the information will reach those whose safety depends on their having it.  Here, not only did Conceptus and Bayer not report required information, but they actively concealed such relevant safety information from the FDA, the medical community, and consumers, including Plaintiffs and Plaintiffs' physicians.

1681.  Conceptus and Bayer further violated federal law in the manufacture of Essure® in that they:

A)    used non-conforming material;

B)    failed to use pre-sterile and post-sterile cages;

C)    manufactured Essure® at an unlicensed facility;

D)    manufactured Essure® for three years without a license to do so;

E)    failed to analyze or identify existing potential causes of non-conforming product and other quality problems;

F)    failed to track the non-conforming product;

G)    failed to follow procedures used to control products which did not conform to specifications;

H)    failed to have complete Design Failure Analyses; and

I)    failed to document CAPA activities for a supplier correction action.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1682.   Violating the conditions of approval for the FDA approval is another way of saying that the manufacturer violated the original design of the product and therefore creates a viable manufacturing defect claim.

1683.   The Essure® devices implanted in Plaintiffs were not reasonably safe for their intended uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Conceptus' and Bayer's design and manufacturing specifications in such a manner as to pose unreasonable increased risks of serious bodily harm to Plaintiffs.

1684.   The Essure® devices manufactured and sold by Conceptus and Bayer and implanted into Plaintiffs were defective in manufacture because they did not comply with Conceptus' and Bayer's own design specifications, used non-conforming material, and deviated from otherwise identical units from the same product line, manufactured with the same specifications.

1685.   At all times mentioned herein, Conceptus and Bayer placed Essure® on the market and supplied the Essure® devices used during Plaintiffs' permanent sterilization procedure.

1686.   The Essure® devices that were implanted in Plaintiffs were promoted, distributed, manufactured and used in a manner that is in violation of federal law, the FDCA, the MDA, and regulations promulgated thereunder.

1687.   Conceptus and Bayer have a duty to manufacture the Essure® device consistent with the specifications, requirements, federal regulations, PMA, and/or conditions of approval. Conceptus and Bayer breached this duty for the reasons set forth below.

1688.   At the time the Essure® devices left control of Conceptus and Bayer when they were implanted into Plaintiffs, they was unreasonably dangerous due to non-compliance by both

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

companies with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

A)    21 U.S.C. § 352(a) because Conceptus and Bayer promoted for the sale of misbranded and adulterated products because the Essure® label is false and misleading because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

B)    21 U.S.C. § 331(a) because Conceptus and Bayer introduced into interstate commerce a medical device that was misbranded, for the reasons set forth herein.

C)    21 U.S.C. § 352(q) because Conceptus and Bayer created and distributed false and misleading advertising for Essure® which is a "Restricted Device" because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

D)    21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Conceptus and Bayer failed to comply with the general quality control standards found in these regulations for the reasons set forth herein.

E)    21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Conceptus and Bayer failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury.

F)    21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Conceptus and Bayer failed to report new clinical investigations and/or scientific studies concerning the Essure® device about which Conceptus and Bayer knew or reasonably should have

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

known about, including but not limited to the Cornell study, the article published in the online medical journal Conception, and the eight (8) articles describing 12 cases of Essure® abdominal migration published between January 2002 and December 2013 that were never reported to the FDA.

G)    21 U.S.C. §§ 360(q); 360(r) because Conceptus and Bayer created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of Essure® in order to convince physicians and patients to use Essure® over other methods of permanent birth control, thereby gaining market share.

H)    21 C.F.R. § 820.198 because Conceptus and Bayer failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, long-term chronic pain, and other quality problems associated with the Essure® device.

I)    21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Conceptus and Bayer (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration outside of the fallopian tubes and/or device fracture/breakage, which strongly indicated the Essure® device was malfunctioning or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiffs' fallopian tubes, and (2) Conceptus and Bayer continued to sell Essure® into the stream of interstate commerce when they knew, or should have known, that the Essure® was malfunctioning or otherwise not responding to its Design Objective Intent.

J)    21 C.F.R. § 814.80 because the Essure® device was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K)    21 C.F.R. § 820.30 because Conceptus and Bayer failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

L)    21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Conceptus and Bayer: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4)

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M)    21 C.F.R. § 820.70 because Conceptus and Bayer failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Essure® device.

1689.    As a direct and proximate result of Defendants' violations of one or more of the above mentioned federal statutory and regulatory standards of care, Essure® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.

1690.    Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

1691.    Conceptus and Bayer failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1692.    Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Defendants' conduct violates these provisions. Rather Plaintiffs are alleging that Defendants' conduct that violates these provisions also violates parallel state laws.

1693.    Conceptus' and Bayer's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1694.    Thus, for violations of federal law, including, the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1695.    At all times herein mentioned, Conceptus and Bayer had specific knowledge of the increased risks involved in the use of Essure®.

249

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1696.  At all times herein mentioned, the Essure® device produced serious side effects, including but not limited to irregular heavy menstrual cycle bleeding, organ perforation, and severe chronic pain which required surgical intervention to remove the Essure® coils or will require surgical intervention to remove the Essure® coils in the future, and Conceptus and Bayer knew or should have known that said usage could be unsafe because of said side effects.

1697.  At all times herein mentioned, Plaintiffs relied upon the misrepresentations of Conceptus and Bayer and used the Essure® product as promoted and instructed.

1698.  The Essure® devices, as given to Plaintiffs, were ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Conceptus and Bayer, who are strictly liable for the injuries arising from its use.  The increased risks and dangers attendant to the Essure® devices greatly outweighed the benefits to be expected from said use as promoted by Conceptus and Bayer

1699.  The Essure® devices failed to perform in a manner that a reasonable consumer would expect them to perform.

1700.  By placing Essure® on the market and promoting Essure® as the safest, most effective permanent sterilization method available, Conceptus and Bayer impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations.  Plaintiffs and Plaintiffs' doctors did rely on each of said misrepresentations and material omissions, all to their damage as hereinabove alleged.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1701.  In doing the things aforementioned, Conceptus and Bayer are guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery of exemplary or punitive damages in the sum according to proof at trial.

## SIXTH CAUSE OF ACTION
### Common Law Fraud

1702.  Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1703.  Plaintiffs bring a claim against Conceptus and Bayer for knowingly concealing information relative to the Essure® device.

1704.  Conceptus and Bayer committed fraud by concealing and/or making fraudulent representations during their promotional practices concerning the Essure® device.

1705.  In connection with the Essure® product, Conceptus and Bayer fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiffs and Plaintiffs' physicians, all as alleged in this Petition.  The specifics regarding the content of the misrepresentations, when and where Conceptus and Bayer made them, and to whom they were made, as well as what aspects of the statements were misleading and why, are alleged above in the body of this Petition.

1706.  Plaintiffs and Plaintiffs' physicians would not have decided to use Essure® had they known of the real increased risks and dangers related to Essure®.

1707.  Any of the following is sufficient to independently establish Conceptus' and Bayer's liability for fraudulent misrepresentation and/or fraud:

A)  Conceptus and Bayer fraudulently concealed and misrepresented the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with Essure®;

B)  Conceptus and Bayer fraudulently concealed and misrepresented information about the known increased risks and dangers as well as the limited benefits of the use of

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Essure® and the relative benefits and availability of alternate options.

1708.  As a medical device manufacturer, Conceptus and Bayer had an affirmative continuing duty to warn the public, including Plaintiff and Plaintiff's physicians regarding the increased risks and dangers they knew, learned, or should have known about associated with Essure®.

1709.  Had Conceptus and Bayer complied with their duties to the FDA as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgeries giving rise to all causes of action.

1710.  Conceptus and Bayer omitted material adverse information and provided inaccurate, false, or misleading information which was material to implanting physicians' treatment decisions, which misled physicians and patients who were relying on those implanting physicians' professional judgment, including Plaintiffs and their implanting physicians.

1711.  Conceptus and Bayer knew that use of Essure® was unreasonably dangerous and could lead to serious side effects as listed herein.  Conceptus and Bayer failed to take any measures whatsoever to alert physicians or the public regarding increased risks and dangers and instead continued to promote the Essure® device as safe, and further took action to conceal said information.

1712.  When Conceptus and Bayer engaged in this deceptive campaign and made the above representations and/or omissions, they knew those representations and/or omissions to be false, or willfully and wantonly and recklessly disregarded whether the representations and/or omissions were true.  These representations and/or omissions were made by Conceptus and Bayer with the intent of defrauding and deceiving the public, including Plaintiffs, Plaintiffs' physicians, and the medical community.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1713.   At the time the aforesaid representations and/or omissions were made by Conceptus and Bayer, Plaintiffs and their medical providers were unaware of the falsity of said representations and/or omissions and reasonably relied upon Conceptus' and Bayer's assertions, promulgated through aggressive sales tactics as set forth herein, that the Essure® device was safe when in fact it was not.

1714.   In reliance upon Conceptus' and Bayer's representations, each Plaintiff's physician used Essure®.

1715.   As a direct and proximate result of said misrepresentations and/or material omissions, each Plaintiff's physician used Essure®.

1716.   Had Plaintiffs' physicians and Plaintiffs been made fully and adequately aware of the inefficacy and serious increased risks and dangers associated with such use, they would not have used it.

1717.   Had the FDA known of the actual dangers of and inefficacy of the use of Essure®, they would have initiated a recall of the product, dear doctor letter, or safety signal and/or warned the public of the danger.

1718.   Conceptus' and Bayer's motive in failing to advise physicians, the public, Plaintiffs, and the FDA of these increased risks was for financial gain and fear that, if they provided proper and adequate information, Essure® would lose sales and market share.

1719.   Conceptus' and Bayer's conduct, as alleged above, was malicious, fraudulent, and oppressive toward Plaintiffs in particular and the public generally, and Conceptus and Bayer conducted themselves in a willful, wanton, and reckless manner by actively violating federal regulations.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1720.   Conceptus and Bayer are guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery of exemplary or punitive damages in sum according to proof at trial.

### SEVENTH CAUSE OF ACTION
**Constructive Fraud**

1721.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1722.   Conceptus and Bayer marketed the Essure® device to and for the benefit of Plaintiffs, and marketed it to their physicians, and Conceptus and Bayer knew or had reason to know of the unreasonable dangers and serious defects in Essure®, and that Plaintiffs and their physicians would use the product.

1723.   Conceptus and Bayer owed Plaintiffs a duty to exercise reasonable or ordinary care under the circumstances, in light of the generally recognized and prevailing best scientific knowledge, and to produce and market Essure® in as safe a manner and condition as possible.

1724.   Specific defects, as specified above in this Petition, in the Essure® device rendered it defective and unreasonably dangerous.

1725.   Through the conduct described in the foregoing and subsequent paragraphs of this Petition, Conceptus and Bayer breached their duties to Plaintiffs.  Such breaches exhibited willful and wanton conduct, and a reckless disregard for the safety of others.

1726.   By breaching their duties to Plaintiffs, Conceptus and Bayer gained an advantage by wrongfully profiting from the sale of Essure®.

1727.   Plaintiffs and their physicians justifiably relied on Conceptus' and Bayer's misrepresentations and material concealment of the actual increased risks and dangers of Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1728.  As the direct, producing, proximate and legal cause and result of Conceptus' and Bayer's breach of their duties, Plaintiffs have suffered severe injuries, great mental and emotional distress, physical pain, pecuniary loss and were otherwise seriously injured and damaged.

1729.  As the direct, producing, proximate and legal cause and result of Conceptus' and Bayer's breach of their duties, Plaintiffs have been injured and incurred damages, including but not limited to medical and hospital expenses, and pain and suffering.

1730.  Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1731.  Conceptus' and Bayer's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### Fraudulent Concealment

1732.  Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Petition as if fully set forth herein and further allege as follows:

1733.  In connection with their Essure® device, Conceptus and Bayer fraudulently and intentionally concealed and suppressed material and important health and safety product risk information from the FDA, Plaintiffs, and Plaintiffs' physicians, all as alleged in this Petition. Plaintiffs and Plaintiffs' physicians would not have used Essure® for permanent sterilization had they known of the increased safety risks and dangers related to Essure®.

1734.  Either of the following is sufficient to independently establish Conceptus' and Bayer's liability for fraudulent concealment:

A)   Conceptus and Bayer fraudulently concealed and misrepresented the increased health and safety risks, dangers, hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the Essure® device to physicians, including Plaintiffs' physicians; and

B)   Conceptus and Bayer fraudulently concealed and misrepresented material safety information about the known increased risks and dangers of the use of Essure® and the relative benefits and availability of alternate procedures.

1735.   Conceptus and Bayer knew, or should have known, that they were concealing, suppressing, and misrepresenting true information about the known increased risks and benefits of the use of Essure® and the relative benefits and availability of alternate procedures.

1736.   Conceptus and Bayer knew that Plaintiffs and Plaintiffs' physicians would regard the matters that they concealed, suppressed, and misrepresented to be important in determining the course of treatment for the Plaintiffs, including Plaintiffs and Plaintiffs' physicians' decision whether or not to use Essure® as a method of permanent sterilization.

1737.   Conceptus and Bayer intended to cause Plaintiffs and Plaintiffs' physicians to rely on their concealment of material safety information, suppression, and misrepresentations about the increased risks and dangers related to Essure® as a method of permanent sterilization.

1738.   Plaintiffs and Plaintiffs' physicians were justified in relying, and did rely, on Conceptus' and Bayer's concealment of information and misrepresentations about the increased safety risks and dangers related to Essure® in deciding to recommend and choose the Essure® procedure for permanent sterilization.

1739.   As a direct and proximate result of Conceptus' and Bayer's fraudulent concealment, suppression, and misrepresentations of material increased health and safety risks and dangers relating to Essure® and Conceptus' and Bayer's promotion and marketing practices, Plaintiffs suffered injuries and economic loss, and Plaintiffs will continue to suffer injuries, damages and economic loss.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1740.   As the direct, proximate, and legal cause and result of Conceptus' and Bayer's false and deceptive marketing and promotion practices related to Essure®, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the enjoyment of life.

1741.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1742.   Conceptus' and Bayer's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## NINTH CAUSE OF ACTION
### Breach of Express Warranty

1743.   Plaintiffs repeat and incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1744.   Conceptus and Bayer utilized journal articles, advertising media, and sales representatives to promote, encourage, and urge the use and purchase of the Essure® device, representing the quality to health care professionals, the FDA, Plaintiffs, and the public in such a way as to induce its purchase or use, thereby making an express warranty that Essure® would conform to the representations.  More specifically, Conceptus and Bayer represented that Essure® was safe and effective, that it was safe and effective for use by individuals such as Plaintiffs, and/or that it was safer and more effective than alternative methods of permanent sterilization.

1745.   The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

1746.  Essure® did not conform to the representations made by Conceptus and Bayer, as the Essure® device was not safe and effective and was not safe and effective for use by individuals such as Plaintiffs.

1747.  At all relevant times, Plaintiffs used Essure® for the purpose and in the manner intended by Conceptus and Bayer.

1748.  Plaintiffs and Plaintiffs' physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its hidden increased risks and its unreasonable dangers.

1749.  Defendants' breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable:

Ala. Code §§ 7-2-313, 7-2-314 (2013); Alaska St. § 45.02.313 (effective 2013); Ariz. Rev. Stat. Ann. § 47-2313 (2013); Ark. Code Ann. § 4-2-313 (2013); Cal. U. Com. Code § 2313(1) (2013); Cal. Civ. Code §1791.2(a) (2013); Co. Rev. St. § 4-2-316 (2013); Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2013); 6 Del. C. § 2-313 (2013); D.C. Code Ann. § 28:2-313 (2013); Fla. Stat. Ann. § 672.313 (2013); O.C.G.A. § 11-2-318 (2013); Haw. Rev. Stat. § 490:2-313 (2013); Id. Code § 28-2-314(2)(c) (2013); Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2013); Ind. Code Ann. § 26-1-2-313 (2013); Iowa Code Ann. § 554.2313 (2013); Kans. Stat. Ann. § 84-2-313 (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c)(2013); Ky. Rev. Stat. § 355.2-318 (2013); La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2013); Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2013); 14 M.R.S. § 221 (2013); Md. Code Ann., Com. Law § 2-318 (2013); Mass. M.G.L. c. 106, § 2-313 (2013);

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Mich. Comp. Laws Ann. § 440.2313 (2013); Minn. Stat. Ann. § 336.2-313 through 315 (2013); Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2013); Mo. Rev. Stat. Ann. § 400.2-313 (2013); Mont. Code Ann. § 30-2-313 (2013); Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2012); Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2012); Nev. Rev. Stat. §§ 104.2312-104.2318(2012); N.H. Rev. Stat. Ann. § 382-A:2-313, et seq. (2013); N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); see also UJI 13-1428 to 1433 NRMA; N.Y. U.C.C. Law 2-313, et seq. (2013); N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2013); N.D. Cent. Code § 41-02-30, et seq. (2013); Ohio Rev. Code Ann. § 1302.26, et seq. (2013); Okla. Stat. tit. 12A, § 2-313 et seq. (2013); Or. Rev. Stat. § 72.3130, et seq. (2013); 13 Pa. Stat. Ann. § 2313, et seq. (2013); R.I. Gen. Laws § 6A-2 (2013); S.C. Code. Ann. § 36-2-313, et seq. (2012); S.D. Stat. 57A-2-313, et seq. (2013); Tenn. Code Ann. § 47-2-313, et seq. (2013); Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2013); Ut. Code Ann. § 70A-2-313, et seq. (2013); Va. Code Ann. § 8.2-318, et seq. (2013); Vt. Stat. Ann. tit. 9A, § 2-313, et seq. (2013); Wa. Rev. Code § 62A.2-108, et seq. (2013); § 7.72.030(2) (2013); W.Va. Code § 46A-6-108, et seq. (2013); Wis. Stat. Ann. § 402.313, et seq. (2013); and Wyo. Stat. § 34.1-2-313 through 315 (2013).

1750.   The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Conceptus' and Bayer's acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, sale, promotion, and distribution of the Essure® device, Plaintiff was implanted with Essure® and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, pain and suffering, and mental and

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

emotional distress for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### Breach of Implied Warranty

1751.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Petition as if fully set forth herein and further allege as follows:

1752.   Essure® was not reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manner.  Nor was Essure® minimally safe for its expected purpose.

1753.   At all relevant times, Plaintiffs used Essure® for the purpose and in the manner intended by Conceptus and Bayer.

1754.   Plaintiffs and Plaintiffs' physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

1755.   The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.

1756.   Conceptus and Bayer breached their implied warranty to Plaintiffs in that Essure® was not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of State Common Law principles and the following statutory provisions as applicable:

Ala. Code §§ 7-2-314, et seq. (2013); Alaska. Stat. §§ 45.02.314, et seq. (2013); Ariz. Rev. Stat. Ann. §§ 47-2314, et seq. (2013); Ark. Code Ann. §§ 4-2-314, et seq. (2013); Cal. Uniform Comm. Code §§ 2314, e2315; Cal. Civ. Code §§ 1791.1(b), 1792.1, and 1792.2(2013); Colo. Rev. Stat. §§ 4-2-316, et seq. (2013); Conn. Gen. Stat. Ann. §§ 42a-2-314, et seq. (2013); Del. Code Ann. tit. 6, §§ 2-314, et seq. (2013); D.C. Code Ann. §§

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

28:2-314, et seq. (2013); Fla. Stat. Ann. §§ 672.314, et seq. (2013); O.C.G.A. §§ 11-2-318, et seq. (2013); Haw. Rev. Stat. §§ 490:2-314, et seq. (2013); Idaho Code § 28-2-314(2)(c) (2013); Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, et seq. (2013); Indiana Code Ann. §§ 26-1-2-314, et seq. (2013); Iowa Code Ann. §§ 554.2314, et seq. (2013); Kan. Stat. Ann. §§ 84-2-314, et seq. (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c) (2013); Ky. Rev. Stat. Ann. §§ 355.2-318 (2013), et seq.; La. Civ. Code Ann. Art. 9:2800:58, et seq. (2013) and is liable for redhibition under this statute; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, et seq. (2013); 14 M.R.S. § 221 (2013); Md. Code Ann., Com. Law §§ 2-314, et seq. (2013); Mass. M.G.L. c. 106, § 2-314 (2013); Mich. Comp. Laws Ann. §§ 440.2314, et seq. (2013); Minn. Stat. Ann. §§ 336.2-313 through 315 (2013); Miss. Code Ann. §§ 11-1-63(i)(3) and §§ 75-2-313; 75-2-314 (2013); Mo. Rev. Stat. Ann. §§ 400.2-314, et seq. (2013); Mont. Code Ann. §§ 30-2-314, et seq. (2013); Neb. Rev. Stat. §§ 2-314, et seq. and Common Law (2012); Nev. Rev. Stat. §§ 104.2312-104.2318 (2012); N.H. Rev. Stat. Ann. §§ 382-A:2-314, et seq. (2013); N.J. Stat. Ann. §§ 12A:2-314, et seq. (2013); N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); see also UJI 13-1428 to 1433 NRMA (2013); N.Y. U.C.C. Law §§ 2-314, et seq. (2013); N.C. Gen. Stat. Ann. §§ 25-2-314, et seq. (2013); N.D. Cent. Code §§ 41-02-31, et seq. (2013); Ohio Rev. Code Ann. §§ 1302.27, et seq. (2013); Okla. Stat. tit. 12A, §§ 2-314 et seq. (2013); Or. Rev. Stat. §§ 72.3140, et seq.; 72.3150 (2013); 13 Pa. Stat. Ann. §§ 2314 et seq. (2013); R.I. Gen. Laws §§ 6A-2-314, et seq. (2013); S.C. Code Ann. §§ 36-2-314, et seq. (2012); S.D. Codified Laws §§ 57A-2-314, et seq. (2013); Tenn. Code Ann. §§ 47-2-314, et seq. (2013); Tex. Bus. & Com. Code Ann. §§ 2.314, et seq. (2013); Utah Code Ann. §§ 70A-2-314, et seq. (2013); Va. Code Ann. §§ 8.2-318, et seq. (2013); Vt. Stat. Ann. §§ 9A-2-314, et seq. (2013); Wash. Rev.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Code §§ 62A.2-314, et seq.; § 7.72.030(2) (2013); W.Va. Code §§ 46A-6-108, et seq. (2013); Wis. Stat. Ann. §§ 402.314, et seq. (2013); and Wyo. Stat. Ann. §§ 34.1-2-313 through 315 (2013).

1757.   As a direct and proximate result of Conceptus' and Bayer's acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, sale, promotion, and distribution of the Essure® device, Plaintiff was implanted with Essure® and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, pain and suffering, and mental and emotional distress for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### Violation of Consumer Protection Laws

1758.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Petition as if fully set forth herein and further allege as follows:

1759.   Plaintiffs purchased and used the Essure® device for personal use and thereby suffered ascertainable losses as a result of Conceptus' and Bayer's actions in violation of the applicable State consumer protection laws, including but not limited to the following:

Ala. Code §§ 8-19-1 et seq. (2013); Alaska Stat. §§ 45.50.471 et seq. (2013); Ariz. Rev. Stat. Ann. §§ 44-1522 et seq. (2013); Ark. Code Ann. §§ 4-88-101 et seq. (2013); Cal. Civ. Code §§ 1770 et seq. and Cal. Bus. & Prof. Code §§ 17200 et seq. (2013); Colo. Rev. Stat. §§ 6-1-105 et seq. (2013); Conn. Gen. Stat. §§ 42-110a et seq. (2013); Del. Code Ann. tit. 6, §§ 2511 et seq. and §§ 2531 et seq. (2013); D.C. Code Ann. §§ 28-3901 et seq. (2013); Fla. Stat. Ann. §§ 501.201 et seq. (2013); O.C.G.A. §§ 10-1-372 et seq. (2013); Haw. Rev. Stat. §§ 480-1 et seq. (2013); Id. Code Ann. §§ 48-601 et seq. (2013); Ill. Comp. Stat. Ann

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

ch. 815, 505/1 et seq. (2013); Ind. Code Ann. §§ 24-5-0.5-1 et seq. (2013); Iowa Code Ann. §§ 714.16 et seq. (2013); Kan. Stat. Ann. §§ 50-623 et seq. (2013); Ky. Rev. Stat. Ann. §§ 367.170 et seq. (2013); La. Rev. Stat. Ann. §§ 51:1401 et seq. (2012); Me. Rev. Stat. Ann. tit. 5, §§ 205A et seq. (2013); Md. Code Ann., Com. Law §§ 13-101 et seq. (2013); Mass. Gen. Laws Ann. Ch. 93A et seq. (2013); Mich. Comp. Laws §§ 445.901 et seq. (2013); Minn. Stat. §§ 325D.43 et seq. and §§ 325F.67 et seq. (2013); Miss. Code Ann. §§ 75-24-1 et seq. (2013); Mo. Ann. Stat. §§ 407.010 et seq. (2013); Mont. Code Ann. §§ 30-14-101 et seq. (2013); Neb. Rev. Stat. §§ 59-1601 et seq. (2012); Nev. Rev. Stat. §§ 598.0903 et seq. (2012); N.H. Rev. Stat. Ann. §§ 358-A:1 et seq. (2013); N.M. Stat. Ann. §§ 57-12-1 et seq. (2013); N.Y. Gen. Bus. Law §§ 349 et seq. and §§ 350-e et seq. (2013); N.C. Gen. Stat. §§ 75-1.1 et seq. (2013); N.D. Cent. Code §§ 51-12-01 et seq. and §§ 51-15-01 et seq. (2013); Ohio Rev. Code Ann. §§ 1345.01 et seq. (2013); Okla. Stat. tit. 15 §§ 751 et seq. (2013); Or. Rev. Stat. §§ 646.605 et seq. (2013); 73 Pa. Stat. §§ 201-1 et seq. (2013); R.I. Gen. Laws. §§ 6-13.1-1 et seq. (2013); S.C. Code Ann. §§ 39-5-10 et seq. (2012); S.D. Codified Laws §§ 37-24-1 et seq. (2013); Tenn. Code Ann. §§ 47-18-101 et seq. (2013); Tex. Bus. & Com. Code Ann. §§ 17.41 et seq. (2013); Utah Code Ann. §§ 13-11-1 et seq. (2013); Vt. Stat. Ann. tit. 9, §§ 2451 et seq. (2013); Va. Code Ann. §§ 59.1-196 et seq. (2013); Wash. Rev. Code. §§ 19.86.010 et seq. (2013); W.Va. Code §§ 46A-6-101 et seq. (2013); Wis. Stat. Ann. §§ 100.20 et seq. (2013); and Wyo. Stat. Ann. §§ 40-12-101 et seq. (2013).

1760.  Had Conceptus and Bayer not engaged in the deceptive conduct described herein, Plaintiffs physicians would not have used Essure® and Plaintiffs would not have purchased and/or paid for Essure® and would not have incurred related medical costs and injury.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1761.   Conceptus and Bayer engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiffs for Essure® that would not have been paid had Conceptus and Bayer not engaged in unfair and deceptive conduct.

1762.   Conceptus and Bayer engaged in unfair methods of competition or deceptive acts or practice that were proscribed by law, including the following:

A)    Representing that good or services have characteristic ingredients, uses, benefits or quantities that they do not have;

B)    Advertising goods or services with the intent not to sell them as advertised; and

C)    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

1763.   Plaintiffs were injured by the cumulative and indivisible nature of Conceptus' and Bayer's conduct.  The cumulative effect of Conceptus' and Bayer's conduct directed at patients, physicians and consumers was to create demand for and sell Essure®. Each aspect of Conceptus' and Bayer's conduct combined to artificially create sales of Essure®.

1764.   Conceptus and Bayer had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Essure® product.

1765.   Had Conceptus and Bayer not engaged in the deceptive conduct described above, Plaintiffs' physicians would not have used the Essure® product and Plaintiffs would not have purchased and/or paid for Essure® and would not have incurred related medical costs.

1766.   Conceptus' and Bayer's deceptive, unconscionable, and fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed above.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1767.  Conceptus' and Bayer's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, trade practices in violation of the state consumer protection statutes listed.

1768.  Conceptus and Bayer have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the above listed consumer fraud statutes.

1769.  Under the respective state statutes, including the statutes listed above, to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Conceptus and Bayer are the supplier, manufacturer, advertiser, and seller, who is subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

1770.  Conceptus and Bayer violated the state statutes that were enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade practices and false advertising, by knowingly and falsely representing that the Essure® product was fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein.  These representations were made in marketing and promotional materials.

1771.  The actions and omissions of Conceptus and Bayer alleged herein are uncured or incurable deceptive acts under the state statutes enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade practices and false advertising.

1772.  Conceptus and Bayer had actual knowledge of the defective and unreasonably dangerous condition of Essure® and failed to take any action to cure such defective and dangerous conditions.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1773.   Plaintiffs' physicians relied upon Conceptus' and Bayer's misrepresentations and material omissions in determining whether to use Essure.

1774.   Conceptus' and Bayer's deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

1775.   Bayer's conduct and acts of unfair competition are ongoing and present a continuing threat of harm to the general public.

1776.   By reason of unlawful acts engaged in by Conceptus and Bayer, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

1777.   As a direct and proximate result of Conceptus' and Bayer's violations of the state consumer protection laws cited herein, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### Missouri Products Liability Action

1778.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Petition as if fully set forth herein and further allege as follows:

1779.   Missouri Revised Statute § 537.760 governs claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, or labeling of any product.

1780.   As used in § 537.760, the term "products liability claim" means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because: (1) Conceptus and Bayer, wherever situated in the chain

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

of commerce, transferred a product in the course of their business; and (2) The product was used in a manner reasonably anticipated; and (3) Either or both of the following: (a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or (b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

1781.   Conceptus and Bayer designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, advertised, manufactured, sold, distributed, marketed, and promoted Essure®, including the Essure® devices that were implanted into Plaintiffs.

1782.   As discussed above, Conceptus and Bayer have a continuing duty to monitor their product post-approval and to discover and report to the FDA any complaints about product performance, adverse events, and any health consequences of which they know or should have known about which may be attributable to the product.   Conceptus and Bayer also have a continuing duty to provide ongoing warnings and instructions regarding safety hazards associated with the Essure® device.

1783.   Conceptus and Bayer had a parallel duty under Missouri Revised Statute § 537.760 to exercise reasonable care in warning the public, including Plaintiffs and/or Plaintiffs' physicians, about the dangers of Essure® that were known or knowable to Defendants at the time of distribution.

1784.   Conceptus' and Bayer's failure to adequately and timely report adverse events is a violation of the federal requirements and state law.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1785.   Specifically, Conceptus and Bayer breached these duties and violated federal law by and including, *inter alia*:

A)   21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Conceptus and Bayer failed to comply with the general quality control standards found in these regulations.

B)   21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Conceptus and Bayer failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury. Defendants' failure to report such events is evidenced by the 2011 FDA Form 483 and by the fact that there were only approximately 900 MDRs reported to the FDA between November 2002 and October 2011 with the majority of those being reported by the manufacturer, but once the MedWatcher app became available and utilized, over 9,000 MDRs were reported directly to the FDA between October 2013 and December 2015, primarily by women with Essure®.

C)   21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Conceptus and Bayer failed to report new clinical investigations and/or scientific studies concerning the Essure® device about which Defendant knew or reasonably should have known about, including but not limited to the Cornell study, the article published in the online medical journal Conception, and the eight (8) articles describing 12 cases of Essure® abdominal migration published between January 2002 and December 2013 that were never reported to the FDA.

D)   21 C.F.R. § 820.198 because Conceptus and Bayer failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, heavy menstrual cycle bleeding, long-term chronic pain, and other quality problems associated with the Essure® device.

E)   21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Conceptus and Bayer (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration outside of the fallopian tubes and/or device fracture/breakage, which strongly indicated the Essure® device was malfunctioning or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiffs' fallopian tubes, and (2) Conceptus and Bayer continued to sell Essure® into the stream of interstate commerce when they knew, or should have known, that the Essure® was malfunctioning or otherwise not responding to

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

its Design Objective Intent.

F)    21 U.S.C. §§ 360(q); 360(r) because Conceptus and Bayer created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of Essure® in order to convince physicians and patients to use Essure® over other methods of permanent birth control, thereby gaining market share.

G)    21 C.F.R. § 814.80 because the Essure® device was manufactured, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

H)    21 C.F.R. § 820.30 because Conceptus and Bayer failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

I)    21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Conceptus and Bayer: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

J)    21 C.F.R. § 820.70 because Conceptus and Bayer failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Essure® device.

K)    21 U.S.C. § 352(a) because Conceptus and Bayer promoted for the sale of misbranded and adulterated products because the Essure® label is false and misleading because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

269

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

L)    21 U.S.C. § 352(q) because Conceptus and Bayer created and distributed false and misleading advertising for Essure® which is a "Restricted Device" because Essure® is not a safer and more effective method of permanent sterilization than alternative methods, evidenced by the over 10,000 reported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files

M)    21 C.F.R. § 814.39 because Conceptus and Bayer failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the thousands of reported and unreported adverse events consisting of serious injuries and pregnancies, by the numerous Essure® studies consisting of thousands of women reporting that patients who undergo the Essure® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the over 30,000 unreported complaints contained in Conceptus' and Bayer's complaint files.

1786.    If Conceptus and Bayer had met their duties under the above mentioned federal and parallel state laws, the FDA would have had the information necessary to warn the public, including Plaintiffs and Plaintiffs' physicians of the increased risks and serious dangers associated with Essure® in time to have lessened or prevent Plaintiffs' injuries, which is evidenced by the fact that the FDA is now mandating a new clinical trial, a "black box" warning, and a patient decision checklist which discuss and warn in detail, the risks of the very same injuries Plaintiffs suffered.

1787.    Plaintiffs and Plaintiffs' physicians would not have used and recommended the Essure® procedure for permanent sterilization if the FDA had been fully and adequately informed of the material and necessary information to be able to communicate the safety risks related to Essure®.

1788.    Additionally, if Conceptus and Bayer had met their duty under the above mentioned federal regulations and parallel state laws, such information would have been made available to

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Plaintiffs and Plaintiffs' treating physicians, as discussed above, which would have allowed Plaintiffs' treating physicians to properly and/or timely diagnose the cause of Plaintiffs' pain and health problems as being the Essure® device.

1789.   Since Conceptus and Bayer failed to meet their duty under the above mentioned federal and parallel state laws, Plaintiffs and Plaintiffs' treating physicians did not know and had no reason to know that Essure® was causing Plaintiffs' injuries.

1790.   As such, Plaintiffs and Plaintiffs' treating physicians could not properly and/or timely diagnose the cause of Plaintiffs' injuries, which caused and/or contributed to Plaintiffs having to endure prolonged and unnecessary pain and suffering.

1791.   As a direct and proximate result of one or more of the above listed violations, and parallel state laws, Plaintiffs sustained serious injuries of a personal and pecuniary nature.

### THIRTEENTH CAUSE OF ACTION
**Violation of Missouri Merchandising Practices Act**

1792.   Plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

1793.   The Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. §407.020 provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…in or from the state of Missouri, is declared to be an unlawful practice…Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

1794.   At all relevant times and as described herein, Conceptus and Bayer knowingly directly and indirectly represented to the FDA, to Plaintiffs, and to Plaintiffs' physicians that the

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Essure® device was a safe and effective method of permanent birth control when compared to other alternatives, and that when used, it was not defective.

1795.  Conceptus' and Bayer's advertising, promotions, and representations contained therein were false and misleading and constituted unfair or deceptive acts and practices declared unlawful by the MMPA.  Conceptus and Bayer knowingly made false representations for the purpose of deceiving the FDA, Plaintiffs, and Plaintiffs' physicians regarding the safety and efficacy of Essure® in order to ensure the marketability and success of Essure®, which was in violation of the MMPA.

1796.  Had Conceptus and Bayer disclosed the true facts concerning the increased risks and damages they knew or should have known to be associated with Essure®, the FDA would have required Conceptus and Bayer to amplify its warning label earlier than February 2016, which would have lessened or prevented Plaintiffs' injuries because Plaintiffs' physicians and Plaintiffs would not have chosen to recommend and undergo the Essure® procedure.

1797.  Conceptus and Bayer engaged in the unlawful practices set forth in this Petition in the sale of merchandise in trade or commerce.

1798.  Conceptus' and Bayer's concealment, misrepresentations and/or omissions as set forth in this Petition are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiffs regarding Essure®.

1799.  Conceptus and Bayer engaged in the concealment, suppression, misrepresentations and/or omission of the aforementioned material facts with the intent that others, such as the FDA, Plaintiffs, their physicians, and/or the general public would rely upon the concealment, suppression, misrepresentation and/or omission of such material facts and purchase Essure®.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1800.   The concealment, suppression, misrepresentation and/or omission of the aforementioned material facts had the capacity to, was reasonably foreseeable that it would, and did so deceive.

1801.   Plaintiffs' physicians would not have used Essure® in Plaintiffs and Plaintiffs would not have agreed to undergo the Essure® procedure absent the concealment, suppression, or omission of the aforementioned material facts.

1802.   Plaintiffs suffered actual and ascertainable loss of money and damages as an actual and proximate result of Defendants' intentional misrepresentation and concealment of material facts.

1803.   Conceptus' and Bayer's conduct described herein actually and proximately caused Plaintiffs to suffer damages as described throughout this Petition.

1804.   Plaintiffs are entitled to recover her actual damages, attorneys' fees, and other equitable relief, pursuant to Missouri law, including Mo. Ann. Stat. § 407.025.

1805.   Furthermore, Conceptus' and Bayer's unlawful conduct set forth in this Petition was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of their actions and for the rights of Plaintiffs and warrants an award of punitive damages to deter Conceptus and Bayer, and others in similar circumstances, from committing such actions in the future.

### FOURTEENTH CAUSE OF ACTION
**Gross Negligence/Punitive Damages**

1806.   Plaintiffs incorporate by reference all other paragraphs of this Petition as if fully set forth herein and further allege as follows:

1807.   At all relevant times herein, Conceptus and Bayer:

A)      knew or should have known that Essure® was dangerous and ineffective;

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

B)      concealed the dangers and health risks from Plaintiffs, physicians, other medical providers, the FDA, and the public at large;

C)      attempted to misrepresent and did knowingly make misrepresentations to Plaintiffs, their physicians, hospitals, and other medical providers, and the public in general as previously stated herein as to the safety and efficacy of Essure®; and

D)      with full knowledge of the health risks associated with Essure® and without adequate warnings of the same, manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold Essure® for use.

1808.   Conceptus and Bayer, by and through its officers, directors, managing agents, authorized sales representatives, employees and/or other agents who engaged in malicious, fraudulent and oppressive conduct towards Plaintiffs and the public, acted with willful, wanton, conscious, and/or reckless disregard for the safety of Plaintiffs and the general public.

1809.   Conceptus' and Bayer's misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiffs, concerning the safety of Essure®.  Conceptus' and Bayer's conduct was willful, wanton, and undertaken with a disregard for Plaintiffs' rights.

1810.   Notwithstanding the foregoing, Conceptus and Bayer continued to market Essure® to consumers, including Plaintiffs herein, without disclosing the risks.

1811.   Conceptus and Bayer knew of Essure®'s lack of warnings, but intentionally concealed and/or recklessly failed to disclose the risks and continued to market, distribute, and sell Essure® without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Essure®.

1812.   Conceptus' and Bayer's intentional and/or reckless failure to disclose information deprived Plaintiffs of necessary information to enable them to weigh the true risks of using Essure® against its benefits.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

1813.   As a direct and proximate result of one or more of these wrongful acts or omissions of Conceptus and Bayer, Plaintiffs suffered profound injuries that required medical treatment and incurred medical and hospital expenses, for which Plaintiffs have become liable.

1814.   Conceptus and Bayer are liable jointly and/or severally for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law.  Plaintiffs seek actual and punitive damages from Conceptus and Bayer and allege that the conduct of Conceptus and Bayer was committed with knowing, conscious, careless, reckless, willful, wanton, deliberate, and grossly negligent disregard for the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

1815.   Conceptus and Bayer have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant to State Common Law principles including but not limited to the following statutory provisions as applicable:

Ala. Code §§ 6-11-20 (2013); Alaska Stat. § 09.17.020(b) (2013); Ark. Code Ann. § 4-2-313; § 16-55-206 (2013); Cal. Civ. Code §§ 1770 et seq. and Cal. Civ. Code § 3294; Cal. U. Com. Code §§ 2314-2315(2013); Colo. Rev. Stat. § 13-21-102 (2013); Conn. Gen. Stat. §§ 52-240b et seq. (2013); Del. Code Ann. tit. 6, §§ 6855 et seq. (2013); Fla. Stat. Ann. §§ 768.72 (2013); O.C.G.A. §§ 51-12-5.1 (2013); Idaho Code § 6-1601(9); § 6-1604 (2013); Ill. Comp. Stat. Ann ch. 735, 5/2-604.1 (2013); Ind. Code Ann. §§ 34-51-3 et seq. (2013); Iowa Code Ann. § 668A.1 (2013); Kan. Stat. Ann. §§ 60-3702(a) and (e) (2013); Ky. Common Law (2013); Mass. Gen. Laws Ann. c. 229, § 2; M.G.L. c. 93A, § 9(3) (2013); Mich. Comp. Laws (2013); Minn. Stat. Ann. § 549.191; § 549.20, subd.1(a); § 549.20, subd. 4 (2013); Mo. Rev. Stat. § 510.265 (2013); Mont. Code Ann. § 27-1-221(2) (2013);

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Nev. Rev. Stat. § 42.005 (2012); N.M. Rules Ann. § 13-1827 and UJI 13-861 (2013); N.C. Gen. Stat. §§ 1D-1 et seq. (2013); N.D. Cent. Code §§ 51-12-01 (2013); Ohio Rev. Code Ann. §§ 1345.01 (2013); Okla. Stat. tit. 23 § 9.1 (2013); Or. Rev. Stat. § 30.925 (2013); 73 Pa. Stat. §§ 201-1 et seq. (2013); S.C. Code Ann. §§ 15-33-135 (2013); S.D. Codified Laws (2013); 2011 Tenn. Public Acts ch. 510 (2013); Tex. Civ. Prac. & Rem. Code § 41.001 (2010) et. seq.; Utah Code Ann. § 78B-8-2-3 (2013); and Wis. Stat. Ann. § 895.043 (2013).

1816.   Plaintiffs seek actual and punitive damages as alleged herein.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand judgment against all Defendants, and each of them, individually, jointly and severally, and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

A)    compensatory damages to each Plaintiff for past, present, and future damages, including, but not limited to, great pain and suffering and emotional distress and anguish, for personal injuries sustained by each Plaintiff, health and medical care costs, together with interest and costs as provided by law;

B)    for all ascertainable economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

C)    for specific damages according to proof;

D)    for Punitive and Exemplary damages according to proof;

E)    for pre-judgment interest and post-judgment interest as allowed by law;

F)    for reasonable attorneys' fees;

G)    for the costs of these proceedings; and

H)    for such other and further relief as this Court deems just and proper.

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Respectfully submitted,

Date: March 30, 2017

> */s/ Eric D. Holland*
> Eric D. Holland (Mo. Bar #39935)
> R. Seth Crompton (Mo. Bar #57448)
> **HOLLAND LAW FIRM**
> 300 N. Tucker Blvd., Suite 801
> Saint Louis, Missouri 63101
> Tel: (314) 241-8111
> Fax: (314) 241-5554
> eholland@allfela.com
> scrompton@allfela.com
>
> Lewis O. Unglesby (La. Bar #12498)
> Lance C. Unglesby (La. Bar #29690)
> Jason R. Williams (La. Bar #25539)
> Logan H. Greenberg (La. Bar #33865)
> Nicole E. Burdett (La. Bar #32972)
> Adrian M. Simm Jr. (La. Bar #36673)
> *(Pro Hac Vice Applicants Anticipant)*
> **UNGLESBY + WILLIAMS**
> 607 St. Charles Avenue
> New Orleans, Louisiana 70130
> Tel: (504) 345-1390
> Fax: (504) 324-0835
>
> Gregory J. Bubalo, Esq.
> Leslie M. Cronen, Esq.
> Kate A. Dunnington, Esq.
> *(Pro Hac Vice Applicants Anticipant)*
> **BUBALO GOODE SALES & CRONEN PLC**
> 9300 Shelbyville Rd. Ste. 210
> Louisville, KY 40222
> 502-753-1600
> gbubalo@bubalolaw.com
> lcronen@bubalolaw.com
> kdunnington@bubalolaw.com

Electronically Filed - City of St. Louis - March 30, 2017 - 09:09 AM

Wells T. Watson (La. Bar #20406)
Jeffrey T. Gaughan (La. Bar #22384)
Zita M. Andrus (La. Bar #31794)
*(Anticipated Pro Hac Vice)*
**BAGGETT, MCCALL, BURGESS,
    WATSON & GAUGHAN**
3006 Country Club Road
P. O Drawer 7820
Lake Charles, LA 70605
Tel: (337) 478-8888
Fax: (337) 478-8946

Gary C. Johnson, Esq.
Rhonda Blackburn
Raabia Wazir, Esq.
*(Pro Hac Vice Applicants Anticipant)*
**GARY C. JOHNSON, P.S.C.**
110 Caroline Avenue
PO Box 231
Pikeville, KY  41502
606-437-4002
gary@garycjohnson.com
rblackburn@garycjohnson.com
rwazir@garycjohnson.com